CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Thomas J. Moloney
Sean A. O'Neal

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                   :

*In re*                                       :      Chapter 11
                                   :
Truvo USA LLC, *et al*.                       :      Case No. 10-_____ (___)
                                   :
            Debtors:               :      Joint Administration Pending
                                   :
-------------------------------------------------------------------- X

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 363 AND FED. R. BANKR. P. 4001 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS AND (III) SCHEDULING A <u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B)</u>

### ("CASH COLLATERAL MOTION")

Truvo USA LLC ("<u>TUSA</u>"), Truvo Parent Corp. ("<u>Truvo Parent</u>"), Truvo Intermediate

LLC ("<u>PIK Borrower</u>"), Truvo Subsidiary Corp. ("<u>HY Notes Issuer</u>") and Truvo Acquisition

Corp. ("<u>TAC</u>", and together with TUSA, Truvo Parent, PIK Borrower and HY Notes Issuer, the

"<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>"), for the entry of interim order in the form

attached hereto as <u>Exhibit A</u> (the "<u>Interim Order</u>") and a final order substantially similar to the

Interim Order (the "<u>Final Order</u>") pursuant to section 105, 361, 362 and 363 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>"), Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules for the

United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"): (a) authorizing the Debtors to use certain cash that is held in its various accounts; (b) providing the Senior Lenders adequate protection; (c) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) to approve the Interim Order on a final basis (the "Final Order"); and (d) granting related relief.  In support of this Motion, the Debtors rely on the Declaration of Marc Goegebuer in Support of First Day Motions and Applications and in Compliance with Local Rule 1007-2 (the "First Day Declaration").[1]  In further support of this Motion, the Debtors respectfully represent as follows:

## Concise Statement

1.      Pursuant to Rule 4001 of the Bankruptcy Rules and Rule 4001-2 of the Local Bankruptcy Rules, the following are the material provisions regarding the proposed use of cash collateral (as defined in section 363(a) of the Bankruptcy Code) of TUSA, TAC and HY Notes Issuer[2] (such cash, the "Cash Collateral")[3]

| Parties with Interest in Cash Collateral (Bankr. R. 4001(b)(1)(B)(i)) | JPMorgan Europe Limited, as Senior Agent and Security Agent, and the Senior Lenders.  Motion ¶ 10. |
|---|---|
| Use of Cash Collateral (Bankr. R. 4001(b)(1)(B)(ii); Local R. 4001-2(a)(1)) | The Debtors are authorized to use the Cash Collateral in accordance with, and subject to, the Budget in order to satisfy the postpetition costs and expenses of the restructuring and related matters.  Interim Order ¶ 3.  The initial Budget covering the first three months of these Chapter 11 Cases is attached to the Interim Order as Exhibit 1. |
| Adequate Protection for Prepetition Lenders (Bankr. R. 4001(b)(1)(B)(iv); Local R. 4001-2(a)(4)) | As adequate protection for any diminution in the value of the Senior Lenders' interest in the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations resulting from the (a) |

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

[2]     Cash held by Truvo Parent and PIK Borrower is not subject to any liens.  Only the Senior Lenders have asserted liens in the cash held by TUSA, TAC and HY Notes Issuer.

[3]     To the extent anything in this summary is inconsistent with the Interim Order annexed hereto, the Interim Order shall control.

use of the Cash Collateral, (b) use, sale, or lease of the Senio Lender Collateral pledged by the Debtors to secure the Senior Obligations, or (c) the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code (the aggregate amount of such diminution is referred to hereinafter as the "Adequate Protection Obligations"), the Senior Lenders will receive the following adequate protection:

(a) perfected replacement liens and replacement security interests pursuant to section 361(2) of the Bankruptcy Code (the "Replacement Liens") on all property of the Debtors and their estates, whether now owned or hereafter acquired (collectively, the "Postpetition Collateral");

(b) to the extent of any Adequate Protection Obligation, an allowed superpriority administrative claim in the Chapter 11 Cases in the amount of the Adequate Protection Obligations as contemplated by sections 503(b) and 507(b) of the Bankruptcy Code (the "Superpriority Claims"); and

(c) the Debtors and certain of the non-Debtor subsidiaries will make adequate protection payments (the "Adequate Protection Payments") in the form of: (i) payments in cash of all cash-pay interest (at the non-default rate), fees and other amount when and as due under the Senior Facility Agreement (other than as agreed among the Supporting Senior Lenders and the Debtors pursuant to the Plan Support Agreement), (ii) ongoing payment of the reasonable postpetition fees, costs and expenses of the advisors to the CoComm, the Elliott Lender, the Senior Agent and the Security Agent, including the reasonable postpetition (and unpaid prepetition) fees and expenses of legal, financial advisory, investment banking and other professionals (including Linklaters LLP, N.M. Rothschild & Sons Limited, Kleinberg, Kaplan, Wolff & Cohen, P.C., Allen & Overy LLP and any replacement or addition thereto that the CoComm, the Elliott Lender, the Senior Agent or the Security Agent deems reasonably appropriate) retained by the CoComm, the Elliott Lender, the Senior Agent and the Security Agent (collectively, the "Adequate Protection Professionals"), and (iii) the reasonable fees and out-of-pocket disbursements of the four members of the CoComm.

