**EXHIBIT 2**

**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
                                                                        :
*In re*                                                                 :  Chapter 11
                                                                        :
Truvo USA LLC, *et al*.                                                 :  Case No. 10- 13513 (AJG)
                                                                        :
                                    Debtors.                            :  Jointly Administered
                                                                        :
---------------------------------------------------------------------- X

**DISCLOSURE STATEMENT WITH RESPECT TO THE FIRST AMENDED JOINT
PLAN OF REORGANIZATION OF TRUVO USA LLC, *ET AL.*, DEBTORS UNDER
<u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | JENNER & BLOCK |
| Thomas J. Moloney | Vincent E. Lazar |
| Sean A. O'Neal | 353 N. Clark Street |
| One Liberty Plaza | Chicago, Illinois 60654-3456 |
| New York, New York 10006 | ~~Facsimile:~~ **Telephone:** (312) ~~840~~**222**- |
| ~~7389~~**9350** | |
| Telephone: (212) 225-2000 | **Facsimile: (312) 840-7389** |
| Facsimile: (212) 225-3999 | |
| | |
| | Heather D. McArn |
| | 919 Third Avenue, 37th Floor |
| | New York, NY 10022-3908 |
| | Telephone: (212) 891-1600 |
| | Facsimile: (212) 891-1699 |

Counsel for the Debtors
And Debtors in Possession

Dated: ~~July 26,~~**August 30,** 2010

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................1

    A.      General .................................................................................................1

    B.      Holders of Claims Entitled to Vote .....................................................4

    C.      Voting Procedures ...............................................................................5

    D.      Confirmation Hearing ..........................................................................6

    E.      Important Matters ................................................................................6

II.     SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF
    CLAIMS AND EQUITY INTERESTS THEREUNDER ..............................~~6~~**7**

III.    BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 FILING ......~~13~~**14**

    A.      The Debtors' Business .........................................................~~13~~**14**

        1.      Business Overview ..............................................~~13~~**14**

    B.      Corporate History and Structure .........................................~~15~~**16**

    C.      Markets ................................................................................~~17~~**18**

        1.      Belgium .................................................................~~17~~**18**

        2.      Ireland ...................................................................~~19~~**20**

        3.      Portugal .................................................................~~20~~**21**

        4.      Joint Ventures in South Africa and Puerto Rico ....~~20~~**21**

    D.      Employees ...........................................................................~~21~~**22**

    E.      Summary of Prepetition Indebtedness .................................~~21~~**22**

        1.      Senior Financing ...................................................~~21~~**22**

        2.      HY Notes ...............................................................~~23~~**24**

        3.      PIK Loan ...............................................................~~24~~**25**

        4.      Intercompany Debt ................................................~~24~~**25**

        5.      Equity Interests in the Debtors ..............................~~24~~**25**

        6.      Intercreditor Agreement ........................................~~25~~**26**

    F.      Description of Potential U.S. Federal Tax Claims ...............~~26~~**27**

    G.      Historical Financial Information .........................................~~27~~**28**

    H.      Events Leading to the Commencement of the Chapter 11 Cases ...~~27~~**28**

        1.      Changes in the market for directory products .........~~27~~**28**

        2.      Efforts to reorient the Truvo Group's business .......~~28~~**29**

3. Agreement with ~~approximately 80% by value of the Senior Lenders on~~**supporting creditors regarding** the terms of the restructuring ~~28~~ **and the TUSA Sale** ........................................................... **30**

I. Business Strategy of the Reorganized Truvo Group ........................... ~~30~~**32**

IV. THE CHAPTER 11 CASES ..................................................................... ~~32~~**34**

A. Joint Administration of the Debtors' Chapter 11 Cases ..................... ~~32~~**34**

B. Significant "First Day" Motions ........................................................ ~~32~~**34**

1. Cash Management Motion ........................................................ ~~32~~**34**

2. Cash Collateral Motion ............................................................ ~~32~~**34**

3. Section 105 Injunction ............................................................. ~~32~~**35**

4. Retention Applications ............................................................. ~~33~~**35**

C. Coordinating Committee of Senior Lenders ....................................... ~~33~~**36**

D. Informal Noteholder Group ................................................................ ~~33~~**36**

E. **Appointment of the Creditors' Committee** ..................................... **36**

**F.** Claims Process; Last Date to File Proofs of Claims .......................... ~~34~~**37**

V. THE PLAN .............................................................................................. ~~34~~**37**

A. Overview of Chapter 11 ...................................................................... ~~34~~**37**

B. Overview of the Plan .......................................................................... ~~35~~**38**

C. Unclassified Claims ............................................................................ ~~36~~**39**

1. Administrative Expense Claims Generally ............................... ~~36~~**39**

**2. Priority Tax Claims** .............................................................. **40**

**3. Intercompany Claims and Intercompany Equity Interests** .... **40**

D. Description of the Classes ................................................................... ~~37~~**40**

1. Classification of Claims Against and Old Equity Interests in Truvo Parent .......................................................................... ~~37~~**40**

2. Classification of Claims Against PIK Borrower ...................... ~~40~~**43**

3. Classification of Claims Against HY Notes Issuer .................. ~~43~~. ~~Classificati~~

**4. Classification of Claims Against TAC** ................................. **50**

5. Classification of Claims Against TUSA ................................... ~~51~~**55**

E. Means for Implementation ................................................................... ~~55~~**58**

1. Overview .................................................................................... ~~55~~**58**

# TABLE OF CONTENTS
## (continued)

2.      Actions to be Taken on the Effective Date Prior to the TUSA Sale ....... ~~55~~**59**

3.      TUSA Sale And Other Restructuring Transactions ....... ~~56~~**59**

4.      TAC Sale ....... ~~62~~**65**

5.      Liquidation of Debtors ....... ~~62~~**66**

6.      Other Restructuring Transactions ....... ~~63~~**66**

7.      TAC Representation Powers ....... ~~65~~**69**

8.      Closing of the Chapter 11 Cases ....... ~~67~~**71**

9.      Reorganized Truvo Group ....... ~~67~~**71**

10.      Corporate Action ....... ~~68~~**72**

11.      Cancellation of Notes, Instruments and Debentures ....... ~~69~~**73**

12.      Issuance of Plan Securities and Related Documentation ....... ~~70~~**73**

13.      Sources of Cash for Plan Distributions ....... ~~70~~**74**

14.      Intercompany Claims and Intercompany Equity Interests ....... ~~70~~**74**

15.      Automatic Stay ....... ~~70~~**74**

16.      HY Indenture Trustee ....... ~~71~~**74**

F.      Procedures for Resolving Disputed Claims ....... ~~71~~**75**

1.      Resolution of Disputed Claims ....... ~~71~~**75**

2.      No Distributions Pending Allowance ....... ~~71~~**75**

3.      Distributions on Account of Disputed Claims Once They Are Allowed ....... ~~71~~**75**

G.      Provisions Governing Distributions ....... ~~71~~**75**

1.      Distributions for Claims Allowed as of the Effective Date ....... ~~71~~**75**

2.      No Postpetition Interest on Claims Against Debtors ....... ~~72~~**75**

3.      Disbursing Agent ....... ~~72~~**76**

4.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... ~~72~~**76**

5.      Distribution Record Date ....... ~~74~~**78**

6.      Allocation of Plan Distributions Between Principal and Interest ....... ~~74~~**78**

7.      Cash Payments ....... ~~74~~**78**

8.      Withholding and Reporting Requirements ....... ~~74~~**78**

| | | | |
|---|---|---|---|
| 9. | Setoffs | ~~75~~**79** |
| 10. | Designated Affiliate for Distributions to Senior Lenders | ~~75~~**79** |
| 11. | Execution of Documents by Senior Lenders | ~~75~~**79** |
| 12. | Execution of Documents by HY Noteholders and PIK Lenders | ~~76~~**79** |
| 13. | No Fractional Shares or Warrants | ~~76~~**80** |
| H. | Treatment of Executory Contracts | ~~76~~**80** |
| 1. | Assumption of Executory Contracts and Unexpired Leases | ~~76~~**80** |
| 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | ~~77~~**80** |
| 3. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases | ~~77~~**81** |
| 4. | Objections to Rejection, Assumption, Assignment or Cure | ~~78~~**81** |
| 5. | Compensation and Benefit Programs | ~~78~~**82** |
| I. | Summary of New Management Incentive Plan | ~~79~~**83** |
| J. | Summary of the Capital Structure of the Reorganized Truvo Group | ~~79~~**83** |
| 1. | Description of the New Ordinary Shares, Holdco Ordinary Shares, ~~Junior Creditor~~ Holdco Warrants ~~, Junior Creditor Equityco Warrants and MIP Holdco Warrants and MIP~~ **and** Equityco Warrants | ~~79~~**83** |
| 2. | New Bank Debt and New RCF | ~~82~~**85** |
| 3. | New PIK Debt | ~~83~~**87** |
| 4. | New Intercreditor Agreement | ~~84~~**88** |
| K. | Exemption from Securities Laws | ~~84~~**88** |
| L. | Conditions Precedent to Confirmation | ~~85~~**88** |
| M. | Conditions to Obligations of Security Agent and Senior Agent | ~~85~~**89** |
| N. | Conditions to Effective Date | ~~85~~**89** |
| 2. | Waiver of Conditions | ~~86~~**90** |
| 3. | Consequences of Non-Occurrence of Effective Date | ~~86~~**90** |
| O. | Effect of Confirmation | ~~86~~**90** |
| 1. | Binding Effect; Plan Binds All Holders of Claims and Equity Interests | ~~86~~**90** |

TABLE OF CONTENTS

(continued)

**Page**

2. Releases and Related Injunctions ............................................................. ~~87~~**91**

3. Discharge of Claims ............................................................................... ~~88~~**92**

4. Preservation of Rights of Action; Settlement of Litigation Claims ......... ~~88~~**92**

5. Exculpation and Limitation of Liability .................................................. ~~88~~**93**

6. Injunction ............................................................................................... ~~89~~**93**

7. Term of Bankruptcy Injunction or Stays ................................................ ~~89~~**93**

8. Termination of Subordination Rights and Settlement of Related Claims ...................................................................................................... ~~89~~**93**

P. Retention of Jurisdiction .............................................................................. ~~90~~**94**

Q. Bar Dates for Administrative Expense Claims ............................................ ~~91~~**95**

R. Payment of Statutory Fees ............................................................................ ~~92~~**96**

S. Tax Reporting and Compliance ..................................................................... ~~92~~**96**

T. Exemption from Transfer Taxes .................................................................... ~~92~~**96**

U. Amendment or Modification of the Plan ....................................................... ~~92~~**96**

V. Severability of Plan Provisions ..................................................................... ~~92~~**96**

W. **Payment of Statutory Fees** ..................................................................... **97**

**X.** Plan Revocation, Withdrawal or Non-Consummation ............................ ~~93~~**97**

VI. CONFIRMATION OF THE PLAN OF REORGANIZATION ........................... ~~93~~**97**

A. Solicitation of Votes .................................................................................... ~~93~~**97**

B. The Confirmation Hearing ........................................................................... ~~94~~**98**

C. Confirmation ............................................................................................... ~~95~~**99**

1. Acceptance ............................................................................................. ~~95~~**99**

2. Unfair Discrimination and Fair and Equitable Test ............................... ~~95~~**99**

3. Feasibility; Projections; Valuation ......................................................... ~~96~~**100**

4. Best Interests Test .................................................................................. ~~100~~**105**

D. Classification of Claims and Equity Interests .............................................. ~~102~~**107**

E. Consummation ............................................................................................. ~~102~~**107**

VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .............................................................................................................. ~~102~~**107**

A. Liquidation Under Chapter 7 ...................................................................... ~~102~~**107**

B. Alternative Plan of Reorganization.................................................... ~~103~~**107**

C. Dismissal of the Debtors' Chapter 11 cases..................................... ~~103~~**108**

VIII. GOVERNANCE OF HOLDCO, EQUITYCO AND PIKCO........................ ~~103~~**108**

A. Generally............................................................................................. ~~103~~**108**

B. Governance of Equityco and PIKco................................................. ~~104~~**109**

C. Governance of Holdco...................................................................... ~~104~~**109**

1. Board of Directors................................................................... ~~104~~**109**

D. Officers of Reorganized Truvo after the Effective Date................. ~~106~~**111**

IX. CERTAIN RISK FACTORS TO BE CONSIDERED................................... ~~106~~**111**

A. Certain Bankruptcy Considerations................................................. ~~106~~**111**

1. Bankruptcy Matters.................................................................. ~~106~~**111**

2. The Truvo Group's businesses could suffer from the loss of key personnel............................................................................... ~~108~~**113**

3. The Debtors may not be able to grow their business during the Chapter 11 Case without Bankruptcy Court approval............ ~~108~~**113**

4. Pursuit of litigation by the parties in interest could disrupt the confirmation of the Plan and could have material adverse effects on the Truvo Group's businesses and financial condition...... ~~108~~**113**

5. Adverse publicity in connection with the Chapter 11 Cases or otherwise, could negatively affect the Truvo Group's businesses... ~~108~~**113**

B. Risks Relating to the New Ordinary Shares and Junior Creditor Warrants to be Issued     Under the Plan........................................ ~~109~~**114**

1. No public markets for the New Ordinary Shares or Junior Creditor Warrants are currently present, and lack of the development of a public market could result in the New Ordinary Shares or Junior Creditor Warrants being difficult or impossible to trade....... ~~109~~**114**

2. Neither Equityco nor PIKco will be required to, nor do they intend to, file periodic reports with the SEC or any other regulator or stock exchange upon emergence...................................... ~~109~~**114**

3. The Shareholders' Agreement will include restrictions on transfer, as well as drag along and tag along rights............................ ~~109~~**114**

4. The Holdco Ordinary Shares and Equityco Ordinary Shares could be subject to future dilution and, as a result, could decline in value ~~110~~**115**

5. Dividends are not expected to be paid with respect to the New Ordinary Shares for the foreseeable future .......................... ~~110~~**115**

C. Risks Relating to the New Bank Debt and New PIK Debt to be issued under the Plan .......................... ~~110~~**115**

1. No market for the New Bank Debt and New PIK Debt is currently present, and lack of the development of a market could result in the New Bank Debt and New PIK Debt being difficult or impossible to trade .......................... ~~110~~**115**

2. The New PIK Debt will be structurally subordinated to holders of the New Bank Debt .......................... ~~111~~**116**

3. The Reorganized Truvo Group will be subject to significant restrictive debt covenants, which will limit its operating flexibility .......................... ~~111~~**116**

4. The Reorganized Truvo Group will have certain obligations under the New Indemnity that rank first in priority to payment of principal and interest under the New Bank Debt .......................... ~~111~~**116**

5. PIKco has no direct payment obligation towards the holders of the New PIK Debt Notes .......................... ~~111~~**116**

D. Leverage .......................... ~~112~~**117**

E. Risks Relating to U.S. Tax Consequences of the Plan .......................... ~~113~~**118**

1. Risks relating to U.S. federal income tax treatment of the Plan .......................... ~~113~~**118**

2. Risks relating to potential U.S. federal tax claims .......................... ~~113~~**118**

3. Risks relating to potential U.S. tax refunds .......................... ~~113~~**118**

F. Risks Relating to Belgian Tax Consequences of the Plan .......................... ~~113~~**118**

1. The Belgian income tax consequences of the Plan are subject to uncertainties .......................... ~~113~~**118**

2. The New PIK Debt could be recharacterized as equity for Belgian tax purposes .......................... ~~113~~**118**

3. **Holders of the New PIK Debt could face certain other adverse tax consequences** .......................... **119**

G. Risks Relating to the Inherent Uncertainty of Financial Projections .......................... ~~114~~**119**

H. Risks Associated with the Business .......................... ~~114~~**120**

1. Continued Decline in use of Print Directories .......................... ~~114~~**120**

2. Failure of New Print Products .......................... ~~115~~**120**

# TABLE OF CONTENTS

(continued)

Page

3. Failure of the strategy to transform the Truvo Group into a local search and advertising business................................................~~115~~**120**

4. Risk of increased competition from new mobile applications and services................................................~~116~~**121**

5. The Truvo Group may fail to anticipate or respond effectively to changes in technology and consumer preferences, harming its competitive position................................................~~116~~**121**

6. Revenues of the Truvo Group may continue to decline................................................~~116~~**121**

7. Some of the Truvo Group's revenues are derived from entities it does not control................................................~~116~~**122**

8. A prolonged economic downturn and other external events would adversely affect the Truvo Group's business and financial condition................................................~~116~~**122**

9. The Truvo Group may be unable to adequately fund its operations................................................~~117~~**122**

10. The Truvo Group may be unable to compete successfully in each of its markets due to the competitive nature of the directory advertising industry................................................~~117~~**123**

11. Loss of key personnel or the Truvo Group's inability to attract and retain highly qualified individuals could have a material adverse effect on its ability to achieve its operating goals................................................~~118~~**123**

12. The Truvo Group will continue to incur significant severance costs~~118~~**124**

13. Measures taken by the Truvo Group to maximize efficiency, reduce its cost base and position its business to move away from a primary focus on print products may not be adequate and may be detrimental to its future competitiveness................................................~~118~~**124**

14. Strikes or industrial action could disrupt operations................................................~~118~~**124**

15. The Truvo Group may be unable to retain existing customers or acquire new customers................................................~~119~~**124**

16. The loss of important intellectual property rights could adversely affect the Truvo Group's results of operations and future prospects~~119~~**124**

17. The Truvo Group's reliance on small and medium size businesses exposes it to increased credit risk................................................~~120~~**125**

18. Any disruption, failure or other ineffectiveness of internal controls could have a material adverse effect on the Truvo Group's businesses, financial condition and results of operations................................................~~120~~**126**

19. The Truvo Group's significant reliance on technology could have a material adverse effect on its businesses ................................ ~~120~~**126**

20. Risk of fluctuations in the cost of paper and other materials ................................ ~~120~~**126**

21. The Truvo Group's dependence on partnerships, joint ventures and the cooperation of incumbent telecom operators ................................ ~~121~~**126**

22. The Truvo Group relies on third party providers for printing, distribution, delivery services, revenue collection and website design and hosting ................................ ~~122~~**128**

23. Currency exchange risks ................................ ~~122~~**128**

24. Political instability ................................ ~~123~~**128**

25. Legal actions could have a material adverse effect on the operating results or financial condition of the Truvo Group ................................ ~~123~~**128**

26. The Truvo Group faces certain contractual restrictions related to operations in the Netherlands ................................ ~~124~~**129**

I. Regulatory Risks ................................ ~~124~~**130**

1. Government regulation and changes in regulation regarding information technology, data protection, privacy and other matters could have adverse effects on the Truvo Group's businesses, financial condition and results of operations ................................ ~~124~~**130**

2. Existing antitrust regulations, and the possibility of deregulation, may affect the Truvo Group's ability to compete effectively ................................ ~~124~~**130**

3. Initiatives directed at limiting or restricting the distribution of the Truvo Group's print directory products or shifting the costs and responsibilities of waste management related to the Truvo Group's print products could adversely affect its business ................................ ~~124~~**130**

X. U.S. ................................ ~~125~~**131**

A. Plan Securities ................................ ~~125~~**131**

B. Issuance and Resale of Plan Securities Under the Plan ................................ ~~125~~**131**

1. Exemption from Registration ................................ ~~125~~**131**

2. Resales of Plan Securities; Definition of "Underwriter" ................................ ~~126~~**132**

3. Listing of Plan Securities ................................ ~~127~~**133**

XI. EUROPEAN ECONOMIC AREA SECURITIES LAW MATTERS ................................ ~~127~~**133**

A. Offers of securities to the public in the EEA ................................ ~~127~~**133**

B. Takeover bids in Belgium ................................ ~~129~~**135**

TABLE OF CONTENTS
(continued)

**Page**

XII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... ~~130~~**136**

    A.   Introduction ..................................................................................... ~~130~~**136**

    B.   U.S. Federal Income Tax Consequences to the Debtors ................... ~~131~~**137**

    C.   U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims ... ~~132~~**138**

        1.   U.S. Holders of Senior Debt ................................................ ~~132~~**138**

        2.   U.S. Holders of HY Notes ................................................... ~~135~~**144**

        3.   U.S. Holders of PIK Loans ................................................. ~~137~~**146**

        4.   U.S. Holders of Other Claims ............................................. ~~138~~**147**

        5.   Other Considerations ........................................................... ~~138~~**148**

        6.   Information Reporting and Backup Withholding ................... ~~139~~**149**

    D.   U.S. Federal Income Tax Consequences to Non-U.S. ....................... ~~140~~**149**

        1.   Recognition of Gain or Loss on the Exchange ..................... ~~140~~**149**

        2.   Taxation of New Ordinary Shares, HY Noteholder Warrants, PIK Lender Warrants, New Bank Debt and **Total** New PIK Debt ... ~~140~~**149**

        3.   Information Reporting and Backup Withholding ................... ~~140~~**150**

XIII.  CERTAIN DUTCH TAX CONSEQUENCES OF THE PLAN ....................... ~~141~~**150**

    A.   Introduction ..................................................................................... ~~141~~**150**

    B.   Dutch Income Tax Consequences to Holders of New Bank Debt ..... ~~141~~**150**

    C.   Dutch Income Tax Consequences to the Dutch Non-Debtor Subsidiaries ... ~~141~~**150**

        ~~1.~~   ~~Waiver of debt~~ ................................................................. ~~141~~

        **1.**   **Waiver of debt** .................................................................. **151**

        ~~2.~~ **2.** Merger of the Dutch entities .............................................. ~~141~~**151**

XIV.  CERTAIN BELGIAN TAX CONSEQUENCES OF THE PLAN ................... ~~141~~**151**

    A.   Introduction ..................................................................................... ~~141~~**151**

    B.   Belgian Tax Consequences to Belgian Holders of the New Ordinary Shares, New Bank Debt and New PIK Debt ... ~~143~~**152**

        1.   Exchange of Senior Debt for New Ordinary Shares, New Bank Debt and New PIK Debt ................................................ ~~143~~**152**

        2.   New Ordinary Shares ........................................................... ~~143~~**153**

        3.   New Bank Debt .................................................................... ~~145~~**154**

        4.   New PIK Debt ...................................................................... ~~146~~**155**

| | | | |
|---|---|---|---|
| | 5. | Other Tax Considerations | ~~148~~**157** |
| C. | | Belgian Tax Consequences to non-Belgian Holders of New Ordinary Shares, New Bank Debt and New PIK Debt | ~~148~~**158** |
| | 1. | New Ordinary Shares | ~~148~~**158** |
| | 2. | New Bank Debt | ~~149~~**159** |
| | 3. | New PIK Debt | ~~150~~ |
| | ~~4.~~ | ~~Other Tax Considerations~~ | ~~150~~~~159~~ |
| | **4.** | **Other Tax Considerations** | **160** |
| | 5. | Information Reporting | ~~151~~**160** |
| D. | | Belgian Income Tax Consequences to the Belgian Non-Debtor Subsidiaries | ~~151~~**160** |
| | ~~1.~~ | ~~Waiver of debt~~ | ~~151~~ |
| | **1.** | **Waiver of debt** | **161** |
| | ~~2.~~ **2.** | Liquidation of Truvo Corporate CVBA | ~~151~~**161** |
| | 3. | Amendment of terms and conditions of Truvo Belgium intercompany debt | ~~151~~**161** |
| | 4. | Change of Control | ~~152~~**161** |
| XV. | | CONCLUSION | ~~152~~**161** |

**EXHIBITS**

Exhibit 1 – The Plan

Exhibit 2 – Prepetition Corporate Organizational Chart

Exhibit 3 – The Debtors' Liquidation Analysis

Exhibit 4 – Projected Financial Information

Exhibit 5 – Prepetition Intercreditor Agreement

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE IX BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR ANY STATE OR FOREIGN SECURITIES REGULATOR, NOR HAS THE SEC OR ANY SUCH REGULATOR PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON, PARTY OR ENTITY FOR ANY OTHER PURPOSE EXCEPT AS PERMITTED BY APPLICABLE LAW.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS OR SUBSIDIARIES OF THE DEBTORS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

NONE OF THE OFFER OR SALE OF ANY OF THE SECURITIES BEING OFFERED OR SOLD UNDER THE PLAN HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY SIMILAR STATE OR FOREIGN SECURITIES OR "BLUE SKY" LAWS. THE OFFERS AND

ISSUANCES OF THE PLAN SECURITIES AND THE ISSUANCE OF ORDINARY SHARES OF EQUITYCO OR HOLDCO UPON EXERCISE OF THE EQUITYCO WARRANTS AND THE HOLDCO WARRANTS, RESPECTIVELY, ARE BEING MADE IN RELIANCE ON EXEMPTIONS FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT OR APPLICABLE FOREIGN SECURITIES LAWS, SUBJECT TO CERTAIN LIMITATIONS DESCRIBED HEREIN.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH RISKS, UNCERTAINTIES AND FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. FORWARD-LOOKING STATEMENTS ARE OFTEN CHARACTERIZED BY THE USE OF WORDS SUCH AS "BELIEVES," "ESTIMATES," "EXPECTS," "PROJECTS," "MAY," "INTENDS," PLANS" OR "ANTICIPATES" OR BY DISCUSSIONS OF STRATEGY, PLANS OR INTENTIONS. ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS SPEAK ONLY AS OF THE DATE THEY WERE MADE AND THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE ANY SUCH FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN OR THEREIN WILL NOT BE REALIZED. EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES OR INTERNATIONAL FINANCIAL REPORTING STANDARDS.

# I.
# INTRODUCTION

## A.    General

On July 1, 2010 (the "<u>Petition Date</u>"), Truvo USA LLC ("<u>TUSA</u>"), Truvo Parent Corp. ("<u>Truvo Parent</u>"), Truvo Intermediate LLC ("<u>PIK Borrower</u>"), Truvo Subsidiary Corp. ("<u>HY Notes Issuer</u>") and Truvo Acquisition Corp. ("<u>TAC</u>") (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") filed their petitions for relief under chapter 11 ("<u>Chapter 11</u>") of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"). The Debtors' operating subsidiaries have not commenced bankruptcy proceedings.

On July 26, 2010, the Debtors filed their proposed First Amended Joint Plan of Reorganization of Truvo USA LLC, *et al*, Debtors under Chapter 11 of the Bankruptcy Code, dated July 26, 2010, (as it may be amended, the "<u>Plan</u>"), which sets forth the manner in which Claims against, and Equity Interests in, the Debtors will be treated.[1]

This amended disclosure statement, dated July 26, 2010 (as it may be amended, the "<u>Disclosure Statement</u>"), describes certain aspects of the Plan, the Debtors' business and the operations of the non-debtor subsidiaries of the Debtors (the "<u>Non-Debtor Subsidiaries</u>" and, together with the Debtors, the "<u>Truvo Group</u>").

After a careful consideration of the Debtors' business and their prospects as a going concern, the Debtors, in consultation with their legal and financial advisers, concluded that recoveries to creditors will be maximized by implementing the Plan. The cornerstone of the Plan is the proposed sale by TAC of its Equity Interests in TUSA (the "<u>TUSA Sale</u>") to Truvo NV ("<u>Newco</u>") on the Effective Date, pursuant to the Plan, in exchange for a cash payment equal to €600,000,000.00 and in such manner so as to permit the Release in accordance with the terms of the Intercreditor Agreement (attached hereto as <u>Exhibit 5</u>). Following consummation of the TUSA Sale and a series of restructuring transactions authorized under the Plan, all equity of Newco, excluding a de minimis amount owned by Truvo Belgium, will be owned by a newly formed Belgian entity, Holdco. Other than a de minimis number of Holdco ordinary shares owned by Truvo Belgium, at least 53.45% of the equity in Holdco will be owned by a newly formed Belgian entity, Equityco. The remainder of the equity in Holdco will be owned by a second newly formed Belgian entity, PIKco (and together with Equityco, the "<u>New Holding Companies</u>"). Equity (and warrants to subscribe to equity) in the New Holding Companies will be distributed to certain lenders of the Debtors pursuant to the Plan. Following the Effective Date of the Plan all Debtors, other than TAC, will be liquidated in accordance with the Plan. Several of the Non-Debtor Subsidiaries will also be merged or liquidated under the local law of their jurisdiction. The New Holding Companies will be the beneficial owners of the equity in Reorganized Truvo and the Non-Debtor Subsidiaries (together with Newco, Holdco, and the New Holding Companies, the "<u>Reorganized Truvo Group</u>"). The Debtors believe that the creditors of the Debtors will receive more value through the continuation of the Reorganized Truvo Group as a going concern than they would receive upon immediate liquidation of the Debtors.

The Debtors have reached agreement on the principal terms of the Plan, including term sheets comprehensively describing the debt and equity to be issued on the Effective Date and the governance of the Reorganized Truvo Group, with certain ~~Senior Lenders (the "Supporting Senior Lenders") who together hold~~ **creditors holding** approximately ~~80~~**87**% of the outstanding principal amount of the Senior Loans~~, and certain HY Noteholders~~ (the "<u>Supporting</u> ~~HY Noteholders") who together hold~~ **Senior**

---

[1] Unless otherwise indicated, all capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

**Lenders"), certain creditors holding** approximately ~~15~~**48**% of the outstanding principal amount of the HY Notes **(the "Supporting HY Noteholders") and certain creditors holding approximately 74% of the outstanding principal amount of the PIK Debt (the "Supporting PIK Lenders")**. The Supporting Senior Lenders ~~and~~**,** Supporting HY Noteholders ~~are party to a~~**and Supporting PIK Lenders have executed** plan support ~~agreement (the "Plan Support Agreement"), agreeing to vote to accept the Plan. In addition, the Supporting Senior Lenders and Supporting HY Noteholders holding approximately 44% of the outstanding principal amount of the PIK Debt have agreed to vote such PIK Debt Claims to accept the Plan.~~ **agreements, agreeing to vote their claims to accept the Plan, subject to certain terms and conditions, including without limitation Bankruptcy Court approval of the Disclosure Statement.** The Senior Agent and Security Agent are also signatories to ~~the Plan Support Agreement. Obligations of all parties under the Plan Support Agreement to vote to accept the Plan are subject to, among other conditions, Bankruptcy Court approval of a disclosure statement. A copy of the Plan Support Agreement was filed on the Petition Date~~**a plan support agreement. Copies of the plan support agreements have been filed with the Bankruptcy Court**.

Prior to the commencement of the Chapter 11 Cases, the Majority Lenders instructed, and shall further instruct through the Ballots, the Senior Agent to request that TAC sell its Equity Interests in TUSA pursuant to the Plan. Pursuant to Clause 22.4 of the Intercreditor Agreement, and subject to the satisfaction of the conditions set forth in the Plan and Plan Support Agreement, including the Security Agent's receipt of Instructions and the satisfaction of conditions set forth in Exhibit B to the Plan, on the Effective Date, the Security Agent shall release (a) TUSA and all of its subsidiaries (the "TUSA Group") from all past, present and future liabilities and/or obligations (both actual and contingent) as a borrower and/or guarantor of the whole of the Senior Debt (as defined in the Intercreditor Agreement) and High Yield Notes Guarantee Debt (as defined in the Intercreditor Agreement) (including any liability to any other member of the Truvo Group by way of guarantee or contribution), (b) all Security (as defined in the Intercreditor Agreement) granted by the TUSA Group over any assets under any of the Security Documents (as defined in the Intercreditor Agreement); and (c) the Security created pursuant to the Security Documents over the Equity Interests in TUSA (the release contemplated in paragraphs (a), (b) and (c) shall together constitute the "Release").

In addition, upon the Effective Date, the Debtors shall be discharged and released from the Claims and Liens arising under or related to the Senior Loans, HY Notes, and PIK Debt pursuant to the Plan. The Plan provides for a series of transactions, including the TUSA Sale, that will result in the Senior Lenders receiving (i) substantially all of the common shares of the New Holding Companies, and (ii) new debt instruments issued by Newco. In addition, those Senior Lenders that make certain elections will receive debt instruments issued by PIKco. In the event that the HY Noteholder Classes Accept the Plan, they will receive a pro rata share of (i) a €15 million cash distribution and (ii) warrants giving them the right to subscribe to equity in Equityco. In addition, if the HY Noteholder Classes and the PIK Lender Class both Accept the Plan, the PIK Lenders will receive warrants giving them the right to subscribe to equity in Equityco. Further, certain members of management will receive the MIP Equityco Ordinary Shares and the MIP Equityco Warrants.

More specifically, the Plan provides for the following distributions either on or after the Effective Date: (i) payment in full in Cash to Holders of (a) Allowed Administrative Expense Claims, (b) Allowed Priority Tax Claims, (c) Allowed Other Priority Claims and (d) Allowed Other Secured Claims; (ii) pro rata distribution to the Holders of Allowed Senior Debt Claims (as of the Distribution Record Date) of the (a) Senior Lender Equity Distribution, ~~and~~ (b) Senior Lender Debt Distribution**, and (c) MIP Equityco Warrants (for transfer to MIPco pursuant to the Management Incentive Plan)**; (iii) Pro Rata distribution to HY Noteholders of (a) the HY Noteholder Cash Distribution and (b) HY Noteholder Warrants, provided that the HY Noteholder Classes Accept the Plan; (iv) Pro Rata distribution to PIK Lenders of the PIK Lender Warrants, provided that the HY Noteholder Classes and the PIK Lender Class

Accept the Plan; and (v) Holders of Allowed General Unsecured Claims shall receive, either the (a) Pro Rata distribution of GUC Cash Allocation, provided that no such distribution shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim or (b) if such Allowed General Unsecured Claim is a Convenience Claim, Cash equal to the amount of such Allowed General Unsecured Claim or Cash equal to $30,000 if the aggregate amount of such Allowed General Unsecured Claim is in excess of $30,000.

This Disclosure Statement is being distributed pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors entitled to vote on the Plan in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [September 14**30, 2010**], 2010, at [10**9:00** a.m.], prevailing Eastern Time.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit 1);

- Prepetition Corporate Organizational Chart (Exhibit 2);

- The Debtors' Liquidation Analysis (Exhibit 3);

- Projected Financial Information (Exhibit 4); and

- Prepetition Intercreditor Agreement (Exhibit 5).

A Ballot for voting to accept or reject the Plan may be provided with this Disclosure Statement for the Holders of Claims that are entitled to vote to accept or reject the Plan. In addition, Senior Lenders entitled to vote on the Plan may be provided Instructions and Mandatory Transfer Certificates with their Ballots. If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call the Debtors' Voting Agent, Kurtzman Carson Consultants, at 877-660-6673 or 1-732-491-0413 (international).

To obtain additional copies of the Plan and/or the Disclosure Statement, please visit the Debtors' restructuring website at http://www.kccllc.net/truvo. Alternatively, copies are available for review at the Office of the Clerk, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 534, New York, New York 10004 or upon written request to the Voting Agent.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The order that, among other things, approved the Disclosure Statement sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to

confirmation of the Plan, the Voting Record Date and the applicable standards for tabulating the Ballots. Each Holder of a Claim entitled to vote on the Plan should read in their entirety this Disclosure Statement (including the Exhibits attached hereto), the Plan and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

**B.      Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan of reorganization are entitled to vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under the plan. Classes of claims or equity interests under a Chapter 11 plan in which the holders of claims or equity interests are unimpaired under a Chapter 11 plan are deemed to have accepted the proposed plan and are not entitled to vote to accept or reject the plan. In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property are deemed to have rejected a proposed plan and are not entitled to vote to accept or reject such plan.

In connection with the Plan:

- Classes 3C, 4C and 5C (Senior Debt Claims), 2D, 3D, 4D and 5D (HY Notes Claims), 2E (PIK Debt Claims), and 1F, 2F, 3F, 4F and 5F (General Unsecured Claims) are Impaired, and to the extent Claims in Classes 3C, 4C, 5C, 2D, 3D, 4D, 5D, 2E, 1F, 2F, 3F, 4F and 5F are Allowed Claims, the Holders of such Claims are entitled to vote to accept or reject the Plan.

- Classes 1A, 2A, 3A, 4A and 5A (Other Priority Claims) and 1B, 2B, 3B, 4B and 5B (Other Secured Claims) are unimpaired. As a result, Holders of Claims in those Classes are deemed to have Accepted the Plan and are not entitled to vote to accept or reject the Plan.

- Classes 1G, 2G, 3G, 4G and 5G (Statutorily Subordinated Claims) and 1H (Old Equity Interests) are Impaired and are deemed to have rejected the Plan. As a result, Holders of Claims and Equity Interests in those Classes are not entitled to vote to accept or reject the Plan.

ACCORDINGLY, A BALLOT TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3C, 4C, 5C, 2D, 3D, 4D, 5D, 2E, 1F, 2F, 3F, 4F and 5F.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For the purposes of the Plan and Disclosure Statement, Claims denominated in euros will be converted to U.S. dollars as described in the Plan. For a more detailed description of the requirements for confirmation of the Plan, see Article VI below.

Because Classes 1G, 2G, 3G, 4G, 5G and 1H are deemed to reject the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the Bankruptcy Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or equity interests votes to accept the plan. Under that section, a plan may be confirmed by a

bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article VI below.

For a summary of the treatment of each Class of Claims and Equity Interests, see Article II below.

**C.** **Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold more than one type of Claim (e.g., a Senior Debt Claim and a HY Notes Claim) and you are entitled to vote each such type of Claim, you will receive separate Ballots that must be used for each separate type of Claim. However, you will receive one Ballot for all Classes of each type of Claim (e.g., Holders of Senior Debt Claims will receive only one Ballot for Claims in Classes 3C, 4C and 5C and the Holders of HY Notes Claims will receive only one Ballot for Claims in Classes 2D, 3D, 4D and 5D) and will be required to vote the same way in each such Class. Please vote and return your Ballot(s). Notwithstanding the foregoing, General Unsecured Classes will receive a separate Ballot for each Class.

**If you received a Ballot from a broker, bank or other institution that has been "prevalidated" on your behalf, you must return such completed Ballot directly to the Voting Agent so it is received on or before the Voting Deadline. If you received a Ballot from a broker, bank or other institution that did not "prevalidate" it on your behalf, you must return such completed Ballot to such broker, bank or other institution promptly so that it can be forwarded to the Voting Agent so it is received on or before the Voting Deadline. If you received a Ballot from the Debtors, please send such completed Ballot directly to the Voting Agent so it is <u>actually received</u> on or before the Voting Deadline. All Ballots, with the exception of the Master Ballots (as defined in the Debtors' Solicitation Procedures Motion) for HY Notes Claims, sent to the Voting Agent should be sent by U.S. mail, overnight courier or hand delivery to the following address:**

> Truvo Processing
> c/o Kurtzman Carson Consultants
> 2335 Alaska Ave.
> El Segundo, CA 90245

Master Ballots for HY Notes Claims must be sent by U.S. mail, overnight courier or hand delivery to:

> Kurtzman Carson Consultants LLC
> Attn: Truvo Ballot Processing
> 599 Lexington Avenue, 39th Floor
> New York, NY 10022

DO NOT RETURN YOUR NOTES, ~~OLD EQUITY INTERESTS~~ OR ANY OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED, EXECUTED, MARKED AND <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT NO LATER THAN [4:00 PM] (prevailing Eastern Time) on

[September ~~3~~23], 2010 UNLESS EXTENDED BY THE DEBTORS. ALL BALLOTS MUST BE SIGNED.

The Bankruptcy Court set a date of [~~July 30~~**September 1**], 2010 as the record date (the "Voting Record Date") for voting on the Plan. Accordingly, only Holders of record as of the Voting Record Date or otherwise entitled to vote under the Plan, are entitled to receive a Ballot and may vote on the Plan. Each Senior Lender who is a lender of record under the Senior Facility Agreement and is voting to accept the Plan will be required to complete and execute a Mandatory Transfer Certificate attached as an appendix to the Senior Debt Claim Ballot. Further, a vote by a Senior Lender of record under the Senior Facility Agreement to accept the Plan will constitute irrevocably giving the Instructions to the Senior Agent and Security Agent. The Instructions include an agreement by such Senior Lender not to sell, pledge, hypothecate or otherwise transfer its Senior Debt Claims unless the transferee agrees to execute, as a condition to such transfer, the Instructions. Any transfer that does not comply with the foregoing will be void.

**In addition to the Release described in Section 5.1(a) of the Plan, all holders of Claims against the Debtors that vote to accept the Plan or fail to vote on the Plan shall be deemed to unconditionally and forever release the Released Parties as set forth in Section 10.2 of the Plan.**

## D. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [September ~~14~~**30**], 2010 at [~~10~~**9**:00 a.m.], prevailing Eastern Time, before the Honorable Arthur J. Gonzalez, United States Bankruptcy Court, One Bowling Green, New York, New York 10004 (the "Confirmation Hearing"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [September ~~3,~~**23,**] 2010 at [4:00 p.m], prevailing Eastern Time, in the manner described below in Section VI.B. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

IN ADDITION, THE SUPPORTING SENIOR LENDERS AND THE SUPPORTING HY NOTEHOLDERS SUPPORT THE PLAN AND RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

## E. Important Matters

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Consequently, actual events, circumstances, effects and results may vary significantly from those included in, or contemplated by, such projected financial information and such other forward-looking statements. The projected financial information contained herein and in the Exhibits annexed hereto is, therefore, not necessarily indicative of the future financial condition or results of operations of the Truvo Group or the Reorganized Truvo Group, which in each case may vary

significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, their advisors or any Person that the projected financial condition or results of operations can or will be achieved.

## II.
## SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recovery to all stakeholders and to enhance the financial viability of the Reorganized Truvo Group.

The following table classifies the Claims against, and Old Equity Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on rules set forth in the Bankruptcy Code. Finally, the table indicates the estimated recovery for each Class. **As described in Article IX below, the Truvo Group's businesses are subject to a number of risks. The uncertainties and risks related to the Reorganized Truvo Group make it difficult to determine a precise value for the Reorganized Truvo Group and the Plan Securities and other distributions under the Plan. The recoveries and estimates described in the following tables represent the Debtors' best estimates given the information available on the date of this Disclosure Statement and are based on the assumption that the HY Noteholder Classes and the PIK Lender Class each votes to accept the Plan. All statements in this Disclosure Statement as to the amount of Claims are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Claims Allowed by the Bankruptcy Court may vary significantly from these estimates.**

In connection with preparing the estimation of recoveries set forth herein, the following assumptions were made:

The ongoing enterprise value of the Reorganized Truvo Group for the purposes of the Plan, based on the valuation prepared by Houlihan Lokey Howard and Zukin (Europe) Limited ("Houlihan **Lokey**") and subject to the limitations set forth in Article VI.C.3, the Debtors' financial advisor, is approximately €496.2**523.7** million to €666.4**696.3** million.

- The aggregate Allowed amount of Administrative Expense Claims will be approximately $12 million to $24 million.

- The aggregate Allowed amount of unpaid Priority Tax Claims (including Secured Tax Claims) will be approximately $0.

- The aggregate Allowed amount of Other Priority Claims will be approximately $0.

- The aggregate Allowed amount of Other Secured Claims will be approximately $0.

- The aggregate Allowed amount of Senior Debt Claims will be approximately €777,624,505.73 plus accrued but unpaid interest, fees and expenses as of the Petition Date.

- The aggregate Allowed amount of HY Notes Claims will be (in U.S. dollars or U.S. Dollar Equivalent) the sum of approximately €395,000,000.00 and $200,000,000.00 plus accrued but unpaid interest, fees and expenses as of the Petition Date.

- The aggregate Allowed amount of PIK Debt Claims will be approximately €173,014,000.00**173,087,906.94** plus accrued but unpaid interest that has not been capitalized as of the Petition Date.

- The aggregate Allowed amount of General Unsecured Claims will be approximately $5,153**6,403.00**

The following table briefly summarizes the classification and treatment of Claims and Old Equity Interests under the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

[Remainder of page intentionally left blank]

| Class Description | Treatment | Voting Rights |
|---|---|---|
| Class: N/A<br><br>Administrative Expense Claims<br><br>Estimated Allowed Claims: $12 - $24 million | Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Administrative Expense Claim shall be paid in full by the Disbursing Agent, at its election, (i) in Cash, in such amounts as are incurred in the ordinary course of business by the Debtors, or in such amounts as such Administrative Expense Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which there is a Final Order allowing such Administrative Expense Claim, (ii) upon such other terms as may exist in the ordinary course of the Debtors' business or (iii) upon such other terms as may be agreed upon in writing between the Holder of such Administrative Expense Claim and the Disbursing Agent, in each case in full satisfaction, settlement, discharge and release of, such Administrative Expense Claim<br><br>Estimated Percentage Recovery: 100% | N/A |
| Class: N/A<br><br>Priority Tax Claims<br><br>Estimated Allowed Claims:<br><br>$0 | The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be paid in full by the Disbursing Agent, in full satisfaction, settlement, discharge and release of, such Allowed Priority Tax Claim, at the election of the Disbursing Agent (a) in Cash equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (c) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code. On the Effective Date, the Liens securing such Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>Estimated Percentage Recovery: 100% | N/A |

| Class Description | Treatment | Voting Rights |
|---|---|---|
| Classes 1A, 2A, 3A, 4A, 5A:<br><br>Other Priority Claims<br><br>Estimated Allowed Claims:<br><br>$0 | The legal, equitable and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claims becomes an Allowed Other Priority Claims, each Holder of an Allowed Other Priority Claims shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Other Priority Claim, at the election of the Disbursing Agent: (x) Cash equal to the amount of such Allowed Priority Other Priority Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Other Priority Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.<br><br>Any Cash paid to Allowed Class 1A, 2A, and 3A Claims shall be funded from (1) the Cash held by the applicable Debtor as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided under the Plan, from the Additional Cash Allocation<br><br>Estimated Percentage Recovery: 100% | Deemed to Accept |
| Classes 1B, 2B, 3B, 4B, 5B:<br><br>Other Secured Claims<br><br>Estimated Allowed Claims:<br><br>$0 | The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Other Secured Claim is an Allowed Other Secured Claim on the Effective Date or (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Other Secured Claim, at the election of the Disbursing Agent: (x) Cash equal to the amount of such Allowed Other Secured Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Other Secured Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code. On the Effective Date, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>Any Cash paid to Allowed Class 1B, 2B, and 3B Claims shall be funded from (1) the Cash held by the applicable Debtor as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided | Deemed to Accept |

| Class Description | Treatment | Voting Rights |
|---|---|---|
| | under the Plan, from the Additional Cash Allocation.<br><br>Estimated Percentage Recovery: 100% | |
| Classes 3C, 4C, 5C:<br><br>Senior Debt Claims<br><br>Estimated Allowed Claims:<br><br>€777,624,505.73, plus accrued but unpaid interest and any unpaid fees and expenses owed pursuant to the Senior Facility Agreement | On the Effective Date, pursuant to, and upon consummation of, the transactions contemplated in Section 5.3(e) of the Plan (x) each Holder of an Allowed Senior Debt Claim (as of the Distribution Record Date) shall, by transferring its Senior Debt Claims against TAC to Newco, receive in exchange for its Senior Debt Claims against TAC, (1) the Senior Lender Debt Distribution (to be received in the form of the Facility 1 Distribution or Facility 2 Distribution, as applicable) and (2) the Senior Lender Equity Distribution (in the form of the Equityco Distribution and/or the PIKco Distribution, at the Election of the Senior Lender), and (3) the MIP Equityco Warrants (for transfer to MIPco pursuant to the Management Incentive Plan); and (y) the Senior Agent shall (1) receive the proceeds of the TUSA Sale, and (2) distribute such proceeds to Newco (or as Newco directs) as the transferee of, and in full satisfaction, settlement, discharge and release of, the Senior Debt Claims against TAC.<br><br>A vote in favor of the Plan by a Senior Lender which is a lender of record on the date of such vote shall expressly constitute (as set out in the Ballot) an instruction to the Senior Agent and Security Agent to take all actions set out in the Instructions. Upon the occurrence of the Confirmation Date, and without further action by or order of the Bankruptcy Court, (1) the Senior Agent and Security Agent shall be authorized to take (x) all actions contemplated by the Instructions; and (y) any other steps that the Senior Agent or the Security Agent may be instructed to take for the purposes of implementing the Plan, in each case subject to the requisite majorities being obtained for purposes of the Senior Finance Documents, and (2) TAC shall be authorized to serve as proxy to act on behalf of all Holders of Senior Debt Claims (whether or not any such Holder voted in favor of the Plan) in connection with the transactions described in Sections 5.3(e) and 5.10(d) of the Plan but, for the avoidance of doubt, not in relation to the execution of Mandatory Transfer Certificates.<br><br>The consideration provided under the Plan shall be the sole source of recovery for the Holders of the Allowed Senior Debt Claims, in respect of both Debtors and Non-Debtor Subsidiaries.<br><br>On the Effective Date, (1) Senior Debt Claims (other than Claims arising on or after the Effective Date in connection with any of the Restructuring Documents) against TUSA or any Non-Debtor Subsidiary, and the Liens of Senior Lenders granted by TAC on the TUSA Equity Interests, shall, to the | Entitled to Vote |

| Class Description | Treatment | Voting Rights |
|---|---|---|
| | extent of the Release, be extinguished, and (2) the Holders of Senior Debt Claims shall be enjoined from taking any action against any Debtor or Non-Debtor Subsidiary on account of any Senior Debt Claim.<br><br>Estimated Percentage Recovery: ~~63.8~~**67.2**% - ~~84.1~~**87.5**% | |
| Classes 2D, 3D, 4D, 5D: HY Notes Claims<br><br>Estimated Allowed Claims: The sum of €395,000,000.00 and $200,000,000.00 plus accrued but unpaid interest (in U.S. dollars or U.S. Dollar Equivalent). | If the HY Noteholder Classes vote to Accept the Plan, on, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed HY Notes Claim shall receive, in full satisfaction, settlement, discharge, and release of, the HY Notes Claims, (1) a Pro Rata share of the HY Noteholder Cash Distribution, and (2) a Pro Rata share of the HY Noteholder Warrants.<br><br>If the HY Noteholder Classes do not vote to Accept the Plan, Holders of Allowed HY Notes Claims shall not be entitled to any distributions under the Plan.<br><br>The distributions provided to Holders of Allowed HY Notes Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.<br><br>If the HY Noteholder Classes vote to Accept the Plan, TAC shall, upon the occurrence of the Confirmation Date, and without further action by or order of the Bankruptcy Court, be authorized to serve as proxy to act on behalf all Holders of HY Notes Claims (whether or not any such Holder voted in favor of the Plan) in connection with the transactions described in Section 5.3(e) of the Plan.<br><br>The consideration provided under the Plan shall be the sole source of recovery for the HY Notes Claims in respect of both Debtors and Non-Debtor Subsidiaries.<br><br>On the Effective Date, (1) HY Notes Claims of HY Noteholders (other than Claims arising on or after the Effective Date in connection with any of the Restructuring Documents) against TUSA or any Non-Debtor Subsidiary, and the Liens granted by TAC on the TUSA Equity Interests, shall, to the extent of the Release, be extinguished, and (2) the Holders of HY Notes Claims thereof shall be enjoined from taking any action against any Debtor or Non-Debtor Subsidiary on account of any HY Notes Claim.<br><br>Estimated Percentage Recovery if the HY Noteholder Classes vote to Accept the Plan: 2.8% - ~~4.8~~**5.4**%<br><br>Estimated Percentage Recovery if the HY Noteholder Classes | Entitled to Vote |

| Class Description | Treatment | Voting Rights |
|---|---|---|
| | does not vote to Accept the Plan: 0% | |
| Class 2E:<br><br>PIK Loans Claims<br><br>Estimated Allowed Claims:<br><br>€~~173,014,000.00~~**173,087,906.94,** plus accrued but unpaid interest | If the HY Noteholder Classes and the PIK Lender Class vote to Accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed PIK Debt Claim shall receive a Pro Rata share of the PIK Lender Warrants in full satisfaction, settlement, discharge and release of, all Allowed PIK Debt Claims.<br><br>If the HY Noteholder Classes and/or the PIK Lender Class do not vote to Accept the Plan, Holders of Allowed PIK Debt Claims shall not be entitled to any distributions under the Plan.<br><br>The distributions provided to Holders of Allowed PIK Debt Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.<br><br>Estimated Percentage Recovery if the HY Noteholder Classes and the PIK Lender Class vote to Accept the Plan: 0.0% - ~~0.5~~**0.7**%<br><br>Estimated Percentage Recovery if the HY Noteholder Classes and the PIK Lender Class does not vote to Accept the Plan: 0% | Entitled to Vote |
| Classes 1F, 2F, 3F, 4F, 5F:<br><br>General Unsecured Claims<br><br>Estimated Allowed Claims:<br><br>~~$5,153~~**$6,403.00** | Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such General Unsecured Claim is Allowed on the Effective Date or otherwise the date on which such General Unsecured Claim is becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, as made on its Ballot, (x) if such Allowed General Unsecured Claim is a Convenience Claim, Cash equal to the amount of such Allowed General Unsecured Claim or Cash equal to $30,000 if the aggregate amount of such Allowed General Unsecured Claim is in excess of $30,000 or (y) if such Allowed General Unsecured Claim is not a Convenience Claim, a Pro Rata share of the GUC Cash Allocation; provided, however, that no such distribution under the foregoing clause (y) shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim.<br><br>The distributions provided to Holders of Allowed General Unsecured Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.<br><br>Estimated Percentage Recovery: 50% - 100% | Entitled to Vote |

| Class Description | Treatment | Voting Rights |
|---|---|---|
| Classes 1G, 2G, 3G, 4G, 5G<br><br>Statutory Subordinated Claims<br><br>Estimated Allowed Claims:<br><br>$0 | Holders of Allowed Statutory Subordinated Claims shall not receive or retain any distribution or property on account of such Allowed Statutory Subordinated Claims.<br><br>Estimated Percentage Recovery: 0% | Deemed to Reject the Plan. |
| Class 1H:<br><br>Old Equity Interests | Holders of Old Equity Interests shall not receive or retain any distribution or property on account of such Old Equity Interests. On the Effective Date, all Old Equity Interests shall be cancelled.<br><br>Estimated Percentage Recovery: 0% | Deemed to Reject the Plan. |

## III.
## BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 FILING

**A.      The Debtors' Business**

   1. *Business Overview*

    i  Description of the Debtors' Business

   The Debtors are the holding companies for an international group of related companies known as the Truvo Group.  The Truvo Group, through its operating companies outside of the United States (the "Operating Subsidiaries"), is a multinational provider of local search and advertising services, with a primary focus on publishing printed and online directories.  These Operating Subsidiaries are leaders in the local search and advertising market, with key local markets in Belgium, Ireland and, through a joint venture, Portugal.  The Truvo Group also has significant, non-controlling equity interests in leading directory companies operating in South Africa and Puerto Rico.  The Operating Subsidiaries' main source of revenue is the sale of advertising space in their print and online media products.  The Truvo Group has over 1,700 full-time employees outside the United States.

   The Truvo Group has more than 40 years of experience in the print directory business and has consistently held leading positions in the markets in which they operate.  Currently, it offers a range of local commercial search and advertising products, including print, online, voice and mobile services.  Its products constitute the preferred form of advertising for the small and medium size enterprises in its markets, in large part because directory advertising represents one of the most cost-effective advertising vehicles for such enterprises and it has been one of a limited number of providers of directory advertising in its markets. As a result, the Truvo Group has achieved strong customer loyalty evidenced by industry leading annual customer retention rates across the regions in which it operates. However, the Truvo Group's customer retention rates have begun to decline as new forms of media have increased options available to its customers and as a result of the worldwide economic slowdown which caused a concomitant decline in funds spent on advertising by customers and potential customers of the Truvo Group.

   The Operating Subsidiaries' main source of revenue is the sale of advertising space in their print and online media products, with a focus on small and medium size enterprises.  These customers depend on the Truvo Group's products as a cost-effective vehicle for branding and advertising in the markets

where the Operating Subsidiaries do business. The Debtors themselves have no employees or business operations and generate only limited revenues. Instead, the Debtors depend on the Operating Subsidiaries to generate revenue and pay debt service. The Operating Subsidiaries have not sought protection under Chapter 11 or any other insolvency regime.

In response to changing market conditions, the Operating Subsidiaries are transforming from a print-centric directories business to a multi-product business with a focus on Internet-based services and local search and advertising products. While paper-based products have historically accounted for the majority of the Operating Subsidiaries' revenues, an increasing number of online and other products are being offered to capitalize on the growing electronic commercial market. Between 2008 and 2009, revenues derived from online media operations increased from 26.8% to 35.8% of the Truvo Group's net operating revenues. Almost half of the Operating Subsidiaries' advertisers now also advertise online, and their online services account for a significant percentage of total local Internet searches by users across Belgium, Portugal and Ireland. While revenues generated by the Operating Subsidiaries' online products have increased, their growth has not been sufficient to offset declines in their traditional print business.

Since 2004, the Debtors have been privately owned by Truvo Luxembourg S.à r.l ("Truvo Luxembourg"), which is not a Debtor in these Chapter 11 proceedings. Substantially all of the equity in Truvo Luxembourg is owned by funds advised by Apax Partners Worldwide LLP ("Apax") and Cinven Limited ("Cinven"). In addition, certain members of the Truvo Group's current and former management hold minority interests in Truvo Luxembourg. In connection with the purchase of the Truvo Group by its current owners in 2004, and a refinancing of the PIK Loans and Senior Facility that occurred in 2007, the Truvo Group incurred, and currently has outstanding, a substantial amount of debt relative to its earnings.

The Truvo Group is approximately 11 times levered and is required to make cash interest payments totaling approximately €77 million per year. Since 2007, revenues have continued to decline. Current and forecasted revenues are insufficient to service these obligations. In light of the Truvo Group's financial situation, in March 2010 the independent auditor's report to the Truvo Group's shareholders stated that the going concern of the Truvo Group depended on the outcome of the debt restructuring and that the auditor was unable to provide an opinion that the financial statements for the year ended December 31, 2009 gave a fair and true view of the Truvo Group's financial position. The Debtors believe that the Plan represents the best prospect for restructuring the Truvo Group's balance sheet, maximizing recovery for the creditors and allowing its current workforce and management to continue implementing the business plan for the benefit of the new shareholders.

ii    Products

The Operating Subsidiaries provide a variety of products and services that enable consumers to find local products and services and assist advertisers in reaching such consumers. The Operating Subsidiaries' primary product continues to be print directories, which generated approximately 64.2% of the Truvo Group's net operating revenues in 2009. During that year, the Operating Subsidiaries published 102 directories (excluding local and specialty directories) and distributed approximately 11.2 million copies of their yellow pages and combined yellow and white pages directories to business and residential users in their markets. The Operating Subsidiaries operate more than twenty websites offering local search and advertising information to online audiences in their markets. Almost all of the Operating Subsidiaries' products are provided free to end-users, with revenues generated by the sale of advertising. The following chart provides a summary of the products offered by the Operating Subsidiaries.

| Summary of the Operating Subsidiaries' product and service offerings | | | |
|---|---|---|---|
| Product type | Description | Brands | Markets |
| Yellow pages | Print and online classified directories providing listings of local businesses. | Golden Pages, Gouden Gids, Pages d'Or, Páginas Amarelas | Belgium Ireland Portugal |
| White pages | Print and online alphabetical, residential and business directories. | Eircom Phonebook, Witte Gids, Pages Blanches, Páginas Brancas | Belgium Ireland Portugal |
| Local | City and neighborhood printed directories | Zoom, The Local Golden Pages | Belgium Ireland Portugal |
| Specialty | Print directories focused on a particular topic (i.e., business to business, tourist guides, local guide for travelers on the move, seasonal promotional cards, directories printed in Braille) | Páginas Amarelas Turísticas do Algarve, Mobilo, Bouwbijbel, Páginas Amarelas de Concelhos | Belgium Portugal |
| Companion guides | Smaller printed golden pages directories to complement the core golden pages directories | Mobilo, Páginas Amarelas de Bolso | Portugal |
| Operator assisted golden pages | Call center operated service that provides both classified and alphabetical directory information | | Belgium Ireland Portugal |
| Vertical guides | Specialized verticals for specific types of listings | | Belgium Portugal |
| Mobile | Classified and alphabetical listings accessible on mobile handsets | | Belgium Ireland Portugal |
| Search engine marketing | Search engine advertising and search engine optimization services | Truvo, Wiselinks | Belgium Ireland Portugal |
| Direct marketing | Sales of databases for use in direct marketing | Datasell | Belgium Portugal |
| User generated content sites | Community sites for users to exchange experiences and favorite places, shops and restaurants | Truvo.com, Truvo.ie, Truvo.pt | Belgium Ireland Portugal |
| Templated websites | Provision of self-serviced, content-rich and search-engine-optimized websites | Mysite | Belgium Ireland Portugal |

The Debtors anticipate that the Operating Subsidiaries and the Reorganized Truvo Group will introduce a series of new products in the near to medium term. Those products are described in Section III.I below.

**B.    Corporate History and Structure**

TUSA was founded in 1966 by ITT Corporation and The Berry Company. It began operations in Puerto Rico, started publishing and distributing directories in Belgium and Ireland in 1969 and entered The Netherlands, Portugal and South Africa in 1970. Since its inception, the Truvo Group has worked on

behalf of more than 20 telephone companies as an agent providing directory products. Over time, the relationship between the Truvo Group and the telephone companies it maintains relationships with has evolved from agency agreements to either joint ventures or contractual service relationships.

The Truvo Group was purchased by the VNU group (now known as The Nielsen Company B.V.) ("VNU") in 1998. In 2004, TAC, an indirect subsidiary of funds advised by Cinven and Apax Partners, purchased TUSA (the "2004 Acquisition"). Then, as now, TUSA was a holding company that owned, directly and indirectly, operating subsidiaries and other income generating assets of the Truvo Group. Other than TUSA, each of the Debtors was incorporated in Delaware during September 2004 in connection with the 2004 Acquisition. TUSA was incorporated in Delaware in 1966 and converted into a Delaware Limited Liability Company on June 28, 2010.

The Truvo Group sold its operations in the Netherlands in 2008 through the sale of a subsidiary, Gouden Gids B.V., ("Gouden Gids") though it still controls several Dutch entities that do not generate revenues. The Truvo Group holds one of the two seats on the board of directors of Stichting YPIP ("YPIP"), a Dutch trust-like vehicle created in connection with the sale of the Truvo Group's operations in the Netherlands. The other seat on YPIP's board of directors is controlled by De Telefoongids Holding B.V., an affiliate of the purchaser of Gouden Gids. Stichting YPIP holds certain intellectual property used by both Truvo Belgium and Gouden Gids for use in their respective territories, and licenses that intellectual property to Truvo Belgium and Gouden Gids on a perpetual and royalty-free basis.

In May 2010, the Truvo Group closed the sale of its controlling interest in Pagini Aurii, a joint venture with the incumbent Romanian telephone operator that functioned as the leading directory service provider in Romania. Pagini Aurii did not materially contribute to the Truvo Group's financial results and had a negative EBITDA in 2009. The Truvo Group received nominal consideration for its sale.

The below table summarizes the primary assets of each of the Debtors.

| DEBTOR | PRIMARY ASSETS |
|---|---|
| Truvo Parent | 100% of the equity in PIK Borrower and certain intercompany debt obligations |
| PIK Borrower (Truvo Intermediate LLC) | 100% of the equity in HY Notes Issuer and certain intercompany debt obligations |
| HY Notes Issuer (Truvo Subsidiary Corp.) | 100% of the equity of TAC and certain intercompany debt obligations |
| TAC | 100% of the equity of TUSA and certain intercompany debt obligations |
| TUSA | 100% of the equity of Truvo Belgium (except for a de minimis number of shares owned by Truvo Information Holdings LLC), 100% of the equity of Truvo Information Holdings LLC and Truvo Media Holdings LLC, 40% of the equity in a leading directory publisher in Puerto Rico and certain intercompany debt obligations. |

Truvo Belgium Comm. V ("Truvo Belgium") holds, directly and indirectly, 100% of the equity of the other Non-Debtor Subsidiaries, excluding Páginas Amarelas S.A. ("Paginas Amarelas"), Trudon (as defined herein), Axesa and Truvo Nederland B.V.[2] ("Truvo Nederland"). As set forth in the corporate

---

[2] Less than 1% of the shares of Truvo Nederland are owned by former employees. The Truvo Group does not have a record of the identity of those holders.

organization chart attached hereto as _Exhibit 2_, the Debtors have twenty-one subsidiaries (including Páginas Amarelas) as well as minority interests in Trudon and Axesa.

Equity of the Truvo Group is not publicly traded. As of the Petition Date, all outstanding equity of the Truvo Group (except for Truvo Nederland, Páginas Amarelas, Trudon and Axesa) was, directly and indirectly, beneficially owned by funds advised by Apax and Cinven and certain members of its current and former management.

## C. Markets

### 1. _Belgium_

#### i  General Description

Truvo Belgium is the leading local search and directory advertising company in Belgium. It accounted for approximately 82.9% of the Truvo Group's EBITDA in 2009. Between fall 2008 and fall 2009, Truvo Belgium had a large and diversified advertiser base of 97,032 accounts, most of which are small and medium size businesses, and enjoyed a customer retention rate of 79.5%.

All of Truvo Belgium's major competitors exited the printed directory market by 2002. Today, Truvo Belgium competes with a number of smaller local directory companies and, on the national level, faces competition mainly from some niche online providers and other entities that provide "freesheets" like media products both on paper and over the Internet. Major search engines (e.g., Google) are also present on the Belgian online advertising market, offering additional competition. However, Truvo Belgium retains a dominant market position in printed directories and has a growing share of the market for the Internet-based services they provide.

#### ii  Key Relationships

Under Belgian law, Belgacom, Belgium's designated universal service provider ("Belgacom"), is currently designated pursuant to applicable legislation as the universal service provider responsible for the publication of a directory providing access to all residents and businesses. Belgacom has entered into a cooperation agreement with Truvo Belgium to publish that universal directory. That agreement also governs (i) the supply of subscriber data from Belgacom to Truvo Belgium and certain other services and (ii) the terms under which Belgacom acts, and is remunerated, as an agent for Truvo Belgium with regard to the sales of certain listings and certain advertising insertions in Truvo Belgium's white pages directories. For the fiscal year 2009, the database fee paid by Truvo Belgium to Belgacom was €3.3 million and the agency commission was €2.4 million.

See Risk Factor: IX.H.21 for a discussion of changes in how the publisher of a universal directory in Belgium will be selected, changes to the rules governing the universal directory and the potential effect of such changes on the Truvo Group.

#### iii  Products

##### (a)  Online

Truvo Belgium has one of the leading online directory businesses in Belgium, which contributed 38.6% of its operating revenues in 2009. The search engines available on Truvo Belgium's websites permit users to retrieve information by entering either basic or advanced search criteria. In addition, its websites provide street maps for locating addresses and performing searches on maps (via certain

websites), as well as a route finder for planning journeys, and links to advertisers' websites. Users can also post ratings and reviews on the majority of companies listed as well as share these reviews on their profiles on certain social networks and via other third party communications tools.

(b)     Print Products

Truvo Belgium's print products have a core circulation (defined as the number of addresses that receive a yellow pages book or a combined yellow/white pages book) of approximately 3.6 million annually and contributed 61.4% of Truvo Belgium's total net operating revenues in 2009. Truvo Belgium annually publishes 10 regional yellow pages directories under the trade names *Gouden Gids/Pages d'Or* and 19 regional white pages directories under the trade names *Witte Gids/Pages Blanches* throughout Belgium. Truvo Belgium also publishes 26 local guides in Dutch and French under the trade name *Zoom* and 2 pocket guides targeted to mobile people under the trade name *Mobilo*. *Gouden Gids/Pages d'Or* contain information and advertisements on businesses located in Belgium. Each edition of *Gouden Gids/Pages d'Or* includes an introductory section that contains local and regional information on, and addresses and telephone numbers for, a wide range of public services, government ministries and consumer information, as well as coupons and a separate restaurant section.

*Gouden Gids/Pages d'Or* had approximately 2.8 million unique monthly users during 2009. Five of Truvo Belgium's ten yellow pages directories generated more than €10 million of revenues in 2009, with the Brussels edition alone contributing approximately 19% of Truvo Belgium's print revenues. *Witte Gids/Pages Blanches*, the white pages directory published by Truvo Belgium, contains listings of all fixed-line telephone subscribers (other than those who have opted out of the directory) and mobile telephone users who have requested to have their phone numbers included. Each edition contains an introductory section that provides information about telephone services, call rates, telecommunication operators and the Institute for Postal Services and Telecommunications, the Belgian telecommunications regulatory agency. *Witte Gids/Pages Blanches* had approximately 3.2 million unique users per month in 2009. Each local directory contains both an informational section created in collaboration with local administrative authorities that contains, organized under alphabetically arranged headings, information on local cities, towns and the region. In 2009, Truvo Belgium's local guides generated approximately 1.0 million unique users.

Please see Section IX.H.21 for certain risks related to Truvo Belgium's print products.

(c)     Other search products and services

Truvo Belgium provides operator-assisted yellow pages that allow users to consult all the categories of *Gouden Gids/Pages d'Or* in Dutch, French or English. That service is available 24 hours a day, 7 days a week to both mobile and fixed-line telephone users. In 2009, Truvo Belgium's operator-assisted yellow pages received an average of 6,024 calls per day. Truvo Belgium also delivers *Gouden Gids/Pages d'Or* to mobile phone handsets through the use of many mobile technologies, such as "Vodafone Live" and Apple's iPhone, and cooperation with every mobile operator offering those platforms. These mobile sites are available on all devices with Internet access. Truvo Belgium has also developed and launched an application for Apple's iPhone and has begun developing and commercializing applications for various other "smartphone" platforms.

Truvo Belgium offers search engine management services to a segment of its advertisers. These services are supported by a specialized back office staff that optimizes advertisers' presence on the web, outside of the directory space. Truvo Belgium recently expanded its offerings in online advertising solutions by selling targeted advertisements on several platforms and websites. It has entered into exclusive partnerships with Microsoft Advertising, Netlog and Beweb. As a result, its customers are able

to advertise on platforms such as Microsoft Hotmail, MSN, Live Messenger, Netlog as well as newspaper and magazine sites in the Beweb portfolio.

### 2. *Ireland*

#### i    General Description

Truvo Ireland Ltd. ("Truvo Ireland") is a leading local search and directory advertising company in Ireland. Truvo Ireland generated approximately 14.2% of the Truvo Group's EBITDA in 2009. Between fall 2008 and fall 2009, Truvo Ireland had approximately 25,250 unique customers and an annual customer retention rate of 75.0%.

Truvo Ireland has a strong position in the Irish printed directory market, though it does face competition. For example, Truvo Ireland's largest competitor, an entity known as Independent Directory, has an estimated 13% share of the funds spent on directory advertising in the Dublin area (the largest market in Ireland). GoldenPages.ie, the Truvo Group's primary online portal in Ireland, competes with a number of local Internet-based directories and with Google, Yahoo and MSN. In addition, Truvo Ireland competes for advertising revenues with local media companies, especially local radio stations and the regional press, both of which have targeted the market segment of small and medium size enterprises in response to the recent deregulation of Ireland's radio industry.

#### ii    Key Relationships

As Ireland's designated universal service provider, eircom has a statutory obligation to publish and distribute Ireland's universal services telephone directory for both business and residential listings (the "eircom Phone Book"). Pursuant to an agreement with eircom for the calendar years 2007 to 2013, and in return for the payment of a publishing rights fee to eircom, Truvo Ireland has undertaken the production and distribution of the eircom Phone Book and secured the rights to sell advertisements in its pages.

#### iii    Products

##### (a)    Online

Online products and services contributed 14.7% of Truvo Ireland's net operating revenues in 2009. During 2009, Internet users conducted over 16 million searches on Truvo Ireland's website: www.GoldenPages.ie. Truvo Ireland launched mobile electronic pages (m.goldenpages.ie) in early 2009 and pursuant to a production agreement with eircom, manages and sells advertising on www.eircomphonebook.ie. As Internet users in Ireland subscribe to broadband services in increasing numbers, Truvo Ireland expects to benefit from an increase in revenues generated from advertising on its website. Currently 35% of Truvo Ireland's advertisers have purchased advertising on Truvo Ireland's website. Truvo Ireland intends to focus its sales and marketing efforts on increasing online advertiser penetration and Internet revenues. The provision of new services for small and medium size enterprises in Ireland, including the creation of proprietary websites for such entities, is expected to be a significant driver of future growth. The potential market is significant, the Debtors estimate that 40% of small and medium size enterprises in Ireland do not have a website.

##### (b)    Print

The Golden Pages Classified Directory (the "Classified Directory") is Ireland's incumbent classified directory and contains information on approximately 160,000 businesses nationwide, organized

by over 2,000 classifications. The six regional print editions of the Classified Directory had a core circulation of approximately 1.8 million copies. The Dublin edition contributed 50.5% of the revenues generated by the classified directories in 2009. The eircom Phonebook, published by Truvo Ireland, is a readily available source in Ireland for information on international and local access codes, emergency telephone numbers, government agencies, city councils and other municipal and non-governmental organizations. In addition, Truvo Ireland publishes four local directories (Louth, Meath, Kildare and Wicklow). Overall, print products contributed 85.3% of Truvo Ireland's net operating revenues in 2009.

3.    *Portugal*

The Truvo Group has entered into a joint venture, Páginas Amarelas, with Portugal Telecom S.A. ("Portugal Telecom") for the provision of directory and search products in Portugal. In 2009, Páginas Amarelas was responsible for approximately 2.8% of the EBITDA of the Truvo Group. The Truvo Group holds 50% of the voting power of the joint venture and has an economic interest entitling it to approximately 75% of the dividends distributed by Páginas Amarelas. Páginas Amarelas has entered into a credit facility agreement with certain lenders, under which €25.4 million was outstanding as of May 31, 2010. That credit facility expires on April 30, 2013 and is unrelated to debt of the Debtors.

Páginas Amarelas holds a dominant position in the printed directory market in Portugal. It publishes 23 printed directories annually with a core circulation of 4.5 million copies. In 2009, its yellow pages were used by 43% of the adult population, while its white pages have a regular user base of approximately 14% of the Portuguese adult population. Other print products produced by Páginas Amarelas include specialized and local directories and a tourist guide. Print products created by Páginas Amarelas face competition principally from one major competitor, a company known as Guião that offers print and online directories focused primarily on the business-to-business market.

Páginas Amarelas also provides a series of online services, including white and yellow pages and a number of specialty directory sites. Its yellow pages site provides Internet users with information on approximately 440,000 companies in Portugal and had approximately 223,850 monthly visits in 2009. Internet products contributed approximately 46.9% of Páginas Amarelas net operating revenues in 2009, an increase of roughly ten percentage points over the prior year. Páginas Amarelas also offers other products for mobile users and sells information from its database to marketing companies.

As with other subsidiaries of the Debtors, Páginas Amarelas primarily generates revenue through the sale of advertising. It utilizes multiple commercial models, including pay-per-inclusion models and newer pay-for-performance[3] models. Those newer models accounted for 9.3% of its 2009 operating revenues.

4.    *Joint Ventures in South Africa and Puerto Rico*

The Truvo Group owns a significant percentage of the equity in leading local search and directory companies in South Africa and Puerto Rico. In South Africa, the Truvo Group has invested in a joint venture known as Trudon (Pty) Ltd. ("Trudon") with Telkom S.A. Ltd. ("Telkom"), South Africa's incumbent telephone operator. The Truvo Group's Puerto Rican joint venture is known as Axesa Servicios de Información S. en C. and was entered into with Caribe Media Inc., which is owned by Local Insight Media Holdings, Inc. ("Axesa **S. en. C.**") The Truvo Group holds 35.1% of the equity in Trudon and 39.6% of the equity in Axesa **S. en. C.,** as well as 40% of the equity in Axesa Servicios de Information Inc. ("Axesa GP"), Axesa **S. en. C.,**'s general partner **(and together with Axesa S. en. C., "Axesa")**, which owns 1% of the equity in Axesa **S. en. C.** In 2009, the Truvo Group received dividends

_____

[3] Pay-for-performance pricing is a model in which the advertiser is paying for the contacts received through its advertising program.

in the amount of €8.6 million from Trudon.  The Truvo Group received dividends of €2.5 million from Axesa in 2009.

Telkom has appointed Trudon to produce its white and yellow pages directories for the South African market. The Truvo Group receives a 3.5% royalty on the net revenues of Trudon. As the majority owner of Trudon, Telkom has the right to appoint the majority of Trudon's board of directors; however, there are a number of matters that require approval by either 75% of the shareholders or 75% of the board of directors, giving the Truvo Group a blocking right over certain material matters.  The Truvo Group's ability to sell its interest in Trudon is subject to certain restrictions, and it may be called upon to either transfer some or all of its interest or to make further capital contributions.  Its interest may be diluted if it fails to make the requested contributions.

Axesa is the leading directory publisher in Puerto Rico.  Truvo Belgium has entered into an advisory agreement with Axesa  (the "<u>Advisory Agreement</u>") under which Truvo Belgium receives 4% of Axesa's gross advertising revenues (plus fees and costs) in exchange for providing Axesa with the advice and assistance that Axesa deems necessary to perform its various business activities.  TUSA receives dividends generated by Axesa. The Truvo Group is under no obligation to invest further capital in Axesa, but its interest may be diluted if it fails to make contributions requested by Axesa GP.  There are certain restrictions on the Truvo Group's ability to transfer its interest in Axesa.

Please see Section IX.H.21 for certain risks related to the Advisory Agreement.

**D.    Employees**

The Debtors have no employees, though each Debtor has corporate directors (managers for PIK Borrower and TUSA) and officers. Personnel costs for the Truvo Group totaled 40.9% of net operating revenues in 2009.  The number of employees the Truvo Group had in each major market in which they currently operate, as of the end of 2009, is described in the table below:

| Market | Weighted Average Number of Employees in 2009[4] |
|---|---|
| Belgium | 632 |
| Ireland | 246 |
| Portugal | 489 |

In conjunction with its efforts to transition away from dependence on printed products, the Truvo Group has begun to restructure its workforce. It has increased its focus on using telephone contacts, rather than in person meetings, to contact advertisers. Further, the Truvo Group has created a training program intended to increase employees' knowledge of and proficiency with forms of new media and to provide each employee with the skills needed to allow them to perform as the Truvo Group increases its emphasis on online and mobile products.  In doing so, the Truvo Group has been able to minimize dependence on redundancies to restructure its workforce.

**E.    Summary of Prepetition Indebtedness**

1.    *Senior Financing*

In 2007, TAC and certain other members of the Truvo Group entered into a €1.025 billion senior secured credit facility agreement with J.P. Morgan Europe Limited, as facility agent and security agent, which facility was funded by a group of international financial institutions.  The Truvo Group entered into the Senior Facility Agreement to fully refinance a then-outstanding senior credit facility entered into

---

[4] Weighted by full time equivalent.

in 2004. All borrowings under the Senior Facility Agreement were made by certain Non-Debtor Subsidiaries. The Senior Facility Agreement included a €50 million revolving facility (the "Revolving Facility") made available to Truvo Services & Technology B.V. ("Truvo Services & Technology"), a Non-Debtor Subsidiary. The Revolving Facility was cancelled pursuant to a notice from the Debtors and the Non-Debtor Subsidiaries given to the Senior Agent under the Plan Support Agreement. As described in Section III.E.6, the Senior Lenders benefit from certain express contractual and structural subordination and turnover provisions set forth in the Intercreditor Agreement.

In 2009, the Truvo Group repaid €140 million of the principal owed under the Senior Loans from proceeds of the sale of its operations in the Netherlands,[5] described in Section III.B. As of the Petition Date, approximately €777.6 million, plus accrued interest, was outstanding under the Senior Facility Agreement, and the Truvo Group was current on all its obligations thereunder.

Certain Non-Debtor Subsidiaries have guaranteed and/or pledged their assets and granted security interests to secure the relevant Truvo Group obligations under the Senior Facility Agreement. In addition, TAC and TUSA are guarantors of the obligations under the Senior Facility Agreement. HY Notes Issuer, TAC and TUSA have pledged substantially all of their assets in favor of the Security Agent on behalf of the Senior Lenders. As a result, the Truvo Group has pledged substantially all of its assets to secure the Senior Loans. The obligations of certain of the Debtors under the Senior Facility Agreement (and related guarantees and security documents) are secured by the following pledges and liens:

| Debtor | Security Interest |
|---|---|
| HY Notes Issuer (Truvo Subsidiary Corp.) | • A New York law governed first priority pledge of 65% of the shares of TAC.<br><br>• A New York law governed first priority lien in respect of all property, with certain exceptions. That first priority lien includes intercompany loans, except HY Notes Issuer's pledge of the HY Notes Proceeds Loan granted by TAC to HY Notes Issuer (the "HY Notes Issuer Proceeds Loan"). A second priority security interest over the HY Notes Issuer Proceeds Loan was granted to the Senior Lenders, ranking below the lien granted to the HY Noteholders. Under the Intercreditor Agreement, the HY Notes Issuer Proceeds Loan is subordinated to amounts owed under the Senior Facility Agreement.<br><br>• To the extent the assets described in the above two paragraphs are insufficient to repay the monies owed under the Senior Loans, the New York law governed security agreement between HY Notes Issuer and the Senior Agent (the "HY Notes Issuer Security Agreement") would allow the Senior Lenders to assert an unsecured claim for the deficiency. |
| TAC | • A New York law governed first priority pledge of 65% of the membership interests in TUSA.<br><br>• A New York law governed first priority lien in respect of substantially all property including intercompany loans.<br><br>• A Dutch-law governed first priority pledge over claims under (a) any intra-group arrangements between TAC and either TUSA or Truvo Services & Technology and/or (b) the sale and purchase agreement, dated September |

[5]Approximately €97.2 million was applied to amounts owed by Truvo Belgium, approximately €26.4 million was applied to amounts owed by Truvo Services & Technology and approximately €16.6 million applied to amounts owed by Truvo Ireland Holdings B.V.

| Debtor | Security Interest |
|---|---|
|  | 26, 2004 between TAC and VNU International N.V., VNU Finance B.V. and VNU N.V. |
| TUSA | • A Belgian law governed first priority pledge of 65% of the shares of Truvo Belgium.<br><br>• A New York law governed first priority lien in respect of substantially all property including intercompany loans.<br><br>• A Dutch Antilles law governed first ranking pledge of receivables due under the intercompany loan made by TUSA to Truvo Curaçao N.V. ("Truvo Curaçao"). |

### 2. *HY Notes*

In 2004, HY Notes Issuer issued €395 million of 8.5% HY Notes and $200 million of 8.375% HY Notes. As described in section III.E.6, the HY Noteholders have agreed to certain express contractual and structural subordination and turnover provisions to benefit the Senior Lenders. As of the Petition Date, the 8.5% HY Notes and the 8.375% HY Notes were traded on the Irish Stock Exchange. The HY Notes are identified by the following CUSIP and ISIN numbers:

- 8.5% Regulation S Permanent Euro Global Note:
    - ISIN XS0206614702
- 8.5% 144A Euro Global Note:
    - ISIN XS0206615428
- 8.375% Regulation S Permanent Dollar Global Note:
    - ISIN USU94285AA83, CUSIP U94285 AA 8
- 8.375% 144A Euro Global Note:
    - ISIN: US92926TAA25, CUSIP 92926T AA 2

Coupon payments on the HY Notes are due on December 1 and June 1, with a grace period of 30 days. HY Notes Issuer did not make the June 1, 2010 coupon payment. The obligations under the HY Notes are guaranteed by PIK Borrower and, on a senior subordinated basis, by TAC, TUSA, Truvo Belgium, Truvo Corporate CVBA and Truvo Services & Technology. The obligations under the HY Notes are secured by the following pledges and liens:

| Debtor | Security Interest |
|---|---|
| HY Notes Issuer | • A New York law governed second priority pledge of 65% of the shares of TAC.<br><br>• A New York law governed first priority lien in respect of the HY Notes Issuer Proceeds Loan. Under the Intercreditor Agreement, the HY Notes Issuer Proceeds Loan (as defined above) is subordinated to amounts owed under the Senior Facility Agreement. |
| TAC | • A New York law governed second priority pledge of 65% of the membership interests in TUSA.<br><br>• A New York law governed second priority security in respect of the HY Notes Proceeds Loan owed by TUSA to TAC. |
| TUSA | • A Belgian law governed second priority pledge of 65% of the shares in |

| DEBTOR | SECURITY INTEREST |
|---|---|
| | Truvo Belgium. |
| | • A Belgian law governed second priority pledge of the intercompany loan of part of the proceeds of the HY Notes from TUSA to Truvo Belgium. |
| | • A Dutch Antilles law governed second priority pledge of the intercompany loan of part of the proceeds of the HY Notes from TUSA to Truvo Curaçao. |

3.    *PIK Loan*

In 2007, PIK Borrower entered into the €130,188,399 PIK Loan Agreement with J.P. Morgan Europe Limited, as the administrative agent. The PIK Loans were funded by a group of international financial institutions. The Truvo Group used the proceeds from the PIK Loans to refinance a prior PIK facility entered into by the Truvo Group in 2004 (the "2004 PIK Notes"). In July 2009, J.P. Morgan Europe Limited was replaced as administrative agent by Wilmington Trust (London) Limited (the "PIK Agent"). The obligations under the PIK Loans are neither guaranteed by any member of the Truvo Group nor secured by any pledges or security interests granted by any member of the Truvo Group. No interest has ever been paid to the PIK Lenders under the PIK Loan Agreement; rather, accrued interest has been added to principal, such that the outstanding obligation under the PIK Loan Agreement as of ~~May 31, 2010~~**the Petition Date** was ~~approximately €173,014,000.~~**€173,087,906.94 plus accrued but unpaid interest.**

4.    *Intercompany Debt*

The Debtors have entered into two principal series of intercompany loans. First, in 2004, HY Notes Issuer lent the proceeds obtained from issuance of the HY Notes to TAC, which then lent those funds to TUSA. Certain Non-Debtor Subsidiaries then borrowed those monies from TUSA. The terms of the above-described loans among the Debtors mirror those of the HY Notes (each a "HY Notes Proceeds Loan"). Second, in 2007, PIK Borrower, HY Notes Issuer, TAC and TUSA entered into a series of transactions under which the proceeds of the PIK Loans were lent by each entity to its immediate subsidiary, and from TUSA to one of the Non-Debtor Subsidiaries. Various other intercompany debt instruments also exist between the Debtors and the Non-Debtor Subsidiaries and are used as a means to fund expenses.

5.    *Equity Interests in the Debtors*

On the Petition Date, Truvo Parent had:

• 1,000 shares of ordinary shares authorized for issuance, 100 of which were outstanding and held by Truvo Luxembourg. All equity in Truvo Luxembourg is owned by funds advised by Apax and Cinven, Stichting Management WD, which has issued certificates to certain members of the Truvo Group's current and former management, and Andrew Day, the former chief executive officer of the Truvo Group,

• 1,000,000 shares of preferred stock authorized for issuance, no shares of which were outstanding, and

• 725,000,000 shares of Series A Preferred Stock, 654,181,525 shares of which were outstanding and owned by funds advised by Apax and Cinven.

As of the Petition Date, (i) no ordinary, preferred or Series A preferred shares were held in treasury by Truvo Parent, (ii) each of HY Notes Issuer and TAC was authorized to issue 1,000 shares of

ordinary shares and had 100 shares outstanding, (iii) PIK Borrower was authorized to issue 1,000 membership units and had 100 units outstanding, and (iv) TUSA had issued certain membership interests. All outstanding Equity Interests in each of the Debtors, other than Parent, are owned by that Debtors' immediate parent, as shown in <u>Exhibit 2</u>. None of PIK Borrower, HY Notes Issuer, TAC or TUSA hold any shares or membership units in treasury.

6. *Intercreditor Agreement*

In connection with the Senior Facility Agreement, certain of the Debtors and certain Non-Debtor Subsidiaries, as borrowers and guarantors under the Senior Facility Agreement, the HY Notes, and the PIK Loan Agreement, and as borrowers and lenders under certain intercompany debt instruments, entered into the Intercreditor Agreement with, among others, the various agents and indenture trustees under such debt agreements.

The relative rights and priorities in respect of the Senior Loans, the HY Debt, the PIK Loans, certain intercompany loans and investor debt are governed by the Intercreditor Agreement. Generally, the Intercreditor Agreement provides that the obligations under the Senior Loans rank senior in priority to obligations under the HY Notes Guarantee Debt. Certain intercompany debt ranks behind the HY Notes Guarantee Debts. The Intercreditor Agreement provides that the HY Guarantees are subordinated in right of payment to the Senior Loans (and Senior Guarantees) and includes turnover provisions limiting recoveries by certain parties to the Intercreditor Agreement until obligations owed to senior parties are discharged. The Intercreditor Agreement also provides various mechanisms permitting the Security Agent (acting on the instructions of the Senior Lenders or an Instructing Group (as defined in the Intercreditor Agreement)) to release the Operating Subsidiaries from all of their debt obligations under the Senior Loans, Senior Guarantees and HY Guarantees, as well as any associated security interests, if those Operating Subsidiaries are sold in connection with an Enforcement Action. In particular, Clause 22.4 of the Intercreditor Agreement gives the Security Agent the authority to execute the foregoing releases on behalf of all Senior Lenders and HY Noteholders, and also sets out the conditions to the exercise of that authority. J.P. Morgan Europe Limited acts as the Security Agent under the Intercreditor Agreement. Specifically, the Intercreditor Agreement ranks debt by entity as follows:

At PIK Borrower:

· First, debt issued under the PIK Loan Agreement[6] and

· Second, debt issued to Truvo Parent;

At HY Notes Issuer:

· First, the debt under HY Notes and debt which is designated as pari passu with it as allowed under the HY Notes Indenture;

· Second, the High Yield Subordinated Debt (as defined in the Intercreditor Agreement)[7]; and

· Third, debt owed to PIK Borrower or TAC.

At TAC, TUSA, and certain Non-Debtor Subsidiaries, as applicable:

---

[6] The unsecured guarantee of the HY Notes issued by PIK Issuer is not ranked in the Intercreditor Agreement and is effectively pari passu with the PIK Debt.

[7] There is no such debt outstanding.

- First, debt under the Senior Facility Agreement and debt which is designated as pari passu with it, as allowed under the Senior Facility Agreement;

- Second, guarantees of the HY Notes, intercompany debt by which the proceeds of the HY Notes are onlent and debt that is pari passu with the above two mentioned categories, as allowed under the HY Notes Indenture;

- Third, the Senior Subordinated Debt (as defined in the Intercreditor Agreement)[8] and the High Yield Subordinated Debt; and

- Fourth, intercompany debt other than debt owed to PIK Borrower, HY Notes Issuer or TAC.[9]

The Intercreditor Agreement also sets forth subordination of the liens granted to secure obligations under the HY Notes to the liens granted to secure obligations under the Senior Loans (with the exception of liens on the HY Notes Issuer Proceeds Loan, which secures obligations under the HY Notes Indenture on a first priority basis as described in Section III.E.2 above (the HY Notes Issuer Proceeds Loan itself is subordinated to amounts owed under the Senior Facility Agreement)) and includes turnover provisions which require all parties other than the Senior Lenders to turn over any payment (other than limited permitted payments) to the Security Agent. The Security Agent is required, subject to certain limitations, to distribute the proceeds of that payment to unpaid fees, costs, expenses and liabilities of (i) the Security Agent, then (ii) the HY Indenture Trustee, then (iii) the Senior Agent, and then (iv) to repay the Senior Debt. Only after the Senior Debt is fully repaid will other creditors that are party to the Intercreditor Agreement be able to obtain a recovery.

In May 2007, HY Notes Issuer entered into a security agreement by which HY Notes Issuer pledged certain assets to the Senior Lenders; this lien is not ranked by the Intercreditor Agreement.

## F. Description of Potential U.S. Federal Tax Claims

The U.S. consolidated group of corporations headed by Truvo Parent (the "U.S. Group"), which consists of all of the Debtors except for the PIK Borrower (which is a disregarded entity for U.S. federal income tax purposes), has engaged in discussions with the U.S. Internal Revenue Service (the "IRS") with respect to the U.S. Group's U.S. federal tax liability for taxable years 2006 and 2007, and believes that it has reached an agreement to settle all of the issues. The US Group currently anticipates that it will receive a tax refund in respect of those years in an amount equal to approximately $7 million.

In addition, the IRS has assessed late penalties and interest equal to approximately $11 million with respect to TUSA's short taxable year that ended November 30, 2004 and has filed a lien in respect of that claim for $4,264,424. The US Group believes that the assessment is incorrect and is disputing this claim. The Debtors believe that the asserted lien constitutes a contingent, unliquidated and disputed Other Secured Claim, and the remaining amount of penalties and interest constitutes a contingent, unliquidated and disputed General Unsecured Claim.

See Section XII.B for a description of anticipated tax consequences of the prepetition conversion of Truvo USA, Inc. into a limited liability company and the restructuring, including a tax refund that may be received by the U.S. Group.

---

[8] There is no such debt outstanding.
[9] Intercompany debt owed to and by other members of the Truvo Group is not ranked by the Intercreditor Agreement.

## G.   Historical Financial Information

The Debtors' fiscal year ends on December 31.  Financial information regarding the Truvo Group for the fiscal year ending December 31, 2009 is available in the 2009 Annual Report issued by PIK Borrower (the "Annual Report"), available at:

http://info.truvo.com/fileadmin/downloads/downloads%20wdgroup/Truvo_Intermediate_2009_Annual_Report_March_2_2010.pdf.

The Annual Report was audited by Ernst & Young Reviseurs d'Entreprises SCCRL ("Ernst and Young"). Ernst and Young issued a qualified audit report because of uncertainty related to the Truvo Group's efforts to restructure its debt.

The Truvo Group has prepared its consolidated financial statements in accordance with IFRS as adopted by the Regulation (EC) No 1606/2002 of the European Parliament and of the Council of 19 July 2002 on the application of international accounting standards, and in accordance with the legal and regulatory requirements applicable in the various jurisdictions where its members are incorporated.  The Truvo Group has also prepared an unaudited financial report for the first quarter of 2010.  That report is available at:

http://info.truvo.com/fileadmin/downloads/downloads%20wdgroup/20100526_Truvo_Intermediate_Q1_2010_report_100526.pdf.

## H.   Events Leading to the Commencement of the Chapter 11 Cases

The Debtors have commenced these Chapter 11 proceedings to effectuate a recapitalization and transform the Truvo Group's business model, with the consent of ~~Supporting Senior Lenders holding approximately 80% in value of the Senior Loans and Supporting HY Noteholders holding approximately 15% of the value of the HY Notes.  In addition, the Supporting Creditors hold approximately 44% of the value of the PIK Debt~~a significant percentage of creditors.  A combination of factors – including the global economic slowdown, an accelerating shift away from printed directories towards online and other media and the Truvo Group's substantial indebtedness – require the Debtors to restructure the Truvo Group's balance sheet.  The Debtors believe that a Chapter 11 restructuring, combined with a sale of TUSA that satisfies the conditions for the release mechanism set forth in Clause 22.4 of the Intercreditor Agreement to a newly formed entity to be owned by certain of the Debtors' creditors, will position the Truvo Group as a viable long-term provider of printed, online and mobile products.  **The Truvo Group has reached agreement on the principal terms of the Plan, including term sheets comprehensively describing the debt and equity to be issued on the Effective Date and the governance of the Reorganized Truvo Group, with Supporting Senior Lenders holding approximately 87% of the outstanding principal amount of the Senior Loans, Supporting HY Noteholders holding approximately 48% of the outstanding principal amount of the HY Notes and Supporting PIK Lenders holding approximately 74% of the outstanding principal amount of the PIK Debt.**

### 1.   *Changes in the market for directory products*

The Truvo Group has been significantly affected by the continuing shift from print media towards online products.  Over the past three years, the Truvo Group has experienced declines in print usage of up to 25% per annum in key markets.  That shift was, and in large part continues to be, caused by the fast penetration of broadband Internet connections that have allowed for the creation of new and interactive means for consumers and businesses to exchange information and has created an increasingly diverse array of new services and products targeted at the traditional user and advertiser base of the Truvo

Group's business.  The shift towards online products was accelerated by the global economic slowdown. During ~~that time~~ **2009,** the gross domestic product of the key markets in which the Truvo Group operates declined by approximately ~~4~~**2.5**% to ~~8~~**7**%. As a result, customers changed their advertising habits and shifted budgets from print directories to investments in their own websites and in online media.

Unlike print directory markets, online advertising markets are characterized by a highly diversified and competitive universe of products, ranging from search engines to any number of other types of websites and portals.  This higher level of competition results in downward price pressure and decreases the market share that can be captured and retained by the Truvo Group.  The Truvo Group is engaged in a comprehensive effort to reorient its business to better take advantage of this changing market; however, new value-added products require larger expenditures for development and support relative to the Truvo Group's historic portfolio of printed offerings.  As a result, revenues and operating margins are declining significantly.  Between 2007 and 2009, revenues declined from €379 million to €279 million, EBITDA declined from €177 million to €111 million and operating margins dropped from 47% to 38%.

**Prior to the Petition Date, the Debtors determined that the Truvo Group's projected cash flow could not support its existing capital structure. Throughout 2010, revenues have continued to decline.  As of the Petition Date, the Truvo Group was approximately 11 times levered and was required to make cash interest payments totaling approximately €77 million per year.  According to internal projections, prepared by the Debtors with the assistance of their professionals, the Truvo Group would no longer have sufficient cash to make cash interest payments by mid-2011. As set forth in the Declaration of Marc C.F. Goegebuer in Support of First Day Motions and Applications and in Compliance with Local Rule 1007-2, on the Petition Date the Debtors were balance sheet insolvent.** In light of the Truvo Group's financial situation, in March 2010, the independent auditor's report to the Truvo Group's shareholders stated that the going concern of the Truvo Group depended on the outcome of the debt restructuring and that the auditor was unable to provide an opinion that the financial statements for the year ended December 31, 2009 gave a fair and true view of the Truvo Group's financial position.

2.    *Efforts to reorient the Truvo Group's business*

In response to these challenges, in 2009 the Truvo Group reduced operating costs by over €4 million, took steps to reduce working capital needs, and engaged in a number of actions intended to retain and attract advertisers and users, including reducing the complexity of the offerings in its print portfolio, revamping the Truvo Group's online presence to provide a more user-friendly environment, making investments of approximately €6 million in new online products, and developing new tools and services to assist advertisers in reaching consumers over the Internet.  **The percentage of the Truvo Group's advertisers that utilized its online services increased from 32% in 2008 to 46% in 2009.** Further, the Truvo Group has made a significant investment in retraining its 1,700 employees to enable them to compete in an increasingly Internet-based market.

In an effort to begin exploring various strategic options, the Truvo Group hired Houlihan **Lokey** in the middle of 2009.  Soon thereafter, the Truvo Group began discussions with an ad hoc committee of Senior Lenders (the "Senior Lender Ad Hoc Committee"). The Senior Lender Ad Hoc Committee was subsequently formally appointed by certain Senior Lenders as a Coordinating Committee of Senior Lenders (the "CoComm"). In March 2010, the Truvo Group began discussions with an informal group of HY Noteholders (the "Informal Noteholder Group") to further explore restructuring options. Although the Debtors attempted to reach a consensual resolution with the Informal Noteholder Group, they were unable to do so prior to the Petition Date.

**While the Debtors did not engage in a formal prepetition marketing process, it was well-known that the Truvo Group was engaged in restructuring discussions as evidenced by various public disclosures and press reports, since October 2009. Neither the Company nor its financial advisors received any expressions of interest prior to the Petition Date and in consultation with its financial advisors, the Debtors determined in their business judgment that in light of market conditions, a formal marketing process was unlikely to yield any prospect of superior recoveries for creditors. Nonetheless, if expressions of interest are received prior to the Confirmation Date, the Debtors will respond in a manner consistent with their fiduciary duties.**

3. *Agreement with* ~~*approximately 80% by value of the Senior Lenders on*~~***supporting creditors regarding*** *the terms of the restructuring **and the TUSA Sale***

Following several months of meetings and negotiations, the Truvo Group **has** reached agreement on the principal terms of the Plan, including term sheets comprehensively describing the debt and equity to be issued on the Effective Date and the governance of the Reorganized Truvo Group, with ~~the~~ Supporting Senior Lenders ~~who together hold~~**holding** approximately ~~80~~**87**% of the outstanding principal amount of the Senior Loans, ~~and the~~ Supporting HY Noteholders ~~who together hold at~~**holding** approximately ~~15~~**48**% of the outstanding principal amount of the HY Notes~~. Such parties have executed the Plan Support Agreement, agreeing to vote to accept the Plan. In addition, the Supporting Senior Lenders and Supporting HY Noteholders hold approximately 44~~ **and Supporting PIK Lenders holding approximately 74**% of the outstanding principal amount of the PIK Debt~~and have agreed to vote such PIK Debt Claims to accept the Plan. The Senior Agent and~~**. The Supporting Senior Lenders, Supporting HY Noteholders and Supporting PIK Lenders have executed plan support agreements, agreeing to vote their claims to accept the Plan, subject to certain terms and conditions, including without limitation Bankruptcy Court approval of the Disclosure Statement. The Senior Agent and the** Security Agent are **also** signatories to ~~the Plan Support Agreement. Obligations of all parties under the Plan Support Agreement to vote to accept the Plan are subject to, among other conditions, Bankruptcy Court approval of a disclosure statement. A copy of the Plan Support Agreement was filed on the Petition Date~~**a plan support agreement. Copies of the plan support agreements have been filed with the Bankruptcy Court.**

The cornerstone of the Plan is the TUSA Sale, by which TAC will sell its Equity Interests in TUSA to Newco, at the request of the Senior Agent, acting on the instructions of the Majority Lenders (as defined in the Senior Facility Agreement) in exchange for a cash payment equal to €600,000,000.00. Prior to the commencement of the Chapter 11 Cases, as part of the Plan Support Agreement, the Supporting Senior Lenders instructed, and shall further instruct through the Ballots, the Senior Agent to request that TAC sell or dispose of its Equity Interests in TUSA pursuant to the Plan. When returning their ballots, the Majority Lenders will give the Instructions to the Senior Agent and Security Agent.[10] The Instructions will become effective following the satisfaction of certain conditions set out in Exhibit B to the Plan Support Agreement. TAC has agreed to enter into a purchase agreement for the TUSA Equity Interests (the "Purchase Agreement") upon the receipt of a request from the Senior Agent to sell the TUSA Equity Interests. A copy of the Purchase Agreement is attached as Exhibit A to the Plan. In connection with the TUSA Sale, and subject to the terms and conditions set forth in the Plan Support Agreement and the Intercreditor Agreement, acting on the instructions of the Senior Agent (instructed by the Majority Lenders) the Security Agent will grant a Release of:

---

[10] Holders of Senior Debt Claims who obtain those Claims after the Voting Record Date will have the opportunity to execute stand-alone Instructions, and will be required to execute Instructions if they have purchased Senior Debt Claims from Supporting Senior Lenders.

- the TUSA Group from all past, present and future liabilities and/or obligations (both actual and contingent) as a borrower and guarantor of the whole of the Senior Debt and High Yield Notes Guarantee Debt (as defined in the Intercreditor Agreement) (including any liability to any other member of the Truvo Group by way of guarantee or contribution);

- all Security (as defined in the Intercreditor Agreement) granted by the TUSA Group over any assets under any of the Security Documents (as defined in the Intercreditor Agreement); and

- the Security created pursuant to the Security Documents over the Equity Interests in TUSA.

To fund Newco's purchase of TAC's Equity Interests in TUSA, Newco will enter into the Daylight Facility Agreement with one or more Daylight Funders. ~~Discussions with~~ **The Daylight Facility Agreement will provide Newco access to borrowings under a short-term Daylight Facility, to be drawn down on the Effective Date prior to the consummation of the TUSA Sale, and to be repaid on the Effective Date after the consummation of the TUSA Sale. Newco will draw down on the Daylight Facility to pay consideration in cash for the TUSA Sale. The movement of such consideration will be governed by the Plan and the Funds Flow Agreement. The maximum commitment under the Daylight Facility will be equal to or greater than the Cash Purchase Price. Arms length discussions with a number of** potential Daylight Funders are ongoing**. A commitment letter with regard to the Daylight Facility Agreement will be filed with the Bankruptcy Court prior to the Confirmation Hearing**.

In connection with the TUSA Sale, and without prejudice to the Senior Agent Conditions Precedent and/or the Security Agent Conditions Precedent, the Senior Lenders (by the Senior Lender Classes voting to Accept the Plan) will (i) transfer a portion of their Senior Debt Claims against TAC to Newco in exchange for an obligation to acknowledge indebtedness to the Senior Lenders pursuant to the New Senior Credit Agreement, such obligation to be conditional upon the repayment of the Daylight Facility; and (ii) transfer by way of contribution (acting through TAC appointed as a proxy under the Plan) the remainder of their Senior Debt Claims against TAC to Newco in exchange for Newco Ordinary Shares.

**The Debtors believe that the TUSA Sale complies with all of the requirements in Clause 22.4 of the Intercreditor Agreement necessary to effectuate the Release, including without limitation:**

- **All of the claims of the Senior Finance Parties under the Senior Facility Agreement against the TUSA Group, as well as all of the Liens on the TUSA Group and its assets, are to be unconditionally released or discharged when the Equity Interests in TUSA are sold pursuant to the Plan and Purchase Agreement.**

- **Prior to the Petition Date, the Security Agent selected an internationally recognized investment bank to provide, prior to the execution of the Purchase Agreement with respect to the TUSA Sale, a certification of the fair market value for the Equity Interests in TUSA. The Debtors understand that this valuation analysis is substantially completed, but it remains subject to ongoing review and revision prior to the execution of the Purchase Agreement.**

- **The consideration for the TUSA Sale payable by Newco will be in cash in the amount of the Cash Purchase Price. This cash amount will be paid by Newco to**

**TAC. No consideration other than the Cash Purchase Price shall be paid by Newco in exchange for the Equity Interests in TUSA.**

• **The proceeds of the TUSA Sale will be applied by TAC to the Senior Agent and in accordance with the waterfall set forth in Clause 21.1 of the Intercreditor Agreement, including, without limitation, the provisions relating to the payment of the fees of the Security Agent, HY Indenture Trustee and the Senior Agent in accordance with the terms thereof. The Truvo Group intends to satisfy any such claims out of its existing cash reserves.**

**The Cash Purchase Price of €600 million was determined following arms' length discussions between representatives of TAC, the CoComm, the Elliott Lender, the Senior Agent and the Security Agent. The Debtors believe that this Cash Purchase Price reflects the fair market value for the Equity Interests in TUSA on the terms and conditions set forth in the Purchase Agreement.**

Mandatory Transfer Certificates, executed by each Senior Lender (as required pursuant to the Confirmation Order) and Newco will be released to the Senior Agent. Newco and the Security Agent will enter into the Accession Deed (as defined in the Intercreditor Agreement). For the avoidance of doubt, the Mandatory Transfer Certificates must be executed by the Senior Lenders and not by TAC acting as proxy on their behalf.

Newco will draw down on the Daylight Facility to pay consideration in cash for the TUSA Sale. The movement of such consideration will be governed by the Plan and the Funds Flow Agreement.

As set forth in the Purchase Agreement, which is attached as Exhibit A to the Plan, the TUSA Sale is subject to a number of conditions precedent, including the following:

· entry of a Confirmation Order that is (including any amendment or modifications thereof) reasonably satisfactory to Newco and that approves the transactions contemplated in the Purchase Agreement;

· all conditions to the occurrence of the Effective Date contained in the Plan, other than the Closing or those actions specified to occur on the Effective Date shall have been satisfied or waived;

· the Court shall have granted relief from the automatic stay (and any preliminary injunction entered in the Chapter 11 Cases) to permit the acceleration of the Senior Debt;

· the Security Agent shall have granted the Release;

· the Senior Lenders shall have executed Mandatory Transfer Certificates transferring to Newco all of the Senior Lenders' rights under TAC's Senior Guarantee, to take effect on the Effective Date; and

· the Daylight Funders shall have (i) satisfied their obligations to fund under the Daylight Facility Agreement or (ii) delivered to Newco a notice that all conditions precedent under the Daylight Facility Agreement have been satisfied or waived in accordance with the terms thereof and such notice shall not have been rescinded or revoked.

The Senior Lenders (by the Senior Lender Classes voting to Accept the Plan, and acting through TAC, appointed as a proxy under the Plan) will contribute Newco Ordinary Shares to Holdco in exchange for Holdco Ordinary Shares and will then, in accordance with the Election set forth in Article III of the

Plan: (a) contribute Holdco Ordinary Shares to Equityco in exchange for the Equityco Distribution and/or (b) contribute Holdco Ordinary Shares to PIKco in exchange for the PIKco Distribution.

In the event that the HY Noteholder Classes Accept the Plan, the HY Noteholders will receive (i) the HY Noteholder Cash Distribution and (ii) HY Noteholder Warrants. In addition, if the HY Noteholder Classes and the PIK Lender Class Accept the Plan, the PIK Lenders will receive the PIK Lender Warrants.

## I.    Business Strategy of the Reorganized Truvo Group

The Reorganized Truvo Group will continue to own all of the Non-Debtor Subsidiaries (except as described in Article V of the Plan), including the leading directory companies in Belgium, Ireland and, through a joint venture, Portugal, as well as significant minority interests in Axesa and Trudon. The Debtors expect that the primary focus of the Reorganized Truvo Group will be to continue the transformation of the Operating Subsidiaries into businesses focused predominately on providing Internet-based services. This transformation is expected to result in a smaller scale of business (meaning, in part, reduced revenue and EBITDA **compared to historic performance**), with a focus on Internet-based products. The Reorganized Truvo Group's business plan is predicated on evolving from a company dependent upon holding a leading position in printed directories to a significant player in certain online markets.

While its transformation away from reliance on printed directories is ongoing, the Debtors anticipate that the Reorganized Truvo Group will continue to actively manage its portfolio of print products. To best exploit the continued potential of print products, the Debtors expect that the Reorganized Truvo Group will focus on cutting costs and selectively investing in its portfolio of printed products. The Debtors further expect that the Reorganized Truvo Group will continue to make its print offerings more attractive to advertisers by simplifying its offerings and pricing, modifying its products to reduce the costs of production, and reducing or eliminating products that do not generate significant support from advertisers.

In addition, the business plan of the Reorganized Truvo Group contemplates that it will:

- grow its online businesses by developing new products and enhancing the usability of existing offerings, including by introducing:

    · new interfaces and design for key websites and search tools;

    · "3D" video that is expected to offer a 360 degree view of a business interior with interactive elements that will effectively deliver rich content and drive user decision making, as well as provide an additional revenue stream and infrastructure on which to build further innovations;

    · "virtual paper" which the Debtors anticipate will allow end-users to interactively browse a product catalogue, brochure or menu online and provide an enhanced user experience, as well as provide an additional revenue stream;

    · richer search results when looking up businesses, including time and location sensitive advertising; and

    · listings for advertisers that will be available on certain global positioning system devices;

- improve the quality of search results and add new search channels;

- provide guaranteed leads and contacts to advertisers as well as providing them with the ability to easily and effectively create and manage their own online presence;

- grow beyond the provision of search and directory services by introducing new products not aimed at traditional consumers, including online services providing content rich video, and search engine optimization consultancy;

- consider expanding into a number of adjacent businesses, like customer relationship management, mobile platforms and web agency;

- convert current operations used to provide back office support for print products into centers capable of managing advertising campaigns for customers;

- provide a "one stop shop" for local advertising, continuing to primarily serve small and medium size enterprises; and

- update efforts to reach out to advertisers, with an enhanced focus on telesales, including the use of third party call centers to make initial contact.

As a result of these efforts, the Debtors expect that the Reorganized Truvo Group will obtain a larger share of the advertising budgets of small and medium size enterprises in its markets and increase its advertising base in all markets in which it operates.

     As of the Petition Date, the Truvo Group has had substantial success introducing new products to enhance its online offerings. The development and deployment of those offerings has resulted in substantial capital expenditures. Such expenditures will likely continue to be necessary after the Effective Date. Likewise, the Truvo Group has incurred, and the Debtors anticipate the Reorganized Truvo Group will continue to incur, substantial costs required to enhance infrastructure needed to efficiently develop and provide online products and effectively redirect its workforce to focus on Internet-based services and sales. The actions described above are expected to result in an increase in revenues generated by online products, as is set forth in the financial projections attached hereto as <u>Exhibit 4</u>. In addition, approximately €800,000 incentive payment will be due to certain members of the Debtors' management upon the consummation of a restructuring, as part of a larger incentive plan under which total costs (including social charges) could reach €12.3 million over a four-year period. On the Effective Date, the Reorganized Truvo Group will also enter into the Management Incentive Plan.

# IV.
## THE CHAPTER 11 CASES

## A.    Joint Administration of the Debtors' Chapter 11 Cases

     On the Petition Date, the Bankruptcy Court granted the Debtors' motion requesting procedural consolidation of the Chapter 11 Cases for ease of administration.

## B.    Significant "First Day" Motions

     On the Petition Date, the Debtors filed several motions requesting the Bankruptcy Court to enter orders authorizing the Debtors to continue operating in the ordinary course. These motions are designed to ease the strain on the Debtors' businesses as a consequence of the filings.

1. *Cash Management Motion*

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to manage funds and to pay expenses. In order to, among other things, avoid administrative inefficiencies, on the Petition Date, the Debtors moved the Bankruptcy Court (the "Cash Management Motion") for an order (i) approving the continued use of the Cash Management System, (ii) permitting continued Intercompany Transactions and Granting Superpriority Status to postpetition Intercompany Claims (all as defined in the Cash Management Motion), and (iii) granting certain other relief. The Cash Management Motion was granted on an interim basis on July 1, 2010 and on a final basis on July 22, 2010.

2. *Cash Collateral Motion*

The Debtors have significant cash needs to fund the Chapter 11 reorganization. Cash in the bank accounts of HY Notes Issuer, TAC and TUSA, however, is subject to the Senior Lenders' liens. Without authorization to use this cash collateral, the Debtors may not be able to reorganize. Accordingly, on the Petition Date, the Debtors moved the Bankruptcy Court (the "Cash Collateral Motion") for an order (i) authorizing the Debtors to use certain cash collateral that is subject to the Senior Lenders' liens, (ii) providing the Senior Lenders adequate protection with respect to that cash collateral, and (iii) granting certain other relief. The Majority Lenders have consented to the Debtors' use of the cash collateral in accordance with the Budget (as defined in the Cash Collateral Motion). The Cash Collateral Motion was granted on an interim basis on July 1, 2010, and on a final basis on July 22, 2010. Pursuant to that final order, the Debtors are paying fees of various professionals.

**Under the Cash Collateral Motion, the Debtors have stipulated the existence and validity of the Senior Lenders' claims against and liens over the assets of the Truvo Group. The Debtors undertook a limited investigation of Avoidance and Other Actions against the Senior Lenders based on a review of the relevant security documents and lien searches for security interests perfected against the Debtors prior to making such stipulation. This limited investigation did not provide any basis on which to conclude that the Debtors had valid or valuable Avoidance and Other Actions against the Senior Lenders. The Debtors' investigation did not uncover any valuable avoidance actions against any other parties. The Debtors believe that a more extensive investigation of Avoidance and Other Actions would be of limited or no use to improving recoveries for holders of Allowed HY Notes Claims and Allowed PIK Debt Claims, given the amount of Senior Debt, the Debtors' valuation of the Reorganized Truvo Group and the terms of the Intercreditor Agreement. Both the HY Notes and the PIK Loans are expressly subordinated (both as to payment and security) to the Senior Loans, and under the Intercreditor Agreement any proceeds paid to the HY Noteholders or the PIK Lenders from recoveries that the Debtors could obtain as a result of Avoidance and Other Actions would be turned over for the benefit of the Senior Lenders.**

3. *Section 105 Injunction*

On the Petition Date, the Debtors filed an adversary complaint and motion seeking injunctive relief pursuant to section 105(a) of the Bankruptcy Code, or in the alternative, an extension of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Section 105 Injunction"). The adversary complaint names as defendants the Senior Lenders that are not signatories to the Plan Support Agreement, the HY Indenture Trustee, those entities that the Debtors believe to hold HY Notes, and those additional unknown individuals and institutions that hold HY Notes. The Debtors sought the Section 105 Injunction to enjoin these entities from pursuing their Non-Debtor Subsidiaries that had guaranteed and/or pledged security interests in respect of obligations under the Senior Facility Agreement or the HY Notes (collectively, the "European Guarantors"). As set forth in the motion papers filed by the Debtors, absent

entry of the Section 105 Injunction, the Debtors believe that pursuit of such claims against the European Guarantors would seriously compromise their ability to consummate the Plan.

On the Petition Date, the Bankruptcy Court granted a temporary restraining order on an ex parte basis, pending a hearing on the Section 105 Injunction. The temporary restraining order precluded any action by Senior Lenders that are not signatories to the Plan Support Agreement or holders of the HY Notes ~~from any action~~ against the European Guarantors to enforce the rights and obligations under the Senior Facility or the HY Notes including, without limitation, (i) commencing or continuing acts to obtain possession of control of the property of the European Guarantors, (ii) commencing any legal proceeding against the European Guarantors, including insolvency or similar proceedings, or (iii) enforcing or creating any lien against the European Guarantors or their property. Following a hearing on July 14, 2010, the Bankruptcy Court entered a preliminary injunction, enjoining these actions until the earlier of: (i) termination of the Plan Support Agreement in accordance with its terms, or (iii) 120 days (subject in each case to the rights of the Debtors and other parties to request an extension or modification). The preliminary injunction order excepts from its scope, however, actions taken in furtherance of or to effectuate the Debtors' Plan or the Plan Support Agreement.

4.     *Retention Applications*

On the Petition Date, the Debtors filed several motions for the retention of professionals. Specifically, the Debtors requested that the Bankruptcy Court authorize the Debtors to retain (i) Cleary Gottlieb Steen & Hamilton LLP, as restructuring counsel, (ii) Jenner and Block LLP, as restructuring counsel, (iii) Houlihan **Lokey**, as financial adviser, (iv) Kurtzman Carson Consultants LLP, ("KCC") as notice and claims agent (the "Claims Agent"), and (v) certain ordinary course professionals. ~~The Debtors anticipate that they will soon file a motion to retain Simpson Thacher & Bartlett LLP, as special counsel.~~ The motion to retain KCC as Claims Agent was granted on July 1, 2010. The motions to retain Cleary Gottlieb Steen & Hamilton LLP, Jenner and Block LLP, and certain ordinary course professionals were granted on July 22, 2010. The motion to retain Houlihan **Lokey** is scheduled to be heard on ~~August 5, 2010.~~ **September 14, 2010.**

**On July 27, 2010 the Debtors filed a motion for the retention of Simpson Thacher & Bartlett LLP, ("STB") as special counsel. The motion to retain STB was granted on August 12, 2010. On August 6, 2010 the Debtors filed a motion to retain Deloitte Belastingconsulenten BV o.v.v.e. CVBA and Deloitte Tax LLP as tax advisors. That motion was granted at a hearing on August 26, 2010.**

**C.     Coordinating Committee of Senior Lenders**

Prior to the Petition Date, the CoComm was formed. Pursuant to engagement letters executed with Linklaters LLP ("Linklaters"), legal advisor to the CoComm, and N.M. Rothschild & Sons Limited ("Rothschild"), financial advisors to the CoComm (together with Linklaters LLP, the "CoComm Advisors"), the Debtors are obligated to pay certain fees of Linklaters and the CoComm, and Truvo Belgium is obligated to pay certain fees of Rothschild. The CoComm consists of Alcentra Limited, Allied Irish Banks, p.l.c., Avoca Capital Holdings and Harbourmaster Capital Management Limited.[11]

**D.     Informal Noteholder Group**

Prior to the Petition Date, the Informal Noteholder Group was formed. Initially, the Informal Noteholder Group consisted of Elliott Advisors (UK) Limited ("Elliott"), Goldman Sachs Asset

---

[11] Alchemy Special Opportunities LLP was a member of the Senior Lender Ad Hoc Committee at its inception but resigned from that post prior to the creation of the CoComm.

Management LP and AllianceBernstein L.P. Pursuant to engagement letters executed with Bingham McCutchen LLP ("Bingham"), as legal advisor to the Informal Noteholder Group, and Jefferies International Ltd. ("Jefferies"), as financial advisor to the Informal Noteholder Group (together with Bingham, the "Informal Noteholder Group Advisors"), the Debtors were obligated to pay certain fees of the Informal Noteholder Group Advisors. On June 22, 2010, Bingham informed the Debtors that Elliott had resigned from the Informal Noteholder Group and that the Informal Noteholder Group represented less than 33 1/3% of the outstanding HY Notes. The Debtors **then** terminated the Bingham fee letter ~~in accordance with its terms~~ (which termination became effective on July 1, 2010)~~. In addition, the Debtors sent a reservation of rights to Jefferies stating that, in accordance with the terms of the Jefferies fee letter, they may terminate the Jefferies fee letter in the event the firm continues to represent less than 33 1/3% of the HY Notes for a 45-day consecutive period.~~ **and the Jefferies fee letter (which termination become effective on August 6, 2010) in accordance with their terms.**

**E.** **Appointment of the Creditors' Committee**

**Due to a lack of interest, no committee was appointed at the creditors' committee formation meeting held on July 8, 2010. On August 2, 2010, the United States Trustee for the Southern District of New York (the "Trustee") appointed a three-member Official Committee of Unsecured Creditors of Truvo USA LLC, and affiliated debtors in possession (the "Creditors' Committee"). The entities initially appointed to the Creditors' Committee were the following: Alliance Bernstein LP (a HY Noteholder), Bank of New York Mellon - London Branch (as HY Notes Indenture Trustee), and Normandy Hill Capital, L.P. (a HY Noteholder).**

**On August 12, 2010 the Creditors' Committee filed a motion to retain Cadwalader, Wickersham and Taft LLP as counsel to the Creditors' Committee. That motion was granted at a hearing on August 26, 2010. On August 17, 2010, the Creditors' Committee filed a motion to retain Chanin Capital Partners, LLC as financial advisor to the Creditors' Committee. That motion is scheduled to be heard on September 14, 2010.**

**F.** ~~E.~~ Claims Process; Last Date to File Proofs of Claims

On July 13, 2010 the Debtors filed their Schedules, including the list of creditors, parties to executory contracts and certain financial information. The Schedules are available on the Claims Agent's website at ~~truvoinfo@~~**http://www.**kccllc.~~com. On July 20, 2010,~~ **net/truvo.** TUSA ~~filed its~~**has subsequently** amended ~~schedules to reflect the addition of one~~**the Schedules to add a limited number of** additional unsecured ~~creditor~~**creditors** to Schedule F.

On July 15, 2010, the Bankruptcy Court entered an order requiring that any Person or entity, other than a Governmental Unit and certain other specified persons, holding or asserting a Claim against the Debtors file a written proof of Claim with the Clerk of the Bankruptcy Court for the Southern District of New York or KCC, as the claims agent for the Bankruptcy Court, on or before August 12, ~~2010~~**2010 (the "Bar Date"),** and that Governmental Units file a proof of claim, in the same manner, within 180 days of the Petition Date (the "Bar Date Order"). Under the Bar Date Order, any Person or entity that is required to file a proof of Claim and fails to timely file such proof of Claim will be forever barred, estopped and enjoined from receiving a distribution under the Plan and will be forever barred, estopped and enjoined from asserting a Claim against the Debtors, their estates, the Reorganized Truvo Group, and any of its successors or assigns.

**Notice of the Bar Date and a proof of claim form were mailed to (i) the United States Trustee; (ii) all persons or entities that requested notice of the proceedings in the Chapter 11 Cases; (iii) all creditors and other known holders of claims as of the date of the Bar Date Order, including**

**all persons or entities listed in the Schedules as holding claims; (iv) all parties to executory contracts and unexpired leases of the Debtors; (v) all parties to litigation with the Debtors; (vi) all governmental units required to be notified; and (vii) all persons and entities included in the Debtors' Special and General Service Lists.**

**A total of 20 proofs of claim asserting Claims against various Debtors were filed in the Chapter 11 Cases. All Claim amounts are unliquidated. The Debtors are continuing the process of reviewing the proofs of claim and reconciling them with their books and records.**

## V.
## THE PLAN

### A.     Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In general, a Chapter 11 plan of reorganization (i) divides claims and equity interests into separate classes, (ii) specifies the property, if any, that each class is to receive under the plan and (iii) contains other provisions necessary to the reorganization of the debtor and required or permitted by the Bankruptcy Code.

After a plan of reorganization has been filed, the holders of claims who are impaired and not deemed to have rejected the plan are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims who are Impaired and entitled to vote on the Plan to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.     Overview of the Plan

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

The Plan classifies Claims and Equity Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Equity Interests. Claims and Equity Interests shall be included in a particular Class only to the extent such Claims or Equity Interests qualify for inclusion within such Class. The Plan segregates the various Claims (other than those that do not need to be classified) into 29 separate Classes and segregates the Old Equity Interests into one Class. These Classes take into account the differing nature and priority of Claims against, and Equity Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims or Equity Interests in the following Classes are based on the books and records of the Debtors.

This section summarizes the treatment of each of the Classes of Claims and Equity Interests under the Plan, describes the capital structure of Reorganized Truvo Group and describes other provisions of the Plan. Only Holders of Allowed Claims – Claims that are not in dispute, are not contingent, are liquidated in amount and are not subject to objection or estimation – are entitled to receive Distributions under the Plan. For a more detailed description of the definition of "Allowed," see Section 1.1 of the Plan. Until a Disputed Claim or Equity Interest becomes Allowed, distributions of Cash, securities and/or other instruments or property otherwise available to the Holder of such Claim or Equity Interest will not be made.

The Plan is intended to enable the Reorganized Truvo Group to continue present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization except as contemplated by the Plan. The Debtors believe that the Reorganized Truvo Group will be able to perform their obligations under the Plan and continue to meet all expenses after the Effective Date without further financial reorganization. Also, the Debtors believe that the Plan permits fair and equitable recoveries, while expediting the reorganization of the Reorganized Truvo Group.

The Confirmation Date is the date that the Confirmation Order is entered by the Clerk on the docket of the Bankruptcy Court. The Effective Date is the first Business Day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Section 9.3 of the Plan are satisfied or waived and the parties consummate the transactions contemplated by the Plan.

The Debtors anticipate that the Effective Date will occur during the third quarter of 2010. Such date could be delayed should there be a delay in entry of the Confirmation Order. Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Equity Interest will be in full satisfaction, settlement, release and discharge of all Claims or Equity Interests. The Reorganized Truvo Group will make all payments and other distributions to be made under the Plan unless otherwise specified.

## C.   Unclassified Claims

### 1.   *Administrative Expense Claims Generally*

Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Administrative Expense Claim shall be paid in full by the Disbursing Agent, at its election, (i) in Cash, in such amounts as are incurred in the ordinary course of business by the Debtors, or in such amounts as such Administrative Expense Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which there is a Final Order allowing such Administrative Expense Claim, (ii) upon such other terms as may exist in the ordinary course of the Debtors' business or (iii) upon such other terms as may be agreed upon in writing between the Holder of such Administrative Expense Claim and

the Disbursing Agent, in each case in full satisfaction, settlement, discharge and release of, such Administrative Expense Claim.

i        Professional Fees

Except as expressly provided in the Cash Collateral Order, all final fee applications for Professional Fees incurred prior to the Effective Date and for services rendered during or in connection with the Chapter 11 Cases shall be Filed with the Bankruptcy Court and served on the Disbursing Agent and its counsel, and the Office of the United States Trustee (U.S. Department of Justice, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Brian S. Masumoto, Esq.) no later than the Professional Fees Bar Date. If the Disbursing Agent and any such Professional cannot agree on the amount of fees and expenses to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court. Holders of Professional Fees Claims that are required to File and serve applications for final allowance of their Professional Fees Claims and that do not File and serve such applications by the required deadline shall be forever barred from asserting such Professional Fees Claims against the Debtors, the Reorganized Truvo Group or their respective properties, and such Professional Fees Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fees Claims must be Filed and served on Reorganized Truvo and its counsel, and the Office of the United States Trustee and the requesting party no later than fifteen (15) days (or such longer period as may be allowed by the Disbursing Agent or by order of the Bankruptcy Court) after the date on which an application for final allowance of such Professional Fees Claims was Filed and served.

The Debtors expect to incur professional fees in the amount of approximately $4 million monthly until the Effective Date. These constitute the bulk of the anticipated Administrative Expense Claims. The Non-Debtor Subsidiaries will also incur certain professional fees related to the Chapter 11 Cases and Restructuring Transactions, including under agreements to pay certain professional fees of the CoComm, the Elliott Lender (as defined in the Plan Support Agreement), the Senior Agent and the Security Agent, and will be responsible for certain success fees in an approximate amount of €4.8 million upon the Effective Date.

ii        Substantial Contribution Claims

`   All requests for compensation or reimbursement of Substantial Contribution Claims shall be Filed and served on Reorganized Truvo and its counsel, the Office of the United States Trustee (U.S. Department of Justice, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Brian S. Masumoto, Esq.), and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Bankruptcy Court, no later than forty-five (45) days after the Effective Date. Unless such deadline is extended by agreement of the Disbursing Agent, Holders of Substantial Contribution Claims that are required to File and serve applications for final allowance of their Substantial Contribution Claims and that do not File and serve such applications by the required deadline shall be forever barred from asserting such Substantial Contribution Claims against the Debtors, the Reorganized Truvo Group or their respective properties, and such Substantial Contribution Claims shall be deemed discharged as of the Effective Date. Objections to any Substantial Contribution Claims must be Filed and served on Reorganized Truvo and its counsel, the Office of the United States Trustee and the requesting party no later than fifteen (15) days (or such longer period as may be allowed by the Disbursing Agent or by order of the Bankruptcy Court) after the date on which an application for final allowance of such Substantial Contribution Claims was Filed and served.

**2.**      ~~iii~~*Priority Tax Claims*

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such

Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be paid in full by the Disbursing Agent, in full satisfaction, settlement, discharge and release of, such Allowed Priority Tax Claim, at the election of the Disbursing Agent (a) in Cash equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (c) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code. **If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. 6621.** On the Effective Date, the Liens securing such Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

### 3. *Intercompany Claims and Intercompany Equity Interests.*

*Intercompany Claims and Intercompany Equity Interests have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan. As provided in Section 5.15 of the Plan, all Intercompany Equity Interests will be cancelled and/or sold to Newco and Holders thereof will be entitled to no distribution under the Plan.*

## D. Description of the Classes

1. *Classification of Claims Against and Old Equity Interests in Truvo Parent*

   i   Class 1A:  Other Priority Claims against Truvo Parent

      (a)   *Classification*.  Class 1A consists of all Allowed Other Priority Claims against Truvo Parent.

      (b)   *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 1A Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 1A Claim is an Allowed Class 1A Claim on the Effective Date or (b) the date on which such Class 1A Claim becomes an Allowed Class 1A Claim, each Holder of an Allowed Class 1A Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 1A Claim, at the election of the Disbursing Agent: (x) Cash equal to the amount of such Allowed Class 1A Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 1A Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.  Any Cash paid to Allowed Class 1A Claims shall be funded from (1) the Cash held by Truvo Parent as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided hereunder, from the Additional Cash Allocation.

(c)     *Voting*.  Class 1A Claims are Unimpaired and the Holders of Allowed Class 1A Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

ii      Class 1B:  Other Secured Claims against Truvo Parent

(a)     *Classification*.  Class 1B consists of all Allowed Other Secured Claims against Truvo Parent.

(b)     *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 1B Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 1B Claim is an Allowed Class 1B Claim on the Effective Date or (b) the date on which such Class 1B Claim becomes an Allowed Class 1B Claim, each Holder of an Allowed Class 1B Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 1B Claim, at the election of the Disbursing Agent: (x) Cash equal to the amount of such Allowed Class 1B Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 1B Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.  On the Effective Date, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.  Any Cash paid to Allowed Class 1B Claims shall be funded from (1) the Cash held by Truvo Parent as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided hereunder, from the Additional Cash Allocation.

(c)     *Voting*.  Class 1B Claims are Unimpaired and the Holders of Allowed Class 1B Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

iii     Class 1F:  General Unsecured Claims against Truvo Parent

(a)     *Classification*.  Class 1F consists of all General Unsecured Claims against Truvo Parent.

(b)     *Treatment*.

(A)     Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class 1F Claim is Allowed on the Effective Date or otherwise the date on which such Class 1F Claim becomes Allowed, each Holder of an Allowed General

Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, as made on its Ballot, (x) if such Allowed Class 1F Claim is a Convenience Claim, Cash equal to the amount of such Allowed Class 1F Claim or Cash equal to $30,000 if the aggregate amount of such Allowed Class 1F Claim is in excess of $30,000 or (y) if such Allowed Class 1F Claim is not a Convenience Claim, a Pro Rata share of the GUC Cash Allocation; provided, however, that no such distribution under the foregoing clause (y) shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim.

(B)    The distributions provided to Holders of Allowed General Unsecured Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

(C)    *Voting*.  Class 1F Claims are Impaired and the Holders of Allowed Class 1F Claims are entitled to vote to Accept or reject the Plan.

iv    Class 1G:  Statutory Subordinated Claims against Truvo Parent

(a)    *Classification*.  Class 1G consists of all Statutory Subordinated Claims against Truvo Parent.

(b)    *Treatment*.  Holders of Allowed Statutory Subordinated Claims shall not receive or retain any distribution or property on account of such Allowed Statutory Subordinated Claims.

(c)    *Voting*.  Class 1G Claims are Impaired and the Holders of Allowed Class 1G Claims are conclusively presumed to reject the Plan.  The votes of Holders of Class 1G Claims will not be solicited.

v    Class 1H:  Old Equity Interests in Truvo Parent

(a)    *Classification*.  Class 1H consists of all Old Equity Interests in Truvo Parent.

(b)    *Treatment*.  Holders of Old Equity Interests in Truvo Parent in shall not receive or retain any distribution or property on account of such Old Equity Interests. On the Effective Date, all Old Equity Interests shall be cancelled.

(c)    *Voting*.  Class 1H Old Equity Interests in Truvo Parent are Impaired and the Holders of Allowed Class 1H Old Equity

Interests are conclusively presumed to reject the Plan.  The votes of Holders of Class 1H Old Equity Interests will not be solicited.

2.    *Classification of Claims Against PIK Borrower*

i    <u>Class 2A:  Other Priority Claims against PIK Borrower</u>

(a)    *Classification*.  Class 2A consists of all Allowed Other Priority Claims against PIK Borrower.

(b)    *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 2A Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 2A Claim is an Allowed Class 2A Claim on the Effective Date or (b) the date on which such Class 2A Claim becomes an Allowed Class 2A Claim, each Holder of an Allowed Class 2A Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 2A Claim, at the election of the Disbursing Agent:   (x) Cash equal to the amount of such Allowed Class 2A Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 2A Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code. Any Cash paid to Allowed Class 2A Claims shall be funded from (1) the Cash held by PIK Borrower as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided hereunder, from the Additional Cash Allocation.

(c)    *Voting*.  Class 2A Claims are Unimpaired and the Holders of Allowed Class 2A Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

ii    <u>Class 2B:  Other Secured Claims against PIK Borrower</u>

(a)    *Classification*.  Class 2B consists of all Allowed Other Secured Claims against PIK Borrower.

(b)    *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 2B Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 2B Claim is an Allowed Class 2B Claim on the Effective Date or (b) the date on which such Class 2B Claim becomes an Allowed Class 2B Claim, each Holder of an Allowed Class 2B Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 2B Claim, at the election of the Disbursing Agent:   (x) Cash equal to the amount of such Allowed Class 2B Claim; (y) such other less favorable treatment

as to which the Disbursing Agent and the Holder of such Allowed Class 2B Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code. On the Effective Date, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. Any Cash paid to Allowed Class 2B Claims shall be funded from (1) the Cash held by PIK Borrower as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided hereunder, from the Additional Cash Allocation.

(c) *Voting*. Class 2B Claims are Unimpaired and the Holders of Allowed Class 2B Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

iii     <u>Class 2D: HY Notes Claims against PIK Borrower</u>

(a) *Classification*. Class 2D consists of all HY Notes Claims against PIK Borrower. The HY Notes Claims shall be Allowed Class 2D Claims in the aggregate amount (in U.S. dollars or U.S. Dollar Equivalent) of the sum of € 395,000,000.00 and $ 200,000,000.00 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the HY Indenture, for all purposes under the Plan. Each HY Noteholder shall be entitled to a single recovery under the Plan on account of its HY Notes Claims against all Debtors, and will be provided a single Ballot entitling it to vote its HY Notes Claims against all Debtors.

(b) *Treatment*. Each Holder of an Allowed HY Notes Claim against PIK Borrower shall receive the treatment described in Section 3.5(d)(ii) of the Plan in full satisfaction, settlement, discharge and release of, all HY Notes Claims against PIK Borrower.

(c) *Voting*. Class 2D Claims are Impaired and the Holders of Allowed Class 2D Claims are entitled to vote to Accept or reject the Plan.

iv     <u>Class 2E: PIK Debt Claims against PIK Borrower</u>

(a) *Classification*. Class 2E consists of all PIK Debt Claims against PIK Borrower. The PIK Debt Claims shall be Allowed Class 2E Claims in the aggregate amount of € ~~173,014,000.00~~**173,087,906.94 plus accrued but unpaid interest as of the Petition Date** for all purposes under the Plan.

(b)　*Treatment*.

  (A) If the HY Noteholder Classes and the PIK Lender Class vote to Accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed PIK Debt Claim shall receive a Pro Rata share of the PIK Lender Warrants in full satisfaction, settlement, discharge and release of, all Allowed PIK Debt Claims.

  (B) If the HY Noteholder Classes and/or the PIK Lender Class do not vote to Accept the Plan, Holders of Allowed PIK Debt Claims shall not be entitled to any distributions under the Plan.

  (C) The distributions provided to Holders of Allowed PIK Debt Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

  (D) If the HY Noteholder Classes and the PIK Lender Class vote to Accept the Plan, TAC shall, upon the occurrence of the Confirmation Date, and without further action by or order of the Bankruptcy Court, be authorized to serve as proxy to act on behalf of all Holders of PIK Debt Claims (whether or not any such Holder voted in favor of the Plan) in connection with the transactions described in Section 5.3(e) of the Plan.

  (E) The consideration provided under the Plan shall be the sole source of recovery for the Allowed PIK Debt Claims.

(c)　*Voting*.　Class 2E Claims are Impaired and the Holders of Allowed Class 2E Claims are entitled to vote to Accept or reject the Plan.

v <u>Class 2F:  General Unsecured Claims against PIK Borrower</u>

(a)　*Classification*.　Class 2F consists of all General Unsecured Claims against PIK Borrower.

(b)　*Treatment*.

  (A) Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class 2F Claim is Allowed on the Effective Date or otherwise the date on which such Class 2F Claim becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction,

settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, as made on its Ballot, (x) if such Allowed Class 2F Claim is a Convenience Claim, Cash equal to the amount of such Allowed Class 2F Claim or Cash equal to $30,000 if the aggregate amount of such Allowed Class 2F Claim is in excess of $30,000 or (y) if such Allowed Class 2F Claim is not a Convenience Claim, a Pro Rata share of the GUC Cash Allocation; provided, however, that no such distribution under the foregoing clause (y) shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim.

(B)     The distributions provided to Holders of Allowed General Unsecured Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

(c)     *Voting*.   Class 2F Claims are Impaired and the Holders of Allowed Class 2F Claims are entitled to vote to Accept or reject the Plan.

vi     Class 2G:  Statutory Subordinated Claims against PIK Borrower

(a)     *Classification*.   Class 2G consists of all Statutory Subordinated Claims against PIK Borrower.

(b)     *Treatment*.   Holders of Allowed Statutory Subordinated Claims shall not receive or retain any distribution or property on account of such Allowed Statutory Subordinated Claims.

(c)     *Voting*.   Class 2G Claims are Impaired and the Holders of Allowed Class 2G Claims are conclusively presumed to reject the Plan.  The votes of Holders of Class 2G Claims will not be solicited.

3.     *Classification of Claims Against HY Notes Issuer*

i     Class 3A:  Other Priority Claims against HY Notes Issuer

(a)     *Classification*.   Class 3A consists of all Allowed Other Priority Claims against HY Notes Issuer.

(b)     *Treatment*.   The legal, equitable and contractual rights of the Holders of Allowed Class 3A Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 3A Claim is an Allowed Class 3A Claim on the Effective Date or (b) the date on which such Class 3A Claim becomes an Allowed Class 3A Claim, each Holder of an Allowed Class 3A Claim shall be paid in full by the

Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 3A Claim, at the election of the Disbursing Agent: (x) Cash equal to the amount of such Allowed Class 3A Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 3A Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code. Any Cash paid to Allowed Class 3A Claims shall be funded from (1) the Cash held by HY Notes Issuer as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided hereunder, from the Additional Cash Allocation.

(c)     *Voting*.  Class 3A Claims are Unimpaired and the Holders of Allowed Class 3A Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

ii     Class 3B:  Other Secured Claims against HY Notes Issuer

(a)     *Classification*.  Class 3B consists of all Allowed Other Secured Claims against HY Notes Issuer.

(b)     *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 3B Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 3B Claim is an Allowed Class 3B Claim on the Effective Date or (b) the date on which such Class 3B Claim becomes an Allowed Class 3B Claim, each Holder of an Allowed Class 3B Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 3B Claim, at the election of the Disbursing Agent: (x) Cash equal to the amount of such Allowed Class 3B Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 3B Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.  On the Effective Date, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. Any Cash paid to Allowed Class 3B Claims shall be funded from (1) the Cash held by HY Notes Issuer as set forth in the Debtors' Schedules, and (2) to the extent that such funds are insufficient to pay such Claims in full as provided hereunder, from the Additional Cash Allocation.

(c)    *Voting*.  Class 3B Claims are Unimpaired and the Holders of Allowed Class 3B Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

iii    Class 3C: Senior Debt Claims against HY Notes Issuer

(a)    *Classification*.   Class 3C consists of all Senior Debt Claims against HY Notes Issuer.  The estimated amount of the Allowed Class 3C Claims is € 777,624,505.73 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the Senior Facility Agreement, for all purposes under the Plan.  Each Senior Lender shall be entitled to a single recovery under the Plan on account of its collective Senior Debt Claims against all Debtors, and will be provided a single Ballot entitling it to vote its collective Senior Debt Claims against all Debtors.

(b)    *Treatment*. Each Holder of an Allowed Senior Debt Claim (as of the Distribution Record Date) against the HY Notes Issuer shall receive the treatment described in Section 3.5(c)(ii) of the Plan in full satisfaction, settlement, discharge and release of, all Senior Debt Claims against HY Notes Issuer.

(c)    *Voting*.   Class 3C Claims are Impaired and the Holders of Allowed Class 3C Claims are entitled to vote to Accept or reject the Plan.

iv    Class 3D: HY Notes Claims against HY Notes Issuer

(a)    *Classification*.  Class 3D consists of all HY Notes Claims against HY Notes Issuer.  The HY Notes Claims shall be Allowed Class 3D Claims in the aggregate amount (in U.S. dollars or U.S. Dollar Equivalent) of the sum of €395,000,000.00 and $200,000,000.00 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the HY Indenture, for all purposes under the Plan. Each HY Noteholder shall be entitled to a single recovery under the Plan on account of its HY Notes Claims against all Debtors, and will be provided a single Ballot entitling it to vote its HY Notes Claims against all Debtors.

(b)    *Treatment*.  Each Holder of an Allowed HY Notes Claim against HY Notes Issuer shall receive the treatment described in Section 3.5(d)(ii)of the Plan in full satisfaction, settlement, discharge and release of, all HY Notes Claims against HY Notes Issuer.

(c)    *Voting*.   Class 3D Claims are Impaired and the Holders of Allowed Class 3D Claims are entitled to vote to Accept or reject the Plan.

v        <u>Class 3F:  General Unsecured Claims against HY Notes Issuer</u>

(a)    *Classification*.  Class 3F consists of all General Unsecured Claims against HY Notes Issuer.

(b)    *Treatment*.

(A)    Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class 3F Claim is Allowed on the Effective Date or otherwise the date on which such Class 3F Claim becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, as made on its Ballot, (x) if such Allowed Class 3F Claim is a Convenience Claim, Cash equal to the amount of such Allowed Class 3F Claim or Cash equal to $30,000 if the aggregate amount of such Allowed Class 3F Claim is in excess of $30,000 or (y) if such Allowed Class 3F Claim is not a Convenience Claim, a Pro Rata share of the GUC Cash Allocation; <u>provided</u>, <u>however</u>, that no such distribution under the foregoing clause (y) shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim.

(B)    The distributions provided to Holders of Allowed General Unsecured Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

(C)    *Voting*.  Class 3F Claims are Impaired and the Holders of Allowed Class 3F Claims are entitled to vote to Accept or reject the Plan.

vi       <u>Class 3G:  Statutory Subordinated Claims against HY Notes Issuer</u>

(a)    *Classification*.  Class 3G consists of all Statutory Subordinated Claims against HY Notes Issuer.

(b)    *Treatment*.  Holders of Allowed Statutory Subordinated Claims shall not receive or retain any distribution or property on account of such Allowed Statutory Subordinated Claims.

(c)    *Voting*.  Class 3G Claims are Impaired and the Holders of Allowed Class 3G Claims are conclusively presumed to reject the Plan.  The votes of Holders of Class 3G Claims will not be solicited.

4.    *Classification of Claims Against TAC*

i    Class 4A:  Other Priority Claims against TAC

(a)    *Classification*.  Class 4A consists of all Allowed Other Priority Claims against TAC.

(b)    *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 4A Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 4A Claim is an Allowed Class 4A Claim on the Effective Date or (b) the date on which such Class 4A Claim becomes an Allowed Class 4A Claim, each Holder of an Allowed Class 4A Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 4A Claim, at the election of the Disbursing Agent:   (x) Cash equal to the amount of such Allowed Class 4A Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 4A Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.

(c)    *Voting*.  Class 4A Claims are Unimpaired and the Holders of Allowed Class 4A Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

ii    Class 4B:  Other Secured Claims against TAC

(a)    *Classification*.  Class 4B consists of all Allowed Other Secured Claims against TAC.

(b)    *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 4B Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 4B Claim is an Allowed Class 4B Claim on the Effective Date or (b) the date on which such Class 4B Claim becomes an Allowed Class 4B Claim, each Holder of an Allowed Class 4B Claim shall be paid in full by the Disbursing Agent in full satisfaction, discharge and release of, such Allowed Class 4B Claim, at the election of the Disbursing Agent:   (x) Cash equal to the amount of such Allowed Class 4B Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 4B Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.   On the Effective Date, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or

rule or the vote, consent, authorization or approval of any Person.

(c) *Voting*.  Class 4B Claims are Unimpaired and the Holders of Allowed Class 4B Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

iii    Class 4C: Senior Debt Claims against TAC

(a) *Classification*.  Class 4C consists of all Senior Debt Claims against TAC.  The estimated amount of the Allowed Class 4C Claims is € 777,624,505.73 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the Senior Facility Agreement, for all purposes under the Plan.  Each Senior Lender shall be entitled to a single recovery under the Plan on account of its collective Senior Debt Claims against all Debtors, and will be provided a single Ballot entitling it to vote its collective Senior Debt Claims against all Debtors.

(b) *Treatment*.

(A) On the Effective Date, pursuant to, and upon consummation of, the transactions contemplated in Section 5.3(e) of the Plan (x) each Holder of an Allowed Senior Debt Claim (as of the Distribution Record Date) shall, by transferring its Senior Debt Claims against TAC to Newco, receive in exchange for its Senior Debt Claims against TAC, **a Pro Rata share of** (1) the Senior Lender Debt Distribution (to be received in the form of the Facility 1 Distribution or Facility 2 Distribution, as applicable), (2) the Senior Lender Equity Distribution (in the form of the Equityco Distribution and/or the PIKco Distribution, at the Election of the Senior Lender), and (3) the MIP Equityco Warrants (for transfer to MIPco pursuant to the Management Incentive Plan); and (y) the Senior Agent shall (1) receive the proceeds of the TUSA Sale, and (2) distribute such proceeds to Newco (or as Newco directs) as the transferee of, and in full satisfaction, settlement, discharge and release of, the Senior Debt Claims against TAC.

A vote in favor of the Plan by a Senior Lender which is a lender of record on the date of such vote shall expressly constitute (as set out in the Ballot) an instruction to the Senior Agent and Security Agent to take all actions set out in the Instructions. Upon the occurrence of the Confirmation Date, and without further action by or order of the Bankruptcy Court, (1) the Senior Agent and Security Agent shall be authorized to take (x) all actions contemplated by the Instructions; and (y) any other steps

that the Senior Agent or the Security Agent may be instructed to take for the purposes of implementing the Plan, in each case subject to the requisite majorities being obtained for purposes of the Senior Finance Documents, and (2) TAC shall be authorized to serve as proxy to act on behalf of all Holders of Senior Debt Claims (as of the Distribution Record Date), whether or not any such Holder voted in favor of the Plan, in connection with the transactions described in Sections 5.3(e) and 5.10(c) - (d) of the Plan but, for the avoidance of doubt, not in relation to the execution of Mandatory Transfer Certificates.

(B)     The consideration provided under the Plan shall be the sole source of recovery for the Holders of the Allowed Senior Debt Claims, in respect of both Debtors and Non-Debtor Subsidiaries.

(C)     On the Effective Date, (1) Senior Debt Claims (other than Claims arising on or after the Effective Date in connection with any of the Restructuring Documents) against TUSA or any Non-Debtor Subsidiary, and the Liens granted by TAC on the TUSA Equity Interests, shall, to the extent of the Release, be extinguished, and (2) the Holders of Senior Debt Claims shall be enjoined from taking any action against any Debtor or **any** Non-Debtor Subsidiary**,** on account of any Senior Debt Claim **to the extent that such actions relate to claims or liens subject to the Release**.

(c)     *Voting.*     Class 4C Claims are Impaired and the Holders of Allowed Class 4C Claims are entitled to vote to Accept or reject the Plan.

iv     Class 4D: HY Notes Claims against TAC

(a)     *Classification.*  Class 4D consists of all HY Notes Claims against TAC.  The HY Notes Claims shall be Allowed Class 4D Claims in the aggregate amount (in U.S. dollars or U.S. Dollar Equivalent) of the sum of €395,000,000.00 and $200,000,000.00 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the HY Indenture, for all purposes under the Plan.  Each HY Noteholder shall be entitled to a single recovery under the Plan on account of its HY Notes Claims against all Debtors, and will be provided a single Ballot entitling it to vote its HY Notes Claims against all Debtors.

(b)     *Treatment*.

(A)     If the HY Noteholder Classes vote to Accept the Plan, on, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed HY Notes Claim shall receive, in full satisfaction, settlement, discharge, and release of, all HY Notes Claims against TAC, (1) a Pro Rata share of the HY Noteholder Cash Distribution, and (2) a Pro Rata share of the HY Noteholder Warrants.

(B)     If the HY Noteholder Classes do not vote to Accept the Plan, Holders of Allowed HY Notes Claims shall not be entitled to any distributions under the Plan.

(C)     The distributions provided to Holders of Allowed HY Notes Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

(D)     If the HY Noteholder Classes vote to Accept the Plan, TAC shall, upon the occurrence of the Confirmation Date, and without further action by or order of the Bankruptcy Court, be authorized to serve as proxy to act on behalf all Holders of HY Notes Claims (whether or not any such Holder voted in favor of the Plan) in connection with the transactions described in Section 5.3(e) of the Plan.

(E)     The consideration provided under the Plan shall be the sole source of recovery for the Holders of HY Notes Claims in respect of both Debtors and Non-Debtor Subsidiaries.

(F)     On the Effective Date, (1) HY Notes Claims of HY Noteholders (other than Claims arising on or after the Effective Date in connection with any of the Restructuring Documents) against TUSA or any Non-Debtor Subsidiary, and the Liens granted by TAC on the TUSA Equity Interests, shall, to the extent of the Release, be extinguished, and (2) the Holders of HY Notes Claims thereof shall be enjoined from taking any action against any Debtor or **any** Non-Debtor Subsidiary**,** on account of any HY Notes Claim **to the extent that such actions relate to claims or liens subject to the Release**.

(c)     *Voting*.   Class 4D Claims are Impaired and the Holders of Allowed Class 4D Claims are entitled to vote to Accept or reject the Plan.

v        Class 4F:  General Unsecured Claims against TAC

(i)      *Classification*.  Class 4F consists of all General Unsecured Claims against TAC.

(ii)      *Treatment*.

(A)      Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class 4F Claim is Allowed on the Effective Date or otherwise the date on which such Class 4F Claim becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, as made on its Ballot, (x) if such Allowed Class 4F Claim is a Convenience Claim, Cash equal to the amount of such Allowed Class 4F Claim or Cash equal to $30,000 if the aggregate amount of such Allowed Class 4F Claim is in excess of $30,000 or (y) if such Allowed Class 4F Claim is not a Convenience Claim, a Pro Rata share of the GUC Cash Allocation; provided, however, that no such distribution under the foregoing clause (y) shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim.

(B)      The distributions provided to Holders of Allowed General Unsecured Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

(iii)      *Voting*.  Class 4F Claims are Impaired and the Holders of Allowed Class 4F Claims are entitled to vote to Accept or reject the Plan.

vi        Class 4G:  Statutory Subordinated Claims against TAC

(a)      *Classification*.  Class 4G consists of all Statutory Subordinated Claims against TAC.

(b)      *Treatment*.  Holders of Allowed Statutory Subordinated Claims shall not receive or retain any distribution or property on account of such Allowed Statutory Subordinated Claims.

(c)      *Voting*.  Class 4G Claims are Impaired and the Holders of Allowed Class 4G Claims are conclusively presumed to reject the Plan.  The votes of Holders of Class 4G Claims will not be solicited.

5.      *Classification of Claims Against TUSA*

i       Other Priority Claims against TUSA

(a)     *Classification*.  Class 5A consists of all Allowed Other Priority Claims against TUSA.

(b)     *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 5A Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 5A Claim is an Allowed Class 5A Claim on the Effective Date or (b) the date on which such Class 5A Claim becomes an Allowed Class 5A Claim, each Holder of an Allowed Class 5A Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 5A Claim, at the election of the Disbursing Agent:  (x) Cash equal to the amount of such Allowed Class 5A Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 5A Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.

(c)     *Voting*.  Class 5A Claims are Unimpaired and the Holders of Allowed Class 5A Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

ii      Class 5B:  Other Secured Claims against TUSA

(a)     *Classification*.  Class 5B consists of all Allowed Other Secured Claims against TUSA.

(b)     *Treatment*.  The legal, equitable and contractual rights of the Holders of Allowed Class 5B Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (a) the Initial Distribution Date if such Class 5B Claim is an Allowed Class 5B Claim on the Effective Date or (b) the date on which such Class 5B Claim becomes an Allowed Class 5B Claim, each Holder of an Allowed Class 5B Claim shall be paid in full by the Disbursing Agent in full satisfaction, settlement, discharge and release of, such Allowed Class 5B Claim, at the election of the Disbursing Agent:  (x) Cash equal to the amount of such Allowed Class 5B Claim; (y) such other less favorable treatment as to which the Disbursing Agent and the Holder of such Allowed Class 5B Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.  On the Effective Date, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or

rule or the vote, consent, authorization or approval of any Person.

(c)   *Voting*.  Class 5B Claims are Unimpaired and the Holders of Allowed Class 4B Claims are deemed to have Accepted the Plan and are therefore not entitled to vote.

iii   Class 5C: Senior Debt Claims against TUSA

(i)   *Classification*.  Class 5C consists of all Senior Debt Claims against TUSA.  The estimated amount of the Allowed Class 5C Claims is €777,624,505.73 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the Senior Facility Agreement, for all purposes under the Plan.  Each Senior Lender shall be entitled to (1) a single recovery under the Plan on account of its collective Senior Debt Claims against all Debtors, and (2) a single Ballot entitling it to vote its collective Senior Debt Claims against all Debtors.

(ii)   *Treatment*. Each Holder of an Allowed Senior Debt Claim (as of the Distribution Record Date) against TUSA shall receive the treatment described in Section 3.5(c)(ii) of the Plan in full satisfaction, settlement, discharge and release of, all Senior Debt Claims against TUSA.

(iii)   *Voting*.   Class 5C Claims are Impaired and the Holders of Allowed Class 5C Claims are entitled to vote to Accept or reject the Plan.

iv   Class 5D: HY Notes Claims against TUSA

(a)   *Classification*.  Class 5D consists of all HY Notes Claims against TUSA.  The HY Notes Claims shall be Allowed Class 5D Claims in the aggregate amount (in U.S. dollars or U.S. Dollar Equivalent) of the sum of €395,000,000.00 and $200,000,000.00 plus accrued but unpaid interest as of the Petition Date and any unpaid fees and expenses owed pursuant to the terms of the HY Indenture, for all purposes under the Plan.  Each HY Noteholder shall be entitled to a single recovery under the Plan on account of its HY Notes Claims against all Debtors, and will be provided a single Ballot entitling it to vote its HY Notes Claims against all Debtors.

(b)   *Treatment*.  Each Holder of an Allowed HY Notes Claim against TUSA shall receive the treatment described in Section 3.5(d)(ii) of the Plan in full satisfaction, settlement, discharge and release of, all HY Notes Claims against TUSA.

(c) *Voting*. Class 5D Claims are Impaired and the Holders of Allowed Class 5D Claims are entitled to vote to Accept or reject the Plan.

v Class 5F:  General Unsecured Claims against TUSA

(a) *Classification*.  Class 5F consists of all General Unsecured Claims against TUSA.

(b) *Treatment*.

(A) Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class 5F Claim is Allowed on the Effective Date or otherwise the date on which such Class 5F Claim becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, as made on its Ballot, (x) if such Allowed Class 5F Claim is a Convenience Claim, Cash equal to the amount of such Allowed Class 5F Claim or Cash equal to $30,000 if the aggregate amount of such Allowed Class 5F Claim is in excess of $30,000 or (y) if such Allowed Class 5F Claim is not a Convenience Claim, a Pro Rata share of the GUC Cash Allocation; provided, however, that no such distribution under the foregoing clause (y) shall exceed an amount of 50% of the face amount of such Allowed General Unsecured Claim.

(B) The distributions provided to Holders of Allowed General Unsecured Claims shall be funded from the distribution otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Senior Debt Claims.

(c) *Voting*.  Class 5F Claims are Impaired and the Holders of Allowed Class 5F Claims are entitled to vote to Accept or reject the Plan.

vi Class 5G:  Statutory Subordinated Claims against TUSA

(a) *Classification*.  Class 5G consists of all Statutory Subordinated Claims.

(b) *Treatment*.  Holders of Allowed Statutory Subordinated Claims shall not receive or retain any distribution or property on account of such Allowed Statutory Subordinated Claims.

(c) *Voting*.  Class 5G Claims are Impaired and the Holders of Allowed Class 5G Claims are conclusively presumed to reject

the Plan.  The votes of Holders of Class 5G Claims will not be solicited.

**E.      Means for Implementation**

    1.    *Overview*

        i    The Financial Restructuring provides for, among other things:

        (a)    the discharge of Claims and Liens against the Debtors pursuant to the Plan;

        (b)    the implementation of a series of transactions, including the transfer to Newco of Senior Debt Claims against TAC, and the Release.  For the avoidance of doubt, the Release shall not include or be deemed to include the Senior Debt Claims against TAC other than a release of the Lien over TAC's Equity Interest in TUSA, which shall continue to be outstanding after such Release until discharged and extinguished by virtue of the Plan. The Release shall be made in accordance with Clause 22.4 of the Intercreditor Agreement, in connection with a sale of TUSA Equity Interests made at the request of the Senior Agent in connection with an Enforcement Action; and

        (c)    issuance of New Ordinary Shares and Junior Creditor Equityco Warrants, and entry into the New Bank Debt and New PIK Debt.

        ii    Upon the completion of the transactions contemplated herein, following the Effective Date:

        (a)    Equityco and PIKco will operate as the holding companies for Holdco.

        (b)    Holdco will operate as the holding company for Newco.

        (c)    Newco will operate as the holding company for (i) Reorganized Truvo, and (ii) Truvo Belgium and its subsidiaries (all Non-Debtor Subsidiaries).

        (d)    Reorganized Truvo will remain in existence to (a) serve as collection agent for the Debtors for the purpose of collecting the Tax Refund, if any, (b) take actions as required under the Plan, and (c) fulfill its mandate as proxy pursuant to the Plan, and thereafter will be liquidated, all as set forth in Section 5.5 of the Plan.

        (e)    Each of the Debtors (other than TAC) will be liquidated on the Effective Date, as set forth in Section 5.5 of the Plan.

2. *Actions to be Taken on the Effective Date Prior to the TUSA Sale*

i    On the Effective Date, but immediately prior to the consummation of the TUSA Sale:

(a)    (i) Truvo Parent shall designate TAC as collection agent for each of the Debtors for purposes of prosecuting and collecting the Tax Refund; (ii) Truvo Parent, PIK Borrower, HY Notes Issuer and TAC will each acknowledge that TUSA is the beneficial owner of the Tax Refund and will unconditionally and forever release and waive any claim they have now or in the future to the Tax Refund; and (iii) each Debtor other than TUSA shall irrevocably assign any right to retain or receive the Tax Refund to Truvo Belgium, which in turn will transfer such right to Truvo Services & Technology as set forth in Section 5.3 of the Plan, as of the Effective Date.

(b)    Pursuant to the Plan and section 365 of the Bankruptcy Code, TUSA and TAC shall each assume the Assumed Contracts to which such Debtor is a party and shall assign the Assumed Contracts to Truvo Belgium.

3. *TUSA Sale And Other Restructuring Transactions*

The implementation of the Plan is predicated upon the approval by the Bankruptcy Court of the TUSA Sale and the consummation thereof hereunder. The terms and conditions of the TUSA Sale, as set forth in the Purchase Agreement, are incorporated herein and shall be deemed to constitute part of the Plan for all purposes. The following summary of the TUSA Sale in clauses (a)-(d) below, as set forth in the Purchase Agreement, is qualified in its entirety by the terms thereof:

(a)    The Purchase Agreement provides that Newco shall pay the Cash Purchase Price as set forth in the Purchase Agreement.

(b)    The Purchase Agreement provides for the sale of TAC's Equity Interests in TUSA.

(c)    Upon consummation of the TUSA Sale, TAC shall no longer have any ownership interests in TUSA or any of its subsidiaries.

(d)    As a condition to the consummation of the TUSA Sale, the Debtors must receive, pursuant to the Confirmation Order, Bankruptcy Court approval of and authorization for, among other things, the Debtors to perform all of their obligations under the Purchase Agreement.

(e)    The steps to accomplish and implement the TUSA Sale are as follows:

(A)    Prior to the Effective Date:

1    Each of Holdco, Equityco and PIKco will be incorporated as subsidiaries of the Truvo Initial Owners, each in the form of a Belgian NV (*naamloze vennootschap*).

2    Pursuant to the Confirmation Order, the automatic stay (and any preliminary injunction entered in the Chapter 11 Cases) will be modified to permit acceleration of the Senior Loans and the making of a demand under the Senior Guarantee Claims against TAC.

3    Mandatory Transfer Certificates shall be executed by all Senior Lenders (as required under the Plan and the Confirmation Order) and Newco, and delivered to the Senior Agent (to take effect on the Effective Date following the granting of the Release by the Security Agent). Newco shall execute and deliver an Accession Deed to the Security Agent, to take effect on the Effective Date.

4    TAC will contribute its intercompany receivables against TUSA to TUSA's capital at face value.

5    Within five Business Days following receipt of the Company Notice (as defined in the Instructions), per the instruction of the Majority Lenders (as defined in the Senior Facility Agreement), as evidenced by duly executed ballots expressly setting out the Instructions (or other duly executed documentation) and subject to the satisfaction of the relevant Senior Agent Conditions Precedent, the Senior Agent will issue an acceleration notice to the Obligors (as listed in Schedule 2 to Exhibit F to the Plan) (a) canceling the Total Commitments (as defined in the Senior Facility Agreement); (b) declaring all Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Senior Finance Documents be immediately due and payable; and (c) demanding immediate repayment of all Utilisations together with accrued interest and all other amounts accrued or outstanding under the Senior Finance Documents as of the date of acceleration.

(B) On the Effective Date, pursuant to the direction of the Majority Lenders, as evidenced by duly executed Ballots expressly setting out the Instructions (or other duly

executed documentation), and subject to satisfaction or waiver of each of the relevant Senior Agent Conditions Precedent and each of the relevant Security Agent Conditions Precedent, the following events will occur in the sequence described in ~~this~~ Section 5.3(e)(ii) of the Plan.

1. Truvo Initial Owners will~~, following the Confirmation Date,~~ transfer 79% of the ordinary shares of Newco to certain of the Senior Lenders (or to a special purpose vehicle formed by certain of the Senior Lenders) in accordance with Regulation S under the Securities Act or another available exemption from registration thereunder; Truvo Initial Owners will retain 21% of the ordinary shares of Newco until the commencement of the TUSA Sale on the Effective Date.

2. The Senior Agent will make a demand on TAC under the Senior Guarantee Claims against TAC.

3. The Senior Agent will request TAC to sell its Equity Interests in TUSA to Newco for cash consideration. Pursuant to such request, TAC, TUSA and Newco will enter into the Purchase Agreement providing for TAC to sell its Equity Interests in TUSA to Newco for the Cash Purchase Price (to be paid in accordance with the Funds Flow Agreement).

4. Pursuant to Clause 22.4 of the Intercreditor Agreement and the Instructions, the Security Agent will grant the Release.

5. TUSA will transfer (a) all its assets (including its right and entitlement to the Tax Refund) except (i) ownership interests in Truvo Belgium and (ii) the Existing X/N Notes, and (b) the TUSA Transferred Intercompany Claims, to its direct subsidiary Truvo Belgium in exchange for debt (the terms and conditions of which will be aligned with the New Senior Credit Agreement) and new ordinary shares issued by Truvo Belgium.

6. Truvo Belgium will transfer the assets described in this paragraph 6 to Truvo Services & Technology for aggregate fair market value in exchange for recognition of share premium and debt (the terms and conditions of which will be

aligned with the New Senior Credit Agreement) from Truvo Services & Technology. Transferred assets will be: (a) the right to the Tax Refund, and (b) Truvo Belgium's interest in Truvo Services South Africa (Pty) Ltd.

7      The terms and conditions of the Existing X/N Notes will then be amended to align the interest rate with the New Bank Debt.

8      Mandatory Transfer Certificates, executed by Newco and all Senior Lenders (as required under the Plan and the Confirmation Order) will be executed by the Senior Agent, and the Accession Deed referred to above will be entered into by Newco and the Security Agent.

9      Without prejudice to the Senior Agent Conditions Precedent and/or the Security Agent Conditions Precedent, the Senior Lenders (by the Senior Lender Class voting to Accept the Plan) will (a) transfer a portion of their Senior Debt Claims against TAC to Newco in exchange for an obligation to acknowledge indebtedness to the Senior Lenders pursuant to the New Senior Credit Agreement (the "Debt Acknowledgement Obligation"), such obligation to be conditional upon the repayment of the Daylight Facility; and (b) transfer by way of contribution (acting through TAC appointed as a proxy under the Plan) the remainder of their Senior Debt Claims against TAC to Newco in exchange for Newco Ordinary Shares.

10     In exchange for the Equity Interests in TUSA, Newco shall pay the Cash Purchase Price to TAC, subject to the terms and conditions of the Purchase Agreement and in accordance with the Funds Flow Agreement. The Cash Purchase Price will be funded through the Daylight Facility.

          (a) In accordance with the Plan, the Confirmation Order, and the Funds Flow Agreement, TAC will ~~pay~~**receive** the proceeds of the sale of the Equity Interests in TUSA **and pay them** over to the Senior Agent.

          (b) The Senior Agent will pay such proceeds ~~to~~**at the direction of** Newco-

(or as Newco directs), as transferee of the Senior Debt Claims against TAC in each case, in accordance with (and subject to the terms of) the Funds Flow Agreement and the Senior Facility Agreement. (c) In accordance with the Funds Flow Agreement, Newco will apply the proceeds of the sale of the Equity Interests in TUSA, to repay the Daylight Facility.

11 Newco and the **The** Senior Lenders, **Newco and certain members of the Reorganized Truvo Group** will enter into the New Senior Credit Agreement pursuant to the Debt Acknowledgement Obligation.

12 The Senior Lenders (by the Senior Lender Classes voting to Accept the Plan, and acting through TAC, appointed as a proxy under the Plan) will contribute Newco Ordinary Shares to Holdco in exchange for Holdco Ordinary Shares and MIP Holdco Warrants (to be issued in accordance Section 5.3(e)(ii)(13) of the Plan).

13 TAC, representing all Senior Lenders pursuant to the Plan, and Truvo Belgium shall, by voting at an extraordinary meeting of shareholders of Holdco, (a) to adopt the Holdco Charter in accordance with the Shareholders' Agreement, (b) provided that the Requisite Junior Classes have voted to Accept the Plan, cause Holdco to issue Junior Creditor Holdco Warrants for the benefit of HY Noteholders and PIK Lenders and, (C**b**) cause Holdco to issue MIP Holdco Warrants to TAC, acting on behalf of the Senior Lenders, pursuant to the Management Incentive Plan **and (c) adopt the Holdco Charter in accordance with the Shareholders' Agreement**. Provided that the HY Noteholder Classes have voted to Accept the Plan, Truvo Belgium shall also distribute to each HY Noteholder, its Pro Rata share of the HY Noteholder Cash Distribution. The issuance of the Junior Creditor Holdco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan) on or after the Effective Date is subject to the delivery of Acceptance Notices as further described in Section 6.12 of the Plan.

14    In accordance with the Election set forth in Article III of the Plan, the Senior Lenders (by the Senior Lender Classes voting to Accept the Plan and acting through TAC appointed as a proxy under the Plan) shall: (a) contribute Holdco Ordinary Shares to Equityco in exchange for the Equityco Distribution ~~(including the MIP Equityco Ordinary Shares)~~, and/or (b) contribute Holdco Ordinary Shares to PIKco in exchange for the PIKco Distribution.

15    TAC, representing all Senior Lenders having contributed Holdco Ordinary Shares to Equityco in exchange for the Equityco Distribution pursuant to the Plan, shall transfer the MIP Equityco Ordinary Shares to MIPco in a transaction not subject to, or exempt from, the registration requirements of the Securities Act.

16    TAC, representing all Senior Lenders pursuant to the Plan, and Truvo Belgium, shall, by voting at an extraordinary meeting of shareholders of Equityco and PIKco, as applicable, (a) ~~adopt the Equityco Charter and PIKco Charter, as applicable, in accordance with the Shareholders' Agreement, (b)~~ provided that the Requisite Junior Classes have voted to Accept the Plan, cause Equityco to issue HY Noteholder Warrants and PIK Lender Warrants for the benefit of the HY Noteholders and the PIK Lenders, respectively, in exchange for Junior Creditor Holdco Warrants transferred to Equityco by the HY Noteholders and the PIK Lenders (acting through either TAC pursuant to Section 5.7 of the Plan, on the Effective Date, or any two directors of Holdco pursuant to the powers granted under the Acceptance Notice, following the Effective Date), ~~and~~ (**e**b) cause Equityco to issue MIP Equityco Warrants to the Senior Lenders in exchange for MIP Holdco Warrants transferred to Equityco by the Senior Lenders (acting through TAC, appointed as a proxy under the Plan) **and (c) adopt the Equityco Charter and PIKco Charter, as applicable, in accordance with the Shareholders' Agreement**.

17    TAC, representing all Senior Lenders pursuant to the Plan, will transfer the MIP Equityco Warrants to MIPco in a transaction not subject

to, or exempt from, the registration requirements of the Securities Act.

18    Newco, as TUSA's sole member, will adopt a resolution to commence, and take actions relating to, the dissolution and liquidation of TUSA.

19    TUSA will then distribute all its remaining assets to Newco, including: (a) TUSA's ownership interests in Truvo Belgium, and (b) receivables against Truvo Belgium (i.e., receivables from the debt issued as consideration for the transfer of assets by TUSA to Truvo Belgium and the Existing X/N Notes).

20    Newco, as TUSA's sole member, will adopt a written consent approving the filing of a certificate of cancellation, upon the filing of which TUSA will have dissolved and liquidated.

21    Truvo Belgium will assume all of Newco's obligations under the New Senior Credit Agreement by way of novation by change of debtor. Truvo Belgium's claims against Newco as a result of such assumption of obligations shall be set off against Truvo Belgium's debt vis-à-vis Newco. No physical movement of funds will be required in order to achieve such debt push-down.

22    Truvo Services & Technology will assume a portion of Truvo Belgium's obligations (the Senior Dutch Tranche and Second Lien Dutch Tranche) under the New Senior Credit Agreement by way of a novation by change of debtor. Truvo Services & Technology's claims against Truvo Belgium as a result of such assumption of obligations shall be set-off against Truvo Belgium's debt vis-à-vis Truvo Services & Technology resulting from the sale of assets described in ~~paragraph 5 above~~**Section 5.3(e)(ii)(6) of the Plan**. No physical movement of funds will be required in order to achieve this debt push-down.

4.    *TAC Sale*

After the completion of the TUSA Sale, on the Effective Date, Reorganized Truvo will be sold to Newco free and clear of all Claims, Liens, or other liabilities pursuant to the TAC Purchase Agreement and the Plan. The terms and conditions of the TAC Sale, including the TAC Purchase Agreement, are

incorporated into the Plan and shall be deemed to constitute part of the Plan for all purposes. In exchange for the Equity Interests in Reorganized Truvo, Newco shall pay a nominal cash consideration of €1 and assume certain liabilities as set forth in the TAC Purchase Agreement.

5.    *Liquidation of Debtors*

i      Debtors other than TAC

On the Effective Date, immediately after the completion of the TUSA Sale, following the transactions contemplated under Section 5.3 of the Plan. TUSA, and each of the Debtors other than TAC, will be liquidated pursuant to the Plan. A certificate of cancellation or dissolution, as applicable for each Debtor, except TAC, will be filed with Delaware's Secretary of State immediately after the Effective Date. Each such liquidation shall be effective as of the Effective Date pursuant to the Plan and the Confirmation Order.

ii     Reorganized Truvo

(a)    After the foregoing transactions, as of the Effective Date, Reorganized Truvo will remain in existence solely to (a) serve as a collection agent for the Debtors for the purpose of prosecuting and collecting the Tax Refund, if any, (b) take actions as required under the Plan, and (c) fulfill its mandate as proxy pursuant to the Plan.

(b)    The Tax Refund, if any, will be collected by Reorganized Truvo and remitted to Truvo Services & Technology following resolution of tax issues. Following the remittance of the Tax Refund, Reorganized Truvo will be liquidated pursuant to the Plan. A certificate of dissolution for TAC will be filed with Delaware's Secretary of State.

(c)    The liquidation of Reorganized Truvo shall be effective as of the first Business Day following Reorganized Truvo's distribution of the Tax Refund to Truvo Services & Technology, pursuant to the Plan and Confirmation Order without any further action by the stockholders, members, or directors of Reorganized Truvo. A certificate of cancellation or dissolution for Reorganized Truvo will be filed with Delaware's Secretary of State immediately thereafter.

6.    *Other Restructuring Transactions*

(a)    On or after the Effective Date, without limiting any rights and remedies of the Debtors or Reorganized Truvo Group under the Plan or applicable law, the Reorganized Truvo Group may enter into such transactions and may take such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Truvo Group. Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be

determined by the Reorganized Truvo Group to be necessary or appropriate (collectively, the "Restructuring Transactions") provided such Restructuring Transactions comply with the terms of (including applicable lender or shareholder consent requirements), and are not prohibited by, the Plan, the Plan Support Agreement, the New Bank Debt, the Shareholders' Agreement or the Purchase Agreement. The actions to effect the Restructuring Transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and the Purchase Agreement and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and the Purchase Agreement and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Reorganized Truvo Group to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Truvo Group vesting in one or more surviving, resulting, or acquiring corporations. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to the Reorganized Truvo Group, such surviving, resulting or acquiring corporation will perform the obligations of the Reorganized Truvo Group pursuant to the Plan to pay or otherwise satisfy the Allowed Claims to the extent not already paid or satisfied.

(b)     The Restructuring Transactions will include, without limitation, the following actions:

- Truvo Corporate CVBA, a Non-Debtor Subsidiary, will complete its liquidation proceedings under applicable Belgian law. Prior to the Effective Date, Truvo Corporate CVBA will have transferred, in its entirety, all of its transferable assets and liabilities to Truvo Belgium and commenced dissolution and liquidation proceedings under applicable Belgian law.

- The shareholders of the following five Dutch entities, all Non-Debtor Subsidiaries, shall cause domestic legal merger proceedings into Truvo Services & Technology within ~~90~~**140** calendar days of the Effective Date: Truvo Dutch Holdings B.V. (the Netherlands), Truvo Nederland Holdings ~~B.V.~~ **(as defined below)** (the Netherlands), Truvo Nederland (the Netherlands), Truvo Ireland Holdings B.V. (the Netherlands) and Truvo Portugal Holdings B.V. (the Netherlands).[12]

  - **These domestic legal merger proceedings will involve (in the following order) (i) a transfer by Truvo Nederland Holdings of its 99.428% shareholding in Truvo Nederland to Truvo Dutch Holdings B.V., (ii) a merger of Truvo Nederland into Truvo Nederland Holdings (a) preceded by an amendment to the articles of association of Truvo Nederland Holdings providing for a two-class capital structure (with one of the two classes being redeemable at the option of the issuer), (b) pursuant to which merger the redeemable class of shares will be issued to the holders of the minority shareholding, and (c) followed by a statutory redemption procedure in respect of the redeemable shares to remove the minority shareholding in Truvo Nederland Holdings resulting from the merger, and as a result of which the holders of that minority shareholding will receive a personal claim for the payment of a to be determined monetary amount (up to a preset maximum amount) against Truvo Nederland Holdings, which claim, ultimately, will become a claim exercisable (for a 5-year period) against Truvo Services & Technology as a result of the subsequent legal mergers), (iii) a merger of Truvo Portugal Holdings B.V. into Truvo Services & Technology, (iv) a merger of Truvo Nederland Holdings into Truvo Dutch Holdings B.V., (v) a merger of Truvo Ireland Holdings B.V. into Truvo Dutch Holdings B.V., and (vi) a merger of Truvo Dutch Holdings B.V. into Truvo Services & Technology.**

- Truvo Curaçao (the Netherlands Antilles) shall be liquidated within 90 calendar days of the Effective Date, and all assets

---

[12] Certain of the Dutch merger proceedings may be commenced prior to the Effective Date.

and liabilities of Truvo Curaçao will be assumed by Truvo Services & Technology as a result thereof.[13]

- Truvo Information Holdings LLC shall transfer its ownership interest in Truvo Belgium (10 shares) to Truvo Services & Technology for a nominal consideration. The latter will become the new unlimited partner of Truvo Belgium. Truvo Information Holdings LLC will merge into Reorganized Truvo following such transfer.

- Truvo Media Holdings LLC shall transfer its ownership interest in Servicios Tecnicos E Desenvolvimento LDA (Portugal) (100 shares) to Truvo Belgium for a nominal consideration. Truvo Media Holdings LLC will merge into Reorganized Truvo following such transfer.

- Truvo Technologies SRL (Romania) will commence sale or liquidation procedures by the end of 2010, and the proceeds thereof, if any, will be received by Truvo Services & Technology.

7. *TAC Representation Powers*

i       Upon the Effective Date, without prejudice to the generality of Section 12.2 of the Plan and more specific provisions elsewhere in the Plan, the Senior Lenders (as of the Distribution Record Date), regardless of whether any such Senior Lender has voted in favor of the Plan, shall delegate pursuant to the Ballot and/or shall be deemed to delegate to TAC, with power to fully sub-delegate such powers, the powers to, on their behalf (but, for the avoidance of doubt, not in relation to the execution of Mandatory Transfer Certificates):

(a)     waive the convening and publication requirements set forth in Articles 533 and 535 of the Belgian Companies Code in respect of any ordinary, special or extraordinary shareholders' meetings that will be held for Newco, Holdco, PIKco and/or Equityco in implementation of Section 5.3 of the Plan and take part in such shareholders' meetings (including, but not limited to, for the approval of any matters that fall within the scope of Articles 445 and 556 of the Belgian Companies Code, for the issuance of the Junior Creditor Holdco Warrants, and the Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), the MIP Holdco Warrants, or the MIP Equityco Warrants, or for the appointment of directors in accordance with the Shareholders' Agreement);

(b)     participate in all deliberations, exercise their votes during such ordinary, special or extraordinary shareholders' meetings in such a manner as to give effect to Section 5.3 of the Plan (including, but not limited to, for the approval of any matters that fall within

---

[13]     Truvo Curaçao liquidation proceedings may be commenced prior to the Effective Date.

the scope of Articles 445 and 556 of the Belgian Companies Code, for the issuance of the Junior Creditor Holdco Warrants and the Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), the MIP Holdco Warrants, or the MIP Equityco Warrants, for any amendment of the charter of Holdco, Equityco and/or PIKco, or for the appointment of directors in accordance with the Shareholders' Agreement), to make all types of declarations, to accept or propose any amendments to the agenda, to confirm the (partial) fulfillment or non-fulfillment of any conditions, to sign all deeds, minutes, lists of attendance, registers (including shareholders registers) and documents, to substitute and in general, to do all that is necessary or required to implement the present delegation;

(c)     without prejudice to Section 5.7**(a)**(vii) of the Plan, proceed with the contributions in kind and quasi-contributions in accordance with the Plan, to subscribe to, fully pay up and receive the shares in Newco, Holdco, Equityco and/or PIKco in exchange for such contributions on behalf of the Senior Lenders (as of the Distribution Record Date) in accordance with Section 5.3 of the Plan;

(d)     vote in favor of the issuance of the Junior Creditor Holdco Warrants, and the Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), the MIP Holdco Warrants, and the MIP Equityco Warrants, and the power to delegate to the directors of Holdco and/or Equityco the power to perform all acts required in Article 591 of the Belgian Companies Code;

(e)     waive during such extraordinary shareholders' meetings their preferential subscription rights in relation to the issuance of the Junior Creditor Holdco Warrants and the Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), the MIP Holdco Warrants, and the MIP Equityco Warrants;

(f)     perform any action necessary to execute any resolution taken during the meetings;

(g)     accept the Newco Ordinary Shares, the Holdco Ordinary Shares, the Equityco Ordinary Shares (including the MIP Equityco Ordinary Shares), the PIKco Ordinary Shares, the MIP Holdco Warrants and the MIP Equityco Warrants, as set forth in the Plan and the Management Incentive Plan;

(h)     transfer the MIP Holdco Warrants to Equityco, and the MIP Equityco Warrants and MIP Equityco Ordinary Shares to MIPco, as set forth in the Plan and the Management Incentive Plan; and

(i) without limiting the generality of the foregoing, perform any action and sign any documents (whether in their capacity as ~~shareholder~~**shareholders** of Newco, Holdco, Equityco and/or PIKco or in their capacity as Senior Lenders) necessary or useful for, or in relation to, the implementation of the Plan;

provided that, for the avoidance of doubt, such delegation shall not extend beyond the steps necessary to consummate the transactions set forth in Section 5.3(e) of the Plan.

ii    Upon the Effective Date, without prejudice to the generality of Section 12.2 and more specific provisions elsewhere in the Plan, the HY Noteholders and the PIK Lenders, regardless of whether any such HY Noteholder or PIK Lender has voted in favor of the Plan, shall delegate pursuant to the Ballot and/or shall be deemed to delegate to TAC, with power to fully sub-delegate such powers, the powers to, on their behalf:

(a) waive the convening and publication requirements set forth in Articles 533 and 535 of the Belgian Companies Code in respect of any ordinary, special or extraordinary shareholders' meetings that will be held for Holdco and Equityco in implementation of Section 5.3 of the Plan and to sign all deeds, minutes or lists of attendance;

(b) accept the Junior Creditor Holdco Warrants and the Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan) as prescribed by the Plan and to sign the relevant warrants registers;

(c) transfer the Junior Creditor Holdco Warrants to Equityco (provided that the Requisite Junior Classes have voted to Accept the Plan), as prescribed by the Plan and to sign Holdco's warrants register; and

(d) without limiting the generality of the foregoing, perform any action (whether in their capacity as holder of Junior Creditor Holdco Warrants and/or the Junior Creditor Equityco Warrants, provided that the Requisite Junior Classes have voted to Accept the Plan) necessary or useful for, or in relation to, the implementation of the Plan.

8.    *Closing of the Chapter 11 Cases*

When all Disputed Claims against any Debtor either have become Allowed or have been disallowed by Final Order, and no controverted matter remains outstanding, the Debtors shall seek authority with the Bankruptcy Code to close the applicable Debtor's chapter 11 case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

9.    *Reorganized Truvo Group*

Except as otherwise provided in the Plan, the Purchase Agreement or the Confirmation Order, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims,

rights and Litigation Claims of the Debtors, and any other property acquired by the Debtors or the Reorganized Truvo Group under or in connection with the Plan, shall vest in the relevant member of the Reorganized Truvo Group, free and clear of all Claims, Liens, charges, other encumbrances and Old Equity Interests, subject to the Restructuring Transactions. On and after the Effective Date, each member of the Reorganized Truvo Group may operate its businesses and may use, acquire, and dispose of property and compromise or settle any Claims against the Debtors without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan, the Purchase Agreement or the Confirmation Order. Without limiting the foregoing, each member of the Reorganized Truvo Group may pay the charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services without application or notice to or order of the Bankruptcy Court.

10. *Corporate Action*

i Certificates of Incorporation and By-Laws

The certificates or articles of incorporation and by-laws of TAC shall be amended to satisfy the provisions of the Plan, the Plan Support Agreement and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.

**i** ~~ii~~ Corporate Governance, Directors, Officers, and Corporate Action

(a) Certificates of Incorporation and By-Laws.

(A) The certificates or articles of incorporation and by-laws of TAC shall be amended to satisfy the provisions of the Plan, the Plan Support Agreement and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.

**(b)** ~~(ii)~~ *Directors and Officers of Reorganized Truvo after the Effective Date*. See Article VIII for a discussion of the governance of the Reorganized Truvo Group

**(c)** ~~(iii)~~ *Corporate Action*. On the Effective Date, the adoption of the Holdco Charter, Equityco Charter, PIKco Charter and similar constituent and organizational documents by, and the selection of directors and officers for, the Reorganized Truvo Group, and all other actions contemplated by or described in the Plan with respect thereto, shall be authorized and approved by TAC

appointed as proxy of all Holders of Senior Debt Claims under the Plan and be binding and in full force and effect in all respects (subject to the provisions of the Plan and the Confirmation Order), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule (other than filing such organizational documents with the applicable governmental unit as required by applicable law) or the vote, consent, authorization or approval of any Person. All matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Truvo Group, and any legal or corporate action required in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Truvo Group or by any other Person. On the Effective Date, the appropriate officers of the Debtors and the Reorganized Truvo Group and members of their respective boards of directors are authorized to issue, execute and deliver, and consummate the transactions, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Truvo Group, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

11. *Cancellation of Notes, Instruments and Debentures*

On the Effective Date and upon consummation of the transactions set out in Section 5.3 of the Plan, except as otherwise provided in the Plan or the Confirmation Order, (a) any notes, bonds, indentures, or other instruments or documents evidencing or creating any of the following Claims, Liens or Equity Interests that are Impaired under the Plan shall be deemed cancelled and extinguished, including without limitation: (i) Senior Debt Claims against the Debtors; (ii) HY Notes Claims against the Debtors; (iii) PIK Debt Claims; (iv) Old Equity Interests in Truvo Parent; and (v) Intercompany Equity Interests in the Debtors (other than Equity Interests in TUSA, which shall be transferred pursuant to the TUSA Sale); and (b) the obligations of the Debtors under any such agreements, documents, indentures, or certificates of designation governing the Senior Loans, HY Notes, PIK Loans and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan shall be, and are hereby, discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or Reorganized Truvo Group or by any other Person. Unless otherwise agreed by the HY Indenture Trustee, on the Effective Date, each of DTC, Euroclear and Clearstream, as applicable, shall surrender for cancellation to the HY Indenture Trustee the certificates for the HY Notes that are held by it. Notwithstanding the foregoing, the Senior Facility Agreement, the HY Indenture and the PIK Loan Agreement shall continue in effect solely for the purposes of: (i) allowing Senior Lenders (as of the Distribution Record Date and Newco as transferee of the Senior Debt Claims

against TAC), HY Noteholders, and PIK Lenders to receive distributions under the Plan and (ii) allowing and preserving the rights of the Senior Agent, HY Indenture Trustee and PIK Agent to make distributions in satisfaction of Allowed Senior Debt Claims, Allowed HY Notes Claims and Allowed PIK Debt Claims.

12.    *Issuance of Plan Securities and Related Documentation*

On the Effective Date, Newco, Holdco, Equityco, PIKco and TAC (acting as a proxy under the Plan) are authorized to and shall distribute, or cause to be distributed in accordance with the transactions set out in Section 5.3 of the Plan, the Plan Securities, and any and all other securities, notes, stock, instruments, certificates and other documents or agreements required to be issued, executed or delivered pursuant to the Plan (collectively, the "New Securities and Documents"), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.  See Section V.K, and Articles X and XI for a discussion of applicable exemptions from registration under U.S. and foreign securities laws.

Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, and any other agreement or document related to or entered into in connection with same, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

13.    *Sources of Cash for Plan Distributions*

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors to make payments pursuant to the Plan shall be obtained from existing Cash balances, the Cash Purchase Price in accordance with the Funds Flow Agreement, and the operations of the Debtors or their Affiliates.  The Reorganized Truvo Group may also make such payments using Cash received from their subsidiaries through the Reorganized Truvo Group's consolidated cash management systems.

14.    *Intercompany Claims and Intercompany Equity Interests*

On the Effective Date:

(a)    ~~The~~**the** Intercompany Claims against the Debtors shall be discharged and/or cancelled, except for the TUSA Transferred Intercompany Claims, which shall be transferred to Truvo Belgium on the Effective Date; ~~and~~

(b)    the Intercompany Equity Interests in ~~the Debtors shall be cancelled and~~**TAC and TUSA shall be sold to Newco pursuant to the TAC Sale and TUSA Sale, respectively, on the Effective Date, and the holders of such Intercompany Equity Interests shall** receive no distribution under the Plan~~, other than~~**; and**

(c)    the Intercompany Equity Interests in ~~TUSA, which shall be transferred pursuant to the TUSA Sale~~**the Debtors other than TAC shall be cancelled as of the end of the Effective Date**

- 75 -

**and the Holders of such Intercompany Equity Interests shall receive no distributions under the Plan**.

15. *Automatic Stay*

The automatic stay (and any preliminary injunction entered in the Chapter 11 Cases) will be deemed modified upon entry of the Confirmation Order to permit acceleration of the Senior Loans and the making of a demand under the Senior Guarantee Claims against TAC, in accordance with the transactions contemplated under Section 5.3(e) of the Plan and as set forth in the Instructions.

16. *HY Indenture Trustee*

**Notwithstanding anything to the contrary in the Plan, the** HY Indenture Trustee shall be entitled to payment of reasonable documented compensation and the reimbursement of all reasonable documented out-of-pocket expenses, disbursements and advances incurred or made by the HY Indenture Trustee prior to and after the Effective Date to the extent required under the HY Notes Indenture and the Intercreditor Agreement. **For the avoidance of doubt, any claims of the HY Indenture Trustee shall not be treated as General Unsecured Claims.**

## F. Procedures for Resolving Disputed Claims

1. *Resolution of Disputed Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtors and the Disbursing Agent shall have the exclusive right to make and File objections to Claims (other than Administrative Expense Claims and Professional Fees Claims to which other parties may object as set forth in Section 3.1(a) of the Plan) and shall serve a copy of each objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than ninety (90) days after the Effective Date. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if service is effectuated in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases. The Debtors and the Disbursing Agent shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof.

2. *No Distributions Pending Allowance*

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim.

3. *Distributions on Account of Disputed Claims Once They Are Allowed*

If a Disputed Claim becomes an Allowed Claim after the Initial Distribution Date, the Disbursing Agent shall be authorized to cause a distribution to be made on account of such Disputed Claim on the

date of Allowance or as soon as reasonably practicable thereafter. Such distributions will be made pursuant to the applicable provisions of Article VI of the Plan.

**G.    Provisions Governing Distributions**

1.    *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made pursuant to the Plan shall be deemed to have been made on the Effective Date. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Section 8.3 of the Plan.

2.    *No Postpetition Interest on Claims Against Debtors*

Except to the extent provided under the Plan Support Agreement, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of any such Claim against the Debtors shall be entitled to payment or distributions on account of interest accruing on or after the Petition Date.

3.    *Disbursing Agent*

Except as otherwise provided herein, all Cash distributions and other payments to be made by the Debtors or the Reorganized Truvo Group, or by any of them, under the Plan or otherwise in connection with the Chapter 11 Cases (including, without limitation, professional compensation and statutory fees) shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan.

4.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

i    Delivery of Distributions to Holders of Allowed Claims in General

(a)    Except with respect to the Senior Debt Claims, HY Notes Claims, and PIK Debt Claims and unless otherwise agreed to between the Debtors and the Holder of an Allowed Claim, the Debtors shall make distributions to the Holders of Allowed Claims in the same manner and to the same addresses as such payments are made in the ordinary course of the Debtors' businesses.

(b)    No distributions shall be made on a Disputed Claim until and unless such Disputed Claim becomes an Allowed Claim.

(c)    In order to permit distributions under the Plan, Reorganized Truvo may, but will not be required to, establish reasonable reserves for Disputed Claims.

(d)      On the Effective Date, distributions, if any to (i) Holders of Allowed Senior Debt Claims (as of the Distribution Record Date) shall be delivered to such Holders in accordance with transactions set out in Sections 5.3(e)(ii)(9), (11)-(13) of the Plan, (ii) Holders of Allowed HY Notes Claims shall be delivered to the HY Indenture Trustee or, if so directed by the HY Indenture Trustee, shall be delivered to the Disbursing Agent for distribution to such Holders, and (iii) Holders of Allowed PIK Debt Claims shall be delivered to the PIK Agent or, if so directed by the PIK Agent, shall be delivered to the Disbursing Agent for distribution to such Holders.

(e)      Other than the evidentiary certificates referred to at the end of this paragraph, physical certificates representing Plan Securities will not be issued pursuant to the Plan. The ordinary shares in Newco, Holdco, PIKco and Equityco will be registered (*op naam*). Ownership in Newco, Holdco, Equityco and PIKco shall be evidenced by registration in the respective shareholders registers of Newco, Holdco, Equityco and PIKco, as applicable. The Junior Creditor Holdco Warrants and Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), MIP Holdco Warrants, and MIP Equityco Warrants shall be registered (*op naam*). Ownership in Junior Creditor Holdco Warrants and Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), MIP Holdco Warrants, and MIP Equityco Warrants shall be evidenced by registration in the respective warrants register of Holdco and Equityco. A certificate shall be issued to evidence registration in these shareholders and warrants registers.

ii      <u>Undeliverable and Unclaimed Distributions</u>

(a)      *Holding of Undeliverable and Unclaimed Distributions.* If the distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address.

(b)      *After Distributions Become Deliverable.* The Disbursing Agent shall make all distributions that have become deliverable or have been claimed since the Initial Distribution Date as soon as practicable after such distribution has become deliverable or has been claimed.

(c)      *Failure to Claim Undeliverable Distributions.* Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within six months after the later of the

Effective Date or the date such distribution is due shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Truvo Group or their property. In such cases, (a) any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Reorganized Truvo Group free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and (b) any New Securities and Documents held for distribution on account of such Claim shall be canceled and of no further force or effect, or not issued. Nothing contained in the Plan shall require the Debtors, the Reorganized Truvo Group, or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(d) *No Effect on Cash Distributions*. Any Holder of an Allowed HY Notes Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) entitled to receive both a distribution of Cash and a distribution of Plan Securities may receive such Cash distribution even if its distribution of Plan Securities has not yet occurred, is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed.

5. *Distribution Record Date*

On the Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Equity Interest, other than one based on a HY Note, is transferred less than 20 days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

6. *Allocation of Plan Distributions Between Principal and Interest*

Distributions to any holder of an Allowed Claim shall, to the extent permitted by applicable law, first be allocated for income tax purposes to the principal amount of the Allowed Claim and then, to the extent that the consideration exceeds the principal amount of the Allowed Claim, to the remaining portion of such Allowed Claim, if any.

7. *Cash Payments*

Payments made pursuant to the Plan shall be made by the Disbursing Agent in Cash and by (i) checks drawn on or (ii) wire transfer from a domestic bank selected by the Disbursing Agent. Any Cash distributions required under the Plan in respect of HY Notes Claims shall be paid by the Disbursing Agent to the HY Indenture Trustee by federal funds wire transfer on the Initial Distribution Date. Any Cash distributions required under the Plan in respect of HY Notes Claims to foreign Creditors may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Any check issued by the Disbursing Agent shall be null and void if not

negotiated within ninety (90) days after issuance and shall be deemed to be an unclaimed distribution pursuant to Section 6.4(b) of the Plan.

8.    *Withholding and Reporting Requirements*

In connection with the Plan and all distributions hereunder, the Reorganized Truvo Group shall comply with all withholding and reporting requirements imposed by any U.S. federal, state or local taxing authority or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Truvo Group shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Truvo Group for the payment and satisfaction of such tax obligations.  Any Cash, New Ordinary Shares, other New Securities and Documents and/or other consideration or property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an unclaimed distribution pursuant to Section 6.4(b) of the Plan.

9.    *Setoffs*

The Reorganized Truvo Group may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, set off against any Claim (other than the Senior Debt Claims, the HY Notes Claims and PIK Debt Claims), the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Truvo Group may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Truvo Group of any such claim that the Debtors or the Reorganized Truvo Group may have against such Holder.

10.    *Designated Affiliate for Distributions to Senior Lenders*

In accordance with applicable law, any Holder of Senior Debt Claims (as of the Distribution Record Date) may, upon written instruction to TAC no later than the date of the Confirmation Hearing, designate one or more Affiliates of such Senior Lender to receive all or a designated portion of Senior Lender Debt Distributions and Senior Lender Equity Distributions that would otherwise have been made to such Senior Lender under the Plan; provided, however, that any affiliate so designated must qualify for an exemption of withholding taxes on interest payments made by Truvo Belgium under the New Senior Credit Agreement, and provided, however, that Reorganized Truvo may refuse to give effect to such designation if, as a result, interest payments by Truvo Belgium under the New Senior Credit Agreement would no longer qualify for an exemption of withholding taxes.

11.    *Execution of Documents by Senior Lenders*

As a condition precedent to receiving any Senior Lender Debt Distribution hereunder, each Senior Lender (as of the Distribution Record Date) must execute and deliver to the Disbursing Agent (i) the New Senior Credit Agreement, (ii) the New Intercreditor Agreement, and (iii) the New Indemnity. Any Senior Lender (as of the Distribution Record Date) that fails to comply before the Effective Date

with the foregoing condition precedent may not participate in any Senior Lender Debt Distribution under the Plan, and all Senior Lender Debt Distributions with respect to the Allowed Senior Debt Claims (as of the Distribution Record Date) of such Senior Lender shall be treated as unclaimed distributions in accordance with Section 6.4(b) of the Plan.

As a condition precedent to receiving any PIKco Distribution hereunder, each Senior Lender (as of the Distribution Record Date) that has made an Election to receive a PIKco Distribution must execute and deliver to the Disbursing Agent the New PIK Agreement and related documentation. Any Senior Lender (as of the Distribution Record Date) that fails to comply before the Effective Date with the foregoing condition precedent may not participate in any PIKco Distribution under this Plan, and all PIKco ~~distributions~~**Distributions** with respect to the Allowed Senior Debt Claims (as of the Distribution Record Date) of such Senior Lender shall be treated as unclaimed distributions in accordance with Section 6.4(b) of the Plan.

12. *Execution of Documents by HY Noteholders and PIK Lenders*

As a condition precedent to receiving any Junior Creditor Holdco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan), each Holder of an Allowed HY Notes Claim and/or Allowed PIK Debt Claim must execute and deliver to the Disbursing Agent an Acceptance Notice no later than six months following the Effective Date. Any Holder of an Allowed HY Notes Claim and/or Allowed PIK Debt Claim that fails to comply with the foregoing condition precedent within six months following the Effective Date will not receive any Junior Creditor Holdco Warrants under the Plan, and all Junior Creditor Holdco Warrants (and corresponding Junior Creditor Equityco Warrants) not so issued shall be treated as unclaimed distributions in accordance with Section 6.4(b) of the Plan.

13. *No Fractional Shares or Warrants*

There shall be no distribution of (i) fractional shares of Newco Ordinary Shares, Holdco Ordinary Shares, Equityco Ordinary Shares (including, for the avoidance of doubt, the MIP Equityco Ordinary Shares), or PIKco Ordinary Shares, or (ii) fractional ~~MIP~~ Equityco ~~Warrants, Junior Creditor Equityco Warrants, MIP Holdco~~ Warrants. Where a fractional share, ~~MIP Equityco Warrants, Junior Creditor~~ Equityco Warrant~~, MIP Holdco Warrants or Junior Creditor~~ **or** Holdco Warrant would otherwise be called for, the actual issuance shall reflect a rounding down of such fraction~~.~~**.**

**H.    Treatment of Executory Contracts**

Section 365 of the Bankruptcy Code affords the Debtors the power to assume or reject, subject to Bankruptcy Court approval, executory contracts. Pursuant to the Bankruptcy Code, the Debtors have (a) 60 days after the Petition Date to assume or reject unexpired leases of nonresidential real property unless such time period is extended by the Bankruptcy Court for cause and (b) until confirmation of the Plan to assume or reject executory contracts. The Debtors' treatment of executory contracts is set forth below:

1. *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, only executory contracts and unexpired leases of the Debtors that are identified on Exhibit C to the Plan as Assumed Contracts (or referenced in Section 7.5 of the Plan) will be deemed assumed and assigned to Truvo Belgium, in accordance with and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. All other executory contracts and unexpired leases of the Debtors shall be deemed rejected as of the Effective Date (or other earlier rejection date, as applicable), including, without limitation, those executory contracts and unexpired

leases that (i) have been rejected by order of the Bankruptcy Court, (ii) are the subject of a motion to reject pending on the Effective Date, (iii) are identified on Exhibit D to the Plan (which may be amended by the Debtors to add or remove executory contracts and unexpired leases by Filing such Exhibit with the Bankruptcy Court and serving it on the affected contract parties at any time on or prior to five (5) days prior to the deadline set by the Bankruptcy Court for Filing objections to confirmation of the Plan), (iv) are rejected pursuant to the terms of the Plan, (v) are not capable of assumption pursuant to section 365(c) of the Bankruptcy Code or (vi) are being terminated or replaced in connection with the TUSA Sale or are otherwise subject to the release or discharge set forth in Articles III and X of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption, assignment or rejection of any Assumed Contracts, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments and rejections pursuant to sections 365(a), 365(f) and 1123 of the Bankruptcy Code. To the extent any provision in any Assumed Contract assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the applicable member of Reorganized Truvo Group's assumption or assignment of such Assumed Contract, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

### 2. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of claim with respect to Claims arising from or in connection with the rejection of executory contracts or unexpired leases, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection or, if listed in Exhibit D to the Plan, thirty (30) days after the date of entry of the Confirmation Order, as applicable. Any Claims arising from or in connection with the rejection of an executory contract or unexpired lease not Filed within such time will be forever barred from assertion against the Debtors or the Reorganized Truvo Group, their Estates or property unless otherwise ordered by the Bankruptcy Court or provided for in the Plan. All Allowed Claims arising from or in connection with the rejection of an executory contract or unexpired lease shall be treated as Allowed General Unsecured Claims.

### 3. *Cure of Defaults of Assumed Executory Contracts and Unexpired Leases*

Any monetary amounts by which each of the Assumed Contracts is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash in the amounts set forth on Exhibit C to the Plan, on or as soon as practicable following the Effective Date, or on such other terms as the parties to each such Assumed Contract may otherwise agree in writing.

In the event of a dispute pertaining to assumption or assignment or the cure amounts set forth in this Section 7.3 to the Plan and on Exhibit C to the Plan, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of the dispute in accordance with the Plan. The cure amounts set forth on Exhibit C to the Plan shall be final and binding on all non-debtor parties (including any successors and designees) to the executory contracts and unexpired leases set forth on Exhibit C to the Plan and shall not be subject to further dispute or audit based on performance prior to the time of assumption, irrespective of the terms and conditions of such executory contracts or unexpired leases. Each counterparty to an executory contract or unexpired lease listed on Exhibit C to the Plan, whether entered before or after the Petition Date, is hereby forever barred, estopped, and permanently enjoined from (i) asserting against the Reorganized Truvo Group, or the property of any of them, any default existing as of the Effective Date or, against the Reorganized Truvo Group, any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (ii) imposing or

charging against the Reorganized Truvo Group any accelerations, assignment fees, increases or any other fees as a result of any assumption or assignment pursuant to the Plan. To the extent that any Person fails to File a timely objection to the cure amount listed on Exhibit C to the Plan or otherwise as set forth in Section 4 to the Plan, such Person is deemed to have consented to such cure amounts and the assignments of such executory contracts or unexpired leases pursuant to the Plan.

Upon the assignment to Truvo Belgium of any executory contract or unexpired lease under the Plan, no default shall exist under any such contract or lease and no counterparty to any such contract or lease shall be permitted to declare a default by the Debtors or the Reorganized Truvo Group thereunder or otherwise take action against the Reorganized Truvo Group as a result of the consummation of the TUSA Sale or any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under such contract or lease. Any provision in an Assumed Contract that is assigned under the Plan which prohibits or conditions the assignment or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.

4.      *Objections to Rejection, Assumption, Assignment or Cure*

Responses or objections, if any, to the rejection, assumption and/or assignment of the executory contracts and unexpired leases identified on Exhibit C or Exhibit D to the Plan, including the cure amounts related to any contracts or leases to be assumed under the Plan as identified on Exhibit C to the Plan, shall be Filed, together with proof of service, with the Clerk of the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408, with one copy to chambers, such that the responses or objections are actually received no later than [4:00 p.m.] (prevailing Eastern Time) on [September 3,]**23,** 2010**]** the "**Confirmation Objection Deadline**") by each of the following parties:

> (i) counsel to the Debtors, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attention: Thomas J. Moloney, Esq., Sean A. O'Neal, Esq., and a copy to Jenner & Block, 353 N. Clark Street, Chicago, Illinois 60654-3456, Attention: Vincent E. Lazar, Esq.;

> (ii) the Office of the United States Trustee, U.S. Department of Justice, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attention: Brian Masumoto, Esq.;

> (iii) counsel to the CoComm, Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105, Attention: Martin Flics, Esq.;

> (iv) counsel to the Senior Agent and Security Agent, Allen & Overy LLP, One Bishops Square, London, E1 6AD, fax: +44 203-088- 0088, Attention: Randal Weeks, Esq.; ~~and~~

> (v) counsel to the Elliott Lender, Kleinberg Kaplan Wolff & Cohen, P.C., 551 Fifth Avenue, 18th Floor, New York, New York 10176, fax: 212-986-8866, Attention: Abbey Walsh**, Esq.; and**

> **(vi) counsel to the Creditors' Committee, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, NY 10281, Attention: Gregory M. Petrick, Esq. and Ingrid Bagby, Esq. and 700 Sixth Street, N.W., Washington, DC 20001, Attention: Marc C. Ellenberg**, Esq.

Any objection to the proposed cure amount set forth on Exhibit C to the Plan shall state with specificity the cure amount the objecting party believes is required and provide appropriate documentation in support thereof. If any response or objection is not timely Filed and served before the Confirmation Objection Deadline, the responding or objecting party shall be barred from objecting to the rejection, assumption, assignment or cure amount provided hereunder and be precluded from being heard at the Confirmation Hearing with respect to such objection.

5.    *Compensation and Benefit Programs*

Except as otherwise expressly provided in the Plan or listed on Exhibit D to the Plan, all employment and severance policies, and all compensation and benefit plans, policies and programs of the Debtors applicable to their employees, retirees and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all compensation, incentive and bonus plans, savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, life and accidental death and dismemberment insurance plans, are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been terminated, accelerated or modified as a result of the commencement of any Chapter 11 Case or the consummation of any transactions contemplated by the Plan (including, without limitation, any change of control agreements) shall be Reinstated and such termination, acceleration or modification shall be rescinded and deemed not to have occurred.

**I.    Summary of New Management Incentive Plan**

Pursuant to Section 5.11 of the Plan, and subject to approval by the Senior Lenders holding at least two-thirds of the outstanding obligations under the Senior Facility Agreement ~~(which approval the Debtors expect to receive prior to August 5, 2010)~~, as of the Effective Date, the Reorganized Truvo Group will adopt the Management Incentive Plan substantially in the form attached as Exhibit ~~M~~**L** to the Plan Supplement. Under the Management Incentive Plan, on the Effective Date, certain members of the Reorganized Truvo Group's management will indirectly receive through a series of transactions involving, among other things, the establishment of Manco and MIPco:

- A percentage of the ordinary shares in Equityco indirectly representing 5% of the ~~equity~~**ordinary shares** of Holdco at the end of the Effective Date~~, pursuant to the Plan and Management Incentive Plan~~. Equityco ordinary shares held by Manco shall rank pari passu with all other ordinary shares of Equityco;

- 10-year call options **to be issued by MIPco** which will entitle the holders thereof, through **the exercise by MIPco of the** MIP Equityco Warrants, to acquire **ordinary** shares in Equityco in an aggregate amount indirectly representing 5% of the Fully Diluted Holdco Stock. Each call option shall give the holder the right to acquire one share of Equityco. The strike price for any such MIPco Call Option shall be equal to the strike price for one ~~Junior Creditor~~ Equityco Warrant. Pursuant to the Shareholders' Agreement, the shareholders of Holdco and Equityco will commit to vote, upon the expiration of the 5-year terms of the MIP Holdco Warrants and MIP Equityco Warrants respectively, for the issuance of Replacement MIP Holdco Warrants and Replacement MIP Equityco Warrants respectively.

In addition, certain members of management will be entitled to receive cash payments upon the occurrence of specific milestones and events, including receipt of certain tax refunds and the disposal of

certain business units.  For a more detailed description of the Management Incentive Plan, please see Exhibit ~~M~~**L** to the Plan Supplement, which will be filed prior to the Voting Deadline.

## J.    Summary of the Capital Structure of the Reorganized Truvo Group

1.    *Description of the New Ordinary Shares, Holdco Ordinary Shares, ~~Junior Creditor~~ Holdco Warrants ~~Junior Creditor Equityco Warrants and MIP Holdco Warrants and MIP~~ **and** Equityco Warrants*

i    <u>In General</u>

After the Effective Date, all of the equity in Holdco, other than a de minimis amount acquired by the Truvo Initial Founders upon incorporation of Holdco, will be held by PIKco and Equityco. Holders of Allowed Senior Debt Claims will receive Equityco Ordinary Shares (including MIP Equityco Ordinary Shares) and/or PIKco Ordinary Shares, as described in Section V.D above. Holders of Equityco Ordinary Shares will then transfer the MIP Equityco Ordinary Shares to MIPco pursuant to the Plan and Management Incentive Plan.  If the HY Noteholder Classes Accept the Plan, HY Noteholders will receive the HY Noteholder Warrants representing an indirect interest in 14% of the fully diluted ordinary shares of Holdco on the Effective Date (assuming that Acceptance Notices have been received by the Disbursing Agent in respect of all Junior Creditor Holdco Warrants in accordance with Section 6.12 of the Plan). If the HY Noteholder Classes and the PIK Lender Class Accept the Plan, PIK Lenders will receive the PIK Lender Warrants representing an indirect interest in 1% of the fully diluted ordinary shares of Holdco on the Effective Date (assuming that Acceptance Notices have been received by the Disbursing Agent in respect of all Junior Creditor Holdco Warrants in accordance with Section 6.12 of the Plan). In addition, certain members of management will receive indirectly, through the MIPco Call Options, the right to acquire shares in Equityco through the exercise of the MIP Equityco Warrants. Any ~~HY Noteholder Warrant, PIK Lender Warrant, or MIP~~ Equityco Warrant will give the right to subscribe to one share in Equityco. The strike price for ~~HY Noteholders Warrants, PIK Lender Warrants, and/or MIP~~**the** Equityco Warrants shall be calculated in accordance with the following formula, subject to anti-dilution provisions set forth in the Warrants Terms and Conditions:

$$e = E * N / n$$

where

e = the strike price of one Equityco Warrant;
E = the Holdco Warrant Strike Price;
N = the aggregate number of Holdco Warrants issued; and
n = the aggregate number of Equityco Warrants issued.

The ~~HY Noteholder Warrants, PIK Lender Warrants and MIP~~ Equityco Warrants will be mirrored by ~~Junior Creditor Holdco Warrants and MIP~~ Holdco Warrants which will be transferred to Equityco, as described in Section V.E. Any ~~Junior Creditor Holdco Warrant or MIP~~ Holdco Warrant will give the right to subscribe to one share in Holdco.  The strike price for any such ~~Junior Creditor Holdco Warrant or MIP~~ Holdco Warrant shall, subject to anti-dilution provisions set forth in the Warrants Terms and Conditions, be calculated in accordance with the following formula:

$$E = V / N$$

where

E = the strike price of one Holdco Warrant (the "<u>Holdco Warrant Strike Price</u>")
V =  €150,000,000; and

N = the number of issued ordinary shares in Holdco at the end of the Effective Date.

ii      Transferability

Ordinary equity in PIKco will be represented by registered shares, which will be transferable only together with the portion of New PIK Debt stapled to such ordinary equity in PIKco, will not be transferable to competitors of the Reorganized Truvo Group and which will face certain additional transfer restrictions described below. Ordinary equity in Equityco will be represented by registered shares, which will not be transferable to competitors and which will face certain additional transfer restrictions described below. Transferees of ordinary equity in Equityco or PIKco must become party to the Shareholders' Agreement. Transfers of ordinary shares in Equityco and PIKco will also be subject to drag along rights and tag along rights, where the transfer would result in the transferee holding ordinary equity in Equityco and ordinary equity in PIKco that represents an aggregate interest of 66⅔% or more (in respect of the drag along rights), or more than 50% (in respect of the tag along rights) of the ordinary shares in Holdco. Ordinary shares in Holdco will be represented by registered shares and will not be transferable for 5 years except on an exit event or initial public offering ("IPO") and in accordance with applicable laws.

Each of PIKco and Equityco will be required to monitor the number of Persons that hold ordinary shares in PIKco or Equityco, respectively, or, in the case of Equityco, that hold Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan) or MIP Equityco Warrants, in order to ensure its respective compliance with certain provisions of the Exchange Act. In particular, section 12(g) of the Exchange Act imposes reporting obligations on any "foreign private issuer" that has a class of securities held of record by more than 500 Persons of whom at least 300 Persons are resident in the United States. The Reorganized Truvo Group intends to use (a) shareholders registers to monitor the number and location of holders of (i) ordinary shares in PIKco (and thereby also monitor the number and location of holders of New PIK Debt stapled to ordinary shares in PIKco) and (ii) ordinary shares in Equityco (including ordinary shares issued upon the exercise of the Junior Creditor Equityco Warrants and MIP Equityco Warrants), and (b) a warrants register to monitor the number and location of holders of Junior Creditor Equityco Warrants (provided that the Requisite Junior Classes have voted to Accept the Plan) and MIP Equityco Warrants (the securities in (a)(i), collectively, the "Registered PIKco Securities", the securities in (a)(ii) and (b) collectively, the "Registered Equityco Securities"). Because the Exchange Act reporting obligations would present a material financial burden for Equityco and PIKco, Equityco and PIKco each intend to impose certain restrictions on transfers of, respectively, Registered Equityco Securities and Registered PIKco Securities, to ensure that no such transfer would result in the imposition of the reporting obligations described above.

Any Person that wishes to transfer any Registered PIKco Securities or Registered Equityco Securities will be required to notify PIKco or Equityco, as applicable, in writing prior to such transfer, disclosing the identity of the proposed transferee and such information as PIKco or Equityco, as applicable, may deem necessary in order to determine whether the proposed transferee is "resident in the United States" within the meaning of Rule 12g3-2(a) under the Exchange Act. Within three (3) Business Days of the receipt of such written notification, the board of directors of PIKco or Equityco, as applicable, or the Person responsible for the day-to-day management of PIKco or Equityco, as applicable, will confirm whether the proposed transfer would result in the Registered PIKco Securities or the Registered Equityco Securities (as applicable) being held by more than 500 Persons of whom at least 300 Persons are resident in the United States. In the event that this threshold would be met or exceeded as a result of the proposed transfer, the proposed transferor will not be permitted to transfer any Registered Equityco Securities or any Registered PIKco Securities, as applicable, to the proposed transferee. Any

transfer of any Registered Equityco Securities or Registered PIKco Securities in violation of the foregoing procedures and restrictions will be null and void ab initio.

In addition, members of management who indirectly receive equity in Equityco under the Management Incentive Plan will face certain additional restrictions on transfer as provided in the Management Inventive Plan.

iii     <u>Exit and Refinancing</u>

Pursuant to the Shareholders' Agreement, Equityco, PIKco, their respective shareholders and Holdco will facilitate:

(i) an asset sale of all or a substantial part of the Reorganized Truvo Group, if approved by holders of ordinary shares in Equityco and PIKco representing in aggregate 66.67% or more of the shares voted of Holdco.

(ii) an initial public offering, if approved by holders of ordinary shares in Equityco and PIKco representing in aggregate **an indirect interest in 40% or** more ~~than 50%~~ of the **fully diluted** shares ~~voted~~ of Holdco **following such initial public offering**; or

(iii) a refinancing, if approved by holders of ordinary shares in Equityco and PIKco representing in aggregate 66.67% or more of the shares voted of Holdco.

See Exhibit F to the Plan Support Agreement for a detailed term sheet describing the terms of equity in Holdco, Equityco and PIKco. Prior to the Voting Deadline, the Debtors will file with the Court, as Exhibits to the Plan Supplement, copies of the definitive documentation. These documents will be available on the Claims Agent's website at http://www.kccllc.net/truvo.

2.     *New Bank Debt and New RCF*

On the Effective Date, various members of the Reorganized Truvo Group will become obligors of the New Bank Debt. The New Bank Debt is comprised of two senior tranches, totaling €350 million of senior secured debt, and two-second lien tranches, totaling €100 million of second lien secured debt. In addition, the New Senior Credit Agreement will provide for a revolving credit or other liquidity facility with a maximum commitment of €25 million. The New Bank Debt and the New RCF will be guaranteed by the current guarantors of the Senior Facility Agreement which will become indirect subsidiaries of Newco, together with the borrowers under the facilities, all material subsidiaries and any other members of the Reorganized Truvo Group necessary to ensure that the guarantors at all times account for at least 85% of the Reorganized Truvo Group's consolidated assets, consolidated EBITDA and consolidated turnover (with certain exceptions for entities that will be liquidated or merged). The New Bank Debt and the New RCF will be secured in accordance with certain security principles that will be included in the New Senior Credit Agreement. The Senior Lenders will receive the New Bank Debt as part of their recovery under the Plan and will not be required to tender any additional consideration in exchange for the New Bank Debt.

See Exhibit G to the Plan Support Agreement for a detailed term sheet describing the New Bank Debt and New PIK Debt. Prior to the Voting Deadline, the Debtors will file with the Court, as Exhibits to the Plan Supplement, copies of the definitive debt documentation, including the New Senior Credit Agreement, the New PIK Agreement and the New Intercreditor Agreement. These documents will be available on the Claims Agent's website at http://www.kccllc.net/truvo.

i       <u>New Senior Bank Debt</u>

The New Senior Bank Debt is comprised of the Senior Belgian Tranche and the Senior Dutch Tranche. The Senior Belgian Tranche totals €242,566,844.92, and the primary obligors will be Newco and Truvo Belgium. The Senior Dutch Tranche totals €107,433,155.08, and the primary obligors, after the Effective Date, will be Newco and Truvo Services & Technology. Interest on the New Senior Bank Debt will accrue at EURIBOR plus a 3% margin per annum plus any mandatory costs. Interest periods will be 3 months for the Senior Belgian Tranche and 1, 2 or 3 months for the Senior Dutch Tranche at the relevant borrower's election. However, that margin may increase if the leverage ratio of the Reorganized Truvo Group is reduced to pre-agreed levels. The New Senior Bank Debt will mature four years and six months after the Effective Date. There is no mandatory amortization; however, there will be an annual cash flow sweep equal to 75% of excess cash flow generated by the Truvo Group to apply from December 31, 2011 and in that year to be calculated such that only an amount in excess of €30 million less the actual aggregate amount of cash on the balance sheet of members of the Reorganized Truvo Group as of the Effective Date is available to be swept. The annual cash flow sweep will be applied first to the New Second Lien Bank Debt and after the New Second Lien Bank Debt is fully repaid to the New Senior Bank Debt.

ii       <u>New Second Lien Bank Debt</u>

The New Second Lien Bank Debt is comprised of the Second Lien Belgian Tranche and the Second Lien Dutch Tranche. The Second Lien Belgian Tranche totals €69,304,812.83 and the primary obligors will be Newco and Truvo Belgium. The Senior Dutch Tranche totals €30,695,187.17 and the primary obligors, after the Effective Date, will be Newco and Truvo Services & Technology. Interest on the Second Lien Bank Debt will accrue at EURIBOR plus a 6% margin per annum, which is comprised of a 2% annual cash margin and a 4% annual payment-in-kind margin plus any mandatory costs. Interest periods will be 3 months for the Second Lien Belgian Facility and 1, 2 or 3 months for the Second Lien Dutch Tranche at the relevant borrower's election. The New Second Lien Bank Debt will mature 5 years after the Effective Date. There is no mandatory amortization; however, there will be an annual cash flow sweep equal to 75% of excess cash flow generated by the Truvo Group to apply from December 31, 2011 and in that year to be calculated such that only an amount in excess of €30 million less the actual aggregate amount of cash on the balance sheet of members of the Reorganized Truvo Group as of the Effective Date is available to be swept. The annual cash flow sweep will be applied first to the New Second Lien Bank Debt and after the New Second Lien Bank Debt is fully repaid to the New Senior Bank Debt. The New Second Lien Bank Debt will be contractually subordinated to the New Senior Bank Debt.

iii       <u>New RCF</u>

The New RCF will have a maximum commitment of €25 million. Newco, Truvo Belgium and Truvo Services & Technology will be able to draw on the New RCF. Interest will accrue at EURIBOR (with a EURIBOR floor) plus ~~an [8]%~~**a** margin ~~per annum~~**to be set forth in the New Senior Credit Agreement**. Interest periods will be 1, 2 or 3 months at the relevant borrower's election. The Reorganized Truvo Group will also be responsible for a ~~[4]%~~ commitment fee~~, per annum,~~ on the New RCF**, in an amount to be set forth in the New Senior Credit Agreement**. The New RCF will have a final maturity date of four years and six months from the Effective Date. Newco will have the right to cancel all or part of the unutilized portion of the New RCF on 3-business days notice. The RCF will rank senior to the New Senior Bank Debt upon enforcement and will otherwise rank pari passu with the New Senior Bank Debt. Amounts outstanding under the New RCF must be reduced to zero for not less than 5 consecutive business days in each financial year of Newco. The terms of the New RCF are still being finalized.

3.    *New PIK Debt*

On the Effective Date, PIKco will issue the New PIK Debt.  The New PIK Debt will be comprised of up to €150 million of payment in kind notes.  The final amount of New PIK Debt will depend on the election made by Holders of Allowed Senior Debt Claims when they submit Ballots pursuant to the solicitation procedures.  The New PIK Debt will be structurally subordinated to the New Bank Debt.  The New PIK Debt will not be guaranteed by any member of the Reorganized Truvo Group and will be non-recourse to them.  It will be secured by a first ranking pledge of all of PIKco's shares in Holdco and PIKco's bank accounts.  Interest will accrue at EURIBOR plus an 8% margin per annum.  Interest periods will be 6 months.  The New PIK Debt will mature 9 years after the Effective Date.

The New PIK Debt will be embodied within dematerialized X/N notes (the "New PIK Debt Notes"), which will represent the entire principal amount of the New PIK Debt on the Effective Date.  The New PIK Debt Notes will be registered with, or with a depository for, the NBB as operator of the X/N Clearing System.  Investors may hold an interest in the New PIK Debt Notes directly in their securities accounts with the NBB or indirectly through an account with one of the participants in the X/N Clearing System, which include Euroclear and Clearstream, Luxembourg and most credit institutions and investment firms. Payments of any amounts owing in respect of the New PIK Debt will be made through a domiciliary agent and the X/N Clearing System in accordance with the agency agreement and the regulations of the X/N Clearing System.  Unless instructed otherwise by the domiciliary agent, the NBB will debit the account of the domiciliary agent with the NBB for payments due by PIKco to the holders of the New PIK Debt in accordance with the regulations of the X/N Clearing System and will be responsible for ensuring that payments are credited to the accounts of the relevant participants in the X/N Clearing System.  The payment obligations of PIKco under the New PIK Debt will be discharged by payment to the domiciliary agent in respect of each amount so paid.

The persons shown in the records of the NBB, of participants in the X/N Clearing System and of their respective sub-participants as the holders of a particular principal amount at maturity of the New PIK Debt Notes only have recourse against the NBB, participants in the X/N Clearing System or their sub-participants, as the case may be, for their share of each payment so made by PIKco to, or to the order of, the holders of such New PIK Debt Notes.

4.    *New Intercreditor Agreement.*

On the Effective Date, certain members of the Reorganized Truvo Group will enter into the New Intercreditor Agreement governing the security provided for, and the priority of, the New Senior Bank Debt, the New RCF and the New Indemnity (as defined below).  Under the New Intercreditor Agreement, the obligations to pay principal and interest under the New Bank Debt will rank behind the obligations of certain members of the Reorganized Truvo Group[14] under a secured indemnity given to the Security Agent and the Senior Agent and their officers, employees and agents in respect of any claim, damage, expense, cost, loss or liability (including reasonable legal costs and expenses) arising in connection with the Financial Restructuring (the "New Indemnity").  The New Indemnity will specify the terms and conditions upon which the security may be released.  These terms and conditions will include a requirement that the New Indemnity will continue to be secured after a refinancing and any other events still to be agreed, but after a period of two years and six months, if certain conditions are met, the obligations under the New Indemnity may rank behind the financing of the Reorganized Truvo Group.  The New Indemnity will cease to be secured ten years after the Effective Date.  The New Indemnity is still being finalized and will be filed as Exhibit ~~L~~**K** to the Plan Supplement.

---

[14] The New Indemnity will be granted by the borrowers and guarantors under the New Senior Credit Agreement.

**K.** **Exemption from Securities Laws**

To the extent the Plan Securities constitute "securities" as defined in section 2(a)(1) of the Securities Act and except with respect to any entity that is an underwriter as defined in subsection (b) of section 1145 of the Bankruptcy Code, section 2(a)(11) of the Securities Act and article 2(1)(a) of the Prospectus Directive (as defined below), the issuance of Plan Securities (and the issuance of ordinary shares of Equityco upon the exercise of the Junior Creditor Equityco Warrants) and the exchange of Plan Securities for the Claims of the HY Noteholder Classes, if they Accept the Plan, and the Claims of the PIK Lender Class, if they and the HY Noteholder Classes Accept the Plan, shall be exempt from registration under U.S. state and U.S. federal securities laws pursuant to section 1145 of the Bankruptcy Code. Notwithstanding the foregoing, the (1) transfer of MIP Equityco Ordinary Shares to MIPco (and the subsequent sale of such MIP Equityco Ordinary Shares to Manco), (2) the transfer of MIP Equityco Warrants to MIPco, and (3) the exercise of ~~Junior Creditor Holdco Warrants and MIP~~ Holdco Warrants by Equityco shall be effected in transactions not subject to, or exempt from, the registration requirements of the Securities Act.

The issuance of the Plan Securities (and the issuance of Equityco ordinary shares and Holdco ordinary shares upon the exercise of the Equityco Warrants **and** the Holdco Warrants, respectively) and the exchange of Plan Securities for the Senior Debt Claims, the HY Notes Claims (if the HY Noteholder Classes vote to Accept the Plan) and the PIK Debt Claims (if the HY Noteholder Classes and the PIK Lender Class vote to Accept the Plan), as applicable, fall outside the scope of, or are otherwise exempt pursuant to, Directive 2003/71/EC of the European Parliament and of the Council of November 4, 2003.

**L.** **Conditions Precedent to Confirmation**

It is a condition precedent to confirmation of the Plan that the Bankruptcy Court shall have entered a Confirmation Order containing the terms and conditions required by the Plan Support Agreement.

**M.** **Conditions to Obligations of Security Agent and Senior Agent**

All actions to be taken by the Security Agent or the Senior Agent as contemplated by the Plan shall be subject to, respectively, the Senior Agent Conditions Precedent and the Security Agent Conditions Precedent.

For the avoidance of doubt, (1) nothing in the Plan shall require the Security Agent to follow any instructions, other than those set out in Exhibit F to the Plan, except in accordance with the Intercreditor Agreement, the Senior Facility Agreement and other Senior Finance Documents (and subject to the limitations set out therein) and which are within the power and authority of the Security Agent, as so instructed, and (2) nothing herein shall require the Senior Agent to follow any instructions of the Majority Lenders, other than those set out in Exhibit F to the Plan, except in accordance with the Intercreditor Agreement, Senior Facility Agreement and other Senior Finance Documents (and subject to the limitations set out therein) and which are within the power and authority of the Senior Agent, as so instructed.

**N.** **Conditions to Effective Date**

Each of the following is a condition precedent to the occurrence of the Effective Date:

i  the Confirmation Order (including any amendment or modification thereof) shall have been entered by the Bankruptcy Court in form and

substance reasonably satisfactory to the Debtors, the CoComm and the Elliott Lender, and shall not have been stayed or reversed or vacated on appeal;

ii      the satisfaction (or waiver in accordance with the terms therein) of all conditions precedent specified in the Purchase Agreement for the closing of the TUSA Sale other than the occurrence of the Effective Date or those actions specified to occur on the Effective Date;

iii     all of the conditions precedent for the closing of the Daylight Facility shall have been satisfied (or waived in accordance with the terms thereunder) other than the occurrence of the Effective Date;

iv     all of the conditions precedent for entry into the New Bank Debt and New PIK Debt shall have been satisfied or waived in accordance with the terms thereof;

v      merger control clearance or approval of the transactions contemplated under the Plan in each jurisdiction where notification of such transactions is mandatory shall have been obtained by the issuance of a positive clearance decision from the relevant government body (or shall have been deemed to have been obtained by the expiry of the relevant waiting period or by the termination of the relevant waiting period); and

vi     notice of the projected Effective Date shall have been provided to the CoComm, the Elliott Lender, Security Agent and Senior Agent no later than five (5) Business Days prior to the projected Effective Date.

2.     *Waiver of Conditions*

Each of the conditions set forth in Section V.N may be waived in whole or in part by the Debtors, in consultation with and after obtaining the written consent of the Majority Supporting Senior Lenders (which consent shall not be unreasonably withheld), without any other notice to parties in interest or notice to or order of the Bankruptcy Court and without a hearing. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

For the avoidance of doubt, only the Security Agent and Senior Agent may waive, respectively, the Security Agent Conditions Precedent and Senior Agent Conditions Precedent.

3.     *Consequences of Non-Occurrence of Effective Date*

If, following the entry of the Confirmation Order, (i) the Effective Date does not occur on or before December 31, 2010, or such later date as is agreed upon in writing by the Debtors and the Majority Supporting Senior Lenders, and (ii) the Plan Support Agreement has terminated in accordance with its terms, then the Confirmation Order will be deemed vacated, pursuant to Section 9.5 of the Plan, by the Bankruptcy Court without further notice or order. If the Confirmation Order is vacated pursuant to Section 9.5 of the Plan, (a) the Debtors shall File a notice to this effect with the Bankruptcy Court, (b) the Plan shall be null and void in all respects, (c) any settlement of Claims provided for hereby shall be null

and void without further order of the Bankruptcy Court, and (d) the time within which the Debtors may assume, assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated; provided, however, that the Debtors retain their rights to seek further extensions of such deadline in accordance with, and subject to, section 365 of the Bankruptcy Code, and nothing contained in the Plan or Disclosure Statement shall (x) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action, (y) prejudice in any manner the rights of any Debtor or any other Entity or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by any Debtor or any other Entity.

## O.    Effect of Confirmation

### 1.    *Binding Effect; Plan Binds All Holders of Claims and Equity Interests*

On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claims against and Equity Interests in any Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject the Plan.

Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party, including, without limitation, any Holder of Senior Debt Claims (as of the Distribution Record Date and the Effective Date, as applicable), HY Notes Claims or PIK Debt Claims, shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan, including the transactions set out in Section 5.3 of the Plan and to perform any other act, including, without limitation, the execution of Mandatory Transfer Certificates and the execution of documents necessary to effectuate the New Senior Credit Agreement, the New PIK Agreement, New Intercreditor Agreement, the Shareholders' Agreement and all other documents set forth or contemplated in the Plan or Plan Supplement, that is necessary for the consummation of the Plan and the transactions contemplated herein.

Without limiting the paragraph immediately above, pursuant to the Confirmation Order, each Holder of Senior Debt Claims (as of the Distribution Record Date), acting directly and in their individual capacities (and not otherwise), shall be obliged to execute and deliver to the Senior Agent a Mandatory Transfer Certificate.

### 2.    *Releases and Related Injunctions*

#### i    Releases by the Debtors

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and any Person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to unconditionally and forever release, waive and discharge all Causes of Action against each of the Released Parties in connection with or related to the Debtors, Reorganized Truvo, the Chapter 11 Cases, the Plan (other than the rights of the Debtors to enforce the Plan and the contracts, releases, indentures, and other agreements or documents delivered thereunder), that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Chapter 11 Cases, the Disclosure Statement, the Plan Support Agreement, the Plan (including, without limitation, the solicitation of votes on the Plan), the TUSA Sale, or the Daylight Facility, and that may be asserted by the Debtors in their individual capacities or on behalf (whether directly or derivatively) of the Debtors or

their Estates, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; provided that the foregoing shall not operate as a waiver or release from any Causes of Action arising out of the acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.

ii       Releases by Holders of Claims

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim against the Debtors (including any HY Noteholders, Senior Lenders and PIK Lenders) that votes to accept the Plan or that fails to vote on the Plan shall be deemed to unconditionally and forever release, waive, and discharge each of the Released Parties from any Causes of Action in connection with or related to the Debtors, the Chapter 11 Cases, the Plan Support Agreement, or the Plan (including, without limitation, the solicitation of votes on the Plan) or the TUSA Sale (other than the rights of the Released Parties to enforce the Plan and the contracts, releases, indentures, and other agreements or documents delivered thereunder) that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date which could have been asserted by the Holders of Claims, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; <u>provided</u>, <u>however</u>, that the foregoing shall not operate as a waiver or release from any Causes of Action arising out of the acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; <u>provided further</u>, for the avoidance of doubt, the releases set forth in Section 10.2 of the Plan shall not apply to any liabilities or causes of action under the New Bank Debt.

**iii      <u>Each of the releases in Sections 10.2(a) and 10.2(b) of the Plan are in addition, and without prejudice, to</u>**

**(a)      <u>the Release; and</u>**

**(b)      <u>the satisfaction, settlement, discharge and release of all Claims against the Debtors pursuant to Section 10.3 of the Plan.</u>**

3.      *Discharge of Claims*

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order: (1) all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any kind or nature whatsoever against the Debtors or any of their assets or properties and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to Accept or reject the Plan or voted to reject the Plan; and (3) all Persons shall be precluded from asserting against the Debtors, the Debtors' Estates, Reorganized Truvo, their successors and assigns, and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever,

including, but not limited to, demands and liabilities that arose on or before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

4.      *Preservation of Rights of Action; Settlement of Litigation Claims*

i        Preservation of Rights of Action

Except as otherwise provided in the Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order of the Bankruptcy Court, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims.  Reorganized Truvo, as the successor in interest to the Causes of Action of the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims. Notwithstanding the foregoing, the Debtors and Reorganized Truvo shall not File, commence or pursue any claim, right or Cause of Action under sections 547 or 548 of the Bankruptcy Code; provided, however, that, notwithstanding any statute of limitations, the Debtors and the Disbursing Agent shall have the right to assert or raise such Litigation Claims (a) as defenses or counterclaims (up to the amount asserted in the Claims against the Debtors) with respect to any Disputed Claim and (b) in connection with the Claims objection process with respect to a Claim that is not an Allowed Claim, in which case such Litigation Claim can be raised as an objection to such Claim and not as defenses or counterclaims.

ii        Settlement of Litigation Claims

At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  After the Effective Date, the Disbursing Agent may, and shall have the exclusive right to, compromise and settle any Claims against them and claims they may have against any other Person or Entity, including, without limitation, the Litigation Claims, without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtors as of the Effective Date.

5.      *Exculpation and Limitation of Liability*

The Released Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of any Claim against or an Equity Interest in the Debtors, or any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, or arising out of, the Chapter 11 Cases, formulating, negotiating, or implementing the Plan Support Agreement, Purchase Agreement and the Plan, the solicitation of acceptances of the Plan, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, the offer and issuance of any securities under the Plan, including, without limitation, the steps taken to effectuate the transactions described in Section V.E.3 of the Plan, except for acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.

6.      *Injunction*

Except as otherwise provided in the Plan or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order of the Bankruptcy Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Estate(s) or any of their

property on account of any such Claims or Equity Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtors, the Reorganized Truvo Group or their property on account of such Claims or Equity Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with the Plan.

By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions ~~described above~~**set forth in Section 10.6 of the Plan.**

**As to the IRS, nothing in the Plan or the Confirmation Order, including this Section 10.6 of the Plan, shall discharge, release, or otherwise preclude any valid right of setoff or recoupment against a Debtor or Reorganized Debtor.**

7.    *Term of Bankruptcy Injunction or Stays*

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

8.    *Termination of Subordination Rights and Settlement of Related Claims*

The classification and manner of satisfying all Claims and Equity Interests under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise. All subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan to Holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; provided, however, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with the Plan.

**P.      Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

i    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any

Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

ii     resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or any member of the Reorganized Truvo Group may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

iii     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

iv     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

v     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

vi     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, including, without limitation, any other contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

vii     modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

viii     hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Truvo Group, including counsel fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

ix     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

| x | hear and determine causes of action by or on behalf of the Debtors or the Reorganized Truvo Group; |
|---|---|
| xi | hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; |
| xii | hear and determine matters concerning the Purchase Agreement; |
| xiii | hear and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed; |
| xiv | determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order or any contract, instrument, release (including the releases in favor of the Released Parties) or other agreement or document created in connection with the Plan or the Confirmation Order; |
| xv | enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases; |
| xvi | hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and |
| xvii | enter orders closing the Chapter 11 Cases. |

## Q. Bar Dates for Administrative Expense Claims

Holders of alleged Administrative Expense Claims not paid prior to the Effective Date shall submit proofs of Claim on or before the Administrative Expense Claims Bar Date or forever be barred from doing so (unless such alleged Administrative Expense Claim is incurred in the ordinary course of business by the Debtors and is not yet past-due, in which case the applicable Administrative Expense Claims Bar Date shall be thirty (30) days after such due date or as otherwise ordered by the Bankruptcy Court). The Debtors and Reorganized Truvo shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Expense Claims Bar Date to review and File objections to such Administrative Expense Claims, if necessary. In the event an objection is Filed as contemplated by Section 12.4 of the Plan, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.

## R. Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date or as soon as practicable thereafter by the Disbursing Agent.

## S. Tax Reporting and Compliance

Each member of the Reorganized Truvo Group is hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

## T.     Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, Transfer or exchange (or deemed issuance, Transfer or exchange) of the Plan Securities; (b) the consummation of the TUSA Sale; (c) the creation of any mortgage, deed of trust, Lien, pledge or other security interest; (d) the making or assignment of any lease or sublease; or (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan (including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, dissolution, deeds, bills of sale and transfers of tangible property) will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders) or other similar taxes in the United States.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date shall be deemed to have been in furtherance of or in connection with the Plan.

## U.     Amendment or Modification of the Plan

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan, with the written consent of the CoComm and the Elliott Lender, which consent shall not be unreasonably withheld, at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has Accepted the Plan shall be deemed to have Accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

## V.     Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**W.** **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**X.** ~~W.~~ Plan Revocation, Withdrawal or Non-Consummation

Subject to the terms of the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, except as otherwise provided by the Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtors or any other Person or Entity or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

# VI.
## CONFIRMATION OF THE PLAN OF REORGANIZATION

**A.** **Solicitation of Votes**

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims and Equity Interests in Classes 3C, 4C, 5C, 2D, 3D, 4D, 5D, 2E, 1F, 2F, 3F, 4F, 5F, 1G, 2G, 3G, 4G, 5G and 1H of the Plan are Impaired, but only the Holders of Allowed Claims in Classes 3C, 4C, 5C, 2D, 3D, 4D, 5D, 2E, 1F, 2F, 3F, 4F and 5F are allowed to vote to accept or reject the Plan. Holders of Claims and Old Equity Interests in Classes 1G, 2G, 3G, 4G, 5G and 1H are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan. The Claims in Classes 1A, 2A, 3A, 4A, 5A, 1B, 2B, 3B, 4B and 5B are conclusively presumed to have accepted the Plan, and the solicitation of acceptances with respect to such Classes is not required under section 1126(f) of the Bankruptcy Code.

As to Classes of Claims entitled to vote on the Plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan. For purposes of the Plan and Disclosure Statement, Claims denominated in euros will be converted to U.S. dollars as described in the Plan. Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of voting to Accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated pursuant to the section 4.6(a) of the Plan), such Class shall be deemed to have voted to Accept the Plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Unless otherwise agreed by the Debtors any Holder of a Claim that is scheduled by the Debtors as unliquidated, disputed or contingent, other than Claims arising in Classes 3C, 4C and 5C (Senior Debt Claims), 2D, 3D, 4D and 5D (HY Note Claims), 2E (PIK Debt Claims), is not entitled to vote unless the Holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan. In addition, unless otherwise agreed by the Debtors, Holders of Claims entitled to vote on the Plan that wish to vote their Claims in an amount listed on a proof of Claim filed before the applicable bar date, rather than as scheduled by the Debtors, will likewise need to obtain an order of the Bankruptcy Court temporarily allowing such Claim in such amount.

**B.    The Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for [September 14**30**], 2010 at [10**9**:00 a.m.**,**], prevailing Eastern Time, before the Honorable Arthur J. Gonzalez, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Responses or objections, if any, to confirmation of the Plan including the assumption and/or assignment of certain executory contracts under the Plan, cure amounts related to any contracts to be assumed under the Plan as identified on Exhibit D to the Plan and the consummation of the Financial Restructuring, (a) shall be in writing; (b) shall state the name and address of the objector and its interest in the Debtors' cases; (c) shall state, if appropriate, the amount and nature of the objector's Claim or interest; (d) shall state the grounds for the responses or objections and the legal basis therefore; and (e) shall reference with specificity the text of the Plan to which the responses or objections are made, and shall provide proposed language changes or insertions to the Plan to resolve the responses or objections. Any response or objection to cure amounts must state with specificity the cure amount the objecting party believes is required and provide appropriate documentation in support thereof. Any such response or objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties, and the other parties requesting notice in these cases, on or before [September 3**,23**]**,** 2010 at [4:00 p.m.**PM**], prevailing Eastern Time**,** (the "Confirmation Objection Deadline").

> (i) the Debtors, Truvo USA LLC, Corporation Trust Center, 1209 Orange Street, Wilmington, DE, Attention: Marc Goegebuer with a copy to Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: Thomas J. Moloney, Esq. and Sean A. O'Neal, Esq., and a copy to Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654-3456, Attention: Vincent E. Lazar, Esq.;
>
> (ii) the Office of the United States Trustee, U.S. Department of Justice, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attention: Brian S. Masumoto, Esq.;
>
> (iii) counsel to the CoComm, Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105, Attention: Martin Flics, Esq.;
>
> (iv) counsel to the Senior Agent and Security Agent, Allen & Overy LLP, One Bishops Square, London, E1 6AD, fax: +44 203-088- 0088, Attention: Randal Weeks, Esq.; and

(v) counsel to the Elliott Lender, Kleinberg Kaplan Wolff & Cohen, P.C., 551 Fifth Avenue, 18th Floor, New York, New York 10176, fax: 212-986-8866, Attention: Abbey Walsh**, Esq.; and**

**(vi) counsel to the Creditors' Committee, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, NY 10281, Attention: Gregory M. Petrick, Esq. and Ingrid Bagby, Esq. and 700 Sixth Street, N.W., Washington, DC 20001, Attention: Marc C. Ellenberg**, Esq.

## C.  Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) Accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the plan.

### 1.  *Acceptance*

Classes 3C, 4C and 5C (Senior Debt Claims), 2D, 3D, 4D and 5D (HY Notes Claims), 2E (PIK Debt Claims) and 1F, 2F, 3F, 4F and 5F (General Unsecured Claims) are Impaired and are entitled to vote to Accept or reject the Plan.  Classes 1A, 2A, 3A, 4A and 5A (Other Priority Claims) and 1B, 2B, 3B, 4B and 5B (Other Secured Claims) of the Plan are unimpaired and, therefore, are conclusively presumed to have voted to Accept the Plan.  Classes 1G, 2G, 3G, 4G, and 5G (Statutorily Subordinated Claims) and 1H (Old Equity Interests) are deemed to reject the Plan because they will not receive a Distribution under the Plan.  Thus, only Classes 3C, 4C, 5C, 2D, 3D, 4D, 5D, 2E, 1F, 2F, 3F, 4F, and 5F are entitled to vote to Accept or reject the Plan.  Because Classes 1G, 1H, 2G, 3G, 4G and 5G are Impaired and are deemed to reject the Plan the Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to such Classes.  In addition, to the extent any Impaired Class(es) entitled to vote on the Plan reject(s) the Plan, the Debtors may also seek the nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such rejecting Class(es).  Finally, the Debtors reserve their rights to amend the Plan in accordance with Section 12.6 of the Plan with respect to any such Rejecting Class(es).

### 2.  *Unfair Discrimination and Fair and Equitable Test*

To obtain nonconsensual confirmation of the Plan, also referred to as a "cram down", it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-Accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of creditors or equity holders if:

- Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in subclause (i) or (ii) of this subparagraph.

- **General Unsecured Creditors**.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims or equity interests of the non-Accepting class will not receive or retain any property under the plan on account of such claims and equity interests.

- **Equity Interests**.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its equity interest or (ii) the holder of an interest that is junior to the non-Accepting class will not receive or retain any property under the plan on account of such equity interest.

A plan of reorganization does not "discriminate unfairly" with respect to a non-Accepting class if the value of the cash and/or securities to be distributed to the non-Accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-Accepting class.

3.  *Feasibility; Projections; Valuation*

i   Feasibility; Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization, except as contemplated by the Plan.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Truvo Group for each of the 4 fiscal years from 2010 (the "Projections").  The Projections, and the assumptions on which they are based, are set forth in Exhibit 4 hereto.  Based upon these Projections, the Debtors believe that the Reorganized Truvo Group will be able to make all payments required pursuant to the Plan while conducting ongoing businesses operations and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization, except as set forth in the Plan.

The Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on December 31, 2010.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  Those assumptions considered to be significant are described in Exhibit 4 hereto.  The Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the Projections or their ability to achieve the projected results.  Many of the assumptions on which the Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and

circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the four-year period of the Projections may vary from the projected results and the variations may be material.

**The Debtors are not outperforming the Projections and in fact recent performance and visibility into sales for the balance of the year lead the Debtors to believe they will likely underperform their forecast for full year 2010. The Debtors have reduced their preliminary forecast for full year 2010 (the "FY 2010 Re-forecast"). The FY 2010 Re-forecast is still preliminary and is not reflected in the Projections.** All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in connection with their evaluation of the Plan.

**The Company has adjusted the Projections filed on July 27, 2010 to account for shifts in the forward exchange rates for the ZAR (South African Rand) / EUR and the USD / EUR from October 2009 (the date of the previous forward curve) to July 2010. Houlihan Lokey has revised the previously filed valuation as of July 1, 2010 and updated as of August 13, 2010, with an assumed effective date of December 31, 2010, in order to provide the most up-to-date valuation of Reorganized Truvo Group.**

        ii    <u>Valuation</u>

        (a)    Overview.

The Debtors have been advised by Houlihan **Lokey**, their financial advisor, with respect to the consolidated enterprise value of the Reorganized Truvo Group (which consists of the aggregate enterprise value of Reorganized Truvo Group) on a going-concern basis (the "<u>Enterprise Value</u>"). The consolidated Enterprise Value is comprised of the following components: (a) the estimated value of the Reorganized Truvo Group's operations on a going concern basis ~~and~~ (b) **estimated cash at exit and (c)** the estimated value of the potential United States tax refunds, as of an assumed Effective Date of December 31, 2010. **In preparing the Enterprise Value, Houlihan Lokey estimated that Reorganized Truvo Group will have approximately €25.5 million of excess cash (net of the Reorganized Truvo Group's estimated working capital needs) assuming the Debtors have full access to the €25.0 million New RCF (as anticipated in the Plan).** Solely for purposes of the Plan, the analysis performed by Houlihan **Lokey** indicates that the estimated hypothetical reorganization value of the Reorganized Truvo Group is within the range of €~~496.2~~**523.7** million to €~~666.4~~**696.3** million (with a mid-point estimate of approximately €~~581.3~~**610.0** million) as of an assumed Effective Date of December 31, 2010. Houlihan **Lokey** performed this valuation for each of the two main operating entities, Truvo Belgium and Truvo Ireland, along with the Debtors' three joint-ventures Páginas Amarelas, Trudon and Axesa, considering the respective economic ownership and control rights at each entity.

Based upon the estimated range of the reorganization value of the Reorganized Truvo Group of €~~496.2~~**523.7** million to €~~666.4~~**696.3** million (with a mid-point estimate of approximately €~~581.3~~**610.0** million) less face value of debt of €450.0 million and solely for the purposes of the Plan, Houlihan **Lokey** has estimated the range of equity value for Reorganized Truvo Group of €~~46.2~~**73.7** million to €~~216.4~~**246.3** million (with a mid-point estimate of approximately €~~131.3~~**160.0** million). The debt facilities contemplated as part of the plan of reorganization were negotiated in that context, and may reflect below-market terms for similar companies with similar leverage profiles. To the extent these debt facilities are more favorable to the Reorganized Truvo Group than what could otherwise be attained on the open market, such benefit will accrue ratably to all shareholders of the Reorganized Truvo Group.

THE ESTIMATED HYPOTHETICAL RANGE OF REORGANIZATION VALUES ASSUMES AN EFFECTIVE DATE OF DECEMBER 31, 2010, REFLECTS WORK PERFORMED BY

HOULIHAN **LOKEY** ON THE BASIS OF INFORMATION CONCERNING THE BUSINESS, AND ASSETS OF THE DEBTORS AVAILABLE TO HOULIHAN **LOKEY** AS OF JULY 1, 2010. NEITHER HOULIHAN **LOKEY** NOR THE DEBTORS HAVE UPDATED THE ESTIMATED HYPOTHETICAL RANGE OF REORGANIZATION VALUES TO REFLECT INFORMATION AVAILABLE TO THE DEBTORS OR HOULIHAN **LOKEY** SUBSEQUENT TO ~~JULY 1,~~ **AUGUST 13,** 2010. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN **LOKEY**'S CONCLUSIONS, HOULIHAN **LOKEY** DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

In preparing its analysis of the estimated hypothetical Enterprise Value of the Reorganized Truvo Group, Houlihan **Lokey**, among other analyses: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods including the most current financial results through July 1, 2010; (ii) reviewed certain internal and public financial and operating data of the Debtors including financial projections prepared and provided by management relating to their business and their prospects; (iii) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (iv) reviewed publicly available financial data and considered the market value of public companies which Houlihan **Lokey** deemed generally comparable to the operating business of the Debtors; (v) considered certain economic and industry information relevant to the Reorganized Truvo Group; and (vi) conducted such other analysis, inquiries, and investigations as it deemed appropriate.

ALTHOUGH HOULIHAN **LOKEY** CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED TRUVO GROUP'S BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL (I) FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AND (II) PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN **LOKEY** DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION WITH THE HYPOTHETICAL RANGE OF REORGANIZATION VALUES SET FORTH HEREIN.

THE ESTIMATED HYPOTHETICAL RANGE OF REORGANIZATION VALUES DESCRIBED HEREIN DOES NOT PURPORT TO BE AN APPRAISAL OR NECESSARILY REFLECT THE VALUES WHICH MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

THE ANALYSIS OF THE REORGANIZED TRUVO GROUP'S EQUITY VALUE PREPARED BY HOULIHAN **LOKEY** REPRESENTS THE HYPOTHETICAL RANGE OF EQUITY VALUES AND IS BASED ON THE ASSUMPTIONS CONTAINED HEREIN. THE ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF A PLAN OF REORGANIZATION AND THE DETERMINATION OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF EQUITY VALUES OF THE REORGANIZED TRUVO GROUP THROUGH THE APPLICATION OF VARIOUS GENERALLY ACCEPTED VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT, AND WILL

FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF EQUITY VALUES OF THE REORGANIZED TRUVO GROUP SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, HOULIHAN **LOKEY**, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

(b) Assumptions regarding the Reorganized Truvo Group

Solely for purposes of the Plan, with respect to the hypothetical range of Enterprise Value of the Reorganized Truvo Group, in addition to the foregoing, Houlihan **Lokey** has relied upon the following assumptions:

- The successful reorganization of the Debtors' businesses and finances in a timely manner.

- The implementation of the Reorganized Truvo Group's business plan and the achievement of the financial forecasts reflected therein.

- The present senior management of the Debtors will continue in their current positions following consummation of the Plan.

- The general financial and market conditions as of the assumed Effective Date of the Plan will not differ materially from those conditions prevailing as of the date of this Disclosure Statement or through the projection period.

- The Plan becomes effective in accordance with the estimates and other assumptions discussed herein.

Houlihan **Lokey**'s estimate represents a hypothetical range of value that reflects the estimated intrinsic value of the Reorganized Truvo Group derived through the application of various valuation techniques. Such analysis does not purport to represent valuation levels that would be achieved in, or assigned by, the public markets for debt and equity securities or private markets for corporations. Houlihan **Lokey**'s estimate of the hypothetical range of Enterprise Value does not purport to be an appraisal or to necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

(c) Valuation Methodology.

The following is a brief summary of certain financial analyses performed by Houlihan **Lokey**, including a discounted cash flow analysis, publicly traded company analysis and precedent transactions analysis, to arrive at its estimate of the hypothetical range of the Enterprise Value of the Reorganized Truvo Group. Houlihan **Lokey** performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtors on which such analyses were based and other factors, including the projected financial results of the Reorganized Truvo Group. Houlihan **Lokey**'s estimates of the hypothetical range of Enterprise Values predominately relied upon the discounted cash flow analysis methodology and publicly traded company analysis given the limitations associated with the applicability of precedent transactions analysis in determining the Enterprise Value of the Reorganized Truvo Group for reasons described below.

(A)    Discounted Cash Flow Analysis

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by an estimated weighted average cost of capital ("WACC"). The expected future cash flows have two components: the present value of the projected unlevered free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections). Houlihan **Lokey**'s discounted cash flow valuation is based on the projection of Reorganized Truvo Group's operating results. This approach relies on the company's ability to project future cash flows with some degree of accuracy. Since Debtors' projections reflect significant assumptions made by their management concerning anticipated results, the assumptions and judgments used in the projections may or may not prove correct and therefore, no assurance can be provided that projected results are attainable or will be realized. Houlihan **Lokey** cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' projections.

**Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Truvo Group, which in turn affect its cost of capital and terminal multiples. Houlihan Lokey calculated its DCF valuation based on discount rate range of 8.5% - 9.5% and terminal multiple range of 5.2x – 6.2x for the core business.**

(B)    Comparable Companies Analysis

The comparable company analysis involves identifying a group of publicly traded companies whose businesses are similar to those of the Reorganized Truvo Group and then calculating ratios of enterprise value to EBITDA of these companies based upon the public market value of such companies' securities. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, business risks, growth prospects, business maturity, market presence, and size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. The ranges of ratios derived were then applied to the Reorganized Truvo Group's projected financial results to derive a range of implied values.

**Houlihan Lokey selected the following publicly traded companies on the basis of general comparability to the Reorganized Truvo Group: Dex Media Inc., Eniro AB, PagesJaune Groupe, Seat Pagine Gialle SpA, Supermedia Inc., Yell Group plc, and Yellow Pages Income Fund.**

(C)    Precedent Transactions Analysis

The comparable transaction analysis estimates value by examining public merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. Houlihan **Lokey** also observed historical expected synergies and enterprise premiums paid in selected transactions. Since precedent transaction analysis reflects aspects of value other than the intrinsic value of a company, coupled with the fact that these transactions occurred in a different operating and financial environment, there are limitations as to its usage in the Reorganized Truvo Group's valuation. Houlihan **Lokey**'s

hypothetical range of Enterprise Value does not rely on any precedent transactions because there are very few, if any, recent precedent transactions.

(D)     Analysis of Post-Emergence Tax Attributes

The Debtors expect to recognize capital and ordinary losses as a result of the conversion of Truvo USA, Inc. into a limited liability company, and to carry those losses back to claim a refund of taxes paid in prior years of approximately $105 million.  The Debtors and its advisors have discounted by the core business WACC of ~~9.5~~**9.0**% for one year. The discounted value is then converted to EUR at a forward curve exchange rate for ~~September 30,~~**December 31,** 2011 as of ~~July 1,~~**August 13,** 2010 of $/€ ~~.7932~~**0.7846.**  The timing and amount of a potential refund is subject to significant uncertainties, and there can be no assurance that the Debtors will receive any refund.  **For purposes of the valuation, the high-end value within the Enterprise Value range includes the full discounted value of this asset.**

THE RANGE OF REORGANIZATION VALUES DETERMINED BY HOULIHAN **LOKEY** IS AN ESTIMATE AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

4.     *Best Interests Test*

With respect to each Impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each Holder of a Claim or Equity Interest either (i) Accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To determine what Holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by any unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.  The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition creditors.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, must be compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and Old Equity Interest Holders in the Debtors' Chapter 11 Cases, including (i) the ability of the Senior Lenders and HY Noteholders to enforce their rights under the Senior

Facility Agreement and HY Notes Indenture, respectively, and foreclosure on the assets that are subject to their Liens, (ii) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisers to such trustee; (iii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and (iv) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest with a recovery that is not less than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including Allowed Other Priority Claims and Other Secured Claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for two years after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

Houlihan **Lokey**, with the assistance of the Debtors, prepared the Debtors' Liquidation Analysis, which is annexed hereto as <u>Exhibit 3</u>. The information set forth in <u>Exhibit 3</u> provides (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates and (b) the expected recoveries of the Debtors' creditors and Old Equity Interest Holders under the Plan. The Debtors' Liquidation Analysis, as reflected in <u>Exhibit 3</u> hereto, indicates:

- Holders of Administrative Expense Claims, Priority Tax Claims or Other Priority Claims would receive a 100% recovery on their Claims in a liquidation. Such Holders would also receive a 100% recovery under the Plan.

- Holders of Allowed Senior Debt Claims would have an estimated recovery of between 22.7% and 39.9% on their Claims in a liquidation. Such Holders would receive an estimated recovery of between ~~63.8~~**67.2**% and ~~84.1~~**87.5**% under the Plan.

- Holders of HY Notes Claims would have a recovery of 0.0% on their Claims in a liquidation. Such Holders would receive an estimated recovery of between 2.8% and ~~4.8~~**5.4**% under the Plan, assuming the HY Noteholder Classes vote to Accept the Plan.

- Holders of PIK Debt Claims would have a recovery of 0.0% on their Claims in a liquidation. Such Holders would have an estimated recovery of between 0.0% and ~~0.5~~**0.7**% under the Plan, assuming the HY Noteholder Classes and PIK Lender Class vote to Accept the Plan.

- Holders of General Unsecured Claims would have a recovery of 0.0% on their Claims in a liquidation. Such Holders have an estimated recovery of between 50% and 100% under the Plan.

- Holders of Old Equity Interests and Statutorily Subordinated Claims would have would have an estimated recovery of 0.0% on their Claims in a liquidation. Such Holders would also receive nothing under the Plan.

Underlying the Debtors' Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Debtors' Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated. All Holders of Allowed Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Debtors' Liquidation Analysis is based in connection with their evaluation of the Plan.

**D.    Classification of Claims and Equity Interests**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code.

**E.    Consummation**

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in the Plan, have been satisfied or waived pursuant to the Plan. For a more detailed discussion of the conditions precedent to the Plan, see Article V.N.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

# VII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain highly leveraged and the Debtors will remain unable to service their debt obligations or to cure defaults thereunder. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

**A.    Liquidation Under Chapter 7**

If no plan is confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached hereto as <u>Exhibit 3</u>. For the reasons articulated in Article VI above, the Debtors believe that liquidation under chapter 7 would result in lower aggregate distributions being made to Holders of Allowed Claims than those provided in the Plan.

**B.    Alternative Plan of Reorganization**

The Debtors believe that failure to confirm the Plan will likely lead to expensive and protracted Chapter 11 Cases. In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process involving many different parties with widely disparate interests.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Holders of Claims and enable the Holders of Allowed Claims to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class. As a result, alternatives are limited.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS, AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES AND INCREASE RESTRUCTURING EXPENSES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## C. Dismissal of the Debtors' Chapter 11 cases

Dismissal of all of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of all of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of all of the Debtors' Chapter 11 Cases would permit the Senior Lenders and HY Noteholders to foreclose upon the assets that are subject to their Liens that constitute a material portion of the Debtors' assets. Dismissal will also permit unpaid unsecured creditors, including the PIK Lenders, to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to reorganize and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

## VIII.
## GOVERNANCE OF HOLDCO, EQUITYCO AND PIKCO

## A. Generally

A Shareholders' Agreement governing the equity interests in Holdco, Equityco and PIKco will be entered into on the Effective Date. **See Exhibit F to the Plan Support Agreement for a detailed term sheet describing, *inter alia*, the governance of Holdco, Equityco and PIKco. Prior to the Voting Deadline, the Debtors will file with the Court, as Exhibit I to the Plan Supplement, a copy of the definitive documentation. It will be available on the Claims Agent's website at http://www.kccllc.net/truvo.**

Each ordinary share in Equityco, PIKco and Holdco will have one vote. Operational matters will be approved at the Holdco level with any matters requiring shareholder approval being voted on by the shareholders of Equityco and PIKco on a pass-through basis. Each of Equityco and PIKco will vote their Holdco ordinary shares in the same proportions as votes are cast by shareholders of Equityco and PIKco, respectively, or in the proportions required to achieve the required threshold at Holdco to reflect the intentions of such shareholders. Equityco and PIKco shall vote their Holdco ordinary shares to give effect to the terms of the Shareholders' Agreement.

**B.** **Governance of Equityco and PIKco**

Directors of Equityco and PIKco will be appointed by a vote of more than 50% of the ordinary shares in Equityco and PIKco, respectively. There will be a minimum of three investor directors, appointed by the ordinary shareholders of Equityco and PIKco, respectively, on the board of each of Equityco and PIKco. The quorum for each company's board meetings will be half of the members of such company's board **being present or represented** and at least two of the investor directors on such board **being present**. Each member of each board shall have one vote on each resolution and resolutions will be passed by simple majority, with the chairman having a casting vote in the event of a deadlock.

**C.** **Governance of Holdco**

1. *Board of Directors*

Four investor directors of Holdco will be appointed by the ordinary shareholders of Holdco: two will be appointed from a list of candidates nominated by Equityco and two will be appointed from a list of candidates nominated by PIKco (or three by Equityco and one by PIKco where PIKco has less than 25% of the ordinary shares in Holdco). One of these four investor directors will be appointed as chairman. Any shareholder or group of shareholders under common control of Equityco and/or PIKco indirectly holding more than 20% but less than 66.67% of the ordinary shares in Holdco is entitled to nominate candidates for an additional investor director on the board of Holdco. The board shall also include two directors chosen from among management, initially the CEO and CFO. The quorum for Holdco board meetings will be half of the members of the board and at least three of the investor directors on such board, of which one must be nominated by each of Equityco and PIKco**, being present or represented and at least two members of the board being present**. Each member of the board shall have one vote on each resolution and resolutions will be passed by simple majority, with the chairman having a casting vote in the event of a deadlock.

Certain matters are reserved for decision to the Holdco board (to be approved by a majority of directors and at least one investor director nominated by Equityco and one investor director nominated by PIKco). Those matters include:

· certain strategic decisions (e.g. approval of annual budget or business plan for Holdco or the Reorganized Truvo Group as a whole, entry into or termination of joint ventures or similar arrangements with an aggregate value of more than €250,000 but less than €5 million; borrowings (other than intra Reorganized Truvo Group borrowings) of more than €500,000 but less than €10 million; entry into one or more transactions by members of the Reorganized Truvo Group with an individual or aggregate consideration of more than €500,000 but less than €10 million, per annum; capital expenditure on any item or project greater than €250,000 that is not provided for in the budget; entry into a lease, license or similar obligation under which the rental and all other payments exceed €250,000 a year that is not provided for in the budget; giving of guarantees or indemnities by a member of the Reorganized Truvo Group, except in the ordinary course of business; making any loans by a member of the Reorganized Truvo Group with an aggregate value of more than €500,000 but less than €10 million (other than intra-Reorganized Truvo Group loans or loans by a company that is not within the Reorganized Truvo Group's sole control));

· certain employment and incentive matters (e.g. hiring or change to **conditions of** employment **or service** of any employee **or consultant** earning €200,000 or more annually, other than directors; adoption or variation of any bonus or profit sharing

scheme, share or incentive plan or retirement benefit scheme; and agreement of incentive plans for local employees **or consultants**); and

· certain other expenditures (e.g. surrender**, termination** or material variation of any contract for a value equal to or in excess of €1,000,000; settlement of litigation or arbitration with values of (i) greater than €350,000 but less than €600,000 with respect to employment claims and (ii) greater than €250,000 but less than €500,000 with respect to other claims).

Certain other matters are reserved for decision to the holders of ordinary shares of Holdco.[15]

· The following matters require consent **of** three quarters of votes cast on the ordinary shares of Holdco:

  ● certain matters related to the corporate structure of the Reorganized Truvo Group (e.g. certain matters affecting the ~~loan~~ capital of Holdco; entry by Holdco into an arrangement which would require the issuance, redemption or transfer of equity**, or any other kind of security,** in Holdco; changes to the articles of association of Holdco; any proposed **corporate** reorganization ~~or liquidation~~ (or similar action) of Holdco);

  ● ~~issuance of ordinary shares of Holdco or of any shares ranking in priority to ordinary shares of Holdco or any other~~**any** increase in issued share capital and certain other changes to share capital;

  ● taking steps to wind-up**, liquidate** or dissolve Holdco, appoint a receiver, file bankruptcy, enter into an arrangement with creditors, or any similar action (except that directors may take such steps where failure to do so would be a breach of their fiduciary duty or legal obligations); and

  ● any change of Holdco's name.

· The following matters require consent of two-thirds of votes cast on the ordinary shares of Holdco:

  ● certain strategic decisions (e.g. material changes to the nature of the business; entry into or termination of joint ventures or similar arrangements with an aggregate value of more than €5 million; borrowings (other than intra-Reorganized Truvo Group borrowings) of an aggregate amount of over €10 million; entry into one or more transactions with an individual or aggregate consideration of more than €10 million per annum; making loans with an aggregate value of more than €10 million (other than intra-Reorganized Truvo Group loans or loans by a company that is not within the Reorganized Truvo Group's sole control);

  ● sale (not including an initial public offering), merger or refinancing of ~~the~~ Holdco or the Reorganized Truvo Group;

  ● appointment of the CEO or CFO of ~~Holdco~~**the Reorganized Truvo Group**;

---

[15] Local laws may impose greater consent rights than those described in the Shareholders' Agreement.

- **agreement or variation of** management incentive plans, except for incentive plans for local employees for members of the Reorganized Truvo Group other than Holdco;

- entry by a member of the Reorganized Truvo Group into a transaction with ~~an investor related party~~**a shareholder or a holder of the New PIK Debt** (unless on arms length terms);

- payment of dividends by Holdco; and

- settlement of litigation or arbitration **with respect to Holdco or other members of the Reorganized Truvo Group** for values of (i) greater than €600,000 with respect to employment claims and (ii) greater than €500,000 with respect to other claims.

The shareholder with the largest indirect interest in Holdco that holds greater than 15% but less than 66.67% is entitled to appoint one observer to the Holdco board at its own cost. Audit and remuneration committees will be established, which will include investor directors as members and ~~whose procedures~~**which** will ~~be the same as those for~~**advise** the Holdco board~~, except that one investor director must approve all decisions of such committees~~.

## D.    Officers of Reorganized Truvo after the Effective Date

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of Reorganized Truvo following the Effective Date shall be substantially the same as officers of such entity as of the Confirmation Date (and thereafter shall be subject to the terms of the Holdco Charter).

# IX.
# CERTAIN RISK FACTORS TO BE CONSIDERED

## A.    Certain Bankruptcy Considerations

1.    *Bankruptcy Matters*

i    General

While the Debtors believe that a bankruptcy filing solely for the purpose of implementing an agreed upon restructuring as contemplated by the Plan Support Agreement will be of short duration and will not be seriously disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure that the Plan will be confirmed.

Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could have an adverse effect on the Truvo Group's businesses. Among other things, it is possible that a bankruptcy proceeding could adversely affect the Truvo Group's relationships with their key customers, employees and independent contractors. A bankruptcy proceeding will also involve significant expenses and will divert the attention of the Truvo Group's management from the operation of the businesses.

Further, the Plan provides for conditions that must be satisfied (or waived) prior to the Confirmation Date and for other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

The extent to which a bankruptcy proceeding disrupts the Truvo Group's businesses will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different plan of reorganization that can be confirmed. That would increase both the probability and the magnitude of the adverse effects described above. Even assuming a successful emergence from Chapter 11, there can be no assurance as to the overall long-term viability of the Truvo Group's business.

ii       Failure to Confirm the Plan

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modification would not necessitate the resolicitation of votes to accept the Plan, as modified.

iii       Termination of the Plan Support Agreement

Upon the occurrence of certain conditions, the Plan Support Agreement could be terminated. If the Plan Support Agreement were terminated, the parties thereto would not be obligated to vote in favor of or otherwise support the Plan. Such a termination could materially impair the Debtors' ability to obtain confirmation of the Plan.

iv       Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks on the Debtors' operations. Although the Debtors believe that the Effective Date will occur in the third quarter of 2010, there can be no assurance as to such timing or that the conditions to the Effective Date will ever be satisfied, including without limitation: (i) entry of the Confirmation Order (including any amendment or modification thereof) by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtors, the CoComm and the Elliott Lender, and not have been stayed or reversed or vacated on appeal; (ii) the satisfaction (or waiver in accordance with the terms therein) of all conditions precedent specified in the Purchase Agreement for the closing of the TUSA Sale other than the occurrence of the Effective Date or those actions specified to occur on the Effective Date; (iii) the satisfaction (or waiver in accordance with the terms therein) of the conditions precedent for the closing of the Daylight Facility; (iv) the Debtors obtaining (or being deemed to have obtained by expiry of the relevant waiting period) merger control clearance or approval of the transactions contemplated under the Plan in each jurisdiction where notification of such transactions is mandatory; and (v) satisfaction or waiver of all of the conditions precedent for entry into the New Bank Debt and New PIK Debt in accordance with the terms thereof.

If the Confirmation Order is entered but (i) the Effective Date does not occur on or before December 31, 2010, or such later date as is agreed upon in writing by the Debtors and the Majority Supporting Senior Lenders, and (ii) the Plan Support Agreement has terminated in accordance with its

terms, then the Confirmation Order will be deemed vacated by the Bankruptcy Court without further notice or order.

<blockquote>

v      <u>Risks related to the actions to be taken by the Security Agent and the Senior Agent under the Plan Support Agreement</u>

</blockquote>

The Senior Agent and the Security Agent have each executed the Plan Support Agreement. However, all actions to be taken by the Security Agent or the Senior Agent as contemplated by the Plan Support Agreement and the Plan are subject to the satisfaction of the terms and conditions set forth in Exhibit B to the Plan. Among other things, these conditions require the satisfaction of each of the conditions set forth in Clause 22.4 of the Intercreditor Agreement, the execution and delivery of the Instructions by the Majority Lenders and the execution and delivery of Mandatory Transfer Certificates by all Senior Lenders. There can be no assurance that such conditions will be satisfied or waived in accordance with their terms.

<blockquote>

2.      *The Truvo Group's businesses could suffer from the loss of key personnel*

</blockquote>

The Truvo Group is dependent on the continued services of its senior management team and other key personnel. The loss of key personnel could have a material adverse effect on the Truvo Group's business, financial condition, and results of operations. The Truvo Group may be unable to retain and motivate key executives and employees through the process of reorganization and the Truvo Group may have difficulty attracting new employees. In addition, so long as the Chapter 11 Case continues, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

<blockquote>

3.      *The Debtors may not be able to grow their business during the Chapter 11 Case without Bankruptcy Court approval*

</blockquote>

Transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell or otherwise dispose of all or substantially all of the Debtors' assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage. The Debtors may be unable to continue to grow the Debtors' business through acquisitions and restrictions on the Debtors' ability to pursue other business strategies, unless the Debtors obtain Bankruptcy Court approval for those transactions.

<blockquote>

4.      *Pursuit of litigation by the parties in interest could disrupt the confirmation of the Plan and could have material adverse effects on the Truvo Group's businesses and financial condition*

</blockquote>

There can be no assurance that any parties in interest will not pursue litigation strategies to enforce any Claims in respect of the Truvo Group. Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of such claims. The pursuit of litigation in connection with objections to this Disclosure Statement or the Plan, including the effectiveness and effect of steps required for the implementation of the Plan under the laws of foreign jurisdictions, could delay and disrupt confirmation of the Plan and the Debtors' emergence from bankruptcy. Any litigation may be expensive, lengthy and disruptive to the Truvo Group's normal business operations and the Plan confirmation process, and a resolution of any such strategies that is unfavorable to the Debtors could have a material

adverse effect on the Plan confirmation process, emergence from bankruptcy or on the Truvo Group's businesses, results of operations, financial condition, liquidity and cash flow.

5. *Adverse publicity in connection with the Chapter 11 Cases or otherwise, could negatively affect the Truvo Group's businesses*

Adverse publicity or news coverage relating to the Debtors, including but not limited to publicity or news coverage in connection with this Chapter 11 proceeding, may negatively affect (i) the Truvo Group's businesses during the Chapter 11 proceeding and (ii) the Reorganized Truvo Group's efforts to establish and promote name recognition and a positive image after the Effective Date.

**B.** **Risks Relating to the New Ordinary Shares and Junior Creditor Warrants to be Issued Under the Plan**

1. *No public markets for the New Ordinary Shares or Junior Creditor Warrants are currently present, and lack of the development of a public market could result in the New Ordinary Shares or Junior Creditor Warrants being difficult or impossible to trade. Other uncontrollable market factors could also negatively affect the value of the New Ordinary Shares and Junior Creditor Warrants*

The New Ordinary Shares and Junior Creditor Warrants to be issued pursuant to the Plan are securities for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for the New Ordinary Shares or Junior Creditor Warrants. If a trading market does not develop or is not maintained, holders of the New Ordinary Shares and Junior Creditor Warrants may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Truvo Group.

Furthermore, Persons to whom the New Ordinary Shares or Junior Creditor Warrants are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for such securities may be volatile.

2. *Neither Equityco nor PIKco will be required to, nor do they intend to, file periodic reports with the SEC or any other regulator or stock exchange upon emergence*

Neither Equityco nor PIKco will be required to, nor do they intend to, file periodic reports with the SEC upon emergence. As a result, holders of Equityco or PIKco securities will have access to limited information (other than that provided pursuant to information covenants set forth in the New Senior Credit Agreement and New PIK Agreement and reporting requirements under applicable laws) about these companies and their investment in their respective Plan Securities following the Effective Date.

3. *The Shareholders' Agreement will include restrictions on transfer, as well as drag along and tag along rights*

Ordinary equity in Holdco will not be transferable for 5 years except on an exit event or IPO and in accordance with applicable law. Ordinary shares in Equityco and PIKco will, in addition to the transfer restrictions described in Section V.J.1.ii, be subject to drag along rights and tag along rights, where the transfer would result in the transferee holding ordinary shares in Equityco and PIKco that represent in

aggregate an interest of 66 ⅔% or more (in respect of the drag along rights), or more than 50% (in respect of the tag along rights) of the ordinary shares in Holdco. These requirements, and the transfer restrictions described in Section V.J.1.ii above, may negatively affect the liquidity of ordinary shares in Equityco and PIKco.

4. *The Holdco Ordinary Shares and Equityco Ordinary Shares could be subject to future dilution and, as a result, could decline in value*

The ownership percentage represented by the Equityco Ordinary Shares will be subject to dilution as a result of issuances of ordinary shares in Equityco upon the exercise of the Junior Creditor Equityco Warrants and MIP Equityco Warrants. As described in Section V.E, Equityco will hold Junior Creditor Holdco Warrants and MIP Holdco Warrants that mirror the Junior Creditor Equityco Warrants and MIP Equityco Warrants. As a result, Holdco Ordinary Shares, and the percentage of Holdco Ordinary Shares indirectly held by holders of PIKco Ordinary Shares, may be subject to dilution upon the exercise of such Junior Creditor Holdco Warrants and MIP Holdco Warrants.

In the future, similar to all companies, additional equity financings or other share issuances of ordinary shares in Equityco by the Reorganized Truvo Group could adversely affect the market price of the New Ordinary Shares. Sales by existing holders of a large number of New Ordinary Shares in the public market, or the perception that additional sales could occur, could cause the market price of the New Ordinary Shares to decline.

5. *Dividends are not expected to be paid with respect to the New Ordinary Shares for the foreseeable future*

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Ordinary Shares in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which the Reorganized Truvo Group will be a party, including the New Bank Debt and New PIK Debt, may limit the ability of the Reorganized Truvo Group to pay dividends.

## C. Risks Relating to the New Bank Debt and New PIK Debt to be issued under the Plan

1. *No market for the New Bank Debt and New PIK Debt is currently present, and lack of the development of a market could result in the New Bank Debt and New PIK Debt being difficult or impossible to trade. Other uncontrollable market factors could also negatively affect the value of the New Bank Debt and New PIK Debt*

The New Bank Debt and New PIK Debt to be issued pursuant to the Plan are debt obligations for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for the New Bank Debt and New PIK Debt. If a trading market does not develop or is not maintained, holders of the New Bank Debt and New PIK Debt may experience difficulty in reselling such obligations, or may be unable to do so entirely. Even if such a market were to exist, such obligations could trade at prices lower than the par value of the New Bank Debt and New PIK Debt depending upon many factors, including, without limitation, prevailing interest rates, markets for similar obligations, industry conditions and the performance of, and investor expectations for, the Reorganized Truvo Group.

Furthermore, Persons to whom the New Bank Debt and New PIK Debt is issued pursuant to the Plan may prefer to liquidate their investments rather than hold such obligations on a long-term basis.

Accordingly, any market that does develop for such securities may be volatile. Other factors may further depress any market for the New Bank Debt and New PIK Debt.

The New Bank Debt and New PIK Debt can only be transferred to a bank or financial institution or to a trust, fund or other entity which is regularly engaged or established for the purpose of making, purchasing, or investing in loans, securities or other financial assets. In addition, (i) the New Bank Debt can only be transferred in amounts greater than €1,000,000 and (ii) the New PIK Debt will be stapled to PIKco Ordinary Shares. As a result, a holder of the New PIK Debt may not transfer or assign any of its rights and obligations under the New PIK Debt unless it simultaneously assigns or transfers an equivalent percentage of PIKco Ordinary Shares. This requirement may negatively affect the liquidity of the New PIK Debt.

2.    *The New PIK Debt will be structurally subordinated to holders of the New Bank Debt*

PIKco will be a holding company formed pursuant to the Plan. It will conduct no business of its own and engage in no activities other than holding the Holdco Ordinary Shares. Creditors of PIKco, including holders of the New PIK Debt, will not be able to seek recourse for any breach of the terms and conditions of the New PIK Debt by proceeding directly against the assets of Holdco or any of its subsidiaries. Rather, they will have recourse only to the assets of PIKco, which will be limited to equity in Holdco.

3.    *The Reorganized Truvo Group will be subject to significant restrictive debt covenants, which will limit its operating flexibility*

Significant restrictive covenants, including financial covenants, in the instruments governing the New Bank Debt and New PIK Debt may restrict the Reorganized Truvo Group's flexibility. Such covenants may place restrictions on its ability to: incur additional indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness.

4.    *The Reorganized Truvo Group will have certain obligations under the New Indemnity that rank first in priority to payment of principal and interest under the New Bank Debt.*

The obligations of the Reorganized Truvo Group to pay principal and interest under the New Bank Debt will rank behind the obligations of certain members of the Reorganized Truvo Group[16] under the New Indemnity. The obligations of the relevant members of the Reorganized Group under the New Indemnity will, on and from the Effective Date, be secured by the same security and in accordance with the same security documents entered into by the obligors under the New Bank Debt. As a result, if there is a claim made against the Security Agent or Senior Agent in respect of any claim, damages, expenses, costs, losses or liabilities (including reasonable legal costs and expenses) arising in connection with the Financial Restructuring and the Security Agent and/or Senior Agent makes a claim under the New Indemnity, the relevant members of the Reorganized Truvo Group would have to use their cash resources to satisfy that claim before paying interest or principal on the New Bank Debt. In addition, if the security for the New Bank Debt were to be enforced at a time when there were claims outstanding in respect of the New Indemnity, the proceeds of the security enforcement would be applied in satisfaction of those claims before being applied in satisfaction of the New Bank Debt.

---

[16] The New Indemnity will be granted by the borrowers and guarantors under the New Senior Credit Agreement.

5.      *PIKco has no direct payment obligation towards the holders of the New PIK Debt Notes*

Payments of any amounts owing in respect of the New PIK Debt Notes will be made through a domiciliary agent and the X/N Clearing System in accordance with the agency agreement and the regulations of the X/N Clearing System.

Unless instructed otherwise by the domiciliary agent, the NBB will debit the account of the domiciliary agent with the NBB for payments due by PIKco to the holders of the New PIK Debt Notes in accordance with the regulations of the X/N Clearing System and will be responsible for ensuring that payments are credited to the accounts of the relevant participants in the X/N Clearing System.

The payment obligations of PIKco under the New PIK Debt Notes will be discharged by payment to the domiciliary agent in respect of each amount so paid.

The persons shown in the records of the NBB, of participants in the X/N Clearing System and of their respective sub-participants as the holders of a particular principal amount at maturity of the New PIK Debt Notes only have recourse against the NBB, participants in the X/N Clearing System or their sub-participants, as the case may be, for their share of each payment so made by PIKco to, or to the order of, the holders of such New PIK Debt Notes.

## D.      Leverage

The Debtors believe that they will emerge from Chapter 11 with a level of debt that can be effectively serviced in accordance with their business plan.  However, future circumstances could result in the Reorganized Truvo Group being overleveraged.  If such circumstances should occur, the Debtors would face certain difficulties, including, but not limited to, difficulty in meeting their obligations, reduced flexibility and competitive disadvantages relative to competitors that have less debt.

Additionally, factors beyond the control of the Reorganized Truvo Group could affect its ability to meet debt service requirements. The ability of the Reorganized Truvo Group to meet debt service requirements will depend on its future performance, which, in turn, will depend in part on the ability of the Reorganized Truvo Group to sustain sales conditions in the markets in which it will operate, the economy generally and other factors that are at least partially beyond the Reorganized Truvo Group's control. The Debtors can provide no assurance that the Reorganized Truvo Group's business will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Truvo Group to pay its indebtedness or to fund its other liquidity needs.

Further, the Reorganized Truvo Group may need to borrow additional funds or refinance all or a portion of its indebtedness on or before maturity. There is no assurance that the Reorganized Truvo Group will be able to borrow additional funds or refinance any of its indebtedness on commercially reasonable terms or at all. If the Reorganized Truvo Group is not able to make scheduled debt payments or comply with the other provisions of its debt instruments, its lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

E.    **Risks Relating to U.S. Tax Consequences of the Plan**

1.    *Risks relating to U.S. federal income tax treatment of the Plan*

The U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims are subject to some uncertainty.  The Debtors do not intend to seek any ruling from the IRS on the tax consequences of the Plan, and there is no assurance that the tax consequences of the Plan described in Section XII below would be respected by the IRS.

2.    *Risks relating to potential U.S. federal tax claims*

The Debtors are subject to ongoing discussions with the IRS regarding certain legacy tax issues.  Any claim successfully asserted by the IRS would generally reduce the amount of the refunds expected to be collected by the Debtors, or would require the Debtors to make payments to the IRS.  For a description of the material tax issues raised by the IRS, see Section III.F above.

3.    *Risks relating to potential U.S. tax refunds*

As described in Section XII.B and Section III.F , the timing and amount of any potential refunds are subject to significant uncertainties, and there can be no assurance that the Debtors will receive any refunds.

F.    **Risks Relating to Belgian Tax Consequences of the Plan**

1.    *The Belgian income tax consequences of the Plan are subject to uncertainties*

The Belgian income tax consequences of the Plan are subject to uncertainties.  The Debtors have therefore requested a ruling from the Belgian ruling commission (Federale Overheidsdienst Financiën - Dienst Voorafgaande Beslissingen in fiscale zaken / Services Public Fédéral Finances - Service des Décisions Anticipées en matière fiscale) (the "Belgian Ruling Commission") on certain material tax consequences of the Plan.  The Belgian Ruling Commission issued a favorable ruling on June 23, 2010.  The opinions of the Belgian Ruling Commission are binding on the Belgian tax authorities.  Not all transactions contemplated by the Plan have, however, been the subject of the ruling request.  Although it is expected that these transactions, such as the transfer of assets and liabilities by TUSA to Truvo Belgium and the distribution of assets by TUSA to Newco, will not have material Belgian tax consequences, no assurance can be given that the Belgian tax authorities will not challenge the position of the Debtors in respect of these transactions.  If successful, challenges by the Belgian tax authorities may lead to significant tax liability in situations where Truvo Belgium is not allowed to offset taxable income derived from such transactions against the amount of its carried-forward tax losses.  Such challenges could adversely affect its business and financial position and cause a diversion of management time and resources.  See Section XIV below for a discussion of certain Belgian income tax consequences expected to result from the consummation of the Plan.

2.    *The New PIK Debt could be recharacterized as equity for Belgian tax purposes*

The New PIK Debt will be stapled to the PIKco Ordinary Shares.  As a result, holders of the New PIK Debt may not transfer or assign any of their rights and obligations under the New PIK Debt unless they simultaneously assign or transfer an equivalent percentage of the PIKco Ordinary Shares. Although it is unlikely that this requirement will affect the characterization as debt of the New PIK Debt, there is some uncertainty given the absence of any precedents or official guidelines and there can be no assurance that the Belgian tax authorities will not challenge this characterization and claim that the New PIK Debt

qualifies as equity. If successful, such claim by the Belgian tax authorities may lead to adverse tax consequences for PIKco, which could adversely affect its business and financial position and cause a diversion of management time and resources. With respect to the Holders, a successful challenge may lead to tax consequences that are different than those discussed in Section XIV.B.4 below.

### 3. *Holders of the New PIK Debt could face certain other adverse tax consequences*

In the event that elections of Senior Lenders in favor of the PIKco Distribution would result in the amount of the New PIK Debt (as determined pursuant to the Plan) exceeding the fair market value of the Holdco Ordinary Shares transferred by such Senior Lenders to PIKco in exchange for said New PIK Debt, such excess amount could be deemed to constitute the grant of an abnormal or benevolent advantage, within the meaning of the Belgian Income Tax Code 1992 ("ITC 92"), by PIKco to such Senior Lenders. In such a case, the excess amount would be subject to taxation at PIKco level at the normal Belgian corporate income tax rate (i.e., 33.99%).

The Belgian tax authorities could also argue that any payment to holders of the New PIK Debt in excess of the fair market value of the Holdco Ordinary Shares transferred to PIKco in exchange for the New PIK Debt, qualifies as a "deemed dividend distribution" and is therefore subject to the same tax treatment as a dividend payment (i.e., 25% withholding tax).

In addition, to the extent that the Belgian tax authorities would consider that such transaction constitutes a "simulation" (a sham transaction), substantial additional tax payments and other penalties could be imposed by the Belgian authorities.

For the reasons set forth above, the Debtors reserve the right to amend the Plan, subject to Section 12.6 of the Plan and the applicable provisions of the Plan Support Agreement, in the event that, as a result of the elections of the Senior Lenders, the amount of the New PIK Debt would exceed the fair market value of the Holdco Ordinary Shares to be transferred by such Senior Lenders to PIKco in exchange for said New PIK Debt. No later than two business days after the Voting Deadline, the Debtors will inform the CoComm and the Elliott Lender of the amount of Allowed Senior Debt Claims that have elected to receive a pro rata share of the PIKco Distribution.

### G. Risks Relating to the Inherent Uncertainty of Financial Projections

The Projections set forth in the attached <u>Exhibit 4</u> cover the operations of the Reorganized Truvo Group through fiscal year 2013. As set forth on <u>Exhibit 4</u>, the Projections are based on numerous assumptions, including that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on December 31, 2010.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, many of the assumptions on which the Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and the Reorganized Truvo Group. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the three-year period of the Projections may vary from the projected results and the variations may be material.

The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published

guidelines of the SEC regarding projections or forecasts. The Projections have not been examined or compiled by independent accounts. No assurance can be given that the Projections will be realized. The Debtors make no representation or warranty as to the accuracy of the Projections or their ability to achieve the projected results.

## H.    Risks Associated with the Business

### 1.    *Continued Decline in use of Print Directories*

The Truvo Group has been and may continue to be materially adversely affected by declining usage of printed directories and the shift toward online and other media. In recent years, overall usage of printed directories in Europe and other areas has declined. The Truvo Group expects that print usage will continue to decline. Continuing declines in the use of printed directories could impair the Truvo Group's revenues and continue to have a material adverse effect on its business, financial condition and results of operations. Any further decline in usage of printed directories could (i) impair the Truvo Group's ability to maintain or increase print advertising prices; (ii) cause businesses that purchase advertising in printed directories to reduce or discontinue those purchases; and (iii) discourage businesses that do not purchase advertising in printed directories from doing so in the future.

The shift in usage from print to online and other media has taken place due, in substantial part, to developments in technology, including information distribution methods and users' technological preferences. The Truvo Group's future growth and financial performance will depend upon its ability to develop and market new products and services and to use new or enhanced distribution channels to accommodate the latest technological advances and user preferences and to benefit from the shift in usage from print to online media products. The increasing use of the Internet and telephone by consumers as a means to transact commerce has resulted in new technologies or products being developed and services provided that can compete with the Truvo Group's products and services for advertising sales and consumer usage, which may result in further declines in revenue over time. If advertising customers continue to perceive that printed directories are no longer an effective means of reaching their target audience and the Truvo Group's online products do not present a viable alternative, advertisers may continue to increase the proportion of advertising spend on competing media or other online products, which could further materially adversely affect the Truvo Group's business, financial condition and results of operations.

### 2.    *Failure of New Print Products*

Revenues of some of Truvo Group's core print products have declined in the past few years and are expected to continue to decline. In order to improve the performance of print products, the Truvo Group may choose to introduce new print products, which may require significant investments in the next few years. If these new print products do not successfully attract increased revenues, the increased operating costs related to their implementation may adversely affect the Truvo Group's results of operations.

### 3.    *Failure of the strategy to transform the Truvo Group into a local search and advertising business*

The Truvo Group's core strategy is to transform into a local search and advertising business centered on the further development of its online products and services. Net revenues from Internet advertising represented 35.4% of the Truvo Group's net operating revenues for the year ended December 31, 2009 compared to 26.2% in 2008. In the future, it expects to derive a greater amount of its revenues from Internet advertising as usage growth in online media products substitutes usage decline in print

directories. The developing technologies associated with Internet activities are subject to a variety of challenges and risks including the following:

- The Truvo Group's investment in Internet-based products and services may not generate expected revenues if the use of the Internet as a medium for advertising does not continue to grow. Continued growth of the Internet as a viable tool for advertisers may be inhibited for a number of reasons that are beyond the Truvo Group's control or ability to predict. The Truvo Group's business could be adversely affected if the market for Internet advertising fails to develop or develops more slowly than expected.

- The markets in which the Truvo Group now operates and intends to expand are characterized by rapidly changing technology, continuous introduction of and enhancement to competing products and services, and shifting customer demands, including technology preferences.

- In order to compete in the Internet and online advertising market, the Truvo Group has entered into a number of cooperation and supply arrangements with other operators in the market for Internet and online applications. If any of these arrangements are unsuccessful or terminated, the Truvo Group's ability to maintain and expand its online products and services may be negatively affected.

Any failure by the Truvo Group in the execution of its print product and online strategies, including transformation into a local Internet search and advertising business, could have an adverse effect on its business, financial condition and results of operations.

4.      *Risk of increased competition from new mobile applications and services*

Mobile telecom operators and hardware providers are currently rolling out new mobile platforms and advertising services. The Truvo Group may not be able to develop the products and services necessary to efficiently compete with these new forms of advertising and may therefore lose market share.

5.      *The Truvo Group may fail to anticipate or respond effectively to changes in technology and consumer preferences, harming its competitive position*

Advances in technology will continue to bring new competitors, products and distribution channels to the Truvo Group's industry. As a result, the growth and future performance of the Truvo Group will depend on its ability to develop and market new products and services and create new distribution channels while enhancing existing products, services and distribution channels to incorporate the latest technological advances and accommodate changing user preferences, including the use of the Internet. The Truvo Group may not be able to timely or successfully adapt its businesses to these changes in technology.

6.      *Revenues of the Truvo Group may continue to decline*

The revenues generated by the Truvo Group's print products have continued to decline due to weak economic conditions and competition from other advertising media. Recent print products advertising sales continue to decline as compared to the prior year. Accordingly, if revenues from the Truvo Group's Internet products do not increase significantly, its cash flow, results of operations and financial condition may be adversely affected.

7. *Some of the Truvo Group's revenues are derived from entities it does not control*

As of the Petition Date, the Truvo Group controls only 50% of the voting rights in its Portuguese joint venture and, as such, does not have unfettered control over that entity. The Truvo Group holds minority positions in Axesa~~, Axesa GP~~ and Trudon. Based on its shareholdings and the contractual arrangements entered into with the majority shareholders, the Truvo Group does not control those businesses. While the Truvo Group expects to continue receiving dividend payments, there can be no assurance that the future performance of these businesses will be in line with expectations or that it will continue to receive similar dividends, if any, going forward.

8. *A prolonged economic downturn and other external events would adversely affect the Truvo Group's business and financial condition*

The recent global economic crisis has had a significant negative impact on businesses across regions and industries throughout the world, which, in turn, has had a significant negative impact on the Truvo Group's businesses. In particular, a reduction in advertising spending by customers may lead to a further reduction in their demand for the Truvo Group's products and services and a migration of some or all of their advertising spending to other products or services the Truvo Group does not offer, which could have a material adverse effect on its results of operations and financial condition.

As a significant portion of the Truvo Group's print and online advertising space is generally sold on an annual basis (though an increasing percentage is sold on a monthly basis), customers can only adjust their advertisement volume annually in response to general economic trends. Therefore, a global economic slowdown could have a further material adverse effect on the Truvo Group's businesses, particularly since directory advertising tends to lag behind current economic conditions, as advertising in print directories is sold up to eight months in advance of the publication date. Further, economic slowdowns could force the Truvo Group to delay or reduce capital expenditures needed to reorient its business. As a result, an improvement in general economic conditions and increased advertising spending of the Truvo Group's customers may not have an immediate impact on its print directory business and any increase in revenues will lag behind a general economic recovery.

9. *The Truvo Group may be unable to adequately fund its operations*

The Debtors expect that the Truvo Group will continue to require substantial funds for general corporate and other expenses and may require additional funds for working capital fluctuations. There can be no assurance that the Truvo Group's capital resources will be sufficient to enable it to achieve operating profitability following consummation of the Plan. Failure to generate or raise sufficient funds may require the Truvo Group to delay or abandon some of its expansion plans or expenditures, including its transition towards a focus on online products, which could harm its businesses and competitive positions.

The Truvo Group expects to meet its funding needs through various sources, including, without limitation, existing cash balances, vendor financing and cash flows from future operations. It may also do so by issuing additional debt or equity securities. The addition of new debt post-consummation of the Plan could increase the leverage-related risks described above. However, there can be no assurance that the Truvo Group will have timely access to additional financing sources on acceptable terms, if at all. The Truvo Group's ability to issue debt securities, borrow funds from additional lenders and participate in vendor financing programs may be restricted under the terms of the New Senior Credit Agreement and New PIK Agreement, and there can be no assurance that the respective lenders will waive these restrictions if additional financing is needed beyond that permitted.

Failure to secure necessary capital could restrict the Truvo Group's ability to operate and further develop its business.

10.     *The Truvo Group may be unable to compete successfully in each of its markets due to the competitive nature of the directory advertising industry*

The directory advertising business in general, and especially Internet-based products and services, is competitive. The declining nature of the traditional print directory business has further increased the competitiveness of some of the Truvo Group's markets in recent years. In each of its geographic markets, the Truvo Group usually competes with one or more competitors. In addition, competition in these markets may increase further if certain of the Truvo Group's joint venture and cooperation partners decide to terminate their ongoing partnerships, arrangements or joint ventures or compete with their existing businesses.

Some competitors or potential competitors have substantial advantages in both size and financial resources. This is particularly the case in the online business where certain competitors, such as Google, benefit from substantial market share and other competitive advantages. In addition, the Truvo Group competes against businesses in other media, including newspapers, radio, television, billboards and direct marketing as well as Internet search providers for business and professional advertising. Some of these competing businesses have stated that they are specifically targeting the yellow pages market and have significantly increased their market presence in the past several years.

The Truvo Group's ability to compete successfully for both users and advertisers depends on elements both within and outside its control, including user demand for its services, successful development and timely introduction of new products, pricing, industry trends and general economic trends. An inability to compete successfully could have a material adverse effect on the Truvo Group's business, financial condition and results of operations.

11.     *Loss of key personnel or the Truvo Group's inability to attract and retain highly qualified individuals could have a material adverse effect on its ability to achieve its operating goals*

The Truvo Group's success depends in significant part on its ability to identify, hire and retain key managers. The ability to attract and retain qualified managers depends on numerous factors, including external factors outside of the Truvo Group's control such as economic and social conditions in local markets. If the Truvo Group is unable to hire or retain key managers, the business, financial condition and results of operations of the Truvo Group may be materially adversely affected.

In addition, the Truvo Group's performance depends in large part upon the abilities and continued service of its sales force and other key revenue generating personnel. The loss of key sales force personnel could adversely affect its business prospects and damage its relationship with important customers. It may not be able to prevent the unauthorized disclosure of its procedures, practices, product developments or client lists by its former employees. In addition, the loss of the services of certain key personnel could adversely affect the Truvo Group's ability to implement its business strategy, and no assurance can be given that new staff would be able to do so without delay.

The Truvo Group has focused recruitment initiatives, specific retention programs and incentives, together with various initiatives, to enhance engagement and retain key talent in all functions and layers in the organization. However, flexibility to introduce incentive schemes for the Truvo Group's personnel, to dismiss underperforming employees or to implement other important employment related measures might be affected or prevented by local employment laws.

12. *The Truvo Group will continue to incur significant severance costs*

The Truvo Group has experienced significant severance costs in connection with the termination of its employees. Efforts to restructure certain operations in 2009 led to the incurrence of €15.8 million in costs, mainly related to the reduction of sales forces. The Truvo Group expects to continue to incur significant severance costs in the future.

13. *Measures taken by the Truvo Group to maximize efficiency, reduce its cost base and position its business to move away from a primary focus on print products may not be adequate and may be detrimental to its future competitiveness*

As described in Section III.I above, the Truvo Group has undertaken a number of initiatives to preserve cash, increase efficiency and reduce business costs. These initiatives have included, without limitation, efforts to reduce costs, retrain employees and reduce redundancies, simplify print offerings and a new focus on Internet-based products and services. The Debtors' expectation that these changes will enhance the Reorganized Truvo Group's financial results is based on certain assumptions and variables regarding, among other things, future market conditions. Such assumptions may prove to be incorrect and the expected efficiency improvements and cost savings may not materialize as a result of such measures. In addition, certain measures such as the retraining of employees and refocusing of the sales force may prove detrimental and make the Truvo Group less competitive in the future. Further cost saving measures, if required, may negatively impact its competitive position and long-term growth.

14. *Strikes or industrial action could disrupt operations*

The Truvo Group is exposed to the risk of industrial actions. The implementation of sales targets, efforts to right-size the Truvo Group's workforce, or other labor-related measures could lead to industrial actions by their personnel in the future. In addition, several of the Non-Debtor Subsidiaries are parties to collective bargaining agreements and/or works councils and similar bodies, and a substantial number of their employees in various countries are unionized. Consequently, many labor related measures require negotiations, consultations or, in well-defined circumstances, the prior approval of such works councils or other labor related bodies, making their implementation somewhat unpredictable.

15. *The Truvo Group may be unable to retain existing customers or acquire new customers*

The Truvo Group's success is dependent upon its ability to retain its existing customer base. Established advertisers are more likely to purchase products across its platforms, are less expensive to service or sell to than new advertisers and are less likely than new advertisers to generate bad debt expense. In 2009, the Truvo Group experienced a negative trend in customer retention. Generally, the retention rate in its online business is lower than in its print business. The Truvo Group is also likely to become more dependent on acquisition of new customers, which may prove to be more difficult than anticipated. The failure of the Truvo Group's customers to renew their advertising in the Truvo Group's print and online directories could have a material adverse effect on the Reorganized Truvo Group's business, financial conditions and results of operations.

16. *The loss of important intellectual property rights could adversely affect the Truvo Group's results of operations and future prospects*

Certain of the Truvo Group's trademarks, including the terms "Truvo", "Golden Pages", "Gouden Gids", *"Pages d'Or"* and *"Páginas Amarelas"* as well as the Truvo Group's "walking fingers" logo and

other intellectual property rights are well known in the markets where they compete and are important to its business. The Truvo Group relies upon a combination of database, copyright and trademark laws as well as, where appropriate, contractual arrangements, including licensing agreements and confidentiality agreements, to establish and protect its intellectual property rights. On occasion, the Truvo Group needs to bring claims against third parties in order to protect its intellectual property rights. Similarly, the Truvo Group may become party to proceedings where third parties challenge its use of intellectual property. For example, one party is challenging the validity of the "Truvo" trademark in certain jurisdictions.

The trademark "Yellow Pages" (and translations thereof) is a highly descriptive trademark and could therefore be declared null and void in some jurisdictions. If the Truvo Group's trademark "Yellow Pages" is declared void, it will not be exclusively entitled to use this brand nor will its actions against third parties succeed.

No assurance can be given that any lawsuits or other actions brought by the Truvo Group will be successful or that the Truvo Group will not be found to infringe on the intellectual property rights of third parties. Although the Debtors are not aware of any material infringements of any trademark rights that are significant to their business or that of the other members of the Truvo Group, any lawsuits, regardless of their outcome, could result in substantial costs and diversion of resources and could have a material adverse effect on its business, financial condition and results of operations. In some cases, others have registered or intend to register certain trademarks, logos or Internet addresses that the Truvo Group intends to use in its businesses. If such events recur, the Truvo Group may be required to accept its use of such intellectual property rights or may be required to enter into agreements with them for the use of such trademarks and logos.

The illegal use by third parties or the loss of the Truvo Group's important intellectual property rights, such as databases and trademarks (for example, the "Golden Pages" and "Yellow Pages" trademarks) could have a material adverse effect upon its business, financial condition and results of operations.

The members of the Truvo Group own the intellectual property rights that they use. Certain Benelux and European Community trademarks shared between Truvo Belgium and Gouden Gids (such as yellow color mark or walking fingers design) are, however, owned by YPIP and licensed to Truvo Belgium and Gouden Gids, for use in their respective territories, on a perpetual and royalty-free basis.

17.    *The Truvo Group's reliance on small and medium size businesses exposes it to increased credit risk*

Most of the Truvo Group's operating revenues are derived from selling advertising and listings to small and medium size businesses. In the ordinary course of business, the Truvo Group extends credit to those customers to purchase advertising and listings. Small and medium size businesses tend to have fewer financial resources and higher financial failure rates than large businesses. Those limitations may cause some customers in any given year not to pay for their purchases promptly or at all, especially in difficult economic circumstances. In addition, full collection of late payments can take an extended period of time and consume additional resources. Bad debt expenses as a percentage of net operating revenues were 4.2%, 2.0% and 1.9% for the fiscal years 2009, 2008 and 2007, respectively. A challenging economic environment may require the Truvo Group to increase the amount of credit that it extends to its customers, delay debt collection from these customers or increase the amount of bad debt expense.

18. *Any disruption, failure or other ineffectiveness of internal controls could have a material adverse effect on the Truvo Group's businesses, financial condition and results of operations*

The Truvo Group's businesses are dependent on the ability to process a large number of transactions across numerous and diverse products, and to comply with a number of different legal and regulatory regimes. The Truvo Group's ability to keep accurate records, to monitor and manage business across all its members, to provide high quality customer service and to develop and market profitable products in the future depends, in part, on the effectiveness of its internal controls. Any disruption, failure or other ineffectiveness of internal controls could have a material result on the Truvo Group's businesses, financial condition and results of operations.

19. *The Truvo Group's significant reliance on technology could have a material adverse effect on its businesses*

Most of the Truvo Group's business activity relies to a significant degree on the efficient and uninterrupted operation of its computer and communications systems and those of others. Any failure of existing or future systems could impair its ability to collect, process and store data and the day-to-day management and operation of the Truvo Group's businesses. Such failure could have a material adverse effect on the Truvo Group's businesses, financial conditions and results of operations.

The Truvo Group's computer and communications systems are vulnerable to damage or interruption from a variety of sources. A natural disaster or other unanticipated problems that lead to the corruption or loss of data at the Truvo Group's facilities could have a material adverse effect on its businesses, financial condition and results of operations.

20. *Risk of fluctuations in the cost of paper and other materials*

The Truvo Group is dependent upon suppliers for all of its raw material needs and, therefore, is subject to price increases and delays in receiving supplies of such raw materials. Paper represents its single largest raw material expense and constitutes a significant operating expense. In 2009, expenses for paper equaled approximately 3.9% of the Truvo Group's net operating revenues. Accordingly, significant increases in paper prices may have a material adverse effect on the Truvo Group's ability to operate successfully. While the Truvo Group has entered into agreements to mitigate the risk of such cost increases, its exposure has not been eliminated. In the past, the Truvo Group has experienced substantial fluctuations in the price of paper and, in certain cases, shortages of paper due to strong worldwide demand in periods of strong economic growth. There may be periods during which the Reorganized Truvo Group will not have access to necessary raw materials at commercially reasonable prices, which may have a material adverse effect on its businesses, financial condition or results of operations.

21. *The Truvo Group's dependence on partnerships, joint ventures and the cooperation of incumbent telecom operators*

The Truvo Group's ability to publish and distribute its product offerings in a number of its key geographic markets is based on the continuation of certain cooperation arrangements, publishing agreements or joint ventures with the incumbent telephone operators. A modification, termination or expiration without renewal of these arrangements could have a material adverse impact on its businesses in these markets. Specific risks include, without limitation, the following:

- Truvo Belgium is operating under a cooperation agreement with Belgacom to fulfill Belgacom's current legal obligation to publish a universal white pages directory. The publication of such

directory currently contributes to approximately 10% of Truvo Belgium's annual total sales. Recent changes in Belgian law provide that the publisher of the universal directory will be designated by Royal Decree following an organized tender process. Due to changes governing the distribution of the universal directory that require, except for provisions to the contrary prior to January 1, 2011, the publisher to deliver copies of the white pages directory for the calendar years 2011 to 2013 only to individuals that affirmatively "opt-in" to receive them. Belgacom has publicly announced that it is considering not participating in such tender offer (and will, as a result, not extend its cooperation agreement with Truvo Belgium to publish the universal white pages directory for 2011 onward). The Debtors also anticipate that Truvo Belgium, under the current circumstances, will not participate in that tender process. There can be no assurance that Truvo Belgium's operations will not be detrimentally affected by the recent changes in law or its decision not to participate in the tender process.

- eircom, the incumbent Irish telephone operator, has subcontracted its obligation to publish a universal service directory to Truvo Ireland on an exclusive basis. Truvo Ireland's agreement with eircom is important for its operations in Ireland. In June 2006, eircom and Truvo Ireland entered into a new production agreement for the production of the editions of the alphanumeric directories in respect of the calendar years 2007 through 2013, at significant cost to the Truvo Group. In 2013, the Truvo Group may not be able to renew its agreement with eircom on acceptable terms or at all.

- Páginas Amarelas publishes directories in Portugal pursuant to an agency agreement entered into with Portugal Telecom. That agency agreement can be terminated if either TUSA and Truvo Belgium or Portugal Telecom invokes the "shot-gun" provision (the "Shot-Gun Provision") in the shareholders agreement governing Paginas Amarelas, and as a result the Truvo Group obtains Portugal Telecom's interest in Páginas Amarelas. Under the Shot-Gun Provision either TUSA and Truvo Belgium or Portugal Telecom can, at any time, send a notice (the "Notifying Party") to the other specifying a single price at which it is willing to either purchase the interest of the other party or sell its interest to the other party. In response, the other party must choose to either buy the shares of the Notifying Party or sell its shares to the Notifying Party at the specified price. If that transaction results in the Truvo Group purchasing the interest in Páginas Amarelas held by Portugal Telecom, then the agreement under which Páginas Amarelas publishes the universal directory **and the classified directory products** in Portugal will terminate after two additional sales cycles (typically two years) unless renegotiated. Following the expiration of the publishing arrangement, Páginas Amarelas would be required to transfer all customer data to Portugal Telecom and would be prohibited from retaining any copy. If the Truvo Group were to purchase Portugal Telecom's interest in Páginas Amarelas the Truvo Group would, subject to certain non-compete arrangements, be able to continue its business in Portugal. However, its access to customer data could become more burdensome and Portugal Telecom could decide to enter into direct competition with the Truvo Group or cooperate with its competitors. That could have a material adverse affect on the Truvo Group's competitive position in the Portuguese market.

- The Advisory Agreement between Axesa and Truvo Belgium, pursuant to which Truvo Belgium receives 4% of Axesa's gross advertising revenue, contains a provision that automatically terminates should TUSA's shareholding in Axesa, directly or indirectly, fall below twenty percent (20%). That provision may be triggered by the transactions contemplated in the Plan. No assurances can be given that an agreement will be reached with ~~GTE Directories Corporation~~**Caribe Media Inc., a subsidiary of Local Insight Media Holdings, Inc.** to avoid termination of the Advisory Agreement.

- Generally, the operations of Axesa and Trudon are dependent on their respective agreements with the local incumbent telephone operators and may be materially and adversely affected should their relationships with those telephone operators change.

In addition, the corporate governance provisions of the Truvo Group's joint ventures require shareholder voting on a number of important issues, which may limit the ability of these joint ventures to take advantage of business opportunities, such as future acquisitions, disposals or investments that would otherwise benefit the Truvo Group.

22. *The Truvo Group relies on third party providers for printing, distribution, delivery services, revenue collection and website design and hosting*

The Truvo Group often relies on third party vendors for printing, distribution and, in certain cases, for billing and website design and hosting. It has entered into long-term contracts for some of these services. As a consequence, the Truvo Group may not be able to adjust its expenses in the short term. In addition, any failure of third parties to provide services in accordance with their contractual arrangements and timetables may lead to delay in the delivery of their products and may negatively affect the Truvo Group's businesses. In some markets, the Truvo Group relies on a single supplier for printing and distribution, leaving it exposed to substantial short-term risks if any such supplier must be replaced. As such, the Truvo Group's businesses, financial condition or results of operations may be negatively affected by its reliance on certain third parties.

23. *Currency exchange risks*

Changes in currency exchange rates may affect the Truvo Group's financial results. If the Truvo Group receives dividends from Trudon and/or Axesa the value of such dividends can be affected by foreign currency exchange fluctuations. In addition, the Truvo Group's businesses are also affected by exchange rate transaction risks to the extent its production costs, including raw material purchases, are incurred in currencies other than the local currency.

24. *Political instability*

The Truvo Group's operating results, cash flows and financial condition may be affected as a result of political, economic and regulatory conditions in any of the countries in which they operate, such as high inflation and interest rates, political instability and a difficult regulatory environment.

25. *Legal actions could have a material adverse effect on the operating results or financial condition of the Truvo Group*

Various lawsuits and other actions typical for a business of the Truvo Group's size and nature are pending against the Truvo Group. In addition, from time to time, the Truvo Group receives communications from government or regulatory agencies concerning investigations or allegations of non-compliance with laws or regulations in jurisdictions in which the Truvo Group operates. The Debtors do not expect that the ultimate resolution of pending regulatory and legal matters in future periods will have a material effect on its financial condition. Any potential judgments, fines or penalties relating to these matters, however, may have a material effect on the Truvo Group's results of operations in the period in which they are recognized.

A Non-Debtor Subsidiary, Truvo Nederland, is currently engaged ~~with Gouden Gids as co-defendant,~~ in a lawsuit filed by a Dutch entity known as Just Voice B.V. ("Just Voice") ~~for breach of contract by Truvo Nederland prior to its~~ **, which is alleging that Truvo Nederland tortiously terminated**

**a contractual negotiation between Just Voice and Truvo Nederland that occurred prior to Truvo Nederland's** partial demerger which resulted in the creation of Gouden Gids **(which was subsequently sold, as described in Section III.B)**. Truvo Nederland ~~and Gouden Gids were~~**was** found ~~jointly and severally~~ liable ~~for breach of contract~~ by the court of first instance of Amsterdam and subsequently filed an appeal which is still pending before the High Court of Amsterdam. ~~In the meantime~~ **While that appeal is still pending**, proceedings to determine the quantum of Truvo Nederland ~~and Gouden Gids~~'s liability ~~were~~**have also been** held ~~and on~~**. On** March 3, 2010, the court of first instance ordered that Truvo Nederland ~~and Gouden Gids jointly and severally owe~~**owes** damages to Just Voice in the amount of €369,900 (approximately €470,000 including interest). An appeal of ~~such decision is also pending before the High Court of Amsterdam.~~ **that decision is also pending before the High Court of Amsterdam. Despite the pending appeals, that judgment can be executed against Truvo Nederland.**

**Shortly following the decision on liability, Just Voice made conservatory attachments on certain trademarks owned by Gouden Gids, arguing that the latter should be held liable in its capacity as legal successor of Truvo Nederland following the above-mentioned partial demerger. Pursuant to its undertakings under the Gouden Gids purchase agreement, Truvo Nederland obtained the release of such conservatory attachments by providing a bank guarantee to Just Voice, issued by Fortis Bank (Nederland) B.V. That bank guarantee can only be drawn down in the event Truvo Nederland is found liable on appeal.**

**While the appeals remain pending, and despite the bank guarantee described above, Just Voice has attached certain of Truvo Nederland's intellectual property rights and a Truvo Nederland bank account opened with Fortis Bank (Nederland) B.V. (the credit balance of which amounts to approximately €600,000). The attached intellectual property rights are not currently used by the Truvo Group. The attachments aim to execute the €470,000 award rendered to Just Voice by the court of first instance referenced above. The Senior Lenders benefit from a first-ranking pledge on both the intellectual property and the credit balance of the bank account. That security interest will be subject to the Release.**

Pursuant to the Gouden Gids purchase agreement, TUSA agreed to indemnify Gouden Gids for certain liabilities, including liabilities that **European Directories (**Gouden Gids**'s parent)** may incur as a result of this litigation **or further attachments against Gouden Gids' assets**. Although **European Directories and/or** Gouden Gids may have contingent ~~Claims~~**claims** against TUSA related to damages suffered or that may be suffered ~~by Gouden Gids~~ in connection with the ongoing Just Voice litigation~~, the~~**. Gouden Gids has filed a proof of claim against TUSA, asserting a contingent and unliquidated claim for potential indemnification obligations in connection with the ongoing Just Voice litigation. The** Debtors expect that any such ~~claims will be satisfied by the bank guarantee issued, at the request of Truvo Nederland, for the benefit of Just Voice, and that Gouden Gids will not seek recourse or assert Claims against TUSA for recovery in light of the bank guarantee. The Debtors can provide no assurance, however, that such Claims will not be asserted against TUSA~~**indemnification obligation will be satisfied by the bank guarantee described above.**

The Truvo Group is also exposed to defamation, breach of privacy and other claims and litigation relating to the Truvo Group's directories business, as well as methods of collection, processing and use of personal data. The subjects of the Truvo Group's data and users of data collected and processed by the Truvo Group could also have claims against the Truvo Group if its data was found to be inaccurate or if personal data stored by the Truvo Group was improperly accessed and disseminated by unauthorized persons. These claims could have a material adverse effect on the Truvo Group's businesses, financial conditions or results of operations or otherwise distract its management.

26.    *The Truvo Group faces certain contractual restrictions related to operations in the Netherlands*

In connection with the sale of its operations in the Netherlands, Truvo Nederland Holdings B.V. ("Truvo Nederland Holdings") entered into a five-year non-compete agreement covering the Dutch national market.  That non-compete agreement applies to any direct or indirect holding companies or subsidiaries of Truvo Nederland Holdings, and may restrict the Truvo Group from taking certain actions, including a sale of a portion of its business to Dutch competitors.  That non-compete agreement will expire in March 2013.

## I.    Regulatory Risks

1.    *Government regulation and changes in regulation regarding information technology, data protection, privacy and other matters could have adverse effects on the Truvo Group's businesses, financial condition and results of operations*

The Truvo Group is subject to significant governmental regulation in the countries in which it operates.  Decisions by regulators regarding the Truvo Group, the markets in which it operates and its business practices could adversely affect the Truvo Group's businesses, financial conditions and results of operations.

The adoption of new laws, policies or regulations, in particular in connection with data protection and privacy, could adversely affect the Truvo Group's provision of existing services or restrict the growth of its businesses.

In addition, general advertising laws and regulations and data protection legislation may apply to the Truvo Group's Internet activities in the same way in which they apply to its activities generally.  As businesses in this area develop, specific laws and regulations relating to the provision of Internet services and to the use of the Internet may become more relevant.  Regulation of the Internet and related services is still developing.  The Truvo Group's operations and profitability could be adversely affected if its regulatory environment becomes more restrictive, including through increased regulation of online content.

2.    *Existing antitrust regulations, and the possibility of deregulation, may affect the Truvo Group's ability to compete effectively*

Due to applicable antitrust laws, the Truvo Group's strong position in certain markets limits its flexibility to adjust and differentiate prices and contractual arrangements.  For example, Belgian and Portuguese antitrust authorities have advised the Truvo Group that, given its strong market position, they will closely supervise the Truvo Group's businesses (and may even seek to invalidate certain contracts or try to enforce penalties to the extent they think antitrust laws have been violated) and business practices.  Further, European authorities may take action to deregulate the industries in which the Truvo Group operates.  Such deregulation may increase competition faced by the Truvo Group.

3.     *Initiatives directed at limiting or restricting the distribution of the Truvo Group's print directory products or shifting the costs and responsibilities of waste management related to the Truvo Group's print products could adversely affect its business*

Government authorities, including local and municipal bodies, may impose restrictions on the Truvo Group's ability to distribute its print directories in the markets it serves. Like Truvo Belgium, other members of the Truvo Group could be prohibited from distributing print directories unless residents affirmatively opt-in to receive their print products. In addition, environmental initiatives could shift the costs and responsibilities for waste management for discarded directories to their producers. If such initiatives are enacted, they will increase costs to distribute print products, reduce the number of directories that are distributed and negatively impact the Truvo Group's ability to market its advertising to new and existing clients.

# X.
## U.S. SECURITIES LAW MATTERS

## A.     Plan Securities

The Plan provides for Holdco, Newco, Equityco and PIKco to issue or distribute Plan Securities to Holders of Allowed Senior Debt Claims, Holders of Allowed HY Note Claims (if the HY Noteholder Classes Accept the Plan) and Holders of Allowed PIK Debt Claims (if the PIK Lender Class Accepts the Plan and the HY Noteholder Classes Accepts the Plan). In addition, the Plan provides for Equityco to issue ordinary shares in the event the Equityco Warrants are exercised and for Holdco to issue ordinary shares in the event the Holdco Warrants are exercised.

The Debtors believe that to the extent that the Plan Securities constitute "securities," as defined in section 2(a)(1) of the Securities Act, the offer and sale of the Plan Securities pursuant to the Plan are exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and state securities laws. If the Junior Creditor Equityco Warrants are exercised, the Debtors believe that the issuance of the ordinary shares of Equityco in satisfaction of the Junior Creditor Equityco Warrants shall also be exempt from federal and state securities registration requirements under section 1145(a)(2) of the Bankruptcy Code. In addition, the Debtors believe that subsequent transfers of the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) by the holders thereof that are not "underwriters," as defined in section 2(a)(11) of the Securities Act and in section 1145(b) of the Bankruptcy Code, will be exempt from federal securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code and that the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) generally may be resold without registration under state securities laws pursuant to various registration exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability. Notwithstanding anything included in this Article X, ~~The~~**the** (1) transfer of MIP Equityco Ordinary Shares to MIPco (and the subsequent sale of such MIP Equityco Ordinary Shares to Manco), (2) the transfer of MIP Equityco Warrants to MIPco, and (3) the exercise of Junior Creditor Holdco Warrants and MIP Holdco Warrants by Equityco shall not be pursuant to section 1145 of the Bankruptcy Code, but

shall be effected in transactions not subject to, or exempt from, the registration requirements of the Securities Act.

**B.     Issuance and Resale of Plan Securities Under the Plan**

1.     *Exemption from Registration*

Section 1145(a)(1) of the Bankruptcy Code provides that section 5 of the Securities Act and any state law registration requirements for the offer or sale of a security do not apply to the offer or sale of stock, options, warrants or other securities if (a) the offer or sale occurs under a plan of a security of a debtor, of an affiliate participating in a joint plan with a debtor or of a successor of a debtor under the plan, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or its affiliate and (c) the securities are issued in exchange for such claim or interest or are issued principally in such exchange and partly for cash and property.  In addition, with respect to warrants so issued under a plan, section 1145(a)(2) generally exempts the issuance of stock upon the exercise of such warrants.  In reliance upon these exemptions, the offer and sale of the Plan Securities (and the issuance of the ordinary shares of Equityco upon exercise of the Junior Creditor Equityco Warrants) should not require registration under the Securities Act or any state securities laws and will not be so registered.  To the extent that the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) are issued under the Plan and are covered by section 1145 of the Bankruptcy Code, such Plan Securities  (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) should be eligible for resale without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  Recipients of the Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) are advised to consult with their own legal advisers as to the availability of any exemption from registration under applicable securities laws and as to any applicable requirements or conditions to such availability.

2.     *Resales of Plan Securities; Definition of "Underwriter"*

Section 1145(c) of the Bankruptcy Code provides that the offer or sale of securities pursuant to section 1145 of the Bankruptcy Code is deemed to be a "public offering."  As a result, the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) will not be deemed to be "restricted securities" as defined in the Securities Act, and such Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) may be resold without registration under the Securities Act by persons who are not deemed to be "underwriters" within the meaning of section 1145(b) of the Bankruptcy Code with respect to such Plan Securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, (b) offers to sell securities offered or sold under the plan for the holders of such securities, (c) offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code is determined by reference to section 2(a)(11) of the Securities Act which includes as "statutory underwriters" all persons who, directly or indirectly, control, are controlled by or are under direct or indirect common control with, an issuer of securities. "Control," as defined in Rule 405 under the Securities Act, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of Plan Securities (and ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) who are deemed to be "underwriters" may be entitled to resell such Plan Securities pursuant to the limited exemptions from registration provided under the Securities Act. The availability of any exemptions from registration will depend on the facts and circumstances at the time of resale. Potential recipients of Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) should consult their own counsel about the availability of exemptions from registration of such Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants).

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants). In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtors make no representations concerning the right of any Person to freely resell Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants)**.** Accordingly, the Debtors recommend that potential recipients of Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) consult their own counsel concerning whether they may freely trade such Plan Securities (and the ordinary shares of Equityco issued upon the exercise of the Junior Creditor Equityco Warrants) without compliance with the registration or other requirements of the federal and state securities laws.

3.      *Listing of Plan Securities*

Upon the consummation of the Plan, the Plan Securities are not expected to be publicly traded or listed on any internationally recognized market or exchange. Neither Equityco nor PIKCo will be required to, nor do they intend to, effect such listing or file periodic reports with the SEC or otherwise comply with SEC disclosure or reporting requirements.

# XI.
## EUROPEAN ECONOMIC AREA SECURITIES LAW MATTERS

**A.      Offers of securities to the public in the EEA**

In relation to each member state of the European Economic Area ("<u>EEA</u>") which has implemented Directive 2003/71/EC (Directive 2003/71/EC, together with any relevant implementing measure in each member state hereafter, the "<u>Prospectus Directive</u>") (each, a "<u>Relevant Member State</u>"), an offer to the public of the Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) as provided in the Plan may not be made in that Relevant Member State, except that an offer in that Relevant Member State of the Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively), other than the New Bank Debt, may be made at any time under the following exemptions under the Prospectus Directive, in that Relevant Member State:

· solely to qualified investors (*i.e.*, legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities and legal entities which satisfy two or more of the following criteria: (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000; and (3) an annual net turnover of more than €50,000,000, as shown in the relevant entity's last annual or consolidated accounts) (hereafter an "<u>EEA Qualified Investor</u>");

· to fewer than 100 natural or legal persons, other than EEA Qualified Investors, per Relevant Member State;

· to investors who acquire securities for a total consideration of at least €50,000 per investor, for each separate offer;

· if the offer consists in an offer of securities whose denomination per unit amounts to at least €50,000;

· if the offer consists in an offer of securities with a total consideration of less than €100,000, which limit shall be calculated over a period of 12 months;

*provided* that no such offer will result in a requirement for the publication by Newco, Holdco, Equityco or PIKco of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of an offer, as provided in the Plan, so as to enable an investor to decide to purchase or subscribe for the Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive.

In the case of any Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) being offered to a financial intermediary (as that term is used in Article 3(2) of the Prospectus Directive), such financial intermediary will also be deemed to have represented, acknowledged and agreed that any Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) acquired by it under the Plan have not been acquired on a non-discretionary basis on behalf

of, nor have they been acquired with a view to their offer or resale to persons in circumstances which may give rise to an offer of Plan Securities (and ordinary shares of Equityco and Holdco issued upon the exercise of the Equityco Warrants and Holdco Warrants, respectively) to the public other than their offer of resale in a Relevant Member State under one or more of the exemptions to the publication of a prospectus included in the Prospectus Directive. Newco, Holdco, Equityco and PIKco and their affiliates, and others will rely upon the truth and accuracy of the foregoing representation, acknowledgement and agreement. Notwithstanding the foregoing, a Holder of Allowed Senior Debt Claims, a Holder of Allowed HY Notes Claims or a Holder of Allowed PIK Debt Claims who is not an EEA Qualified Investor and who has notified the relevant issuer of the securities (*i.e.*, Newco, Holdco, Equityco or PIKco) of such fact in writing may, with the consent of such relevant issuer be permitted to acquire such securities under the Plan.

IN THE EVENT THAT YOU ARE A RESIDENT OF A MEMBER STATE OF THE EEA WHICH HAS IMPLEMENTED THE PROSPECTUS DIRECTIVE, NO OFFER OR SOLICITATION OF AN OFFER TO RECEIVE ANY PLAN SECURITIES (AND ORDINARY SHARES OF EQUITYCO AND HOLDCO ISSUED UPON THE EXERCISE OF THE EQUITYCO WARRANTS AND HOLDCO WARRANTS, RESPECTIVELY) SHALL BE DEEMED TO BE MADE TO YOU PURSUANT TO THE PLAN UNLESS (I) YOU ARE AN EEA QUALIFIED INVESTOR OR (II) LESS THAN 100 NATURAL OR LEGAL PERSONS OTHER THAN EEA QUALIFIED INVESTORS FROM SUCH MEMBER STATE PARTICIPATE IN THE RELEVANT OFFERING OR (III) THE TOTAL CONSIDERATION FOR EACH SEPARATE OFFER IS AT LEAST €50,000 PER INVESTOR OR (IV) IF THE OFFER CONSISTS IN AN OFFER OF SECURITIES WHOSE DENOMINATION PER UNIT AMOUNTS TO AT LEAST €50,000 OR (V) IF THE OFFER CONSISTS IN AN OFFER OF SECURITIES WITH A TOTAL CONSIDERATION OF LESS THAN €100,000, WHICH LIMIT SHALL BE CALCULATED OVER A PERIOD OF 12 MONTHS.

**B.**     **Takeover bids in Belgium**

An offer to the public by Holdco to acquire the Newco Ordinary Shares, by Equityco and PIKco to acquire the Holdco Ordinary Shares or by Equityco to acquire the Junior Creditor Holdco Warrants as provided in the Plan, may not be made in Belgium, except that an offer by Holdco to acquire the Newco Ordinary Shares, by Equityco and PIKco to acquire the Holdco Ordinary Shares or by Equityco to acquire the Junior Creditor Holdco Warrants may be made at any time in Belgium, under the following exemptions under the Law of April 1, 2007 relating to take over bids ("*Loi relative aux offres publiques d'acquisition/ Wet op de openbare overnamebiedingen*" and hereafter the "Takeover Bids Law"):

·   for securities that are only held by EEA Qualified Investors;

·   to fewer than 100 natural or legal persons resident in Belgium other than EEA Qualified Investors;

·   for securities whose denomination per unit amounts to at least €50,000;

*provided* that no such offer for Newco Ordinary Shares, Holdco Ordinary Shares or Junior Creditor Holdco Warrants in Belgium will result in a requirement for the publication by Holdco, Equityco or PIKco of a prospectus pursuant to Article 11 of the Takeover Bids Law or a requirement to comply with any other provisions of the Takeover Bids Law.

For the purposes of this provision, the expression "offer to the public" in Belgium in relation to the acquisition of Newco Ordinary Shares by Holdco and Holdco Ordinary Shares by Equityco or PIKco and Junior Creditor Holdco Warrants by Equityco means:

a) a communication, in Belgium, to persons, under any form and by any means, of sufficient information on the terms of the offer to acquire the Newco Ordinary Shares, the Holdco Ordinary Shares or the Junior Creditor Holdco Warrants, as provided in the Plan, so as to enable an investor to decide to transfer its securities;

b) any advertising, in Belgium, whatever the nature of such advertising, aimed at announcing the offer to acquire the Newco Ordinary Shares or the Holdco Ordinary Shares or the Junior Creditor Holdco Warrants or recommending it.

IN THE EVENT THAT YOU ARE A RESIDENT OF BELGIUM, NO OFFER OR SOLICITATION OF AN OFFER TO ACQUIRE NEWCO ~~COMMON STOCK~~**ORDINARY SHARES**, HOLDCO ~~COMMON STOCK~~**ORDINARY SHARES** OR JUNIOR CREDITOR HOLDCO WARRANTS SHALL BE DEEMED TO BE MADE TO YOU PURSUANT TO THE PLAN UNLESS YOU ARE EITHER (I) AN EEA QUALIFIED INVESTOR OR (II) ONE OF LESS THAN 100 NATURAL OR LEGAL PERSONS, OTHER THAN EEA QUALIFIED INVESTORS, RESIDENT IN BELGIUM.

## XII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to certain Holders entitled to vote on the Plan. It is not a complete analysis of all potential **U.S.** federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or **U.S.** federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in **U.S.** federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the **U.S.** federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion addresses the U.S. federal income tax considerations relevant to Holders of the Senior Debt, the HY Notes, the PIK Loans, and Holders of Administrative Expense Claims, Other Priority Claims, Other Secured Claims, Statutory Subordinated Claims and General Unsecured Claims (collectively, "Other Claims"), and to Holders who receive New Ordinary Shares, HY Noteholder Warrants, PIK Lender Warrants, New Bank Debt and New PIK Debt in exchange for their Claims. This discussion does not address all **U.S.** federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders subject to special rules under the **U.S.** federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, Holders subject to the alternative minimum tax, Holders holding ~~the Senior Debt, the HY Notes, the PIK Loans, the New Ordinary Shares, the HY Noteholder Warrants, the PIK Lender Warrants, the New Bank Debt or the New PIK Debt~~**any of the instruments discussed herein** as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, U.S. Holders (as defined below) who have a functional currency other than the U.S. dollar, Holders that acquired the Senior Debt, the HY Notes or the PIK

Loans in connection with the performance of services and Holders that will own, directly, indirectly or by attribution, ten percent or more of the voting stock of any of Equityco, PIKco or Holdco.

The Debtors believe ~~that the Plan will not constitute a reorganization for U.S. federal income tax purposes, and intend to take that position. The remainder of this discussion assumes that the Plan will not constitute a reorganization. If the Plan were to constitute a reorganization, the U.S. federal income tax consequences of the Plan could differ substantially from the consequences described below. The primary effect of reorganization treatment would be that holders of Claims (except for Other Claims) would be unable to recognize a loss upon effectiveness of the Plan (or gain, except to the extent of cash received, if any), and any deferred loss or gain recognition generally would not be recognized until the holders sold or otherwise disposed of the securities received in exchange for their Claims. In addition, holders of Claims would have a carryover basis and carryover holding period in their Claims. The Debtors believe~~, and the remainder of this discussion assumes, that none of Equityco, PIKco, Holdco or Newco will be treated as a "surrogate foreign corporation" for purposes of section 7874 of the IRC **because those companies are organized in Belgium and are members of a group that conducts substantial activities in Belgium relative to its worldwide activities, and therefore qualify for an exception applicable to companies with those characteristics**. If any of Equityco, PIKco, Holdco or Newco were treated as a surrogate foreign corporation, such corporation would generally be subject to U.S. federal income taxation as if it were a U.S. domestic corporation.

For purposes of determining the issue price of New Bank Debt and New PIK Debt received pursuant to the Plan (as discussed in more detail in Section XII.C.1.i), it is necessary to determine whether any of the Senior Debt, New Bank Debt and New PIK Debt ~~are~~**is** "traded on an established market" for ~~applicable~~ U.S. federal income tax purposes. The Senior Debt is not traded on an established market. The Debtors anticipate, and the remainder of this disclosure assumes, that the New Bank Debt and **the** New PIK Debt will not be traded on an established market. If the New Bank Debt or **the** New PIK Debt were traded on an established market, then the issue price of any such traded debt could be equal to its fair market value at the time of issuance (rather than ~~the debt's~~**its** principal amount), which in turn could cause ~~such~~**the** debt to be treated as having been issued with "original issue discount" ("OID") for U.S. federal income tax purposes. In that case, a holder of such debt would be required to include all interest income in respect of the debt (including the OID) on a current-accrual basis by reference to the debt's constant yield to maturity. Holders of the New Bank Debt or **the** New PIK Debt should consult their tax advisers regarding their U.S. federal income tax treatment if the New Bank Debt or **the** New PIK Debt were traded on an established market.

HOLDERS SHOULD CONSULT THEIR TAX ADVISERS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW ~~COMMON STOCK~~**ORDINARY SHARES, THE NEW BANK DEBT, THE NEW PIK DEBT**, THE HY NOTEHOLDER WARRANTS, **AND** THE PIK LENDER WARRANTS, ~~THE NEW BANK DEBT AND NEW PIK DEBT~~ RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER **U.S.** FEDERAL TAX LAWS.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C)**

**TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.**

**B.**     **U.S. Federal Income Tax Consequences to the Debtors**

The Debtors expect to recognize capital and ordinary losses as a result of the conversion of Truvo USA, Inc. into a limited liability company, and to carry those losses back to claim a refund of taxes paid in prior years of approximately $105 million. ~~In addition, under specialized tax rules, the Debtors may realize taxable income as a result of the reorganization that cannot be offset by the losses and in respect of which approximately $7 million in taxes would be due.~~ The timing and amount of a potential refund is subject to significant uncertainties, and there can be no assurance that the Debtors will receive any refund.

**The Debtors believe that any such tax refund should be allocated to TUSA. As the Debtors are not parties to a tax sharing agreement, any tax refund should be allocated to the member(s) who (i) generated the income on which the taxes being refunded were initially paid, (ii) funded the payment of tax to the government, and (iii) generated the loss being used to offset the income and generate the claim for a refund. TUSA satisfies all three criteria. First, the taxes being refunded are taxes imposed in 2008 in respect of (a) TUSA's operations (through subsidiaries, several of which are disregarded for U.S. tax purposes and treated as branches of TUSA), and (b) the sale of Truvo's Dutch operations known as Gouden Gids, which were held by TUSA through its wholly owned indirect subsidiary Truvo Nederland Holdings. The sale was treated as a sale by TUSA because Truvo Nederland Holdings was a disregarded entity for U.S. tax purposes and a branch of TUSA. Second, the taxes imposed in 2008 were paid by TUSA, from a bank account held by TUSA and with funds generated by TUSA and its operating subsidiaries. Third, the losses that will be carried back to offset the 2008 income and gain, i.e., a foreign exchange loss and a stock loss, both result from TUSA's deemed liquidation upon its conversion into an LLC (which occurred on June 28, 2010). The foreign exchange loss was recognized in respect of TUSA's Belgian operations, which are treated for U.S. tax purposes as a branch of TUSA that operates in a currency other than the U.S. dollar. The stock loss was recognized in respect of TUSA's stock, which was effectively treated as being sold by TAC in exchange for the net value of TUSA's assets (which is zero) upon TUSA's conversion into an LLC. Under the subordination, turnover and waterfall provisions in Clauses 14.1 and 21.1 of the Intercreditor Agreement, junior creditors are effectively barred from sharing in any recoveries from TUSA's property unless and until all obligations to the Senior Lenders have been satisfied and discharged in full. Because the Senior Lenders will not receive full recovery under the Plan, they are entitled to benefit from the entire Tax Refund and none of the Tax Refund is available for distribution to either the HY Noteholders or PIK Lenders.**

**Although the Debtors believe that they will have no U.S. federal income tax cash liability in respect of the year 2010 that could offset the amount of the refund, the matter is not entirely free from doubt. Specifically, it is possible that the implementation of the Plan could give rise to the recapture of a "dual consolidated loss," in which case the Debtors could have a potential tax liability of up to approximately $7 million. The Debtors do not expect this result to apply because they believe they will be able to demonstrate, if necessary, to the satisfaction of the IRS that the losses in question are not susceptible to "foreign use" and thus will not be recaptured within the meaning of the relevant tax rules. However, there can be no assurance that the IRS will agree with the Debtors' views on this issue.**

**C.**     **U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims**

This discussion addresses the U.S. federal income tax considerations relevant to U.S. Holders of the Senior Debt, the HY Notes, the PIK Loans and Other Claims. A U.S. Holder is an individual who is a

citizen or resident of the United States, a U.S. domestic corporation or any other person that is subject to U.S. federal income tax on a net income basis in respect of an investment in the Senior Debt, the HY Notes, the PIK Loans or Other Claims.

1.  *U.S. Holders of Senior Debt*

**i**      **Risk That Loss Recognition Will Be Deferred.**

**There are at least two alternative ways of analyzing the series of transactions under which U.S. Holders will receive New Ordinary Shares, New Bank Debt, and, if applicable, New PIK Debt in exchange for Senior Debt. Under the approach that the Debtors believe to be correct, the transaction would be treated as a taxable exchange, and holders would recognize gain or loss in the same manner as if they had sold the Senior Debt. However, it is possible that the transaction could be analyzed as a reorganization followed by a capital contribution, in which event U.S. Holders would not recognize loss, and may not recognize the full amount of any gain. Although the Debtors believe that the arguments supporting taxable exchange treatment are stronger than the arguments supporting reorganization treatment, no assurance can be given that the U.S. tax authorities will agree, and U.S. tax authorities may seek to characterize the series of transaction as a reorganization, or attempt to deny a U.S. Holder's loss recognition on some other theory.**

**If the series of steps pursuant to which former holders of Senior Debt ultimately will receive New Ordinary Shares are analyzed separately (that is, as a preliminary exchange of (a) Senior Debt for Newco Ordinary Shares and New Bank Debt, followed by a subsequent exchange of Newco Ordinary Shares for Holdco Ordinary Shares, followed in turn by (b) a transfer of Holdco Ordinary Shares to PIKco or Equityco, as applicable, in exchange for New Ordinary Shares and, if applicable, New PIK Debt), then the first exchange may satisfy the technical requirements for reorganization treatment under Sections 368(a)(1)(G) and 368(a)(2)(D) of the IRC, and the second exchange may qualify as a transaction described in Section 351 of the IRC. U.S. Holders of Senior Debt would not recognize a loss on either step, and U.S. Holders wishing to recognize a loss would need to transfer the instruments that they receive in a taxable disposition. Gain, if any, would be recognized in respect of the reorganization if and to the extent that a U.S. Holder receives New Bank Debt that does not qualify as a security for tax purposes. Gain would be recognized in respect of the section 351 transaction to the extent the holder receives New PIK Debt.**

**The Debtors believe that the initial exchange of Senior Debt for Holdco Ordinary Shares and New Bank Debt should not be analyzed as a separate transaction (and as a reorganization) because U.S. Holders will never have any meaningful ownership rights or control over the Holdco Ordinary Shares that they will receive and immediately transfer pursuant to the Plan. If the transaction is analyzed as a single integrated transaction for U.S. federal income tax purposes, U.S. Holders of Senior Debt generally would recognize gain or loss for U.S. federal income tax purposes on the receipt of New Ordinary Shares, New Bank Debt and, if applicable, New PIK Debt in exchange for Senior Debt.**

**Based on this analysis, the Debtors intend to take the position that the exchange of Senior Debt for New Ordinary Shares, New Bank Debt and, if applicable, New PIK Debt, will constitute a taxable exchange. However, as indicated above, the U.S. tax authorities are not bound by the Debtors' intended treatment of the transaction, and there is no assurance that they will agree with it. Accordingly, U.S. Holders of Senior Debt should consult their tax advisers regarding this issue and the possibility of recognizing taxable losses in connection with the Plan. Except where indicated otherwise, the remainder of this disclosure assumes that the exchange of Senior Debt for**

**New Ordinary Shares, New Bank Debt and, if applicable, New PIK Debt will constitute a taxable exchange.**

          **ii** ~~i.~~ Exchange of Senior Debt for New ~~Bank Debt, New~~ Ordinary Shares**, New Bank Debt** and New PIK Debt

*Recognition of Gain or Loss*. Pursuant to the Plan, U.S. Holders of the Senior Debt **ultimately** will receive a combination of New ~~Bank Debt, New~~ Ordinary Shares**, New Bank Debt** and, if they elect to receive stock in PIKco, New PIK Debt, in exchange for their Senior Debt. ~~This exchange will constitute~~ **As discussed above in Section XII.C.1.i, the Debtors intend to take the position that this exchange constitutes** a taxable exchange for U.S. federal income tax purposes. ~~As a result~~ **Under that characterization**, a U.S. Holder of Senior Debt will recognize income, gain or loss in an amount equal to the difference between the U.S. Holder's "amount realized" and the U.S. Holder's "adjusted tax basis." Subject to the discussion in Section XII.C.5, a U.S. Holder's amount realized will equal the U.S. dollar fair market value of the New Ordinary Shares received **(not including any MIP Equityco Ordinary Shares and MIP Equityco Warrants, which will be transferred immediately to MIPco)**, as determined on the Effective Date, plus the aggregate "issue price" of the New Bank Debt and the New PIK Debt received (as discussed below). Subject to the discussion in XII.C.5, a U.S. Holder's adjusted tax basis in the Senior Debt will equal the purchase price paid for the Senior Debt. The purchase price is measured in U.S. dollars for these purposes, so that if a U.S. Holder used euros to purchase the Senior Debt, then the purchase price is equal to the value of the euros paid, translated into U.S. dollars at the applicable spot rate on the purchase date. The issue price of each of the New Bank Debt and the New PIK Debt will be equal to its stated principal amount. In general, subject to the discussion of bond premium or market discount, discussed below in Section XII.C.5, any gain or loss recognized by U.S. Holders on the exchange of Senior Debt will be capital gain or loss if the Senior Debt has been held as a "capital asset" within the meaning of IRC section 1221 (generally, property held for investment), and will be long term capital gain or loss if the Senior Debt has been held for more than one year. However, any gain or loss recognized will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which the U.S. Holder held the Senior Debt. This foreign currency gain or loss will not be treated as an adjustment to interest income received on the Senior Debt. If a U.S. Holder has previously claimed a bad debt deduction with respect to the Senior Debt, any recovery of an amount previously deducted will generally be taken into account as ordinary income to the extent of the deduction. If the Senior Debt has not been held as a capital asset, any gain or loss will be taken into account as ordinary income or an ordinary deduction. Long term capital gains recognized by individuals are generally subject to lower tax rates. The deductibility of capital losses by individuals and corporations is subject to limitation.

          **iii** ~~ii.~~ New Ordinary Shares

*Distributions*. Subject to the discussion in "Passive Foreign Investment Companies" below, a U.S. Holder of New Ordinary Shares generally will be required to include in gross income as ~~ordinary~~ dividend income the amount of any distributions paid on the New Ordinary Shares to the extent such distributions are paid out of the current or accumulated earnings and profits of Equityco or PIKco, as applicable, as determined for U.S. federal income tax purposes. Distributions not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. Holder's adjusted tax basis in the New Ordinary Shares, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Ordinary Shares. The amount of any distribution will include the amount of any Belgian tax withheld on the amount distributed, and the amount of a distribution paid in euros will be measured by reference to the exchange rate for converting into U.S. dollars in effect on the date the distribution is received. U.S. Holders that are treated as corporations for U.S. federal income tax purposes generally will not be entitled to **a** dividends received

deduction with respect to distributions out of earnings and profits.  Under current law, dividends received by an individual prior to January 1, 2011 with respect to the New Ordinary Shares will generally be subject to taxation at a maximum rate of 15% if a U.S. Holder will be eligible to claim the benefits of the Tax Treaty between the United States and Belgium with respect to **dividends received from** Equityco or PIKco, as applicable.  Thereafter, such dividends will be taxed at ordinary income rates.  Eligible U.S. Holders may be able to claim a reduction in the rate of withholding of Belgian taxes described in Section XIV.B.2 pursuant to the Tax Treaty between the United States and Belgium.  U.S. Holders may be able to claim foreign tax credits with respect to Belgian taxes withheld on distributions received on the New Ordinary Shares, subject to limitations.

*Sale or Other Taxable Disposition*.  Subject to the discussion in "Passive Foreign Investment Companies" below, a U.S. Holder of New Ordinary Shares will recognize gain or loss upon the sale or other taxable disposition of New Ordinary Shares equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the New Ordinary Shares.  If a U.S. Holder sells **or exchanges** New Ordinary Shares in exchange for euros, the amount realized will be the U.S. dollar value of the euros received on the exchange date.  Any such gain or loss generally will be capital gain or loss if the New Ordinary Shares is**are** held as a capital asset**assets** within the meaning of IRC Section 1221, and will be long term capital gain or loss if the U.S. Holder has held the New Ordinary Shares for more than one year as of the date of the disposition.  Long term capital gains recognized by individuals are generally subject to lower tax rates.  The deductibility of capital losses by individuals and corporations is subject to limitation.

*Passive Foreign Investment Companies*.  A non-U.S. corporation is classified as a "passive foreign investment company" ("**PFIC**") for U.S. federal income tax purposes in any taxable year in which, after applying certain look-through rules, either (1) at least 75 percent of its gross income is "passive income" or (2) at least 50 percent of the average value of its gross assets is attributable to assets that produce passive income or are held for the production of passive income.  Passive income for this purpose generally includes dividends, interest, royalties, rents and gains from commodities and securities transactions.

The Debtors believe that neither Equityco nor PIKco will be a PFIC on the Effective Date, and that neither Equityco nor PIKco is likely to become a PFIC in the foreseeable future.  If either Equityco or PIKco were to become a PFIC, the U.S. federal income tax consequences to a U.S. Holder of New Ordinary Shares in the applicable PFIC could be significantly worse than the consequences described above.  In general, a United States person that holds stock in a PFIC is subject to certain negative tax consequences with respect to dividends received from the PFIC and gain recognized on the sale or disposition of the PFIC's stock.  U.S. Holders should consult their tax advisors regarding the tax consequences of owning stock in a PFIC.

### **iv** iii New Bank Debt

*Interest*.  Payments of interest on the New Bank Debt will be taxable to a U.S. Holder as ordinary interest income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).  The amount of interest income realized by a U.S. Holder that uses the cash method of tax accounting will be the U.S. dollar value of the euro payment based on the exchange rate in effect on the date of receipt.  A U.S. Holder that uses the accrual method of accounting for tax purposes will accrue interest income on the New Bank Debt in euros and translate the amount accrued into U.S. dollars based on either (i) the average exchange rate in effect during the interest accrual period (or portion thereof within the U.S. Holder's taxable year) or (ii) at the accrual basis U.S. Holder's election, at the spot rate of exchange on the last day of the accrual period (or the last day of the taxable year within such accrual period if the accrual period spans more than one taxable year), or at the spot rate

of exchange on the date of receipt, if such date is within five business days of the last day of the accrual period.  A U.S. Holder that makes such an election must apply it consistently to all debt instruments from year to year and cannot change the election without the consent of the IRS.  A U.S. Holder that uses the accrual method of accounting for tax purposes will recognize foreign currency gain or loss, as the case may be, on the receipt of an interest payment made with respect to the New Bank Debt if the exchange rate in effect on the date the payment is received differs from the rate applicable to a previous accrual of that interest income.  This foreign currency gain or loss will be treated as ordinary income or loss but generally will not be treated as an adjustment to interest income received on the New Bank Debt.  **Eligible U.S. Holders may be able to claim a reduction in the rate of withholding of Belgian taxes described in Section XIV.C.2 pursuant to the Tax Treaty between the United States and Belgium.  U.S. Holders may be able to claim foreign tax credits with respect to Belgian taxes withheld on interest received on the New Bank Debt, subject to limitations.**

*Sale or Other Taxable Disposition*.  A U.S. Holder's tax basis in the New Bank Debt generally will equal its principal amount.  Upon the sale, exchange or retirement of the New Bank Debt, a U.S. Holder generally will recognize gain or loss equal to the difference between the amount realized on the sale, exchange or retirement (less any accrued interest, which will be taxable as such) and the U.S. Holder's tax basis in such New Bank Debt.  If a U.S. Holder receives euros in respect of the sale, exchange or retirement of the New Bank Debt, the amount realized will be the U.S. dollar value of the euros received, calculated at the exchange rate in effect on the date the New Bank Debt is disposed of or retired.  Gain or loss recognized by a U.S. Holder generally will be any capital gain or loss if the New Bank Debt is held as a capital asset within the meaning of IRC section 1221, and will be long-term capital gain or loss if the U.S. Holder has held the New Bank Debt for more than one year at the time of disposition.  Long-term capital gains recognized by an individual holder generally are subject to tax at a lower rate than short-term capital gains or ordinary income.  The deduction of capital losses is subject to limitations.  Any gain or loss will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which the U.S. Holder held such New Bank Debt.  This foreign currency gain or loss will not be treated as an adjustment to interest income received on the New Bank Debt.

**v** ~~iv New PIK Debt~~ **Total New PIK Debt**

**For purposes of this discussion, "Additional New PIK Debt" is defined as additional PIK debt paid on the New PIK Debt, and on any prior payments of additional PIK debt.  "Total New PIK Debt" is defined as the New PIK Debt and the Additional New PIK Debt.**

***Characterization of Total New PIK Debt*. The Total New PIK Debt could be treated as debt for U.S. federal income tax purposes, in accordance with its form.  Alternatively, the Total New PIK Debt could be treated as equity for U.S. federal income tax purposes, based on the theory that the principal amount of the New PIK Debt will be substantially greater than the value of the PIKco Ordinary Shares, and PIKco's capitalization suggests that the Total New PIK Debt should be treated as equity.**

***Characterization as Debt*. The following is a summary of certain U.S. federal income tax consequences of owning and disposing of the Total New PIK Debt assuming the Total New PIK Debt is treated as debt for U.S. federal income tax purposes.**

**Original Issue Discount**.  All stated interest on the **Total** New PIK Debt will be treated as OID because interest on the **Total** New PIK Debt will not be unconditionally payable in cash or property (other than additional debt of the issuer) at least annually at a single fixed rate.  As a result, a U.S. Holder of **Total** New PIK Debt will be required to include OID in gross income annually on a

- 144 -

constant yield basis in advance of the receipt of cash attributable to that income, regardless of the U.S. Holder's regular method of tax accounting.  However, a Holder generally will not be required to include separately in income cash payments received on the **Total** New PIK Debt to the extent the payments constitute payments of previously accrued OID.  The amount of OID on the **Total** New PIK Debt will be equal to the excess of (i) the principal amount of the **Total** New PIK Debt due at maturity ~~plus all scheduled interest payments thereon~~ over (ii) the principal amount of the New PIK Debt.  The amount of OID includible in gross income annually by a U.S. Holder of **Total** New PIK Debt will be the sum of the daily portions of OID with respect to the **Total** New PIK Debt for each day during the taxable year (or portion thereof) during which the U.S. Holder holds the **Total** New PIK Debt.  The daily portion is determined by allocating to each day of any accrual period a pro-rata portion of the OID that accrued during the period.  The accrual period of the **Total** New PIK Debt may be of any length and may vary in length over the term of the **Total** New PIK Debt, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period.  The amount of OID allocable to any accrual period will be an amount equal to the product of the adjusted issue price of the **Total** New PIK Debt at the beginning of the accrual period and its yield to maturity (determined on a constant yield method, compounded at the close of each accrual period and properly adjusted for the length of the accrual period).  The adjusted issue price of the **Total** New PIK Debt at the beginning of any accrual period will be the issue price of the ~~debt~~**Total New PIK Debt** plus the aggregate amount of accrued OID for all prior accrual periods minus any payments previously made on the **Total** New PIK Debt.  Under these rules, a U.S. Holder will have to include an increasingly greater amount of OID in income in each successive accrual period.  A U.S. Holder should determine the U.S. dollar amount includible in income as OID for each accrual period by calculating the amount of OID allocable to each accrual period in euros, and translating the amount of euros so derived at the average exchange rate in effect during that accrual period (or portion thereof within a U.S. Holder's taxable year) or, at the U.S. Holder's election (as described above in Section XII.C.1.iii), at the spot rate of exchange on the last day of the accrual period (or the last day of the taxable year within such accrual period if the accrual period spans more than one taxable year), or at the spot rate of exchange on the date of receipt, if such date is within five business days of the last day of the accrual period.  Upon the receipt of an amount attributable to OID on the **Total** New PIK Debt (whether in connection with a payment of interest or the sale or retirement of the **Total** New PIK Debt), a U.S. Holder will recognize ordinary income or loss measured by the difference between the amount received (translated into U.S. dollars at the exchange rate in effect on the date of receipt or on the date of disposition of the **Total** New PIK Debt, as the case may be) and the amount accrued (using the exchange rate applicable to such previous accrual)**.  Eligible U.S. Holders may be able to claim a reduction in the rate of withholding of Belgian taxes described in Section XIV.C.3 pursuant to the Tax Treaty between the United States and Belgium.  U.S. Holders may be able to claim foreign tax credits with respect to Belgian taxes withheld on payments received on the Total New PIK Debt, subject to limitations.**

**Sale or Other Taxable Disposition**.  A U.S. Holder's tax basis in the **Total** New PIK Debt generally will equal the principal amount of the New PIK Debt, increased by any amounts includible in income by the holder as OID (as described above).  Upon the sale, exchange or retirement of the **Total** New PIK Debt, a U.S. Holder generally will recognize gain or loss equal to the difference between the amount realized on the sale, exchange or retirement (less any amount attributable to accrued OID, which will be taxable as interest) and the U.S. Holder's tax basis in such **Total** New PIK Debt.  If a U.S. Holder receives euros in respect of the sale, exchange or retirement of the **Total** New PIK Debt, the amount realized will be the U.S. dollar value of the euros received, calculated at the exchange rate in effect on the date the **Total** New PIK Debt is disposed of or retired.  Gain or loss recognized by a U.S. Holder generally will be capital gain or loss if the **Total** New PIK Debt is held as a capital asset within the meaning of IRC section 1221, and will be long-term capital gain or loss if the U.S. Holder has held the **Total** New PIK Debt for more than one year at the time of disposition.  The deduction of capital losses is

subject to limitations. Any gain or loss will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which the U.S. Holder held such **Total** New PIK Debt. This foreign currency gain or loss will not be treated as an adjustment to interest income received on the **Total** New PIK Debt.

*Characterization as Equity.* **The following is a summary of certain U.S. federal income tax consequences of owning and disposing of the Total New PIK Debt assuming the Total New PIK Debt is treated as equity for U.S. federal income tax purposes. In general, if the Total New PIK Debt is treated as equity for U.S. federal income tax purposes, the Total New PIK Debt will be treated similarly to preferred stock for U.S. federal income tax consequences.**

**Distributions. Subject to the discussion in "Passive Foreign Investment Companies" below, if a U.S. Holder of Total New PIK Debt receives Additional New PIK Debt in respect of the U.S. Holder's existing Total New PIK Debt, the U.S. Holder generally will be treated as receiving a taxable distribution on the existing Total New PIK Debt. Accordingly, the U.S. Holder will be required to include in gross income as dividend income the fair market value of the Additional New PIK Debt received to the extent of PIKco's current or accumulated earnings and profits, as determined for U.S. federal income tax purposes. Distributions not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. Holder's adjusted tax basis in the U.S. Holder's existing Total New PIK Debt, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the Total New PIK Debt. A U.S. Holder will take a tax basis in the Additional New PIK Debt received equal to the fair market value of such Additional New PIK Debt. The amount of any distribution will include the amount of any Belgian tax withheld on the amount distributed. U.S. Holders that are treated as corporations for U.S. federal income tax purposes generally will not be entitled to a dividends received deduction with respect to a receipt of Additional New PIK Debt that is treated as a dividend. Under current law, dividends received by an individual prior to January 1, 2011 with respect to the Total New PIK Debt will generally be subject to taxation at a maximum rate of 15% if a U.S. Holder will be eligible to claim the benefits of the Tax Treaty between the United States and Belgium with respect to payments of Additional New PIK Debt received from PIKco. Thereafter, such dividends will be taxed at ordinary income rates. Eligible U.S. Holders may be able to claim a reduction in the rate of withholding of Belgian taxes described in Section XIV.C.3 pursuant to the Tax Treaty between the United States and Belgium. U.S. Holders may be able to claim foreign tax credits with respect to Belgian taxes withheld on payments received on the Total New PIK Debt, subject to limitations.**

**Sale or Other Taxable Disposition. Subject to the discussion in "Passive Foreign Investment Companies" below, a U.S. Holder of Total New PIK Debt will recognize gain or loss upon the sale or other taxable disposition of Total New PIK Debt (including a redemption of the Total New PIK Debt upon maturity) equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the Total New PIK Debt. Accordingly, if a U.S. Holder receives Additional New PIK Debt and such receipt is not treated as a dividend (because the fair market value of the Additional New PIK Debt received exceeds the current or accumulated earnings and profits of PIKco), such U.S. Holder will generally recognize a gain upon redemption of the Total New PIK Debt equal to the fair market value of the Additional New PIK Debt received that was not subject to tax as a dividend. If a U.S. Holder sells or exchanges Total New PIK Debt in exchange for euros, the amount realized will be the U.S. dollar value of the euros received on the exchange date. Any such gain or loss generally will be capital gain or loss if the Total New PIK Debt is held as a capital asset within the meaning of IRC Section 1221, and will be long term capital gain or loss if the U.S. Holder has held the Total New PIK Debt for more than one year as of the date of the disposition. Long term capital gains recognized by individuals are**

- 146 -

**generally subject to lower tax rates. The deductibility of capital losses by individuals and corporations is subject to limitation.**

**Passive Foreign Investment Companies. For a discussion of certain U.S. federal income tax consequences to a U.S. Holder of Total New PIK Debt if PIKco were to become a PFIC, see Section XII.C.1.iii, "Passive Foreign Investment Companies."**

2. *U.S. Holders of HY Notes.*

i   Exchange of HY Notes for Cash and HY Noteholder Warrants

*Recognition of Gain or Loss.* Pursuant to the Plan, U.S. Holders of HY Notes will receive in exchange for the HY Notes: (a) a combination of HY Noteholder Warrants and cash if the HY Noteholder Classes Accept the Plan, or (b) nothing if the Class does not Accept the Plan. ~~The~~**From the perspective of a U.S. Holder of HY Notes that does not also hold Senior Debt, the** exchange of HY Notes for HY Noteholder Warrants and cash will constitute a taxable exchange for U.S. federal income tax purposes**, without regard to whether the Plan constitutes a reorganization with respect to other holders**. As a result, a U.S. Holder of HY Notes will recognize income, gain, or loss in an amount equal to the difference between the U.S. Holder's amount realized and the U.S. Holder's adjusted tax basis. Subject to the discussion in Section XII.C.5, "Accrued Interest," a U.S. Holder's amount realized will equal the fair market value of the HY Noteholder Warrants received, calculated in U.S. dollars as determined on the Effective Date, plus the cash received, translated from euros to U.S. dollars at the applicable exchange rate on the Effective Date. Subject to the discussion in Section XII.C.5, a U.S. Holder's adjusted tax basis in the HY Notes will equal the purchase price paid for the HY Notes. The purchase price is measured in U.S. dollars for these purposes, so that if a U.S. Holder used euros to purchase the HY Notes, then the purchase price is equal to the value of the euros paid, translated into U.S. dollars at the applicable spot rate on the purchase date. In general, subject to the discussion of bond premium or market discount, discussed below in Section XII.C.5, any gain or loss recognized by U.S. Holders on the exchange of HY Notes will be capital gain or loss if the HY Notes have been held as capital assets within the meaning of IRC section 1221, and will be long term capital gain or loss if the HY Notes have been held for more than one year. However, any gain or loss recognized will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which the U.S. Holder held the HY Notes. This foreign currency gain or loss will not be treated as an adjustment to interest income received on the HY Notes. If a U.S. Holder has previously claimed a bad debt deduction with respect to the HY Notes, any recovery of an amount previously deducted will generally be taken into account as ordinary income to the extent of the deduction. If the HY Notes have not been held as a capital asset, any gain or loss will be taken into account as ordinary income or an ordinary deduction. Long term capital gains recognized by individuals are generally subject to lower tax rates. The deductibility of capital losses by individuals and corporations is subject to limitation.

If a U.S. Holder receives nothing in exchange for the surrender of HY Notes, the U.S. Holder may be able to claim either an ordinary bad debt deduction or a capital or ordinary loss equal to the U.S. Holder's adjusted tax basis in the HY Notes.

**If a U.S. Holder of HY Notes also holds Senior Debt, and the U.S. Holder receives New Ordinary Shares, New Bank Debt and, if applicable, New PIK Debt, in exchange for the Senior Debt, in addition to receiving HY Noteholder Warrants and cash, or nothing, in exchange for the HY Notes, and if the Plan were to constitute a reorganization followed by a capital contribution as described above in Section XII.C.1.i, the tax consequences to a U.S. Holder of HY Notes would differ from the consequences described above. In general, were this characterization to prevail, U.S. Holders of HY Notes that also hold Senior Debt would not be able to recognize any loss**

**realized upon the receipt of HY Noteholder Warrants and cash, or nothing, in exchange for the HY Notes. A U.S. Holder would realize gain on the exchange if the aggregate fair market value of the New Ordinary Shares and New Bank Debt received, and any New PIK Debt and HY Noteholder Warrants received, plus the amount of any cash received, were to exceed the U.S. Holder's aggregate adjusted tax basis in the Senior Debt and the HY Noteholder Warrants. The amount of such gain would be recognized by the U.S. Holder, but only to the extent of the fair market value of any New Bank Debt tranches that are not securities, HY Noteholder Warrants and New PIK Debt received, plus the amount of any cash received.**

ii        HY Noteholder Warrants

*Exercise of Warrants*.  A U.S. Holder generally will not recognize gain or loss upon the purchase of stock pursuant to the exercise of a HY Noteholder Warrant, and will have a tax basis in such stock equal to the U.S. Holder's tax basis in the warrant plus the amount of cash or other property paid to purchase the stock.  A U.S. Holder's initial tax basis in a warrant **acquired in a taxable exchange** will be the fair market value of the ~~warrants~~**warrant** at the time of receipt.  To the extent that a U.S. Holder receives cash in lieu of a fractional share of ordinary shares upon exercising a warrant, the holder generally will be treated as having received the fractional share and then received such cash in redemption of such fractional share. Such redemption will generally result in capital gain or loss equal to the difference between the amount of cash received and the holder's adjusted tax basis in the ordinary shares that is allocable to the fractional shares. In addition, a U.S. Holder's tax basis in the ordinary shares received upon the exercise of a warrant is reduced by the amount of any cash received in lieu of a fractional share.

*Sale, Lapse or Other Taxable Disposition*.  A U.S. Holder of HY Noteholder Warrants will recognize gain or loss upon the sale or other taxable disposition (other than a lapse) of the HY Noteholder Warrants equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the HY Noteholder Warrants.  A U.S. Holder of HY Noteholder Warrants will recognize loss upon the lapse of the HY Noteholder Warrants equal to the U.S. Holder's adjusted tax basis in the HY Noteholder Warrants.  If a U.S. Holder sells HY Noteholder Warrants in exchange for euros, the amount realized will be the U.S. dollar value of the euros received on the exchange date. Assuming Equityco is not a PFIC, any gain or loss recognized generally will be capital gain or loss if the HY Noteholder Warrants are held as capital assets within the meaning of IRC section 1221, and will be long term capital gain or loss if the U.S. Holder has held the HY Noteholder Warrants for more than one year as of the date of the disposition or lapse.  Long term capital gains recognized by individuals are generally subject to lower tax rates.  The deductibility of capital losses by individuals and corporations is subject to limitation.

If Equityco were to become a PFIC (as described above under Section XII.C.1.ii, "Passive Foreign Investment Companies"), the U.S. federal income tax consequences to a U.S. Holder of HY Noteholder Warrants could be significantly worse than the consequences described above.  U.S. Holders should consult their tax advisors regarding the tax consequences of owning warrants to acquire stock in a PFIC.

3.        *U.S. Holders of PIK Loans.*

i        Exchange of PIK Loans for PIK Lender Warrants

*Recognition of Gain or Loss*.  Pursuant to the Plan, U.S. Holders of PIK Loans will receive in exchange for the PIK Loans: (a) PIK Lender Warrants if both the PIK Lender Class and the HY Noteholder Classes Accept the Plan or (b) nothing if both Classes do not Accept the Plan.  ~~The~~**From the**

**perspective of a U.S. Holder of PIK Loans that does not also hold Senior Debt, the** exchange of PIK Loans for PIK Lender Warrants **and cash** will constitute a taxable exchange for U.S. federal income tax purposes**, without regard to whether the Plan constitutes a reorganization with respect to other holders**.  As a result, a U.S. Holder of PIK Loans will recognize income, gain, or loss in an amount equal to the difference between the U.S. Holder's amount realized and the U.S. Holder's adjusted tax basis.  Subject to the discussion in Section XII.C.5, a U.S. Holder's amount realized will equal the U.S. dollar fair market value of the PIK Lender Warrants received, as determined on the Effective Date.  Subject to the discussion in Section XII.C.5 because the PIK Loans were treated as issued with OID for U.S. federal income tax purposes, a U.S. Holder's adjusted tax basis in the PIK Loans will equal the purchase price paid for the PIK Loans, plus the amount of any OID previously taken into account in income (as described above in Section XII.C.3), minus any payments received on the PIK Loans.  The purchase price is measured in U.S. dollars for these purposes, so that if a U.S. Holder used euros to purchase the PIK Loans, then the purchase price is equal to the value of the euros paid, translated into U.S. dollars at the applicable spot rate on the purchase date.  The amount of OID previously taken into account in income and the amount of payments received on the PIK Loans are first calculated in euros, and then translated into U.S. dollars, using the methodology described in Section XII.C.3.  In general, subject to the discussion of bond premium or market discount, discussed below under Section XII.C.5, any gain or loss recognized by U.S. Holders on the exchange of PIK Loans will be capital gain or loss if the PIK Loans have been held as a capital asset within the meaning of IRC section 1221, and will be long term capital gain or loss if the PIK Loans have been held for more than one year.  However, any gain or loss recognized will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which the U.S. Holder held the PIK Loans.  This foreign currency gain or loss will not be treated as an adjustment to interest income received on the PIK Loans.  If a U.S. Holder has previously claimed a bad debt deduction with respect to the PIK Loans, any recovery of an amount previously deducted will generally be taken into account as ordinary income to the extent of the deduction.  If the PIK Loans have not been held as a capital asset, any gain or loss will be taken into account as ordinary income or an ordinary deduction.  Long term capital gains recognized by individuals are generally subject to lower tax rates.  The deductibility of capital losses by individuals and corporations is subject to limitation.

If a U.S. Holder receives nothing in exchange for the surrender of PIK Loans, the U.S. Holder may be able to claim either an ordinary bad debt deduction or a capital or ordinary loss equal to the U.S. Holder's adjusted tax basis in the PIK Loans.

**If a U.S. Holder of PIK Loans also holds Senior Debt, and the U.S. Holder receives New Ordinary Shares, New Bank Debt and, if applicable, New PIK Debt, in exchange for the Senior Debt, in addition to receiving PIK Lender Warrants or nothing in exchange for the PIK Loans, and if the Plan were to constitute a reorganization followed by a capital contribution as described above in Section XII.C.1.i, the tax consequences to a U.S. Holder of PIK Loans would differ from the consequences described above.  In general, were this characterization to prevail, U.S. Holders of PIK Loans that also hold Senior Debt would not be able to recognize any loss realized upon the receipt of PIK Lender Warrants or nothing in exchange for the PIK Loans.  A U.S. Holder would realize gain on the exchange if the aggregate fair market value of the New Ordinary Shares and New Bank Debt received, and any New PIK Debt and PIK Lender Warrants received, were to exceed the U.S. Holder's aggregate adjusted tax basis in the Senior Debt and the PIK Lender Warrants.  The amount of such gain would be recognized by the U.S. Holder, but only to the extent of the fair market value of any New Bank Debt tranches that are not securities, PIK Lender Warrants and New PIK Debt received.**

ii       <u>PIK Lender Warrants</u>

A U.S. Holder generally will not recognize gain or loss upon the purchase of stock pursuant to the exercise of a PIK Lender Warrant, and will have a tax basis in such stock equal to the U.S. Holder's tax basis in the warrant plus the amount of cash or other property paid to purchase the stock. A U.S. Holder's initial tax basis in a warrant **acquired in a taxable exchange** will be the fair market value of the ~~warrants~~**warrant** at the time of receipt. To the extent that a U.S. Holder receives cash in lieu of a fractional share of ordinary shares upon exercising a warrant, the holder generally will be treated as having received the fractional share and then received such cash in redemption of such fractional share. Such redemption will generally result in capital gain or loss equal to the difference between the amount of cash received and the holder's adjusted tax basis in the ordinary shares that is allocable to the fractional share. In addition, a U.S. Holder's tax basis in the ordinary shares received upon the exercise of a warrant is reduced by the amount of any cash received in lieu of a fractional share.

*Sale, Lapse or Other Taxable Disposition.* A U.S. Holder of PIK Lender Warrants will recognize gain or loss upon the sale or other taxable disposition (other than a lapse) of the PIK Lender Warrants equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the PIK Lender Warrants. A U.S. Holder of PIK Lender Warrants will recognize loss upon the lapse of the PIK Lender Warrants equal to the U.S. Holder's adjusted tax basis in the PIK Lender Warrants. If a U.S. Holder sells PIK Lender Warrants in exchange for euros, the amount realized will be the U.S. dollar value of the euros received on the exchange date. Assuming Equityco is not a PFIC, any gain or loss recognized generally will be capital gain or loss if the PIK Lender Warrants are held as capital assets within the meaning of IRC section 1221, and will be long term capital gain or loss if the U.S. Holder has held the PIK Lender Warrants for more than one year as of the date of the disposition or lapse. Long term capital gains recognized by individuals are generally subject to lower tax rates. The deductibility of capital losses by individuals and corporations is subject to limitation.

If Equityco were to become a PFIC (as described above under Section XII.C.1.ii, "Passive Foreign Investment Companies"), the U.S. federal income tax consequences to a U.S. Holder of PIK Lender Warrants could be significantly worse than the consequences described above. U.S. Holders should consult their tax advisors regarding the tax consequences of owning warrants to acquire stock in a PFIC.

### 4.     *U.S. Holders of Other Claims*

Under the Plan, U.S. Holders of Other Claims will generally receive cash or nothing in exchange for their Other Claims. U.S. Holders of Other Claims will generally be subject to taxation on any such cash received in accordance with their accounting method. U.S. Holders of Other Claims that are on the accrual method of accounting may be entitled to a deduction to the extent that the cash received is less than the income previously accrued or to the extent that they receive nothing.

### 5.     *Other Considerations.*

*Accrued Interest.* To the extent that a U.S. Holder of Senior Debt, HY Notes, PIK Loans and Other Claims receives consideration that is attributable to unpaid accrued interest on the applicable debt instrument or Claim, the U.S. Holder may be required to treat such consideration as a payment of interest. There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. Reorganized Truvo intends to take the position that cash or property distributed pursuant to the Plan will first be allocable to the principal amount of a U.S. Holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a U.S. Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the U.S. Holder. A U.S. Holder's tax basis in such property should be equal to the fair market value of the property, and its holding period in the property should begin on the day after the Effective Date. For these purposes, the amount of interest accrued, and the amount received that is attributable to that interest, first should be calculated in euros, and then translated into U.S. dollars, using the methodology described in Section XII.C.3. A U.S. Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. U.S. Holders should consult their tax advisers regarding the extent to which consideration received under the Plan should be treated as attributable to unpaid accrued interest.

*Market Discount*. A U.S. Holder will be considered to have acquired Senior Debt, HY Notes or PIK Loans at a market discount if its tax basis in the applicable debt instrument immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, subject to a statutorily defined *de minimis* exception. Market discount generally accrues on a straight-line basis from the acquisition date over the remaining term of the obligation or, at the U.S. Holder's election, under a constant yield method. Any such market discount would be accrued in euros. A U.S. Holder that acquired Senior Debt, HY Notes or PIK Loans at a market discount previously may have elected to include the market discount in income as it accrued over the term of the applicable debt instrument.

A U.S. Holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of the debt instrument's accrued market discount not previously included in gross income by the U.S. Holder. The amount includible in income by a U.S. Holder in respect of such accrued market discount will be the U.S. dollar value of the amount accrued, generally calculated at the exchange rate in effect on the date that the debt instrument is disposed of by the U.S. Holder.

*Amortizable Bond Premium*. If a U.S. Holder's adjusted issue price in the Senior Debt, HY Notes or PIK Loans is greater than the applicable debt instrument's face amount, such U.S. Holder will be considered to have acquired the applicable debt instrument at a premium. A U.S. Holder that acquired Senior Debt, HY Notes or PIK Loans at a premium previously may have elected to amortize the premium over the term of the Senior Debt, HY Notes or PIK Loans under a constant yield method (first calculated in euros, and then translated into U.S. dollars). A U.S. Holder that elected to amortize bond premium on the Senior Debt, HY Notes or PIK Loans should have reduced its tax basis in the applicable debt instrument by the amount of amortized bond premium used to offset interest income and may, in certain circumstances, be entitled to a deduction for any unamortized bond premium in the taxable year of the exchange.

6.      *Information Reporting and Backup Withholding*

Reorganized Truvo (or its paying agent) may be obligated to furnish information to the IRS regarding the consideration received by U.S. Holders (other than corporations and other exempt U.S. Holders) pursuant to the Plan. U.S. Holders may be subject to backup withholding on the consideration received pursuant to the Plan. Backup withholding may also apply to dividends paid on the New Ordinary Shares, interest paid on the New Bank Debt and**, payments made on** the **Total** New PIK Debt, cash received in lieu of a fractional share of ordinary shares upon exercising HY Noteholder Warrants or PIK Lender Warrants, and proceeds received upon the sale or other disposition of the New Ordinary Shares, the New Bank Debt**,** the **Total** New PIK Debt, the HY Noteholder Warrants and the PIK Lender Warrants. Certain U.S. Holders (including corporations) generally are not subject to backup withholding.

A U.S. Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to Reorganized Truvo (or its paying agent) its taxpayer identification number IRS Form W-9, and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the U.S. Holder has not been notified by the IRS that it is subject to backup withholding. Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their U.S. federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

**D. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims**

This discussion addresses the U.S. federal income tax considerations relevant to Non-U.S. Holders of the Senior Debt, the HY Notes, the PIK Loans and Other Claims. A Non-U.S. Holder is a Holder that is not a U.S. Holder and is not a partnership.

1.  Recognition of Gain or Loss on the Exchange

Non-U.S. Holders generally will not be subject to U.S. federal income tax on the exchange of their Senior Debt, HY Loans and PIK Loans for New Ordinary Shares, HY Noteholder Warrants, PIK Lender Warrants, New Bank Debt, New PIK Debt and/or cash, as applicable, except that: (i) in the case of the HY Notes and PIK Loans, a Non-U.S. Holder may be subject to U.S. federal withholding tax on any amounts received that are attributable to accrued but unpaid interest, unless the Non-U.S. Holder can claim the benefits of the "portfolio interest exemption" or applicable tax treaty benefits, and (ii) a Non-U.S. Holder that is an individual may be subject to tax if the Non-U.S. Holder is present in the United States for 183 days or more in the year of the Exchange and certain other conditions are met. Non-U.S. Holders that receive cash in exchange for Other Claims may be subject to U.S. federal income tax or withholding tax, depending on the nature of the Claim.

2.  Taxation of New Ordinary Shares, HY Noteholder Warrants, PIK Lender Warrants, New Bank Debt and **Total** New PIK Debt

Non-U.S. Holders generally will not be subject to U.S. federal income tax on dividends received on the New Ordinary Shares ~~and~~**,** interest received on the New Bank Debt and **payments received on** the **Total** New PIK Debt. Non-U.S. Holders generally will not be subject to U.S. federal income tax on the sale or exchange of the New Ordinary Shares, the New Bank Debt and the **Total** New PIK Debt, or the exercise of the HY Noteholder Warrants or PIK Lender Warrants, except that a Non-U.S. Holder that is an individual may be subject to tax if the Non-U.S. Holder is present in the United States for 183 days or more in the year of the sale or exchange and certain other conditions are met.

3.  Information Reporting and Backup Withholding

Reorganized Truvo (or its paying agent) may be obligated to furnish information to the IRS regarding the consideration received by Non-U.S. Holders (other than corporations and other exempt Non-U.S. Holders) pursuant to the Plan. Non-U.S. Holders may be subject to backup withholding on the consideration received pursuant to the Plan. Backup withholding may also apply to dividends paid on the New Ordinary Shares, interest paid on the New Bank Debt ~~and~~**, payments made on** the **Total** New PIK Debt, cash received in lieu of a fractional share of ordinary shares upon exercising HY Noteholder Warrants or PIK Lender Warrants, and proceeds received upon the sale or other disposition of the New Ordinary Shares, the New Bank Debt and the **Total** New PIK Debt, to the extent that payments are received from a paying agent in the United States (or under certain circumstances, from a foreign branch

of a U.S. paying agent).  A Non-U.S. Holder generally may avoid any such backup withholding by furnishing to the paying agent an IRS Form W-8BEN (or other applicable Form W-8).

THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISER REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.  NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## XIII.
## CERTAIN DUTCH TAX CONSEQUENCES OF THE PLAN

**A.    Introduction**

The following summarizes certain material Dutch tax consequences expected to result from the consummation of the Plan.  This discussion is for general information purposes only and only describes the expected material Dutch tax consequences that we deem are relevant to Holders resident outside of the Netherlands who receive New Bank Debt in exchange for their Claims.  This summary is based on the laws, regulations and applicable tax treaties, all as in effect in The Netherlands on the date of this Disclosure Statement, and is subject to any changes in law and the interpretation and application thereof, possibly with retroactive effect.

**B.    Dutch Income Tax Consequences to Holders of New Bank Debt**

All payments of interest made by Truvo Services & Technology in respect of the New Bank Debt can be made free of Dutch withholding tax.

**C.    Dutch Income Tax Consequences to the Dutch Non-Debtor Subsidiaries**

Truvo Services & Technology files a consolidated Dutch income tax return that takes into account the business of all the Dutch entities included in the current fiscal unity for Dutch corporate income tax purposes. The consolidated Dutch tax group reported a consolidated tax losses carried forward for Dutch income tax purposes of approximately €126 million as of December 31, 2009, and expects to report additional tax losses with respect to its 2010 taxable year.

1.    *Waiver of debt*

No taxable profits would have to be recognized at the level of the Dutch fiscal unity as a result of the waiver of senior debt at the level of Truvo Services & Technology and Truvo Ireland Holdings B.V., as such waiver will be regarded as an equity movement for Dutch corporate income tax purposes, which is confirmed by the Dutch tax authorities in favorable letter rulings dated June 16, 2010 and July 13, 2010.  As part of this agreement with the Dutch tax authorities, the Dutch fiscal unity will renounce the available tax losses carried forward up to the Effective Date.

The mergers of Truvo Dutch Holdings B.V., Truvo Nederland Holdings, Truvo Nederland, Truvo Ireland Holdings B.V. and Truvo Portugal Holdings B.V. into Truvo Services & Technology should not trigger adverse Dutch tax consequences as roll-over relief should be available.

# XIV.
## CERTAIN BELGIAN TAX CONSEQUENCES OF THE PLAN

## A.    Introduction

The following summarizes certain material Belgian tax consequences expected to result from the consummation of the Plan.  This discussion is for general information purposes only and only describes the expected material Belgian tax consequences to Holders entitled to vote on the Plan.

This summary is based on the laws, regulations and applicable tax treaties, all as in effect in Belgium on the date of this Disclosure Statement, and is subject to any changes in law and the interpretation and application thereof, possibly with retroactive effect.

For the purposes of this summary, a Holder is considered a Belgian Holder if (i) such Holder is an individual who is subject to Belgian personal income tax (personenbelasting / impôt des personnes physiques) (such Holder herein referred to as a "Belgian Individual" and, collectively, as "Belgian Individuals"), (ii) such Holder is a company subject to Belgian corporate income tax (vennootschapsbelasting / impôt des sociétés) (such Holder herein referred to as a "Belgian Company" and, collectively, as "Belgian Companies") and (iii) such Holder is a legal entity subject to Belgian legal entities tax (rechtspersonenbelasting / impôt des personnes morales) (such Holder herein referred to as a "Belgian Legal Entity" and, collectively, as "Belgian Legal Entities").  Holders that are not Belgian Holders are herein collectively referred to as "non-Belgian Holders".

This summary addresses the Belgian tax considerations relevant to Holders of the Senior Debt, and to Holders who receive New Ordinary Shares, New Bank Debt and New PIK Debt in exchange for their Claims.  This summary does not address the Belgian tax consequences to Holders of the HY Notes or of the PIK Loans, and to Holders of Junior Creditor Holdco Warrants or Junior Creditor Equityco Warrants.  These holders are advised to consult their own tax adviser as to the Belgian tax implications of the ownership, exercise and disposition of these warrants.  Furthermore, this summary does not address all Belgian tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to particular investors some of which may be subject to special tax rules, such as banks, insurance undertakings, collective investment schemes, dealers in securities or currencies, persons who hold Shares as a position in a straddle, share-repurchase transactions, conversion transactions or synthetic security or other integrated financial transactions.

For purposes of this summary, it is assumed that:

·   the Senior Debt, the New Bank Debt and the New PIK Debt will be treated as debt for Belgian income tax purposes;

·   each of Newco, Holdco, Equityco and PIKco is a tax resident of Belgium;

- no Belgian Company owns or will own, directly or indirectly, shares in a Debtor, Newco Holdco, Equityco and/or PIKco, representing 10% or more of that company's share capital;

- no Belgian Individual has or will have connected the Senior Debt, the New Bank Debt and/or the New PIK Debt to his or her business; and

- no Belgian Holder is an Organisation for Financing Pensions (instelling voor bedrijfspensioenvoorziening / institution de retraite professionnelle) within the meaning of the Law of October 27, 2006 on the activities and supervision of institutions for occupational retirement provision.

HOLDERS SHOULD CONSULT THEIR TAX ADVISERS REGARDING THE BELGIAN TAX CONSEQUENCES FOR THEM RESULTING FROM THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW ~~COMMON STOCK~~**ORDINARY SHARES**, THE NEW BANK DEBT, THE NEW PIK DEBT, THE JUNIOR CREDITOR HOLDCO WARRANTS, AND THE JUNIOR CREDITOR EQUITYCO WARRANTS RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER THE TAX LAWS OF THE COUNTRY OF WHICH THEY ARE RESIDENT FOR TAX PURPOSES.

**B.    Belgian Tax Consequences to Belgian Holders of the New Ordinary Shares, New Bank Debt and New PIK Debt**

This summary addresses the Belgian tax considerations relevant to Belgian Holders of the Senior Debt.

1.    *Exchange of Senior Debt for New Ordinary Shares, New Bank Debt and New PIK Debt*

*Recognition of Gain or Loss.* Pursuant to the Plan, and as a result of a series of transactions (including the waiver of Senior Debt by the Holders of Senior Debt, the contribution and transfer of the Senior Debt Claims against TAC in exchange for Newco Ordinary Shares and New Bank Debt and the exchange of Newco Ordinary Shares for, ultimately, Equityco Ordinary Shares and/or PIKco Ordinary Shares and New PIK Debt), Holders of the Senior Debt will receive a combination of New Ordinary Shares, New Bank Debt and, if they elect to receive stock in PIKco, New PIK Debt in exchange for their Senior Debt.

- *Belgian Individuals and Belgian Legal Entities.* For Belgian Individuals holding the Senior Debt as a private investment and Belgian Legal Entities, the exchange will generally not constitute a taxable event for Belgian income tax purposes. As a result, any capital loss resulting from the waiver of Senior Debt incurred by such Belgian Holders will not be tax deductible whereas any capital gain realized on the contribution and transfer of the TAC Guarantee by such Belgian Holders should not be subject to Belgian income tax.

Belgian Individuals may, however, be subject to income tax in Belgium at a rate of 33% (to be increased with local taxes) if the capital gains realized on the contribution and Transfer of the Senior Debt Claims against TAC are deemed to be speculative or outside the scope of normal management of private property. Capital losses arising from such

transactions are deductible and, if incurred during the previous five years, can be offset against the taxable income realized by similar transactions.

- *Belgian Companies*. For Belgian Companies, the exchange will constitute a taxable exchange for Belgian income tax purposes. As a result, any capital loss resulting from the waiver of Senior Debt incurred by such Belgian Holder should as a rule be tax deductible. Capital gains realized on the contribution and transfer of the TAC Guarantee by a Belgian Company will generally be included in the taxable income of such Holder for the excess, if any, of (i) market value of the New Bank Debt, New PIK Debt and/or New Ordinary Shares over (ii) the tax book value of the TAC Guarantee. Capital gains realized with respect to the TAC Guarantee by a Belgian Company will be subject to corporate income tax at a rate of 33.99%.

2.     *New Ordinary Shares*

For Belgian tax purposes, dividends include all benefits paid on or otherwise attributed to the New Ordinary Shares, irrespective of their form and the way they are distributed, as well as repayments of statutory capital except repayments of fiscal capital made in accordance with the Belgian Company Code. Fiscal capital generally includes stated capital and paid-up share premiums.

*Belgian Withholding Tax*. Dividends distributed by Equityco or PIKco, as the case may be, with respect to the New Ordinary Shares will, as a rule, be subject to Belgian withholding tax at a rate of 25%.

Redemption and liquidation bonuses distributed by Equityco or PIKco, as the case may be, with respect to the New Ordinary Shares will, as a rule, be subject to Belgian withholding tax at a rate of 10%. Such withholding tax is calculated on the excess of the distribution over the fiscal capital (as defined above), which is represented by the redeemed shares, as the case may be.

*Dividends*. Dividends distributed by Equityco or PIKco, as the case may be, to a Belgian Holder with respect to the New Ordinary Shares will be taxable as follows.

- *Belgian Individuals and Belgian Legal Entities*. For Belgian Individuals holding the New Ordinary Shares as a private investment and for Belgian Legal Entities, the Belgian withholding tax is a final tax and any dividends that have been subject to it need not be reported in such Holder's income tax return.

- *Belgian Companies*. For Belgian Companies, dividends distributed on the New Ordinary Shares will, as a rule, be subject to corporate income tax at a rate of 33.99%.

  However, Belgian Companies will be able to deduct from their taxable income (other than certain disallowed expenses and other taxable items) up to 95% of the dividends received if these dividends are eligible for the dividends-received deduction (*definitief belaste inkomsten / revenues définitivement taxés*). For the dividends-received deduction to apply, New Ordinary Shares held by a Belgian Company must, upon payment or attribution of the dividends, (i) be equal to at least 10% of the share capital of Equityco or PIKco, as the case may be, or have an acquisition value of at least €2,500,000, (ii) qualify as fixed financial assets under Belgian GAAP and (iii) have been or will be held in full ownership during an uninterrupted period of at least one year. Irrespective of whether these conditions are met, the dividends-received deduction applies to all dividends

received by investment companies within the meaning of Article 2, §1, 5°, f) of ~~the Belgian Income Tax Code 1992 ("ITC 92")~~**ITC 92.**

The Belgian withholding tax paid can be credited against the final corporate income tax liability of the Belgian Company, provided that (i) it has full ownership of the New Ordinary Shares at the date the dividend is paid or otherwise attributed to the New Ordinary Shares, and (ii) the dividend distribution does not entail a reduction in value of, or capital loss on, the New Ordinary Shares. The reduction in value/capital loss restriction does not apply if the Belgian Company shows that it had full ownership of the New Ordinary Shares during an uninterrupted period of 12 months prior to the attribution of the dividends, or that, during that period, the New Ordinary Shares did not belong to a taxpayer other than a resident company or a non-resident company having allocated the New Ordinary Shares in an uninterrupted manner to a Belgian establishment.

*Capital Gains and Capital Losses*. Upon the disposal of the New Ordinary Shares, any capital gain realized by a Belgian Holder of the New Ordinary Shares will be taxable as follows.

- *Belgian Individuals and Belgian Legal Entities*. Belgian Individuals holding the New Ordinary Shares as a private investment and Belgian Legal Entities will, as a rule, not be subject to tax on any capital gain arising out of a disposal of the New Ordinary Shares. Conversely, capital losses incurred on the New Ordinary Shares will not be deductible.

  Belgian Individuals may, however, be subject to income tax in Belgium at a rate of 33% (to be increased with local taxes) if the capital gains realized on the New Ordinary Shares are deemed to be speculative or outside the scope of normal management of private property. Capital losses arising from such transactions are deductible and, if incurred during the previous five years, can be offset against the taxable income realized by similar transactions.

- *Belgian Companies*. For Belgian Companies, capital gains realized with respect to the New Ordinary Shares will, as a rule, be tax exempt. Capital losses incurred by such companies are not deductible, except to the extent of the capital loss on fiscal capital incurred as a result of the liquidation of Equityco or PIKco, as the case may be.

3. *New Bank Debt*

*Belgian Withholding Tax*. Payment of interest by or on behalf of Truvo Belgium on the New Bank Debt will, as a rule, be subject to Belgian withholding tax at a rate of 15%, subject to such relief as may be available under applicable domestic law or tax treaty provisions. Payments of interest by or on behalf of Truvo Belgium shall be made without deduction of withholding tax in respect of the New Bank Debt held by authorized credit institutions located in a country of the EEA or in a country with which Belgium has concluded a tax treaty in force on the date of payment.

*Interest*. Payments of interest on the New Bank Debt to a Belgian Holder will be taxable as follows.

- *Belgian Individuals and Belgian Legal Entities*. For Belgian Individuals and Belgian Legal Entities, the Belgian withholding tax at a rate of 15% is a final tax and any interest that has been subject to it need not be reported in such Holder's income tax return.

- *Belgian Companies.* For Belgian Companies, interest paid with respect to the New Bank Debt will, as a rule, be subject to corporate income tax at a rate of 33.99%. The Belgian withholding tax paid can be credited against the final corporate income tax liability of the Belgian Company in the amount that relates to the income that is taxable *pro rata* to the period that the Belgian Company had full ownership of the New Bank Debt.

*Capital Gains and Capital Losses.* Upon the disposal of the New Bank Debt, any capital gain realized by a Belgian Holder of the New Bank Debt will be taxable as follows.

- *Belgian Individuals and Belgian Legal Entities.* Belgian individuals holding the New Bank Debt as a private investment and Belgian Legal Entities will, as a rule, not be subject to tax on any capital gain arising out of the disposal of the New Bank Debt. Conversely, capital losses incurred on the New Bank Debt will not be deductible.

  Belgian Individuals may, however, be subject to income tax in Belgium at a rate of 33% (to be increased with local taxes) if the capital gains realized on the New Bank Debt are deemed to be speculative or outside the scope of normal management of private property. Capital losses arising from such transactions are deductible and, if incurred during the previous five years, can be offset against the taxable income realized by similar transactions.

- *Belgian Companies.* For Belgian Companies, capital gains realized with respect to the New Bank Debt will, as a rule, be subject to corporate income tax at a rate of 33.99%. Capital losses incurred by such Holders are deductible.

  4.  *New PIK Debt*

For Belgian tax purposes, interest includes (i) periodic interest income, (ii) any amounts paid by PIKco in excess of the issue price (upon full or partial redemption, whether or not at maturity, or upon purchase by PIKco), and (iii) in case of a sale of these securities to any third party, excluding PIKco, the *pro rata* accrued interest corresponding to the period that the party selling the security held the New PIK Debt.

*Belgian Withholding Tax on New PIK Debt Notes held in the X/N Clearing System.* Payment of interest on the New PIK Debt will, as a rule, be subject to Belgian withholding tax at a rate of 15%. All payments of interest by or on behalf of PIKco will, however, be made without deduction of withholding tax for New PIK Debt Notes held in book-entry form by eligible Holders in an exempt securities account (an "X-Account") with the X/N Clearing System or with a participant or sub-participant in such system (a "Participant").

Eligible Holders are those persons referred to in Article 4 of the Royal Decree of May 26, 1994, including, *inter alia*:

- Belgian resident companies subject to corporate income tax within the meaning of Article 2, §2, 2° of the ITC 92;

- without prejudice to Article 262, 1° and 5° of the ITC 92, Belgian insurance or pension undertakings within the meaning of Article 2, §3 of the Law of July 9, 1975 on supervision of insurance companies (other than those referred in points 1° and 3° of such Article);

- State-linked social security organizations and institutions assimilated therewith within the meaning of Article 105, 2° of the Royal Decree of August 27, 1993 implementing the ITC 92 (the "Royal Decree");

- non-residents of Belgium within the meaning of Article 105, 5° of the Royal Decree;

- mutual funds within the meaning of Article 115 of the Royal Decree;

- companies, entities or partnerships within the meaning of Article 227, 2° of the ITC 92 which are subject to non-resident income tax in Belgium in accordance with Article 233 of the ITC 92 and whose Notes are held as part of a taxable business activity in Belgium;

- the Belgian State, with respect to its investments exempted from withholding tax in accordance with Article 265 of the ITC 92;

- mutual funds organized under foreign law which are structured as an undivided estate managed by a management company on behalf of certificateholders, provided that their certificates are not publicly offered or otherwise marketed in Belgium; and

- Belgian resident companies not referred to in the first bullet above whose sole or principal activity consists in granting credits or loans.

Eligible Investors do not include individuals residing in Belgium and not-for-profit organizations (other than those referred to in the second and third bullet above). Participants to the X/N Clearing System must keep the New PIK Debt Notes they hold for non-Eligible Investors in a non-exempt securities account (an "N-Account"). All payments of interest in respect of such New PIK Debt Notes will be made subject to deduction of withholding tax at a rate of 15%. In addition, the transfer of New PIK Debt Notes by holders of an N-Account is subject to withholding tax at a rate of 15% on the *pro rata* interest accrued since the last preceding interest payment date.

Upon opening an X-Account with the X/N Clearing System or with a Participant, an Eligible Investor is required to certify its eligible status on a standard form approved by the Minister of Finance. There are no ongoing certification requirements for Eligible Investors, but direct Participants are required to annually report to the X/N Clearing System as to the eligible status of each holder for whom they hold New PIK Debt Notes in an X-Account.

In addition, an X-Account may be opened with a Participant by an intermediary (an "Intermediary") in respect of New PIK Debt Notes that such Intermediary holds for the account of its clients (the "Beneficial Owners"), provided that each Beneficial Owner is an Eligible Investor. In such a case, the Intermediary is required to certify on a standard form approved by the Minister of Finance that (i) it is an Eligible Investor, and (ii) the Beneficial Owners holding their New PIK Debt Notes through it are also Eligible Investors. A Beneficial Owner is also required to certify its eligible status on a standard form approved by the Minister of Finance and to deliver this form to the Intermediary.

However, none of these certification or reporting requirements apply in respect of New PIK Debt Notes held in Euroclear or Clearstream, Luxembourg in their capacity as Participants to the X/N Clearing System, provided that Euroclear or Clearstream, Luxembourg must be able to identify each holder for whom they hold these New PIK Debt Notes in an exempt account.

In accordance with rules and procedures of the X/N Clearing System, a Holder to whom New PIK Debt Notes withdrawn from an X-Account are transferred may, following payment of interest

accrued on such New PIK Debt Notes from the last preceding interest payment date, be entitled to claim an indemnity from the Belgian tax authorities of an amount equal to the withholding tax, if any, applied on interest payable on the New PIK Debt Notes for the period running from the last preceding interest payment date through the date of withdrawal of the New PIK Debt Notes from the X/N Clearing System.

*Interest*.  Payments of interest on the New PIK Debt to a Belgian Holder will be taxable as follows.

- *Belgian Individuals and Belgian Legal Entities*.  For Belgian Individuals and Belgian Legal Entities, who generally qualify as non-Eligible Investors within the meaning of Article 4 of the Royal Decree of May 26, 1994, the Belgian withholding tax at a rate of 15% is a final tax and any interest that has been subject to it need not be reported in such Holder's income tax return.  Belgian Legal Entities that qualify as Eligible Investors are themselves required to pay the 15% withholding tax to the Belgian tax authorities.

- *Belgian Companies*.  For Belgian Companies, interest paid with respect to the New PIK Debt will, as a rule, be subject to corporate income tax at a rate of 33.99%.

*Capital Gains and Capital Losses*.  Upon the disposal of the New PIK Debt, any capital gain realized by a Belgian Holder of the New PIK Debt will be taxable as follows.

- *Belgian Individuals and Belgian Legal Entities*.  Belgian Individuals holding the New PIK Debt as a private investment and Belgian Legal Entities will, as a rule, not be subject to tax on any capital gain arising out of the disposal of the New PIK Debt.  Conversely, capital losses incurred on the New PIK Debt will not be deductible.  The *pro rata* interest included in a capital gain arising out of the disposal of the New PIK Debt will, however, be subject to withholding tax as described above.

  Belgian Individuals may, however, be subject to income tax in Belgium at a rate of 33% (to be increased with local taxes) if the capital gains realized on the New PIK Debt are deemed to be speculative or outside the scope of normal management of private property.  Capital losses arising from such transactions are deductible and, if incurred during the previous five years, can be offset against the taxable income realized by similar transactions.

- *Belgian Companies*.  For Belgian Companies, capital gains realized with respect to the New PIK Debt will, as a rule, be subject to corporate income tax at a rate of 33.99%.  Capital losses incurred by such Holders are deductible.

5.      *Other Tax Considerations*

*Stamp Duties.*  Secondary market trades in respect of the New Ordinary Shares and the New PIK Debt Notes may give rise to a stamp duty (*taks op beursverrichtingen / taxe sur les opérations de bourse*) on the sale and on the purchase of such New  Ordinary Shares and New PIK Debt Notes if they are carried out through intermediation of a professional intermediary established in Belgium. The rate of the stamp tax is 0.07% with respect to the New PIK Debt Notes and 0.17% with respect to the New Ordinary Shares.  However, such tax will be limited to a maximum amount of €500 per taxable transaction and per party.  An exemption from this tax is available under Article 126/1, 2° of the Code on Miscellaneous Duties and Taxes as regards (i) parties to securities trades who are intermediaries within the meaning of Article 2, 9° and 10° of the Law of August 2, 2002 on the supervision of the financial sector and financial services acting for their own account, (ii) insurance undertakings within the meaning of Article 2, §1 of

the Law of July 9, 1975 on supervision of insurance companies acting for their own account, (iii) institutions for occupational retirement provisions within the meaning of Article 2, 1° of the Law of October 27, 2006 regarding the control of institutions for occupational retirement provisions (*instellingen voor bedrijfspensioenvoorziening / institutions de retraite professionnelle*) acting for their own account, (iv) collective investment schemes acting for their own account or (v) non-residents acting for their own account and certifying their non-resident status.

## C.    Belgian Tax Consequences to non-Belgian Holders of New Ordinary Shares, New Bank Debt and New PIK Debt

This summary addresses the Belgian tax considerations relevant to non-Belgian Holders of New Ordinary Shares, New Bank Debt and New PIK Debt.

### 1.    *New Ordinary Shares*

For Belgian tax purposes, dividends include all benefits paid on or otherwise attributed to the New Ordinary Shares, irrespective of their form and the way they are distributed, as well as repayments of statutory capital except repayments of fiscal capital made in accordance with the Belgian Company Code.  Fiscal capital generally includes stated capital and paid-up share premiums.

*Belgian Withholding Tax*.  Dividends distributed by Equityco or PIKco, as the case may be, with respect to the New Ordinary Shares will, as a rule, be subject to Belgian withholding tax at a rate of 25%, subject to such relief as may be available under applicable domestic or tax treaty provisions.

Redemption and liquidation bonuses distributed by Equityco or PIKco, as the case may be, with respect to the New Ordinary Shares will, as a rule, be subject to Belgian withholding tax at a rate of 10%, subject to such relief as may be available under applicable domestic or tax treaty provisions.  Such withholding tax is calculated on the excess of the distribution over the fiscal capital (as defined above), which is represented by the redeemed shares, as the case may be.

Dividends distributed with respect to the New Ordinary Shares to non-Belgian Holders who are not engaged in a trade or business or any other profit-making activity and who are exempt from income tax in their country of residence, will be exempt from Belgian withholding tax, provided that such Holder is not required by contract to transfer the dividends it receives to any ultimate beneficiaries.  In order to benefit from this exemption, the non-Belgian Holder must certify to Equityco or PIKco, as the case may be, its qualifying status and its full ownership of or usufruct over the New Ordinary Shares.

Belgian dividend withholding tax is subject to such relief as may be available under applicable tax treaty provisions.  Belgium has entered into tax treaties with over 85 countries.  These tax treaties generally reduce the Belgian dividend withholding tax to 15%, 10%, 5% or 0% for residents of those countries, depending on the size of their shareholding and certain certification requirements.  Such reduction may be obtained either directly at source or through a refund of the taxes withheld in excess of the applicable tax treaty rate, both subject to the timely filing of a Form 276 Div.-Aut. with the Belgian tax authorities.  Holders should consult their own tax advisors to determine whether they qualify for relief under the applicable tax treaty and, if so, which procedural requirements must be met in order to obtain such relief.

*Dividends*.  For non-Belgian Holders, dividends distributed with respect to the New Ordinary Shares will only be subject to the Belgian withholding tax, unless the non-Belgian Holder holds the New Ordinary Shares in connection with a business conducted in Belgium through a fixed base or a permanent

establishment in Belgium. These Holders should consult their own tax advisors on the tax implications of holding New Ordinary Shares.

*Capital Gains and Capital Losses.* For non-Belgian Holders, capital gains realized upon a disposal of the New Ordinary Shares will generally not be subject to Belgian income tax, unless the non-Belgian Holder holds the New Ordinary Shares in connection with a business conducted in Belgium through a fixed base in Belgium. These Holders should consult their own tax advisors on the tax implications of disposing of New Ordinary Shares.

2. *New Bank Debt*

*Belgian Withholding Tax.* Payment of interest by or on behalf of Truvo Belgium on the New Bank Debt will, as a rule, be subject to Belgian withholding tax at a rate of 15%, subject to such relief as may be available under applicable domestic law or tax treaty provisions. Full or partial relief from withholding tax on payments of interest by or on behalf of Truvo Belgium is available to Holders qualifying as authorized credit institutions and to certain non-Belgian Holders, subject to the following requirements:

- interest payments on the New Bank Debt are exempt from Belgian interest withholding tax if made to authorized credit institutions located in a country of the EEA or in a country with which Belgium has concluded a tax treaty in force on the date of payment;

- interest payments on the New Bank Debt made to non-Belgian Holders are subject to such relief as may be available under applicable tax treaty provisions. Belgium has entered into tax treaties with approximately 85 countries. These tax treaties may reduce the Belgian interest withholding tax rate to 10 or 0%, subject to certain certification requirements. Such Holders should consult their own tax advisors to determine whether they qualify for relief under the applicable tax treaty and, if so, which procedural requirements must be met in order to obtain such relief.

*Interest.* For non-Belgian Holders, interest paid with respect to the New Bank Debt will only be subject to the Belgian withholding tax, if any, unless these Holders hold the New Bank Debt in connection with a business conducted in Belgium through a fixed base or a permanent establishment in Belgium. These Holders should consult their own tax advisors on the tax implications of holding New Bank Debt.

*Capital Gains and Capital Losses.* For non-Belgian Holders, capital gains realized with respect to the New Bank Debt will only be subject to Belgian income tax if these Holders hold the New Bank Debt in connection with a business conducted in Belgium through a fixed base or a permanent establishment in Belgium. These Holders should consult their own tax advisors on the tax implications of disposing of New Bank Debt.

3. *New PIK Debt*

For Belgian tax purposes, interest includes (i) periodic interest income, (ii) any amounts paid by PIKco in excess of the issue price (upon full or partial redemption, whether or not at maturity, or upon purchase by PIKco), and (iii) in case of a sale of these securities to any third party, excluding PIKco, the *pro rata* accrued interest corresponding to the period that the party selling the security held the New PIK Debt.

*Belgian Withholding Tax on New PIK Debt Notes held in the X/N Clearing System.* All payments of interest by or on behalf of PIKco will be made without deduction of withholding tax for New PIK Debt Notes held in book-entry form by eligible non-Belgian Holders in an X-Account with the X/N Clearing System or with a Participant.

For a more detailed description of the rules and procedures of the X/N Clearing System applicable to a non-Belgian Holder of New PIK Debt Notes, see Section XIV.B.4.

*Interest.* For non-Belgian Holders, interest paid with respect to the New PIK Debt will only be subject to Belgian income tax if these Holders hold the New PIK Debt in connection with a business conducted in Belgium through a fixed base or a permanent establishment in Belgium. These Holders should consult their own tax advisors on the tax implications of holding New PIK Debt.

*Capital Gains and Capital Losses.* For non-Belgian Holders, capital gains realized with respect to the New PIK Debt will only be subject to Belgian income tax if these Holders hold the New PIK Debt in connection with a business conducted in Belgium through a fixed base or a permanent establishment in Belgium. These Holders should consult their own tax advisors on the tax implications of disposing of New PIK Debt.

### 4. *Other Tax Considerations*

*Stamp Duties.* Secondary market trades in respect of the New Ordinary Shares and the New PIK Debt Notes may give rise to a stamp duty (*taks op beursverrichtingen / taxe sur les opérations de bourse*) (see Section XIV.D.4). However, a non-Belgian Holder acting for its own account will not be subject to this stamp duty provided that it delivers a certificate confirming its non-resident status.

*Residence.* A non-Belgian Holder will not be, or deemed to be, resident in Belgium for tax purposes merely by reason of acquiring, holding or disposing of New Ordinary Shares, New Bank Debt or New PIK Debt or the execution, performance, delivery and/or enforcement of New Ordinary Shares, New Bank Debt or New PIK Debt.

*EU Council Directive on Taxation of Savings Income.* In accordance with EC Council Directive 2003/48/EC on the taxation of savings income, Belgium will provide to the tax authorities of another EU member state (and certain non-EU countries and associated territories specified in said directive) details of payments of interest or other similar income paid by a person within Belgium to, or collected by such a person for, an individual resident in such other state.

### 5. *Information Reporting*

Truvo Belgium, Newco, Holdco, Equityco and PIKco will be required, in their annual tax return, to furnish information to the Belgian tax authorities regarding payments directly or indirectly made to non-Belgian Holders that are located in countries that do not meet the Organisation for Economic Co-Operating and Development standard with respect to exchange of information, in tax-havens and in jurisdictions where a corporate income tax rate of less than 10% applies, provided that these payments equal or exceed €100,000 per year.

## D. Belgian Income Tax Consequences to the Belgian Non-Debtor Subsidiaries

Truvo Belgium reported tax losses carried forward for Belgian income tax purposes of approximately €55 million as of December 31, 2009, and expects to report additional losses in the amount of approximately €11 million with respect to its 2010 taxable year, to be increased with approximately

€883 million representing the tax deductible capital loss on shares realized as a result of the liquidation of Truvo Corporate CVBA.

1.     *Waiver of debt*

The waiver of debt will require Truvo Belgium to treat the nominal value of the liabilities waived thereby and accrued interest thereon as taxable income. As confirmed by the Belgian ruling commission in its decision of June 23, 2010, Truvo Belgium may offset this "cancellation of indebtedness" income against its tax losses carried forward and its tax losses incurred during its current taxable period.

2.     *Liquidation of Truvo Corporate CVBA*

As a result of the liquidation of Truvo Corporate CVBA, Truvo Belgium will realize a capital loss on the shares it holds in Truvo Corporate CVBA. To the extent that this capital loss represents fiscal capital and provided that it is incurred during the current taxable period, Truvo Belgium will be entitled to deduct this capital loss, as confirmed by the Belgian ruling commission in its decision of June 23, 2010.

3.     *Amendment of terms and conditions of Truvo Belgium intercompany debt*

The Plan includes the amendment of the terms and conditions of TUSA's receivables against Truvo Belgium to align with the terms and conditions of the New Bank Debt. An amendment of certain terms and conditions of intercompany debt could be considered as a non-at arm's length benefit granted by TUSA to Truvo Belgium, taxable to Truvo Belgium notwithstanding the availability of tax losses carried-forward. Although, in light of the circumstances, the amendment of the terms and conditions of TUSA's receivables against Truvo Belgium is not expected to have adverse tax consequences in Belgium, the Debtors expect that Truvo Belgium will seek a tax ruling from the Belgian Ruling Commission to obtain confirmation.

4.     *Change of Control*

Following consummation of the Plan, the Senior Lenders will acquire control over the Truvo Group. Under Belgian tax law, a (direct or indirect) change of control over a Belgian company may result in the loss of the tax losses carried forward if the change of control does not meet valid business reasons. In its decision of June 23, 2010, the Belgian ruling commission has confirmed that the change of control over Truvo Belgium following consummation of the Plan meets valid business reasons and that the tax losses carried forward existing at the level of Truvo Belgium are not impaired as a result of the consummation of the Plan.

# XV.
## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to Holders of Claims. Other alternatives would involve significant delay, greater erosion of value, uncertainty and substantial administrative costs and are likely to reduce, if not eliminate, any return to any creditors who hold Impaired Claims. The Debtors urge the Holders of Impaired Claims in Classes 3C, 4C, 5C, 2D, 3D, 4D, 5D, 2E, 1F, 2F, 3F, 4F and 5F who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by casting their Ballots as set forth in the instructions enclosed with the Ballots so that they will be received not later than [4:00] p.m., prevailing Eastern Time, on [September 3.**23,**] 2010.

Dated: ~~July 26,~~ **August 30,** 2010
New York, New York

Respectfully Submitted,


**TRUVO USA LLC**

By:  /s/ Marc C. F. Goegebuer
      Name:   Marc C. F. Goegebuer
      Title:    Manager

**TRUVO PARENT CORP.**

By:  /s/ Marc C. F. Goegebuer
      Name:   Marc C. F. Goegebuer
      Title:    Director and CFO


**TRUVO INTERMEDIATE LLC**

By:  /s/ Marc C. F. Goegebuer
      Name:   Marc C. F. Goegebuer
      Title:    Manager


**TRUVO SUBSIDIARY CORP.**

By:  /s/ Marc C. F. Goegebuer
      Name:   Marc C. F. Goegebuer
      Title:    Director and CFO


**TRUVO ACQUISITION CORP.**

By:  /s/ Marc C. F. Goegebuer
      Name:   Marc C. F. Goegebuer
      Title:    Director and CFO


Thomas J. Moloney
Sean A. O'Neal
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000

Counsel for the Debtors and Debtors-in-Possession

**EXHIBIT 4**

**PROJECTED FINANCIAL INFORMATION**

The Debtors believe that the Plan meets the feasibility requirement set forth in Section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation, except as provided under the Plan, or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Management developed a business plan and prepared financial projections for the calendar years 2010 through 2013 (the "Projection Period").

THE PROJECTIONS ARE SUBJECT TO FURTHER REVIEW AND ANALYSIS BY THE DEBTORS, AND THE DEBTORS RESERVE THE RIGHT TO SUPPLEMENT, AMEND, UPDATE AND/OR OTHERWISE MODIFY SUCH PROJECTIONS PRIOR TO THE HEARING ON THE DISCLOSURE STATEMENT AND UP TO AND THROUGH THE CONFIRMATION HEARING.

The Debtors, with the assistance of various professionals, prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of the Debtors and the Reorganized Debtors. In connection with the planning and development of the Plan, the Projections were prepared by the Debtors to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement. Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. ~~Debtors' management is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.~~ The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' PROFESSIONALS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES,

NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS AS DETAILED IN ARTICLE [IX] OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS", AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE BASED AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in Truvo's Annual Report on http://info.truvo.com/investor-relations/the-numbers/ and Truvo's Quarterly Report on http://info.truvo.com/investor-relations/the-numbers/.

**The Company has adjusted the Projections filed on July 27, 2010 to account for shifts in the forward exchange rates for the ZAR (South African Rand) / EUR and the USD / EUR from October 2009 (the date of the previous forward curve) to July 2010. The EBITDA and cash flow effects of the revised projections are not materially significant.**

**ACCOUNTING POLICIES**
The Projections have been prepared in good faith based upon assumptions believed to be reasonable. The Projections include assumptions to various financial accounts of the Debtors, which are based upon the Debtors' estimates and market conditions.

**PROJECTION ASSUMPTIONS**

The Debtors, with the assistance of various professionals, prepared the Projections for the four years ending December 31, 2010, 2011, 2012 and 2013, respectively. The Projections are based on a number of assumptions, and while the Debtors have prepared the Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will ultimately be realized. The Projections should be read in conjunction with the assumptions, qualifications and notes contained herein, and the historical financial statements posted by the Debtors. The following summarizes the underlying key assumptions upon which the Projections were based.

Based on the current macroeconomic environment, including the dislocation in the credit markets especially in the Debtors' respective markets, slowdown in consumer spending and ongoing uncertainty in advertising-based media sectors, in conjunction with potential variability surrounding the Debtors' ability to monetize shifting media spend and uncertainty regarding the impact from ongoing transformation initiatives, Management has created its set of financial projections.

The Projections are based on the assumption that the Plan will be confirmed as described in the Disclosure Statement and that the Plan will become effective December 31, 2010. The Debtors' management is implementing a strategic transformation business plan that seeks to effect fundamental changes in how the Debtors' approach the traditional directories business. The business plan emphasizes several critical elements, including: centralization of IT and operations to reduce costs and increase efficiency and flexibility in the Online platform; growing online usage through web design and user-focused performance metrics, supported by extensive local market research; and improving sales force productivity through enhanced training and greater use of technology to increase awareness and skills.

## I. PROJECTED CONSOLIDATED STATEMENT OF OPERATIONS

**Operating Revenue**

The Debtors have historically derived operating revenue primarily from the sale of advertising in print directories and online websites.

Print Revenue – Advertising in print directories is sold a number of months prior to the date each directory is published. The revenues from printed advertisements are recognized on the date that the directories, in which these advertisements are included, are published.

Online Revenue – Revenues from the sale of advertising space on online websites are recognized on a straight-line basis over the period, in which the advertisement is electronically available to consumers.

Growth in operating revenue can be affected by several factors, including changes in the number of advertising customers, changes in the pricing of advertising, changes in the quantity of advertising purchased per customer, changes in the size of the sales force and the introduction of new products. In addition, growth in operating revenue can be affected by the ongoing advertiser and consumer shift toward online-delivered local search information and away from the print product. The projections reflect the Debtors' expectation for continued change in its overall operating revenue mix by forecasting a decline in Print revenue that is partially offset by growth in Online revenue. These revenue trends are correlated with the observed and forecasted trends in usage of the print and online products the company is offering.

The revenue projections are based on an analysis of the business prospects by product (Print Products and Online) prepared by the Debtors' operating executives and financial management. The Debtors' corporate management reviewed the financial projections and made certain adjustments based on its views of the industry and potential new business prospects as well as potential business delays and other risks and contingencies related to the bankruptcy filing.

**Operating Expenses**

Operating expense (excluding depreciation and amortization) is comprised of three expense categories: selling, cost of sales and general and administrative.

Selling – Selling expense includes the sales and sales support organizations, including base salaries and sales commissions paid to the Debtors' local sales force, local marketing and promotional expenses, sales training, advertising and customer care expenses. Sales commissions are ~~amortized over the average life of the directory or advertising service~~**charged to the income and loss statement at the same point in time as the corresponding revenue is recognized**. All other selling costs are expensed as incurred.

Cost of Sales – Cost of sales includes the costs of producing and distributing both print directories and online local search services, including publishing operations, paper, printing, directory distribution, website development and Online traffic costs. Costs directly attributable to producing print directories are recognized when the print directories, to which the costs relate, are published. Cost directly attributable to producing online advertising products are amortized over the period, in which the advertisement is electronically available to consumers. These costs include paper, printing and initial distribution. All other costs are expensed as incurred.

Administrative and Other –Administrative and other expenses include corporate management and governance functions, which are comprised of finance, human resources, marketing, legal, investor relations, billing and receivables management. In addition, administrative and other expenses include operating taxes, insurance and other general expenses including restructuring costs and transition costs. All administrative and other costs are expensed as incurred.

**Post-Reorganization Debt**

The New Bank Debt is comprised of two senior tranches, totalling €350m of senior secured debt, two second lien tranches, totalling €100m of second lien secured debt, and ~~a~~ the New RCF with a maximum commitment of €25m.

Notes:  Projections assume new capital structure in place as of the Effective Date of December 31, 2010.

In the following sections (II. Segment Reporting and III. Current Trading Update), the following terms shall have the following meaning:

*"Segment Reporting"* means the method of presentation used by the Debtors' management in monitoring the operating results of the Truvo Group's business, including the operating results in Portugal (Páginas Amarelas), fully consolidated.

*"Equity Accounting"* means consolidated figures based on the equity method of accounting for Páginas Amarelas in accordance with IFRS

## II. SEGMENT REPORTING

### TABLE 1

The following table reflects the financial projections of the Debtor on the basis of Segment Reporting. The Projections remain unchanged and this table is presented solely to provide the financials in a manner consistent with the Debtor's historic reporting practice prior to the commencement of the Chapter 11 proceeding.

### TABLE 2

The below table is intended to serve as a bridge from the Projections disclosed above, which do not consolidate the financials of Portugal (Páginas Amarelas) and the financials presented in Table 1 on a Segment Reporting basis which consolidate the financials of Portugal (Páginas Amarelas). The Projections remain unchanged and this table is solely presented in order to increase clarity and transparency in line with the Debtors' historic reporting practices prior to the commencement of the Chapter 11 proceedings.

## III. CURRENT TRADING UPDATE

### Year-to-Date June 2010 Financial results

The Truvo Group has recently completed its management accounts for the 2nd Quarter 2010 and is in a position to provide an update for the year-to-date ("YTD") results to June 2010. Please note that the following figures are provided on a preliminary basis and, as such, are not included within the Projections exhibits above. For the YTD, Net Operating Revenue is €96.0m as compared to the YTD plan forecast of €96.6m. The unfavorable €0.6m variance is a combination of a favorable €0.9m variance in Print Revenue and an unfavorable €1.5m variance in Online Revenue. As a result of higher than planned advertising sales in directories published till the end of June, YTD Print Revenue performance is slightly favorable to the YTD plan forecast. This trend is expected to reverse in the second half of the year. Online Revenues

are unfavorable to the YTD plan forecast mainly due to lower Sales Order Input in all business units.

YTD EBITDA of €15.7m is €5.0m higher than the YTD plan forecast of €10.7m primarily as a result of cost savings in the Sales and New Media functions.

Full year 2010 Re-forecast – Segment Reporting

The Company has also, on a preliminary basis, updated the previously disclosed full-year plan forecasts for 2010 based on the observable YTD trends as well as expected market conditions for the remainder of the year (the "FY 2010 Re-forecast"). Given that the Company has completed 73% of its Sales Order Input for the full year, it can provide a preliminary full-year forecast within a reasonable range of accuracy, subject to the assumptions, disclaimers and risk factors set forth in this Exhibit 4 and the Disclosure Statement. Net Operating Revenue based on the FY 2010 Re-forecast is €245.9m, which is €11.2m lower than the previous plan forecast of €257.1m. This unfavorable variance is a combination of a €2.9m unfavorable variance in Print Revenues and a €8.3m unfavorable variance in Online Revenues. The majority of the print directories are published in the second half of the year and the corresponding print revenue is recognized in the second half of the year. Online revenue is also skewed towards the second half of the year. Subsequently, most of the unfavorable revenue variances are expected to materialize during the 3rd and 4th Quarters of 2010. The unfavorable revenue performance relative to the full year plan forecasts, expected for the full year of 2010, is due to an expected shortfall in Ireland of €7.6m, and expected shortfalls of €2.1m in Belgium and €1.4m in Portugal, respectively. The main reason for the unfavorable performance is the continued weakness of the economic environment combined with the structural pressures on the business.

Although Net Operating Revenue, based on the FY 2010 Re-forecast, is €11.2m lower than the full-year plan forecasts, the FY 2010 Re-forecast EBITDA of €74.7m remains in line with the plan forecast because the cost savings related to right-sizing of the sales force as well as the savings in Paper, Print and Distribution, New Media and Marketing Costs are expected to offset the unfavorable variance in Net Operating Revenue. Of the Full Year planned cost savings of approximately €11.1m, €5.7m have already been realized in the first half of the year.

While management has completed the FY 2010 Re-forecast, it continues to work on a re-forecast for 2011, 2012 and 2013, which will reflect the adverse trends observed in 2010 as well as the actions to mitigate such trends. A re-forecast for 2011, 2012 and 2013 is expected to be finalized in September 2010, but there can be no assurance that the reforecast will be finalized by that time.

Full Year 2010 Reforecast – Equity Accounting (consistent with the Projections)

When comparing the FY 2010 Re-forecast to the Projections presented in Exhibit 4, presented according to Equity Accounting, the FY 2010 Re-forecast Net Operating Revenue is €9.7m unfavorable to plan. The Total Costs are €8.7m favorable resulting in an unfavorable variance of €1.0m in EBITDA.

**IV. PROJECTED CONSOLIDATED BALANCE SHEET OF HOLDCO AND ITS SUBSIDIARIES**

**Detailed Explanations**

1. **Non-Current Assets**
   Non-current assets includes goodwill, other intangible assets, property, plant and equipment, investments accounted for under the equity method, deferred tax assets and other financial assets.

2. **Working Capital External Parties**
   Working capital is the net between current assets (trade receivables, inventories, directories in-progress, non-financial prepaid and non-financial current assets), and current liabilities (trade and other payables, deferred income, non-financial accruals and other non-financial current liabilities), all of which have third party counterparts.

3. **Working Capital Discontinued Activities**
   Working capital discontinued activities includes working capital related to the Debtors' Romanian operations and Netherlands operations, both of which have been disposed.

4. **Working Capital Group Companies**
   Working capital discontinued activities includes working capital related to controlled subsidiaries within the Truvo Group.

5. **Other Current Assets and Liabilities**
   Other current assets and liabilities includes accrued income tax receivable / (payable) and  accrued financial income / (expenses).

6. **Senior Facilities**
   Senior Facilities include the Senior Debt Claims pre-adjustment for restructuring and the new facilities post-adjustment for restructuring.

7. **Senior Notes**
   Senior Notes relates to the HY Noteholders Claims pre-adjustment for restructuring.

8. **PIK Facility**
   PIK Facility relates to the PIK Debt Claims pre-adjustment for restructuring.

9. **Related Parties Financial Liabilities**
   These are financial liabilities with parties outside but related to the Truvo Group  , and so includes loans from parties connected to the shareholders.

10. **Other Non-Current Liabilities**

Other non-current liabilities include provisions for early retirement and post-employment benefit plans, provision for tax exposure, long-term payables and deferred tax liabilities.

**11. Transaction Costs**
Transaction costs include any difference between the proceeds (net of transaction costs) and the redemption value that is amortized using the effective interest rate method.

**12. Non-Controlling Interests**
Non-controlling interests represent the portion of profit or loss and net assets of affiliate companies that are not held by the Debtors.

**13. Shareholders' Equity**
Shareholders' equity represents the portion of profit or loss and net assets held by the Debtors. Shareholders' equity also includes Preferred Equity Certificates having no par value and no voting rights.