Interim Order at ¶ 5.1, 5.3 and 5.4.

| | |
|---|---|
| | <u>Carve Out</u>: The Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate to the following (collectively, the "<u>Carve Out</u>"):<br><br>(1) security interests permitted under the Senior Facility Agreement to be senior to the liens granted or purported to be granted to the Senior Lenders, which security interests were actually granted and perfected prior to the Petition Date (the "<u>Senior Prepetition Liens</u>");<br><br>(2) payment of U.S. Trustee Fees, pursuant to 28 U.S.C. § 1930, and any fees payable to the Bankruptcy Court;<br><br>(3) following a Termination Event and delivery of a written notice from the CoComm to the Debtors (the "<u>Carve Out Trigger Notice</u>"), the payment of allowed professional fees and disbursements incurred by professionals retained by the Debtors and any statutory committee (each, a "<u>Committee</u>") appointed in these Chapter 11 Cases (the "<u>Professional Fees and Disbursements</u>") not to exceed the sum of (a) unpaid Professional Fees and Disbursements incurred prior to delivery of such a Carve Out Trigger Notice (the "<u>Carve Out Trigger Date</u>") in accordance with the Budget and (b) $3,000,000. So long as no Carve Out Trigger Date shall have occurred and be continuing, the Debtors shall be permitted to pay without reduction of the Carve Out any statutory fees, fees payable to the Bankruptcy Court and Professional Fees and Disbursement, provided that the payment of such Professional Fees and Disbursements shall comply with the Budget, as set forth below.<br><br>Interim Order at ¶ 5.1. |
| **Material Terms, Including Duration, of Use of Cash Collateral**<br>(Bankr. R. 4001(b)(1)(B)(iii)) | <u>Term</u>. The Debtors' authorization to use Cash Collateral shall commence as of entry of the Interim Order and terminate upon the earliest of (i) the date that is thirty-five (35) days after the Petition Date, (ii) entry of a Final Order granting the Debtors authorization to use Cash Collateral, and (iii) the occurrence of a Termination Event (the "<u>Termination Date</u>").<br><br>Occurrence of the Termination Date shall terminate the rights of the Debtors to use Cash Collateral hereunder, but shall not in any manner affect the rights, privileges or other protections afforded the Senior Lenders, the Senior Agent, the Security Agent, the CoComm or the Elliott Lender, or in any manner affect the validity, priority, enforceability or perfected status of any |

| | Replacement Liens. |
| | |
| | Interim Order ¶ 4. |
| | |
| | <u>Termination Event</u>.  The occurrence of any of the following events, unless waived by the Majority Lenders, shall constitute a Termination Event: |
| | |
| | (1)   termination of that certain Plan Support Agreement by and among the Debtors, the Supporting Senior Lenders and certain other parties pursuant to Section 12(i)(a), (b), (c), (e) or (ii) thereof; |
| | |
| | (2)   The Chapter 11 Cases of TAC or TUSA shall have been dismissed or converted to case under chapter 7 of the Bankruptcy Code, or there shall have been appointed in the Chapter 11 Cases a trustee or examiner with expanded powers beyond the authority to investigate particular activities of the Filing Entities; |
| | |
| | (3)   the Debtors filing a motion seeking to amend the terms of the Interim Order without the prior written consent of the Majority Lenders; |
| | |
| | (4)   the Debtors filing of a motion without the prior written consent of the Majority Lenders seeking approval of any debtor in possession financing or other credit extension for the Debtors; |
| | |
| | (5)   the Interim Order is modified, vacated, stayed, supplemented, reversed, or is for any reason not binding on the Debtors, without the prior written consent of the Majority Lenders; |
| | |
| | (6)   the entry of an order in favor of a creditor granting relief from the automatic stay to foreclose on a material asset having value in excess of $3,000,000 of any of the Debtors, without the prior written consent of the Majority Lenders; |
| | |
| | (7)   the Debtors filing a motion or adversary proceeding, or initiating any other court proceeding, seeking to (i) object to, set aside, avoid, assert defenses to or contest the Senior Obligations, the validity, perfection, priority or enforceability of the Senior Obligations or any other claims or liens of the Senior Lenders pursuant to the |

Senior Facility Agreement against the Debtors or their assets, including but not limited to claims and liens arising under the Interim Order, or (ii) to obtain a monetary judgment or other relief against the Senior Lenders, or the Debtor supports any other party in taking an action described in this bullet, other than, in each case, to enforce the automatic stay, the Interim Order, the Final Order or the Plan Support Agreement, or to seek a temporary restraining order and/or injunction to stay proceedings against Non-Debtor Subsidiaries, as contemplated by clause 1(k) of the Plan Support Agreement;

(8) the failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order;

(9) a default by any of the Debtors in reporting financial information as and when required under the Interim Order, continued for 15 days; and

(10) a variance, resulting from the Debtors' expenditures, from the aggregate amount (for all Debtors combined) of expenditures set forth in the Budget that exceeds twenty percent (20%) on a cumulative basis from the Petition Date until the date of the most recently delivered Budget or Budget.

Interim Order ¶ 7.

Remedies.  The Senior Agent, on behalf of the Senior Lenders, shall provide the Debtors, counsel for any Committee (and if no Committee is appointed, the 20 largest creditors of the Debtors) and the U.S. Trustee with written notice of the occurrence of a Termination Event (the "Remedies Notice").  Upon the expiration of ten (10) business days after the Debtors, counsel for the Committee (and if no Committee is appointed, the 20 largest creditors of the Debtors) and the U.S. Trustee's receipt of the Remedies Notice, the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and modified automatically to the extent necessary to permit the Senior Agent and the Security Agent to exercise their rights and remedies, for the benefit of the Senior Lenders, against all or a portion of the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations and the Postpetition Collateral, including, but not limited to, setoff of any existing Cash Collateral against the Senior Obligations.  The Debtors' right to use the Cash Collateral

shall terminate upon receipt of the Remedies Notice.

Interim Order ¶ 8.

Determination of Validity, Enforceability and Amount of the Security Interests in Favor of the Senior Lenders. Subject to the right of a party in interest to challenge within a specified time period, *inter alia*, the amount and the validity of any Senior Obligation or the Senior Lenders' security interest in or liens on the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations, the Interim Order contains acknowledgements by the Debtors as to the validity, enforceability and amount of such obligations and security interests.

Interim Order ¶¶ K-N.

Waivers and concessions as to validity of prepetition debt. Any party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) wishing to challenge amount, validity, enforceability, priority or extent of the Senior Obligations or the Senior Lenders' security interests in or liens upon the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations or otherwise assert any claims or causes of action against the Senior Agent, the Security Agent or the Senior Lenders, must commence an adversary proceeding or contested matter on behalf of the Debtors' estates against the Senior Agent, the Security Agent or the Senior Lenders by no later than a date that is sixty (60) days from entry of the Final Order (the "Investigation Termination Date").

Interim Order ¶ 17.

Restriction on Use of Cash Collateral and Carve-Out. The Cash Collateral and Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) seeking to invalidate, set aside, avoid, recharacterize or subordinate, in whole or in part, the Senior Obligations, (ii) seeking monetary, injunctive or other affirmative relief against the CoComm, the Elliott Lender, the Security Agent, or any Senior Lender or their advisors, or (iii) seeking to prevent, hinder or otherwise delay the exercise by the Senior Lenders of any rights and/or remedies under this Interim Order, the Senior Facility Agreement, the Intercreditor Agreement, or applicable law, or the enforcement or

realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the Senior Agent, the Security Agent or the Senior Lenders upon any of the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations or Postpetition Collateral; (b) to make any distribution under a plan of reorganization, unless under a plan of reorganization that has been accepted by the class of Senior Lenders thereunder in accordance with Section 1126(c) of the Bankruptcy Code; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Majority Lenders; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors or reorganized Debtors without the prior written consent of the Majority Lenders; (e) to in any way object to, contesting or interfering with the enforcement or realization upon any of the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations or Postpetition Collateral by the Senior Agent, the Security Agent or the Senior Lenders once a Termination Event has occurred; (f) in connection with the incurrence of indebtedness outside the ordinary course of business, without the prior consent of the Majority Lenders; (g) objecting to or challenging (or supporting or encouraging any other person to object to or challenge) in any way the claims, liens, or interests (including interests in the Senior Lender Collateral pledged by the Debtors to secure the Senior Obligations or Postpetition Collateral) held by or on behalf of any Senior Lender; (h) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the CoComm, the Elliott Lender, the Senior Agent, the Security Agent, or any Senior Lender in their capacity as agent and/or lender under the Senior Facility Agreement; (i) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount perfection, priority, or enforceability of any of the Senior Obligations or any other rights or interests of the CoComm, the Elliott Lender, the Security Agent or any Senior Lender; provided, however, that an aggregate of $65,000 from the Carve-Out and the Cash Collateral may be used to pay professional fees and expenses of the Committee (and only the Committee), of appointed, to investigate the claims and liens of the Senior Lenders on or prior to the Investigation Termination Date.

Interim Order ¶ 5.8.

## Jurisdiction

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 361 and 363 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2.

## Background

### A.      Introduction

4.      On the date hereof, the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the date and time of such filing, the "Petition Date").

5.      The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

6.      Simultaneously with the filing of this Motion, the Debtors have sought an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

### B.      Debtors' Corporate Structure and Businesses

#### *Debtors' Businesses*

7.      The Debtors are the holding companies for an international group of related companies known as the Truvo Group.  The Truvo Group, through its operating companies outside of the United States (the "Operating Subsidiaries"), is a multinational provider of local search and advertising services, with a primary focus on publishing printed and online directories.  These Operating Subsidiaries are leaders in the local search and advertising market,

with key local markets in Belgium, Ireland and, through a joint venture, Portugal. The Truvo Group also has significant, non-controlling equity interests in leading directory companies operating in South Africa and Puerto Rico. Together the Truvo Group has over 1,700 full-time employees outside the United States.

8.     The Operating Subsidiaries' main source of revenue is the sale of advertising space in their print and online media products, with a focus on small and medium size enterprises. These customers depend on the Truvo Group's products as a cost-effective vehicle for branding and advertising in the markets where the Operating Subsidiaries do business. The Debtors themselves have no employees or business operations and generate only limited revenues. Instead, the Debtors depend on the Operating Subsidiaries to generate revenue and pay debt service. The Operating Subsidiaries have not sought protection under Chapter 11 or any other insolvency regime.

9.     In response to changing market conditions, the Operating Subsidiaries are transforming from a print-centric directories business to a multi-product business with a focus on Internet-based services and local search and advertising products. The Truvo Group's traditional products include printed yellow pages, white pages, and similar directories. While paper-based products have historically accounted for the majority of the Operating Subsidiaries' revenues, an increasing number of online and other products are being offered to capitalize on the growing electronic commercial market. Between 2008 and 2009, revenues derived from online media operations increased from 26.2% to 35.4% of net operating revenues. Almost half of the Operating Subsidiaries' advertisers now also advertise online, and their online services account for a significant percentage of total local searches by users across Belgium, Portugal and Ireland. While revenues generated by the Operating Subsidiaries' online products have increased, their

growth has not been sufficient to offset declines in their traditional print business and the burden of the Truvo Group's current outstanding indebtedness.

*Capital Structure*

10.     The Debtors and their Operating Subsidiaries are highly leveraged, with a total external financial debt of approximately $1.9 billion, comprised of a senior bank facility, two tranches of high yield notes and a payment-in-kind loan, each as more fully described below:

(a)     <u>Senior Loans</u>. In 2007, TAC (a Debtor in these Chapter 11 proceedings) and certain other members of the Truvo Group entered into a €1.025 billion senior secured credit facility agreement (the "<u>Senior Facility Agreement</u>" and the borrowings thereunder, the "<u>Senior Loans</u>") with J.P. Morgan Europe Limited as facility agent (the "<u>Senior Agent</u>"), which was funded by a group of international financial institutions (the "<u>Senior Lenders</u>"). All borrowings under the Senior Facility Agreement were made by Operating Subsidiaries and are guaranteed and secured, on a first-lien basis, by TAC, TUSA and certain Operating Subsidiaries (the "<u>Senior Guarantees</u>"). In addition, HY Notes Issuer has granted a first-lien pledge on substantially all of its assets in favor of the Senior Lenders. The Senior Facility Agreement also provides for a €50 million revolving facility (the "<u>Revolving Facility</u>") made available to one of the Operating Subsidiaries, but no amounts are outstanding under the Revolving Facility. Pursuant to the Plan Support Agreement, the Revolving Facility will be cancelled shortly after the Petition Date. As of the Petition Date, approximately €777.6 million, plus accrued interest, is outstanding under the Senior Loans.

(b)     <u>HY Notes</u>. In 2004, HY Notes Issuer (a Debtor in these Chapter 11 proceedings) issued €395 million of 8.5% Senior HY Notes due 2014 (the "<u>8.5% HY Notes</u>") and $200 million of 8.375% Senior HY Notes due in 2014 (the "<u>8.375% HY Notes</u>", and together with the 8.5% HY Notes, the "<u>HY Notes</u>", and the holders of such HY Notes, the "<u>HY Noteholders</u>").

Prior to the Petition Date, the HY Notes were traded on the Irish Stock Exchange. The indenture trustee for the HY Notes is Bank of New York. Coupon payments on the HY Notes are due on December 1 and June 1 of each year; however, HY Notes Issuer did not make the June 1, 2010 coupon payment and availed itself of the 30-day grace period under the indenture. The obligations under the HY Notes are guaranteed by PIK Borrower, TAC, TUSA and certain Operating Subsidiaries (the "HY Guarantees") and secured on a second lien basis by certain of the assets of HY Notes Issuer, TAC, TUSA and certain Operating Subsidiaries. In addition, HY Notes Issuer has granted a first lien security interest on a certain intercompany receivable, issued by TAC and structurally and contractually subordinated to the Senior Debt, as security for the HY Notes.

(c)    PIK Loan. In 2007, PIK Borrower (a Debtor in these Chapter 11 proceedings) entered into a €130.1 million PIK loan agreement (the "PIK Loan Agreement", and the borrowings thereunder, the "PIK Loans") with J.P. Morgan Europe Limited, as the administrative agent, and funded by a group of international financial institutions (the "PIK Lenders"). The obligations under the PIK Loans are not guaranteed by any member of the Truvo Group, nor are they secured by any pledges or security interests granted by any member of the Truvo Group. The outstanding obligation under the PIK Loans as of the Petition Date is approximately €173 million.

11.    The relative rights and priorities in respect of the Senior Loans, the HY Debt, the PIK Loans, certain intercompany loans and investor debt are governed by an Intercreditor Agreement dated as of May 23, 2007 (the "Intercreditor Agreement"). Generally, the Intercreditor Agreement provides that the obligations under the Senior Loans rank first, obligations under the HY Notes rank second, obligations under the PIK Loans rank third and

certain intercompany debt ranks fourth. The Intercreditor Agreement provides that the HY Guarantees are subordinated in right of payment to the Senior Loans (and Senior Guarantees) and includes turnover provisions limiting recoveries by certain parties to the Intercreditor Agreement until amounts owed to senior parties are discharged. The Intercreditor Agreement also provides various mechanisms permitting the Security Agent (acting on the instructions of the Senior Lenders) to release the Operating Subsidiaries from all of their debt obligations under the Senior Loans, Senior Guarantees and HY Guarantees, as well as any associated security interests, if those Operating Subsidiaries are sold in connection with an Enforcement Action (as defined in the Intercreditor Agreement). In particular, Clause 22.4 of the Intercreditor Agreement gives the Security Agent the authority to execute the foregoing releases on behalf of all Senior Lenders and HY Noteholders, and also sets out the conditions to the exercise of that authority. J.P. Morgan Europe Limited acts as the Security Agent under the Intercreditor Agreement.

12.     The Debtors are privately owned by Truvo Luxembourg S.a.r.l ("Truvo Luxembourg"), which is not a Debtor in these Chapter 11 proceedings. Substantially all of the equity in Truvo Luxembourg is owned by funds advised by Apax Partners and Cinven. In addition, certain members the Truvo Group's current and former management hold minority interests in Truvo Luxembourg.

### *Circumstances Leading to the Chapter 11 Proceeding*

13.     The Debtors have commenced these Chapter 11 proceedings to effectuate a recapitalization and transform the Truvo Group's business model, with the consent of Senior Lenders holding more than 66 2/3% in value of the Senior Loans. A combination of factors – including the global economic slowdown, an accelerating shift away from printed directories

towards online and other media, and the Truvo Group's substantial indebtedness – require the

Debtors to restructure the Truvo Group's balance sheet.  The Debtors believe that a Chapter 11

restructuring, combined with a sale of TUSA that satisfies the conditions for the release

mechanism set forth in Clause 22.4 of the Intercreditor Agreement to a newly formed entity to be

owned by certain of the Debtors' creditors, will position the Truvo Group as a viable long-term

provider of printed, online and mobile products.

      14.     The Truvo Group has been significantly affected by the continuing shift from

print media towards online products.  Over the past three years, the Truvo Group has

experienced declines in print usage of up to 25% per annum in key markets.  That shift was, and

in large part continues to be, caused by the fast penetration of broadband Internet connections

that have allowed for the creation of new and interactive means for consumers and businesses to

exchange information and has created an increasingly diverse array of new services and products

targeted at the traditional user and advertiser base of the Truvo Group's business.  The shift

towards online products was accelerated by the global economic slowdown.  During that time,

the gross domestic product of the key markets in which the Truvo Group operates declined by

approximately 4% to 8%. As a result, customers changed their advertising habits and shifted

budgets from print directories to investments in their own websites and in online media.

      15.     Unlike print directory markets, online advertising markets are characterized by a

highly diversified and competitive universe of products, ranging from search engines to any

number of other types of websites and portals.  This higher level of competition results in

downward price pressure and decreases the market share that can be captured and retained by the

Truvo Group.  The Truvo Group is engaged in a comprehensive effort to reorient its business to

better take advantage of this changing market; however, new value-added products require larger

expenditures for development and support relative to the Truvo Group's historic portfolio of printed offerings. As a result, revenues and operating margins are declining significantly. Between 2007 and 2009, revenues declined from €389 million to €302 million, EBITDA declined from €179 million to €109 million and operating margins dropped from 46% to 36%.

16.     In response to these challenges, in 2009 the Truvo Group reduced operating costs by over €4 million, took steps to reduce working capital needs, and engaged in a number of actions intended to retain and attract advertisers and users, including reducing the complexity of the offerings in its print portfolio, revamping the Truvo Group's online presence to provide a more user-friendly environment, making investments of approximately €6 million in new online products, and developing new tools and services to assist advertisers in reaching consumers over the Internet. Further, the Truvo Group has made a significant investment in retraining its 1,700 employees to enable them to compete in an increasingly internet-based market.

17.     In an effort to begin exploring various strategic options, the Truvo Group hired Houlihan Lokey Howard and Zukin (Europe) Limited ("Houlihan") in the middle of 2009. Soon thereafter, the Truvo Group began discussions with an ad hoc committee of Senior Lenders (the "Senior Lender Ad Hoc Committee"). The Senior Lender Ad Hoc Committee subsequently became formally appointed by certain Senior Lenders to become a Coordinating Committee of Senior Lenders (the "CoComm"). In March 2010, the Truvo Group began discussions with an informal group of HY Noteholders (the "Informal Noteholder Group") to further explore restructuring options. Although the Debtors attempted to reach a consensual resolution with the Informal Noteholder Group, they were unable to do so prior to the Petition Date.

18.     Following several months of meetings and negotiations, the Truvo Group reached agreement on the principal terms of the plan of reorganization with certain Senior Lenders (the

"Supporting Senior Lenders"), who together hold at least 70% of the outstanding principal amount of the Senior Loans, and certain HY Noteholders (the "Supporting HY Noteholders") who together hold at least 15% of the outstanding principal amount of the HY Notes. Such parties have executed a plan support agreement (the "Plan Support Agreement"), including a related term sheet (the "Plan Term Sheet"), that sets forth the agreed upon terms of the Plan, including term sheets comprehensively describing the debt and equity to be issued on the Effective Date and the governance of the reorganized Truvo Group. The Senior Agent and Security Agent are signatories to the Plan Support Agreement. Obligations of all parties under the Plan Support Agreement are subject to, among other conditions, Bankruptcy Court approval of a disclosure statement. The Debtors intend to promptly file a plan of reorganization (the "Plan") and a related disclosure statement (the "Disclosure Statement") embodying the terms set forth in the Plan Support Agreement.

19.    The Plan Term Sheet outlines the terms of the proposed restructuring, including the following principle terms:

(a)    TUSA Sale.  The Plan Term Sheet provides for the sale by TAC of its equity interests in TUSA to Truvo N.V. ("Newco"), which following the effective date of the Plan, will be owned by an intermediate holding company organized under the laws of Belgium ("Holdco"), which will in turn be owned by two holding companies organized under the laws of Belgium (respectively, "Equityco" and "PIKco.") The sale will be implemented in accordance with Clause 22.4 of the Intercreditor Agreement and pursuant to the Plan resulting in the release of claims and liens related to the Senior Loans, the Senior Guarantees, and the HY Guarantees against all of the members of the Truvo Group being sold.

(b)    <u>Senior Lenders' Recovery</u>.  Under the Plan, the Senior Lenders will receive, in exchange for their existing guarantee claims against TAC, (i) substantially all of the stock of Equityco and PIKco, and (ii) new debt instruments issued by Newco and (iii) depending on certain elections made by Senior Lenders, debt instruments issued by PIKco.  The debt instruments issued by Newco and PIKco will total approximately €600 million, including a first-lien senior loan issued by Newco in the amount of €350 million, a second lien subordinated loan issued by Newco in the amount of €100 million and a payment-in-kind loan in the amount of up to €150 million (the "<u>New PIK Debt</u>").  Under the Plan, each Senior Lender will have the option to elect either:  (i) stock in Equityco; or (ii) a combination of stock in PIKco and its pro rata share of the New PIK Debt, which will be stapled to PIKco stock.  In addition, certain members of the Truvo Group will enter into a €25 million revolving credit facility.

(c)    <u>HY Noteholders and PIK Lenders' Recovery</u>.  If the classes of HY Noteholders class vote to accept the Plan, the HY Noteholders will receive (i) approximately €15 million in cash and (ii) five year warrants issued by Equityco giving them rights to purchase shares in Equityco in an amount corresponding to approximately 14% of the equity in Holdco based on a €150 million strike price.  In addition, if the HY Noteholders and PIK Lenders classes both vote to accept the Plan, the PIK Lenders will receive five year warrants issued by Equityco giving them rights to purchase shares in Equityco in an amount corresponding to approximately 1% of the equity in Holdco based on a €150 million strike price.

20.    The Debtors believe that the Plan represents the best prospect for restructuring the Truvo Group's balance sheet, maximizing recovery for the creditors, and implementing the new business transformation plan.  The Debtors therefore intend to pursue confirmation of the Plan

contemplated by the Plan Support Agreement, with the goal of beginning the solicitation process and emerging from Chapter 11 as soon as possible.

### *The Debtors' Prepetition Cash Management System*

21.     In the ordinary course of business, the Debtors and their non-debtor affiliates use a cash management system (as described in more detail in the Cash Management Motion,[4] the "Cash Management System") to transfer funds between and among the Debtors and their affiliates to manage operations and their cash needs.  Under the Debtors' Cash Management System, the operating subsidiaries, such as Truvo Belgium Comm. V or Truvo Services & Technology B.V., fund the Debtors' expenses through intercompany loans or intercompany credits, as the Debtors themselves have no cash generating capabilities.

22.     Pursuant to the Cash Management Motion, the Debtors request authorization to continue using their Cash Management System.

### Relief Requested

23.     By this Motion, the Debtors request entry of an interim order in the form attached hereto as Exhibit A (the "Interim Order"), and a final order in substantially identical form (the "Final Order"), authorizing:

> (i)     the Debtors to use the Cash Collateral in accordance with the budget (as modified or supplemented from time to time by additional budgets (covering additional time periods), the "Budget"), in which Cash Collateral the Senior Lenders have an interest;[5]
>
> (ii)    the granting of adequate protection to the Senior Lenders with respect to the use of the Cash Collateral;

---

[4]     Contemporaneously herewith the Debtors filed the Debtors' Motion for an Order Pursuant to Section 345, 363(c)(1), 364(c)(1) and 503(b)(1): (A) Approving the Continued Use of the Cash Management System, Bank Accounts and Business Forms and (B) Permitting Continued Intercompany Transactions and Granting Superpriority Status to Postpetition Intercompany Claims (the "Cash Management Motion").

[5]     The initial Budget is attached to the Interim Order as Exhibit 1.

(ii)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "<u>Interim Hearing</u>") on the Motion be held before the Court to consider entry of the Interim Order (a) authorizing the Debtors' use of the Cash Collateral of the Senior Lenders, and (b) granting the adequate protection described in this Motion; and

(iii)    the scheduling of a final hearing (the "<u>Final Hearing</u>") to be held within twenty-one (21) days of the entry of the Interim Order to consider entry of the Final Order.

24.     As discussed above, the Debtors have reached an agreement with the Supporting Senior Lenders concerning the restructuring of the Debtors. In addition, the Debtors and the Majority Lenders have also reached an agreement regarding, and request that the Court approve, the Debtors' use of Cash Collateral on the terms set forth herein, the Interim Order and the Final Order, as well as the continued use of the Cash Management System, as set forth in the Cash Management Motion. The Debtors submit that absent authorization to use Cash Collateral to fund these Chapter 11 Cases, the Debtors, their estates and creditors will suffer immediate and irreparable harm.

## <u>Basis for Relief</u>

25.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[6] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated of this title and unless the court under Section . . . 1108 . . . orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

---

[6]     Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. <u>See</u> 11 U.S.C. § 1107(a).

26.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

27.     Accordingly, pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral without the consent of the secured party or approval from the Court.  After extensive negotiations, the Majority Lenders have consented to the use of the Cash Collateral pursuant to the terms and conditions set forth in the Interim Order.  The Debtors submit that, under the circumstances here, including the Debtors' need to use Cash Collateral and the adequate protection afforded to the Senior Lenders, their request to use Cash Collateral should be approved.

**A.     Debtors' Need to Use Cash Collateral**

28.     The Debtors have significant and immediate cash needs to continue paying the professionals in order to be able to reorganize and emerge from Chapter 11 protection. Reorganization under Chapter 11 is critical to preserving the Debtors' value as a going concern. As shown in the Budget, the Debtors anticipate that aggregate monthly expenses of the estates will total approximately $4 million.  The Debtors, however, have no external operations and are funded exclusively by upstream loans from their operating subsidiaries located outside of the United States.  As such, the Debtors do not have sufficient unencumbered resources to fund the

Chapter 11 expenses.  Simply stated, without authorization to utilize the Cash Collateral, the Debtors may not be able to reorganize.

29.     Pursuant to (and subject to the terms of) the Senior Facility Agreement, the Intercreditor Agreement and the Senior Security Documents, the Security Agent, for the benefit of the Senior Agent and the Senior Lenders, holds valid, binding, perfected, enforceable and non-avoidable first priority (solely as to priority, subject to permitted exceptions under the Senior Facility Agreement) liens on, and security interests in (the "Senior Lender Liens"), substantially all of the assets of TUSA, TAC and the HY Notes Issuer  and their direct and indirect subsidiaries, taken as a whole (the "Senior Lender Collateral").  Specifically, the Debtors' obligations to the Senior Lenders under the Senior Facility Agreement (the "Senior Obligations") are secured, *inter alia*, by the following pledges and liens on the property of TAC, TUSA and HY Notes Issuer:

- HY Notes Issuer has granted (i) a New York law governed first priority pledge of 65% of the shares of TAC and (ii) a New York law governed first ranking security interest in all its property (with certain limited exclusion), including cash.

- TAC has granted (i) a New York law governed first priority pledge of 65% of the shares of TUSA and (ii) a New York law governed first priority security interest in respect of all its property (with certain limited exclusions), including cash.

- TUSA has granted (i) Belgian law governed first priority pledge of 65% of the shares of Truvo Belgium Comm. V. and (ii) a New York law governed first ranking security interest in respect of all its property (with certain limited exclusions), including cash.

TAC and TUSA are also guarantors of the Senior Loans.[7]

---

[7]     The HY Notes are guaranteed by PIK Borrower, TAC, TUSA and certain Operating Subsidiaries and secured on a second lien basis by certain of the assets of HY Notes Issuer, TAC, TUSA and certain Operating Subsidiaries.  In addition, HY Notes Issuer has granted a first lien security interest on a certain subordinated intercompany receivable.  The pledges and security interests granted in favor of the HY Noteholders do not include any of the Debtors' cash.  The PIK Loans are not secured by any pledges or security interests granted by the Truvo Group.

30.     In addition to the relief sought in this Motion, the Debtors have also requested this Court's authorization to utilize the existing Cash Management System in order to pay, *inter alia*, the Chapter 11 professionals.  Specifically, it is the Debtors intention that the requisite funds to pay professionals would be upstreamed from one or more of the Operating Subsidiaries to the applicable Debtor if and when such Debtor must pay such fees.  Funds currently in the Debtors' bank accounts would thus not be utilized to pay professionals.  In light of the Senior Lenders' security interests in the property of Truvo Subsidiary, Truvo Acquisition and Truvo USA, however, the relief sought in the Cash Management Motion, standing alone, would be inadequate to fund the Chapter 11 Cases.

**B.     Proposed Adequate Protection**

31.     To the extent that the Senior Lenders' interests in the Cash Collateral constitutes valid and perfected security interests and liens as of the Petition Date, the Prepetition Secured Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Cash Collateral.  Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property used or proposed to be used by the debtor, the Court shall prohibit or condition such use as is necessary to provide "adequate protection" of that interest.  11 U.S.C. §363(e).

32.     What constitutes "adequate protection" is a "fact-specific inquiry."  <u>See</u> <u>In re Mosello</u>, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).  The purpose of adequate protection is to prevent the diminution in the value of the secured creditors' interests in their collateral during the reorganization process.  <u>See</u> <u>In re WorldCom, Inc.</u>, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure

that the secured creditor receives value for which the creditor bargained for prior to the debtor's bankruptcy."); In re Gallegos Research Group Corp., 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (citing United Savings Ass'n of Texas v. Timbers of Imwood Forest Assoc., Ltd., 484 U.S. 365 (1988)) ("[T]o determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case"); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in value of its collateral during reorganization process). However, "[a]dequate protection, not absolute protection, is the statutory standard." Beker, 548 B.R. at 736.

33. The Debtors have agreed, subject to this Court's approval, to provide the Senior Lenders with the following as adequate protection (collectively, the "Lenders' Adequate Protection Package"). Specifically, the Senior Lenders' Adequate Protection Package is as follows:

(a) Replacement Liens on the Postpetition Collateral; provided, however, that the Postpetition Collateral shall not include the Avoidance Actions;

(b) to the extent of any Adequate Protection Obligation, Superpriority Claims in the amount of the Adequate Protection Obligations as contemplated by sections 503(b) and 507(b) of the Bankruptcy Code;

(c) the Debtors and certain of the non-Debtor subsidiaries will make Adequate Protection Payments in the form of: (i) ongoing payment of the reasonable postpetition fees, costs and expenses of the legal, financial and other professional advisors to the CoComm and the Security Agent, including Linklaters LLP, as legal advisor to the CoComm, N.M. Rothschild & Sons Limited, as financial advisor to the CoComm, Kleinberg Kaplan Wolff &

Cohen, P.C., as legal advisor to the Elliott Lender, and Allen &
Overy LLP, as legal advisor to the Security Agent.

34.     The Debtors submit that the requested use of Cash Collateral and the protections afforded the Senior Lenders in the Interim Order, including the Replacement Liens and the Superpriority Claims, are reasonable, appropriate, and sufficient to satisfy the legal standard of adequate protection.

## C.     The Budget

35.     The Debtors have prepared and delivered to the Majority Lenders an initial three-month Budget (which is attached to the Interim Order as Exhibit 1).  The initial Budget has been thoroughly reviewed by the Debtors and their management and sets forth for the periods covered thereby, among other things, the Debtors' projected monthly disbursements for each month commencing with the month starting on the Petition Date.  In addition to the initial Budget, the Debtors will undertake to deliver to the Majority Lenders updates to the Budget on a monthly basis (the "Budget Report").

36.     The Budget Report will show (i) the actual receipts and disbursements of the Debtors during the period from the initial Budget or the preceding Budget Report, and (ii) a comparison of the actual receipts and disbursements for the Debtors to the receipts and disbursements shown in the Budget both for the preceding reporting period and on a cumulative basis for the period from the Petition Date through the last day of the reporting period.  A variance from the aggregate amount (for all Debtors combined) of expenditures set forth in the Budget that exceeds twenty percent (20%) on a cumulative basis from the Petition Date until the date of the most recently delivered Budget or Budget Report, shall constitute a Termination Event.

37.     In addition, the CoComm, the Elliott Lender, and the Security Agent shall be granted access to the Debtor's books and records as they may from time to time reasonably request, and the Debtors shall continue to comply with all of their financial reporting obligations under the Senior Facility Agreement, and shall provide to the CoComm, the Elliott Lender, and the Security Agent group-wide financial and operating reports on a monthly basis as well as provide cash flow forecasts on a quarterly basis.

**D.     Interim Approval Final Hearing Date Shall Be Established**

38.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on or prior to July 1, 2010, pending the final hearing to be held to consider the final relief requested by this Motion.  In connection with such preliminary hearing, and the pendency period thereafter before a final hearing on this Motion, the Debtors request that the Court authorize the Debtors to use the Cash Collateral, as it is essential to the funding of these Chapter 11 Cases, including the estates' professional fees and expenses, and therefore necessary to avoid immediate and irreparable harm to their estates, pending the final hearing.

<u>**Notice**</u>

39.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) each of the Debtors' twenty (20) largest unsecured creditors; (iii) the Senior Lenders; (iv) counsel to J.P. Morgan Europe Limited as Security Agent under the Intercreditor Agreement and as Senior Agent under the Senior Facility Agreement; (v) counsel to the Elliott Lender (as defined in the Plan Support Agreement); (vi) Bank of New York as Trustee under the Notes Indenture; (vii) Wilmington Trust (London) Limited as Administrative Agent under the PIK Loan Agreement; (viii) counsel to the Coordinating Committee of Senior Lenders; (ix) the

Securities and Exchange Commission; (x) the Internal Revenue Service; and (xi) the United States Department of Justice. In addition, the Chambers of the Judge assigned to preside over these cases is being served by hand. In light of the exigencies of the circumstances and the potential harm to the Debtors, their estates, and other parties in interest that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

**<u>No Prior Request</u>**

40. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully requests that this Court enter (i) the

Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) following a

Final Hearing, enter the Final Order, and (iv) grant such other relief as is just and proper.

Dated:  July 1, 2010              CLEARY GOTTLIEB STEEN & HAMILTON LLP
       New York, New York

By:  ___/s/ Sean A. O'Neal_____
      Thomas J. Moloney
      Sean A. O'Neal
      Members of the Firm
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**